Carolyn **BRADLEY** et al.

v.

**The SCHOOL BOARD OF the CITY OF RICHMOND, VIRGINIA, et al.**

**Civ. A. No. 3353.**

United States District Court,
E. D. Virginia,
Richmond Division.

Jan. 5, 1972.

Order Jan. 10, 1972.

Louis R. Lucas, Memphis, Tenn., James R. Olphin, M. Ralph Page, Richmond, Va., William L. Taylor, Washington, D. C., Jack Greenberg, James M. Nabrit, III, Norman J. Chachkin, New York City, for plaintiffs.

J. Segar Gravatt, Blackstone, Va., Chesterfield Co. School Bd., Robert D. McIlwaine, III, Petersburg, Va., Henrico Co. School Board & Bd. of Supervisors, J. Mercer White, Jr., County Attorney, Richmond, Va., Henrico Co. School Bd. & Bd. of Supervisors, Daniel T. Balfour, Asst. City Atty., Richmond, Va., Richmond City, Frederick T. Gray, Richmond, Va., Chesterfield Bd. of Supervisors, George B. Little, Richmond, Va., Richmond School Bd., William G. Broaddus, Asst. Atty. Gen., Andrew P. Miller, Atty. Gen., Richmond, Va., The State Board of Education and The Supt. of Public Instruction, L. Paul Byrne, Richmond, Va., Henrico Co. Bd. of Supervisors, for defendants.

### MEMORANDUM

MERHIGE, District Judge.

The hearing on the issues currently before the Court in this school desegregation case, which has been before the Court in one posture or another for many years, encompassed weeks of trial, involving eight separate groups of parties, each represented by a team of lawyers, and included the introduction of more than three hundred and twenty-five exhibits.

The primary defendants in the instant issue are members of the Virginia State Board of Education; the State Superintendent of Public Instruction; and the members of the respective school boards and boards of supervisors of Henrico and Chesterfield Counties, both of which adjoin the City of Richmond, Virginia; and the School Board and City Council of the City of Richmond.

The task of complying with the requirements of F.R.Civ.P. 52 in setting out the Court's findings of fact and conclusions of law requires that this memorandum be divided generally into a brief history of the litigation, general findings of fact and conclusions of law, and a section containing precise and specific findings as illustrative instances of the more general findings.

The Court has jurisdiction over all necessary parties in this appropriate class action, 28 U.S.C. § 1343(3) and (4); 42 U.S.C. § 1983; Rule 23(a) and (b) (2) of the Federal Rules of Civil Procedure.

Excerpts from this Court's opinion in Bradley v. School Board of City of Richmond, D.C., 317 F.Supp. 555 (1970), establish the present stage of this litigation. At the time, the schools of the City of Richmond were being operated under a freedom of choice plan, and the plan was approved primarily to insure the opening of schools on the then planned date in September 1970.

*History of Litigation:*

[Excerpts from *Bradley,* supra]

"On March 10, 1970, the plaintiffs filed a motion for further relief, based upon the mandates of our appellate courts requiring school boards to put into effect school plans which would promptly and realistically convert public school systems into ones which were unitary, nonracial systems, removing all vestiges of racial segregation.

On March 12, 1970, the Court ordered the defendants to "* * * within ten

days from this date, advise the Court if it is their position that the public schools of the City of Richmond, Virginia, are being operated in accordance with the constitutional requirements to operate unitary schools as enunciated by the United States Supreme Court.'

On March 19, 1970, defendants filed a statement to the effect that 'they had been advised that the public schools of the City of Richmond are not being operated as unitary schools in accordance with the most recent enunciations of the Supreme Court of the United States,' and further that they had 'requested the Department of Health, Education and Welfare to make a study and recommendation as to a plan which would ensure the operation of a unitary school system in compliance with decisions of the United States Supreme Court,' said plan to be ready by May 1, 1970.

A pre-trial conference was held in open court on March 31, 1970, at which time the Court having some doubt as to the effect or intent of the defendants' statement of March 19, 1970, 'that they had been advised that the public schools of the City of Richmond are not being operated as unitary schools in accordance with the most recent enunciations of the Supreme Court of the United States,' inquired as to whether defendants were desirous of an evidentiary hearing as to the plan they were then operating under, i. e. freedom of choice.

The defendant school board, by counsel, advised the Court that such a hearing would not be necessary and admitted that their freedom of choice plan, although operating in accord with this Court's order of March 30, 1966, was operating in a manner contrary to constitutional requirements.

As a consequence thereof, the Court on April 1, 1970, entered a formal order vacating its previous order of March 30, 1966, and mandatorily enjoining the defendants to disestablish the existing dual system of schools and to replace same with a unitary system, the components of which are not identifiable as either 'white' or 'Negro' schools.

The defendant school board was directed to file its proposed plan by May 11, 1970. Plaintiffs were to file exceptions by June 8, 1970, and hearings were set for June 19, 1970.

The Court heard and considered motions to intervene and permitted all who so moved to intervene, pursuant to Fed. Rules Civ.Proc. Rule 24(b), 28 U.S.C.

Exceptions to the H.E.W. plan were filed by the plaintiffs and those intervenors described as Northside residents.

The hearing on all proposed plans and exceptions thereto was commenced on June 19, 1970, and concluded on June 26, 1970, at which time the Court, recognizing the necessity for expeditious rulings and intending to file these more detailed findings of fact and conclusions of law, advised the defendant school board that its proposed H.E.W. plan was not acceptable—a conclusion which the Court felt then and still feels should have been patently obvious in view of the opinion of the United States Court of Appeals for the Fourth Circuit in Swann v. Charlotte-Mecklenburg Board of Education, 431 F.2d [138] (4th Cir. 1970), which had been rendered on May 26, 1970.

## STUDENT POPULATION BY RACE UNDER FREEDOM OF CHOICE IN EFFECT 1969–70

As of May 1, 1970, the Richmond public school system enrolled approximately 52,000 students. The racial composition of the school student population was roughly 60% Black and 40% White. The board operated 61 school facilities.

### High Schools

Of the seven high schools, three were 100% Black; one was 99.26% White; one was 92% White; one 81% White and one 68% Black, the latter being John Marshall located on the Northside of the City.

### Middle Schools

Of the middle schools, three were over 99.91% Black (99.92%, 100%, 100%); one was 88% Black; one 73% Black;

three were over 91% White (91%, 97%, 98%), and one was 69% Black.

### Elementary Schools

Seventeen elementary schools were 100% Black; four others were in excess of 99.29% Black; one was 78% Black; one was 37% Black; and another was 30% Black.

Two schools were 100% White; thirteen others were 90% or better White; two others were 86% or better White; five others were between 53% and 70% White.

As to the twelve schools with special programs, two were 100% Black; one was 92% Black; one was 83% Black; two others 60% or better Black; four schools had White students ranging from 78% to 100%; two others were 53% or better White.

### Faculty and Staff

Out of a total faculty and staff of 2,501, excluding special program schools,

4 had 100% White faculty and staff;
13 had 100% Black faculty and staff;
16 others had 90% or better White faculty and staff;
12 others had 90% or better Black faculty and staff;
8 others had 80% or better White faculty and staff;
4 others had 80% or better Black faculty and staff.

#### Faculty and Staff by Area

| | |
|---|---|
| East End side of City | 92.2% Black—7.8% White |
| Southside area | 30% Black—70% White |
| Annexed Area | 2.5% Black—97.5% White |
| West End—Northside | 50.6% Black—49.4% White |

There is little doubt that under freedom of choice Richmond public schools had not achieved a unitary system as required by law—see Green v. County School Board of New Kent, *supra* [391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716]. In 1965 the defendant school board was directed to desegregate the faculties and staffs of the public schools, Bradley v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); yet out of a total of 658 faculty and staff members in the East End area schools, 607 were Black and 51 White; in the Southside area schools, 108 were Black and 252 were White; in the West End-Northside area schools, 459 were Black and 448 were White (even there the assignment of faculty and staff was such as to create in the separate schools disparities ranging from 57.1% White and 42.9% Black in one school to other schools in which there were either 100% Black or 100% White).

That the respective Richmond public schools with rare exception, were as to student population and staff readily identifiable as either Black or White schools is too obvious to warrant any further discussion. The defendant school board's admission in this regard was well warranted, and the Court so finds.

### De Jure Segregation

The City of Richmond's present pattern of residential housing contains well defined Black and White areas, which undoubtedly is a reflection of past racial discrimination contributed in part by local, state and federal government.

The City of Richmond has itself described the residential pattern of development as being one in which there has been 'a total isolation and segregation of the Negro.'

Schools have been built on land in which the deeds contain restrictive covenants precluding the use of property by any other than those of the Caucasian race.

Seven years after the *Brown* decision the officials of the city, the school board and the Richmond Redevelopment and Housing Authority were describing schools as Black or White.

Urban renewal sites have generally been selected in well defined Negro residential areas; urban renewal is to a great extent sponsored by agencies of the Federal Government. Local housing authorities or urban renewal authorities such as the Richmond Redevelopment Authority present their proposals to the United States Department of Housing and Urban Development, who in turn review the proposals to ascertain whether they meet federal criteria for funding purposes.

Prior to 1964 public housing projects were built in consideration of racial character and the ultimate uses thereof. They were built for either black or white occupancy. In Richmond they have been established according to racial identity. Between the passage of Title VI of the 1964 Civil Rights Act and 1967, tenants' selection policy could be generally characterized as a freedom of choice, and there was little change in racial character of occupancy of public housing projects.

There is a direct relationship between the selection of sites for public housing projects and the selection of sites for public schools.

Racially segregated housing patterns have resulted to a great extent in limiting options available to black persons to occupy such housing.

The Blacks have generally been 'locked in' so to speak, by the additional factor that for a substantial portion of the time in which Federal Housing Administration operated separately from the Department of Housing and Urban Development, of which it is now a part, its policy was to refuse to insure home loans in those areas which were not racially homogeneous.

Statutes such as we had in Virginia (and in other states, many outside the South), which required racial segregation in housing and schools, as well as restrictive covenants limiting the use and occupancy of land and dwellings to members of the Caucasian race, have long term effects which are not and have not diminished by the lifting of such restrictions. Indeed, even now, some 22 years after the outlawing of restrictive covenants, and years after the outlawing of discriminatory statutes and ordinances in Virginia, the facts are that there are only a few areas in the City of Richmond which are considered ones of a transitional nature.

That private discriminatory actions have made their contribution to the racially segregated housing patterns in Richmond is evidenced by the fact that most subdivision deeds in the area contain racially restrictive covenants. Only four years ago the City purchased land for use by the school board the deed to which contained a racially restrictive covenant. Racially restrictive covenants were included by Lawyers Title Company in abstracts in the city right up to 1969.

The City of Richmond has always permitted higher population densities in black areas than in its white areas.

Knowledgeable people in the field of real estate are reasonably certain, or as expressed by one expert in the field 'could probably guess, with good certainty, the racial acceptability, if you want to use that word, from almost any ad in the paper.' As late as June 23, 1970, there were ads in the local newspapers stating at least two properties were available for sale to 'anyone.'

While the requirements for membership in the Richmond Board of Realtors, a private group of real estate brokers, have no relation to race, there has been and still may be, according to uncontradicted testimony, a clause in the code of ethics of the realtors to the effect that one could not disturb the white community by selling property therein to blacks, although certain areas of the city would be offered to non-whites by all realtors once the board of realtors determined that an area was one of transition and a home had been sold to Blacks in a particular block, and that block was determined by the board to have been 'broken.'

Defendants' Exhibit 18 graphically shows that black areas are generally in the inner city and transition areas are without exception immediately contiguous to the already existing black areas.

The combination of public and private discrimination which has been inflicted upon the Negroes is perhaps best described in the Model Neighborhood Planning Grant application made by the City of Richmond to the Department of Housing and Urban Development as recently as two years ago. In describing the virtually all Negro population of the area for which the application was made the City stated, 'The racial profile of the

Model Neighborhood does not provide an ethnic mix which is representative of total city population, but reflects the total isolation and segregation of the Negro within the city's residential pattern of development;' and later in the same application ·the City stated, 'Community neglect of education is illustrated by the fact that only two of the eight schools in the Model Neighborhood area are less than ten years old, the other six are over thirty years old;' and still further, 'Children do not read and spell correctly. Dropout rate in the schools is too high. Children are not able to speak correctly. Racial discrimination and segregation is visible.'

In the same application in reference to housing the city stated, 'Availability of housing is limited because of the pattern of racial segregation in the community;' and still further, 'Many Negroes with the ability to pay for better housing are confined * * * by social constraints;' and 'Housing available to Negroes in Richmond is limited as in most major United States cities by racial discrimination in the sale and rental of housing;' and 'Discrimination tends to polarize the Negro population into confined areas * * *.' The same application stated, 'As a rule, the Negro schools are older and occupy smaller sites than the white schools.'

### H.E.W. Plan

Pursuant to this Court's order of April 1, 1970, directed to the defendant school board, to create a unitary system of schools, the board for all practical purposes referred the matter to the Division of Equal Educational Opportunities, associated with the United States Office of Education, Department of Health, Education and Welfare.

A team from that division, headed by a program officer, commenced the preparation of a plan for the operation of the public schools of Richmond and presented their suggested plan to the school board on April 30, 1970. The board approved the plan as submitted, with a minor change concerning the incoming senior classes of the respective high schools in the system, and a change as to suggested faculty assignment. The board's plan did not, as suggested by H.E.W., propose to assign teachers and staff so as to approximate, at each facility, the ratio of Black to White teachers in the system as a whole. The board amended that portion of the H.E.W. plan to provide that assignments of teaching and other personnel would be made so as to provide 'substantial integration of same,' which was interpreted by the board to mean a 20% variance on either side of the actual system-wide ratio.

The H.E.W. team secured information from the school administration as to building capacities, enrollments, condition of the school buildings, acreage of the building playgrounds, etc. Each school in the system was visited by groups of two members of the team. Interestingly enough, no detailed transportation information was requested by the team of the school administration, nor was any furnished to them. The evidence disclosed that the H.E.W. team never conferred with the school board. Although it was aware that some limited bus transportation was provided by the school board, and that there was an existing public transportation network, no consideration was given to same by H.E.W. by reason of the fact that by unwritten H.E.W. policy, which apparently was then in effect, transportation resources which could be utilized by a school board were not to be considered and, obviously, since no detailed transportation information was requested or furnished to the H.E.W. people, none was considered.

While the H.E.W. team presumably drafted a plan to desegregate the existing dual system and to provide for a unitary school system with 'as much integration, desegregation as possible,' to quote the witness who testified that he was in charge of the development of the plan, amazingly enough no consideration was given as to the race of the children whom they sought to assign to the school facilities.

The H.E.W. plan was basically a zoning plan, with some clustering of schools. In setting the zones for the various schools, the drafters of the plan considered the capacity of the school buildings, the proximity of the buildings to the pupil population, and factors such as the safety hazards on the immediate approaches to the schools in relation to where the pupils lived. The plan was, in essence, a neighborhood school plan—a plan which under certain circumstances undoubtedly would be commendable. By reason of the residential patterns in the City of Richmond, however, wherein there are with rare exceptions distinct White areas and distinct Black areas, a true neighborhood school plan of necessity can result only in a system in which there are Black schools and White schools and not just schools.

As the Court has already stated and found as a fact, Negroes in Richmond live where they do because they have no choice. Housing is generally not available in other areas of the city.

In the East End of the city, schools therein would be composed of the following:

```
4 schools would be 100% Black
9 schools would be between 93 and 99.65% Black
1 school would be 88% Black
1 school would be 68% Black
1 school would be 64% Black
```

Included in the 16 schools aforementioned are two high schools, one of which would have a 96% Black student population and the other 88% Black student population.

In the Southside area of the city the percentages would be as follows:

```
1 school would be 58% White
1 school would be 59% White
1 school would be 72% White
1 school would be 74% White
1 school would be 84% White
1 school (the Senior High School) would be 72% White
```

In the West End and Northside of the city, the percentages generally would be as follows; with a total of 19 schools (8 schools being paired) the three high schools would be as follows:

```
1 school would be 91% Black
1 school would be 72% Black
1 school would be 72% White
```

and of the elementary and middle schools:

```
3 schools would be 100% Black
1 school would be 97% Black
1 school would be 96% Black
1 school would be 92% Black
1 school would be 80% Black
1 school would be 64% Black
1 school would be 61% Black
1 school would be 54% Black
1 school would be 51% Black
1 school would be 83% White
2 schools would be 80% White
1 school would be 72% White
1 school would be 60% White
```

It is patently obvious that the majority of those schools, as in the East End, are readily identifiable as either a Black or a White school.

In the newly annexed area of the city, an area which is almost all White, under the proposed H.E.W. plan the percentages would be as follows:

```
1 school (the high school) would be 99.26% White
2 schools would be 100% White
6 schools would be between 95–98% White
1 school would be 89% White
```

As a consequence, each of the schools is readily identifable as being a White school.

The burden is upon the school board to erase the racial identity of schools, and this the H.E.W. plan has failed to do.

Accepting the testimony offered by the school board in support of the H.E.W. plan in a literal fashion, the Court finds that (1) no consideration was given to race in the preparation of the plan—a theory which has long passed on; and (2) the plan was drawn in spite of the awareness of the school board of the pattern of residential segregation within the City of Richmond.

The cases are legion in which the courts have consistently stated that regardless of the method used by a school board, whether it be freedom of choice, geographic zoning, pairing, or any other method, they may not continue the operation of a dual system of schools.

Whereas, as heretofore pointed out by the Court, all of the difficulties which this Court now faces were not in whole created by the actions of the school board alone, it is patently obvious that school construction and faculty assign-

ments, coupled with all of the other discriminatory practices engaged in and encouraged by local, state and federal agencies, as well as private discriminatory practices, require that the plan submitted be disapproved by this Court on the ground that, while the assignment of pupils to neighborhood schools is undoubtedly both a sound and desirable concept, it cannot in this Circuit be approved if residence in a neighborhood is denied to Negro pupils solely on the ground of color, as this Court has found.

### The City of Richmond and Annexation

The City of Richmond is surrounded on all sides either by Chesterfield or Henrico County. On January 1, 1970, under an order of annexation entered in the Circuit Court of Chesterfield County, the City of Richmond was granted certain territories of Chesterfield County.

The exhibits before this Court indicate that during the trial of that litigation it was represented by the City of Richmond that the entire area of the present city limits (including the area that was successfully annexed) is anticipated to be within a 30 minute maximum in travel time for one going into or out of the center of the city.

As a consequence of that annexation, it is common knowledge that it was estimated that there were brought into the city limits approximately 40,000 additional residents, and it was estimated during that trial, which was not concluded until July of 1969, that prior to the annexation the City of Richmond was composed of approximately 218,000 persons. Included in the newly acquired citizens of Richmond was a school population of approximately 8,135 students (it was anticipated that this would be the number from the annexed area attending Richmond schools commencing in September 1970). Of that total student population, 97.5% were of the White race and 2.5% (206) were Black. Therefore the Court concludes that the racial composition of the newly acquired territory is overwhelmingly White.

The annexation decree provided that there would be turned over to the City of Richmond upon payment of certain sums thirteen school properties. Those buildings, which the city acquired from the county, would not have sufficient space to take care of all the student population living within the annexed area, there being 3,000 more students than there was building space, and it was agreed that the Richmond school board would provide transportation for children in the annexed area until such time as public transportation becomes available. The agreement provided that Chesterfield County would take care of the excess students at the elementary level until September of 1971, and the excess secondary students until September of 1972.

The Court decree itself, which granted to Richmond approximately 23 square miles, provided that the City of Richmond would construct the necessary schools to serve the annexed area at an estimated cost of fifteen million dollars, which included reimbursement to the Chesterfield County school board for its costs in the construction of three elementary schools for which the Chesterfield County school board was to acquire sites approved by the city at prices to be approved by the city, and was to undertake to build the three elementary schools aforementioned to city specifications and design as directed by an architect selected by the city at contract prices approved by the city. In this connection, the sites have been acquired although no construction has been commenced by reason of an injunction entered by this Court.

The Court finds that the site selection for the elementary schools was made without consideration of the city's being required to effectuate a unitary school system. As one witness stated, most of the work in connection with that aspect of what apparently was a consent decree ' * * * was done in one night down at the Chesterfield Courthouse.'

■ The burden is on the school board to show that any new construction will effectuate and assist in the establish-

ment of a unitary system as distinguished from hindering same.

Of the school properties operated by the defendant school board, 28 have been constructed for over 50 years and one has been in use since 1881.

### Transportation

There is nothing special about the utilization of buses in connection with the Richmond school system. For years school buses have taken students across the James River to classes while the schools were operated in a segregated manner. In the last school year students rode regular V.T.C. service routes across the James River to schools. While the Virginia Transit Company buses all display signs reading 'Caution—School Children,' their buses are not the conventional yellow school bus and hence do not meet the required standards of the Virginia State Department of Education in order to be classified as school buses under laws, concerning eligibility for reimbursement for operating costs.

The Commonwealth of Virginia financially assists only county or city operated school bus systems which conform to certain regulations. Briefly, the legislature of Virginia appropriates a lump sum of money. This money is distributed according to a formula that the State Board of Education has adopted and actually amounts to a division of the funds on the basis of 40% for pupils transported in the previous year, 40% for miles the bus has traveled the previous year, and 20% for buses in use during the current year. The appropriations made by the legislature of Virginia for the past school year in assisting localities to defray the cost of transporting students was $9,140,460.00.

Over 60% of the students attending public schools in Virginia were transported on school buses as defined by the State Board of Education. The operating cost per student in those cities operating school buses throughout the state averaged $23.02 for the year 1968–69. This represented an average of 122 students per each bus operated.

The operating cost per student for counties during that year was $30.61, based on an average of 87 students per bus. The average cost of operating a school bus in Virginia during the school year 1968–69 for cities was $2,814.00, for which the cities were reimbursed by the state sums approximating half of these operative costs.

School boards may, under Virginia law, provide for the transportation of pupils. Over half a million students were transported throughout the state of Virginia during the school year 1968–69. During the school year 1968–69 the average number of pupils transported per bus in the cities of Virginia was 122; the average miles per bus per day was 42—ranging from 18 to 90 miles. In order to be eligible for state financial assistance, a bus must travel a minimum of 16 miles per school day. Statistics show that children transported on school buses are safer than those who travel on foot.

During the 1968–69 school year approximately 18½ million school children were bused to school each day in the United States.

The 63–66 passenger capacity school buses heretofore referred to as having been purchased by the school board for use in transporting children in the newly annexed area were purchased at a cost of $7,500.00 per bus.

Were the system for the operation of schools in the City of Richmond the same this coming year as the year 1969–70, it can readily be seen that it was anticipated that approximately 10,000 students would have been transported either by school board buses or V.T.C. on a daily basis during the school year, as contrasted with plaintiffs' proposed plan which would require, if implemented, the transportation of approximately 15,000 students; and if all children living more than one mile from the school to which they would be assigned under the school board's recently submitted plan, hereinafter referred to as the board's second plan, were transported, transportation facilities would be required to accommodate 15,903 students.

Assuming further that the school board's estimate that of those 15,903, approximately one half, so it is anticipated, would provide transportation of their own in one form or another, it still would require transportation of 7,951 students using the facilities of the Virginia Transit Company, plus the 4,991 to be transported under the direct auspices of the school board, for a total of 12,942 students.

The Court finds further that unquestionably, regardless of what plan may ultimately be approved, the children in the newly annexed area of Chesterfield will require transportation by virtue of the physical surroundings, i. e. lack of sidewalks, etc.

## Defendant School Board's Second Plan

At the conclusion of the hearing on June 26, 1970, the Court announced from the bench its inability to accept the H.E.W. plan for the reasons stated in the record of that hearing, and the Court adopts and incorporates herein its findings and conclusions as enunciated from the bench at that time. The Court did, as heretofore set out, grant leave to the school board to submit another plan if they so desired. That plan was filed on July 23, 1970, and a hearing on same was conducted on August 7, 1970.

The plan itself, of necessity, was drafted with a view in mind to utilize transportation where required. The Court finds from the evidence that the Virginia Transit Company can accommodate such additional volume of transportation as may be required to implement this second proposed plan.

While the Court must frankly state that more will have to be done to so conform to the law as interpreted by the Fourth Circuit and the United States Supreme Court, it is obvious that an effort has been made by the defendant school board to improve its former suggested presentation. For example, their plan now provides for majority to minority transfers at the cost of the school board. They have amended their suggested faculty assignments to conform to the requirements of law.

## High Schools

Two of the high schools under the proposed plan are readily identifiable—Huguenot's student population will be 71% White and 29% Black; John F. Kennedy's student population will be 71% Black and 29% White.

Two other high schools have a disproportionate number of Black to White students. Nevertheless, the progress that has been made is evidenced in the comparison of racial mix so designated in Appendix C.

## Middle Schools

At the middle school level, certain of the schools remain identifiable as Black or White.

## Elementary Schools

That portion of the proposed plan which the Court finds most difficult to approve has to do with the elementary level, for unfortunately almost 9,000 Black students attending 13 schools will be attending schools the population of which will be 90% or more Black, and 4 schools will remain all White. In addition, other elementary schools are racially identifiable.

The Court, bearing in mind the rationale that a segregated school is inherently unequal and recognizing further that those students who have been and are being subjected to segregated education in the public schools are, regardless of race, having thrust upon them educational infirmities which are constitutionally impermissible, is much disturbed about the racial composition anticipated under the school board's plan for the eight schools heretofore referred to.

It must be understood that the Court would, in its opinion, be duty bound to reject the school board's plan under consideration were the plan one which had been submitted for consideration in sufficient time for the board to accomplish

that which is required by law for the opening of school in September. This plan, which the Court is approving on an interim basis, is being approved by reason of the fact that it is the school board's plan, that they consider it educationally sound and capable of immediate implementation." (End of excerpt from *Bradley, supra.*)

*Joinder of State and County Defendants*:

In December 1970, the Court granted leave to have the present State and County officials joined as party defendants. See, Bradley v. School Board of City of Richmond, D.C., 51 F.R.D. 139.

By April 1971, the Court, after additional hearings wherein the further issues now before the Court in reference to the joined defendants were not raised, approved one of three plans then before the Court for the operation of the schools of the City of Richmond for the year 1971–72. See Bradley v. School Board, 325 F.Supp. 828 (1971). The plan, designated Plan III, is the one under which the city schools are currently operating.[1]

The vast amount of evidence taken at the latest hearing, and the seeming complexity of the issues raised, dictate that the Court's treatment thereof cannot, unfortunately, be adequately set out in summary findings.

The plaintiffs and the School Board of the City of Richmond, moving parties as to the issues under consideration, take slightly variant positions; their differences, however, are not significant for the purposes of this memorandum opinion. Briefly, these parties contend that the public schools of the existing city system, with a majority black population, are racially identifiable as currently administered, when viewed, as they contend it should be, as part of the state-wide

educational plant which is dedicated in part to fulfilling the needs of the Richmond metropolitan area, including the city and the two adjoining counties. They allege further that discriminatory acts on the part of the now principal defendants have in the past and still do contribute to produce and maintain what when viewed in the context aforementioned, amounts to dual school systems. In addition, they contend that unless the requested relief is granted, the pupils of the City of Richmond schools, and particularly members of the plaintiff class, will not receive the equality of education to which they are constitutionally entitled.

The proponents of the relief sought contend that a greater degree of desegregation can and should be afforded in what was, and even now is, a dual system. It is their position that the complained of situation has been brought about by, among other things, school division boundaries created and maintained by the cooperative efforts of local and central State officials. The defendants deny the factual allegations and challenge the legal conclusions.

A principal, though not the sole, issue is whether the constitutional duties of appropriate officials, central and local, are of such limited extent as to preclude the granting of the relief called for.

*General Findings of Fact and Conclusions of Law*

 The Court concludes, in the context here presented, that the duty to take whatever steps are necessary to achieve the greatest possible degree of desegregation in formerly dual systems by the elimination of racially identifiable schools is not circumscribed by school division boundaries created and maintained by the cooperative efforts of local

---

1. Other matters in reference to this suit are to be found in D.C., 324 F.Supp. 396 (motion for three judge court, denied) ; see also, D.C., 324 F.Supp. 439 (motion to recuse, denied) ; D.C., 324 F.Supp. 401 (motion to dismiss or for partial summary judgment, denied) ; D.C., 324 F. Supp. 456 (motion for implementation of Plaintiffs' plan at mid-year denied) (defendant City School Board's motion to vacate construction injunction, granted in part and denied in part) ; D.C., 53 F.R.D. 28 (motion for counsel fees, granted).

and central State officials.[2] The Court also concludes that meaningful integration in a bi-racial community, as in the instant case, is essential to equality of education, and the failure to provide it is violative of the Constitution of the United States.[3]

A brief examination of the current data and that of recent years showing pupil assignment patterns in schools of the three political subdivisions of Richmond, Henrico and Chesterfield, shows both great disparities in 1971 racial composition, making both individual facilities and entire systems racially identifiable and also a very recent history of the maintenance of a great number of one-race schools. Some such still exist. The recent statistical history of these school divisions is set forth in accompanying tables. Appendix "A".

Racial identifiability of schools and school systems is both a legal concept—a conclusion of law, ultimately—and a fact of major significance to educators and lay persons. For the law's demands parallel those of educators. Although some school authorities have been slow to accept the fact, it is true that the constitutional wrong condemned in *Brown* imposed, and continues to do so, genuine damage upon children in schools that educators see as racially identifiable. The goals long considered by educators to be necessary and valid purposes of public education cannot be achieved in them. The legal presumption follows close upon these discernible facts:

No *per se* rule can adequately embrace all the difficulties of reconciling the competing interests involved; but in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school au-

thority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Swann v. Charlotte-Mecklenburg Board of Education, *supra,* at 26, 91 S.Ct., at 1281.

Of great relevance to educators in evaluating and determining the identifiability—a perception of students, faculty and community perception—is the historical context within which a school of disproportionate composition exists. Where, as in each of the three political subdivisions here under discussion, authorities have maintained segregated systems, it is of little significance that a given facility may have changed from a school attended by whites to one attended by blacks, or may be in transition. In the context of a continuing dual system, such schools do not lose racial identifiability but are perceived by whites and blacks as ones which are "going black" or "black." To say that such schools are "resegregated" implies not unfairly the continued official involvement in the creation and maintenance of schools identified as intended for one race. The process in the past has taken place by wholesale official reassignment of student bodies and faculties. More recently, under free choice and similar token approaches to desegregation, whereby most schools remain either all black or all white, the changes in school populations have been almost as rapid. Courts recognize that rapid changeovers of this sort also occur in systems under zone assignment plans which preserve the existing patterns to any significant extent. The law therefore dictates that school systems are not effectively desegregated either by piecemeal approaches or compartmentalization, or by separate consideration of par-

2. Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) ; Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed. 2d 577 (1971) ; Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

3. Fourteenth Amendment to the Constitution of the United States ; McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950) ; Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950) ; Brown v. Bd. of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

ticular geographic areas. See, e. g., Davis v. Board of School Commissioners of Mobile, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); U. S. v. Board of School Commissioners of Indianapolis (S.D.Ind., Aug. 1971) [4]; Haney v. County Bd. of Ed. of Sevier County, 410 F.2d 920; Swann & Charlotte-Mecklenberg Bd. of Ed., 431 F.2d 138 (4th Cir. 1970), rev'd. in part 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Yarbrough v. Hulbert-West Memphis School District No. 4, 329 F.Supp. 1059, 1065 (E.D.Ark. 1971). The weakness of such an approach, noted by courts, is that it preserves the racial identifiability of individual facilities. Racial identifiability, therefore, is a function of the composition of the school community and the pupil assignment scheme for the individual schools.

### Community Perceptions

Schools the racial composition of which departs significantly from the community parity, educators agree, are perceived by parents, teachers, administrators, public officials, pupils, and the community at large as facilities designed and operated for one race or the other. Generally schools attended under these circumstances by disproportionate numbers of black students are perceived as inferior. Experts generally concur that this has adverse effects not only on black pupils and teachers, but the entire community. This impact affects both the cognitive and affective development of the pupils. Analogous effects impede the development of white students in disproportionately white schools. In the case of the black student, impairment in the affective domain, that of perception of one's own ability to learn, to function in society, and to control one's destiny, is coupled with failure to advance in the cognitive sphere. Experts agree that this adverse impact cumulates in effect and is most telling in the earliest years.

The damaging stigma of inferiority carried by the identifiably black school is augmented by the community's understanding of the official attitude toward the situation. In Virginia the state's traditional policy of racial separation in all phases of public and private life, the historical policy of educational disparities, beginning with the refusal to afford any education to blacks, proceeding through limited, segregated education (see, e. g., Corbin v. County School Board of Pulaski County, 177 F.2d 924 (4th Cir. 1949)), the systematic obstruction of the rights enunciated in *Brown*,[5] and the deliberate policy to perpetuate segregation through numerous techniques of circumvention,[6] has in combination made clear to white and black members of the community the favor and satisfaction with which the state power views the continued segregation of the schools. Attitudes held throughout the citizenry affect the children in school. They are passed on by black parents, themselves most likely victims of discrimination, and by teachers, who are unlikely to associate the endorsement of containment with great academic expectations. These ideas are adopted by pupils, and the more so when they see them put into current effect in such instances as discriminatory treatment of black faculty members. The element of legal compulsion which lies behind state-mandated segregation strongly augments in fact the damage which ensues from racial isolation.

### Duty of Court

Upon a finding of a Fourteenth Amendment violation it is the duty of a

---

4. 332 F.Supp. 655. See also, Northcross v. Board of Education, Memphis City Schools, et al (W.D.Tenn.Dec.1971); Dandridge v. Jefferson Parish School Board, D.C., 332 F.Supp. 590 (1971).

5. See, e. g., Adkins v. School Board of City of Newport News, D.C., 148 F.Supp. 430, aff'd. 4 Cir., 246 F.2d 325, cert. denied 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed. 2d 63 (1957).

6. Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Griffin v. State Board of Education, D.C., 296 F. Supp. 1178 (1969).

district court to intervene to "eliminate from the public schools all vestiges of state-imposed segregation." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275 (1971). "The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools." *Id.*, 26, 91 S. Ct. 1281. In its task the Court's goal must be dismantling of the dual system and the operation of facilities identifiable not as black schools or white schools but "just schools." Green v. County School Board of New Kent County, *supra.*

### Duty of Officials

■ It is in 1971 accepted law that a school system formerly operated on a basis of compulsory racial segregation will not in every case be found in compliance with the Constitution if an assignment system, perhaps nondiscriminatory when viewed alone or in some other context, is put into use within its jurisdiction. Freedom of choice or residential zone plans will not in every case prove legally acceptable, and in fact they must be abandoned if in practice they fail to dismantle the dual system. Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed. 2d 716 (1968).

The courts have not always so emphatically spelled out the extent of school authorities' affirmative duty. Only a few years ago purportedly neutrally drawn zone lines or neutrally administered freedom of choice plans were accepted in fulfillment of the duty to desegregate. Gilliam v. School Board of City of Hopewell, 345 F.2d 325 (4th Cir. 1965); Bradley v. School Board of City of Richmond, 345 F.2d 310 (4th Cir.), rev'd. on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965). In the light of intervening Supreme Court rulings, such standards no longer apply where the racial identifiability of schools remains intact.

### Division Lines

■ Attendance zone lines formulated by adhering to the most natural bounds of neighborhoods or according to strict proximity of pupils to facilities will not pass muster if the effect is to prolong the existence of a dual system of racially identifiable schools. This is so even though the application of such attendance plans might be more economical in time and transportation cost, might facilitate the operation of more extra-curricular school activities, and might make possible the rather uncertain benefits which some educators attach to the walk-in school. It is not that these may not be valid and rational educational goals; the point is that the end of desegregation may not be subordinated to them.

Henry v. Clarksdale Municipal Separate School District, 409 F.2d 682 (5th Cir. 1969), rejected a zoning plan which, though formulated in good faith, did not work to desegregate the system. Motive was held irrelevant:

It is irrelevant because the ultimate inquiry is not whether the school board has found some rational basis for its action, but whether the board is fulfilling its duty to take *affirmative* steps, spelled out in *Jefferson* and fortified by *Green,* to find realistic measures that will transform its formerly de jure dual segregated school system into a "unitary, nonracial system of public education." *Id.*, 687.

*Clarksdale* is a peculiarly strong case because the "natural" obstacle of a railroad track was deemed insufficient to justify a zone line running along it. The line also coincided with the division between custom-segregated neighborhoods, thus carrying into schools the results of housing segregation. Rationality alone of the zone plan failed to justify this outcome. See also, Board of Public Instruction of Duval County v. Braxton, 402 F. 2d 900 (5th Cir. 1968), where zone lines following the historical bounds of segregated neighborhoods were found invalid.

If further proof were necessary that even physical obstacles of the most natural sort will not be acceptable as zone boundaries when they produce racially identifiable schools, there is United States v. Greenwood Municipal Separate School District, 406 F.2d 1086 (5th Cir. 1969), which held insufficient a white school zone "bounded on the north by the Tallahatchee River and on the south by the Yazoo River," *Id.*, 1092.

Safety considerations are entitled to weight in the formulation of zone lines, but where the same obstacles which are proffered as assignment barriers for children in a purportedly unitary system which were crossed with regularity under the dual system, the argument will fail. Officials can hardly assert the compelling nature of obstacles which they overcame earlier in order to perpetuate segregation:

> The Board's concern for the safety of children who would have to cross railroad tracks or a bayou in order to attend school is entitled to weight, but we find it unconvincing in the context of developing a desegregation plan appropriate for Indianola. Until 1965, when the school board took its first action to comply with the *Brown* decision of eleven years earlier, students of both races freely crossed these hazards in order to maintain the racial purity of Indianola's schools. United States v. Indianola Municipal Separate School District, 410 F.2d 626 (5th Cir. 1969).

Davis v. Board of School Commissioners of Mobile County, supra, establishes definitively that existing physical features—there an interstate highway—should not impede efforts "to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." *Id.*, 402 U.S. 37, 91 S.Ct. 1292. If physical demarcations do not limit the duty of the court to use "all available techniques," *Id.*, 37, 91 S.Ct. 1292, so much the less should political boundaries, when they coincide with no tangible obstacles and are unrelated to any administrative or educational needs.

## Prior Practice

The implications of this doctrine for the Richmond metropolitan area are obvious. The school division lines here, and in other parts of the state where similar separate political entities exist, have never been obstacles for the travel of pupils under various schemes, some of them centrally administered, some of them overtly intended to promote the dual system. The Court does not hesitate to advert to the crossing of school division lines in instances outside the Richmond metropolitan area, because the barriers here in existence do not coincide with substantial physical obstacles. They are political demarcations only.

The State Board has never forbidden by regulation the exchange of pupils across political subdivision lines. It has promoted the crossing of lines for purposes of operating regional segregated schools. It has approved the merger of two political subdivisions into a single school division, for the purposes of facilitating the adoption of schemes of joint schools and the provision of education by contract for residents of one political subdivision by the officials of another. It has regulated in detail the operation of joint schools, approved the initiation of joint school operations, and approved contract systems within and between school divisions. It has disbursed funds for transportation required under such systems and even paid for the shipment of pupils to other states in segregated groups.

Earlier judicial opinions bear witness to Virginia's policy permitting the transportation of pupils across political subdivision lines for the purposes of maintaining segregation. Buckner v. County School Board of Greene County, 332 F.2d 452 (4th Cir. 1964); School Board of Warren County v. Kilby, 259 F.2d 497 (4th Cir. 1958); Goins v. County School Board of Grayson County, 186 F.Supp. 753 (W.D.Va.1960); Corbin v. County School Board of Pulaski County, *supra.*

84

The State Board has been deeply implicated in the administration of the tuition grant and pupil scholarship programs, which were operated completely independently of the wishes of local school officials and resulted in mass movement of pupils across political boundaries in the Richmond area and throughout the state as well, to the extent that it was necessary to appeal to local school boards to confer in order to coordinate the exchange of pupils. In the Richmond area, notably, when the scholarship program was at its height, support for local school expenditures in the counties was high as well.[7]

These instances—and there are others —of the education of pupils of one political subdivision in schools run in whole or in part by officials of another demonstrate as a matter of historical fact the insubstantiality of any argument that strong state concerns support their maintenance as barriers to the achievement of integration. For the State has countenanced much more than the plaintiffs seek here. Standard practice has encompassed schemes under which students are educated in systems financed and operated by local officials wholly irresponsible, in the political sense, to residents of the students' home area. Centrally-enforced uniformity in certain educational practices has no doubt helped to make this acceptable. But here the plaintiffs do not demand that desegregation take place by means that render school authorities politically irresponsible to the parents of the children they teach. Means are available, such as the consolidation form presented in Virginia law, by which representatives of each political subdivision will have a role in management of a combined school system. Flexible state law provisions for financing exist as well. The State cannot insist that compliance with its own statutory policy violates some substantial interest. This is so especially in the light of the recurrent successful use of the joint system of school management, which entails the operation of facilities by a committee of control, having representatives from participating school divisions, with financing provided by the political bodies of each.

Segregation Patterns

Not only do the existing barriers have no relation to natural obstacles or substantial governmental interests, but they are related to strict housing segregation patterns, maintained by public and private enforcement and owing their genesis in substantial part to the manner in which the three school divisions have been operated and expanded. Thus by the maintenance of existing school division lines the State advantages itself of private enforcement of discrimination and prolongs the effects of discriminatory acts of its own agents. Brewer v. School Board of City of Norfolk, 397 F. 2d 37 (4th Cir. 1968), holds that zone lines unjustified by the existence of natural impediments to movement across them are usually unacceptable where they result in segregation. Moreover, the Court said in *Brewer*, they are unacceptable on another ground when they work to assign pupils according to their residence in neighborhoods which are homogeneous by reason of privately enforced housing segregation. The proof here overwhelmingly establishes that the school division lines between Richmond and the counties here coincide with no natural obstacles to speak of and do in fact work to confine blacks on a consistent, wholesale basis within the city, where they reside in segregated neighborhoods.

 School authorities may not constitutionally arrange an attendance zone system which serves only to reproduce in school facilities the prevalent pattern of housing segregation, be it publicly or privately enforced. To do so is only to endorse with official approval the product of private racism. It is

7. A more detailed reference to this program, once termed tuition-grant, is made at p. 137, *infra*.

tantamount to the reestablishment of the dual system under a new regime and falls well below the affirmative action necessary and required to desegregate a bi-racial system.

For a School Board to acquiesce in a housing development pattern and then to disclaim liability for the eventual segregated characteristic that such pattern creates in the schools is for the Board to abrogate and ignore all power, control and responsibility. A Board of Education simply cannot permit a segregated situation to come about and then blithely announce that for a Negro student to gain attendance at a given school all he must do is live within the school's attendance area. To rationalize thusly is to be blinded to the realities of adult life with its prejudices and opposition to integrated housing. Davis v. School District of City of Pontiac, 309 F.Supp. 734, 742 (E.D.Mich.1970), aff'd. 443 F.2d 573, cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971). See also, United States v. Board of Education, Independent School District No. 1, Tulsa County, 429 F.2d 1253, 1256 (10th Cir. 1970); United States v. School District 151 of Cook County, 404 F.2d 1125, 1131 (7th Cir. 1968); Board of Education of Oklahoma City Public Schools v. Dowell, 375 F.2d 158, 165 (10th Cir. 1967); Taylor v. Board of Education of City School District of City of New Rochelle, 294 F.2d 36 (2d Cir. 1961); Bradley v. Milliken, 338 F.Supp. 582 (E.D.Mich., 1971), slip opinion at 10, 12; Johnson v. San Francisco Unified School District, 339 F.Supp. 1315, 1318 (N.D.Cal., 1971).

When school authorities, with knowledge that other available opportunities for pupil assignment will produce less segregation, deliberately select one employing zones drawn in coincidence with housing segregation, their action by inference is discriminatory, and evidence to rebut such a finding must be "clear and convincing," Brewer v. School Board of City of Norfolk, supra, 397 F.2d 41. No such showing has been made in this case, and the conclusion of segregatory intention from this, as well as other evidence, is unavoidable. For the power to temper the marked racial identifiability of the three school systems exists, and it has gone unused.

### Educational Deprivations

Housing segregation and resultant educational deprivations are in another sense traceable to discrimination by school authorities. Where, as here, there has been an historical practice of making available to blacks an inferior public education in terms of conventional, tangible measures and also in terms of the intangible benefits resulting from an integrated education, effects of these educational policies remain observable today and have a discernible impact upon the extent of housing employment, and school segregation. To appreciate fully the impact of segregation on the effective and academic sides of an individual, as several educational experts said, it is necessary to study the course of his entire life. Inferior education limits achievement. Employment discrimination aside, it depresses earning power and restricts the choice of employment. This in turn narrows the range of housing options, confining its victims to low-cost central city sites located near public transportation and low-skilled jobs. When the parents' housing is so fixed, so is the child's. Inferior education also confers on the parent and the child the burden of low socio-economic status, with consequent demonstrated adverse effects on achievement in school. These are the products of past wrongs by educational authorities of the State.

The duties of current educators are affected by such violations of the Constitution. In Gaston County v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969), the Supreme Court affirmed a ruling that an "impartial" literacy test could not be applied as a qualification for voting without the "purpose or . . . effect of denying or abridging the right to vote on account

of race or color," 42 U.S.C. § 1973(b), in a county where blacks historically had been provided with a segregated and inferior education. The same "readily inferable" impact on literacy attainment for voting purposes is here shown to affect achievement generally, insofar as it determines job opportunities and social status. When, likewise, the State's educators impose "impartial" methods of school division organization on the black children of families, heads of which were deprived, as they well knew, by themselves or their official predecessors of an equivalent education to that given whites, they continue knowingly a system which prolongs its own discriminatory and segregatory policies.

In other contexts courts have likewise recognized the enduring effects of educational deprivation upon specific opportunities. In Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed. 2d 158 (1971), the Supreme Court rejected under the 1964 Civil Rights Act educational attainment and aptitude test qualifications for employment which effectively eliminated from consideration far more blacks than whites and had no relation to job performance. Blacks' relative difficulty in surmounting the obstacles appeared, the Court said, to be "directly traceable to race. Basic intelligence must have the means of articulation to manifest itself fairly in a testing process. Because they are Negroes, petitioners have long received inferior education in segregated schools and this Court expressly recognized these differences in Gaston County v. United States, supra. [395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969)] . . . . The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation . . . . [G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'build-in headwinds' for minority groups and are unrelated to measuring job capability." Id., 430–432, 91 S.Ct. 853.

Testing procedures in the school desegregation context have as well been disapproved as components of desegregation plans. See, e. g., United States v. Sunflower County School District, 430 F.2d 839 (5th Cir. 1970); Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1970), rev'd. in part sub nom. Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970).

In the Richmond metropolitan area, assignment under the current school division arrangement creates a "built-in headwind" for the black child seeking a desegregated education. For with his school assignment determined by his residence and with his residence strongly influenced by his parents' economic attainments (putting aside the question of housing discrimination), deficiencies in the public education given blacks make it highly likely that his home will be in the city, where housing and transportation are relatively inexpensive.

### School Construction

School construction policy has contributed substantially to the current segregated conditions. Schools have been built and attendance policies maintained so that, even within existing school divisions and by comparison with the racial ratios prevailing therein, new or expanded facilities were racially identifiable. The evidence shows that this was purposeful, its immediate and intended result was the prolongation and attempted perpetuation of segregation within school divisions.

The longer term impact of the same policy has been the exaggeration of the racial disproportion between the city and the two neighboring counties. This has come about by virtue of the maintenance of school division lines as obstacles to pupil assignment for purposes of desegregation while the area's housing patterns, when its population grew, became increasingly segregated. The continued operation of the schools of each subdivision as racially identifiable facilities

moreover necessarily caused each new school and old ones as well to take on the label of a black or white school. In consequence of prevailing housing segregation, which by its nature prepetuates itself and expands, increasingly as the population of the area grew larger the facilities, old and new, located within the lines describing the City of Richmond became identifiable as black schools, and those in the two counties were nearly all perceived as white schools. The racial identifiability of the entire systems in issue—those of the three school divisions—became manifest when, very recently, attempts were made to desegregate the schools of each division within its own borders. Currently the Richmond system is identifiable as black, and that of each county is perceivably a white system.

Furthermore, not only has the manner of expansion of the community's school plant been such as to partake of the discrimination inherent in its housing patterns, but also it has played a substantial part in the development of those patterns. In addition, school officials have been abetted in the perpetuation of housing discrimination by other governmental agencies.

The outcome of these practices—racial identifiability of systems and of individual facilities within each—cannot now be reversed without the implementation of pupil assignment policies which entail the crossing of school division boundaries. This applies both to newly constructed schools and those which long ago served as components of the officially compelled dual system.

In the light of all the evidence the insistence now by school authorities upon a system of separate attendance districts within the enlarged community reflects the desires of the State's central and local officials, based at least in part on their perceptions of their constituents' wishes, to maintain as great a degree of segregation as possible.

The Fourth Circuit has recognized the potential that school construction and expansion programs have, coupled with assignment plans geared to residential location in some respect, to create or perpetuate denials of equal educational opportunity in building upon and incorporating into the school system existing housing segregation. Brewer v. School Board of City of Norfolk, *supra*. Other circuits have held as well that this is a violation of the Fourteenth Amendment.[8]

In Davis v. School District of City of Pontiac, 309 F.Supp. 734 (E.D. Mich., 1970), aff'd. 443 F.2d 573, cert. denied 404 U.S. 913, 92 S.Ct. 233, 30 L. Ed.2d 186 (1971), legal liability for existing segregation was established in part on the ground that the school board had repeatedly advised the community over a twenty year period that it recognized the adverse effects of school segregation and intended to deal affirmatively with them, but had nonetheless taken no such action. Instead since 1954 it had built ten new elementary schools and altered zone lines twelve times, each time without consideration of the effect of the moves on racial integration. These changes, by a continuing pattern over the years, exaggerated racial imbalance in the system.

When the power to act is available, failure to take the necessary steps so as to negate or alleviate a situation which is harmful is as wrong as is the taking of affirmative steps to advance the situation. Sins of omission can be

8. Davis v. School District of City of Pontiac, 443 F.2d 573 (6th Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); Sloan v. Tenth School District of Wilson County, 433 F.2d 587 (6th Cir. 1970); United States v. Board of Education, Independent School District No. 1, 429 F.2d 1253, 1256, 1259 (10th Cir. 1970); United States v. School District 151 of Cook County, 404 F.2d 1125, 1133 (7th Cir. 1968); Bradley v. Milliken, *supra*, 338 F.Supp. 582 (E.D.Mich., 1971); Johnson v. San Francisco Unified School District, No. C-70 1331 SAW, 339 F.Supp. 1315 (N.D.Cal., 1971), at 1318; Spangler v. Pasadena City Bd. of Education, 311 F.Supp. 501, 517, 522 (C.D.Cal.1970).

as serious as sins of commission. Where a Board of Education has contributed and played a major role in the development and growth of a segregated situation, the Board is guilty of *de jure* segregation . . . . It would be feigned modesty on the part of any Board of Education to suggest that it is controlled by a situation rather than that it can control. *Id.,* 741–742.

When a school board, having demonstrated concern for problems of segregation, and operating in an area where segregated housing patterns prevail and are continuing, builds its facilities and arranges zones so that school attendance is governed by housing segregation, it is operating in violation of the constitution. *Id.,* 742.

Once it has been demonstrated as it has in this case that attendance lines were consistently drawn in such a fashion so as to discourage achievement of integration when such need not have occurred, the presumption can be made that the results reached were intended. *Id.,* 744.

### Intention to Perpetuate

These conclusions apply in a case where no history of other past intentional segregation was relied on in order to establish an affirmative duty to desegregate. In a situation such as the instant one, when officially mandated segregation was enforced by numerous other means, the legal principles are all the more demanding, and the factual inference of intention to perpetuate segregation is the more compelling.

In *Swann* the Supreme Court recognized the effect that such site and capacity selections may have; that of "creating or maintaining a state-segregated school system." Swann v. Charlotte-Mecklenburg Board of Education, 402 U. S. 1, 21, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 554 (1971). The Supreme Court expressly recognized that school segregation owing its origin to discriminatory site and capacity decisions is a cognizable wrong not remedied by the adoption of a nonracial assignment plan:

"Racially neutral" assignment plans . . . may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or the distortion of school size in order to achieve or maintain artificial racial separation. When school authorities present a district court with a "loaded game board," affirmative action in the form of remedial altering of attendance zones is proper to achieve truly nondiscriminatory assignments. Swann v. Charlotte-Mecklenburg Board of Education, *supra,* 28, 91 S.Ct. 1282.

Construction in both counties has tended to correspond with the development of white and black residential areas, and in fact was so intended. Coupled with the hard and fast policy of not transporting pupils across school division lines to promote desegregation and also drawing attendance zones within divisions on a rough proximity basis, county construction policy has given rise to a number of identifiably white schools. Black facilities near the periphery of Richmond —the prime example is Kennedy High School, physically located in Henrico—in the meantime have been built and opened on a segregated basis because Richmond could or would not exchange pupils with the counties in order to desegregate. The counties' policies of drawing attendance zones roughly on a basis of proximity has been departed from on occasion, but so far as this record shows not in an effort to desegregate. Rather new construction was planned for black schools without regard to the possibility of accommodating an expanding black pupil population in white schools. Passing consideration of the role of any governmental agencies in the creation of segregated housing patterns by other means, the construction policies of the school administrators, in which, of course, the State Board played a very substantial role, both perpetuated and manufactured

anew the constitutional wrong of school segregation.

The construction of new schools and the closing of old ones is one of the most important functions of local school authorities and also one of the most complex. They must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner city neighborhoods. Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 20–21, 91 S.Ct. 1278.

The latter portion of the foregoing quotation from *Swann* points up another manner in which school construction may and indeed in our instant case has contributed to school segregation. A school facility's location and its racial composition will affect the desirability of the neighborhood served by it to prospective residents. As the F.H.A. manuals indicate, this sort of desirability is a value which real estate traders will seek to preserve as well. The racial composition of the school serving an area is a significant element in the combination of established factors which govern choice of housing sites for new residents of either race.

The interdependency of housing and school segregation is fully established by the record. Schools were planned with an eye to separate racial occupancy and opened as such, with zone and division lines imposed upon segregated housing patterns. The accommodation of expanding pupil population in new schools paved the way for new urban growth. New residents in turn were governed in their choice of housing by established patterns of residential segregation. They also were attracted to one or another zone by the opportunity to avoid school desegregation. Blacks new to the area and young black adults native to Richmond in the meanwhile were more restricted in choice of housing sites. Overall, the area's population expanded, and over time black residents, with fewer options so far as housing was concerned, comprised a greater and greater proportion of the city's residents, while the area's whites occupied the suburban counties.

This was not beyond the power of school authorities in each of the areas and in the State's central offices to influence. By maintaining black schools and white schools, perceived as such, to serve particular areas, they turned such force as might have been exerted by school policies to assist in eliminating housing segregation in the opposite direction. Because the area's overall population was expanding, the consequences of the maintenance of segregated school systems were extreme.

In creating new segregated facilities to accommodate the area's expanding population, school officials not only built upon the pattern of housing segregation extant in the city and counties, but also encouraged and fostered its extension in a substantial manner. The existence of a number of nearly all white schools, together with a firm policy of refusing to relieve segregation by crossing school division lines, constituted an invitation to white persons seeking new residences in the area to discriminate in their selection according to the racial composition of the school their children would attend. Cf. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). As a result the intensity and magnitude of racial separation increased.

## Metropolitan Schools

The marked racial disproportion between the city and each of the county systems has progressed rapidly in recent years. In substantial part by reason of the appropriate authorities having deliberately deferred so long, and still so doing, according the plaintiff class their constitutional rights, desegregation of the schools of the city and the counties as well cannot now be achieved within the current school division bounds. Perpetuation of the racial identifiability of particular facilities while each school system expanded, by means of the creation of new schools planned for one race or the other, has greatly assisted in the creation of prevailing housing segregation and thereby entrenched school segregation.

Ever since *Brown I*, population growth in the metropolitan area has consisted mainly of the addition of whites to the neighboring counties and blacks to the city. Many of the whites in particular were new in-migrants from outside the area. In 1955 the city schools were 43.4% black overall; Chesterfield's were 20.4% black and Henrico's 10.4% black. Now, in 1972, Richmond schools are about 70% black, and the population of each county system hovers around eight to ten percent black. [The total school population of the three jurisdiction area has expanded from 61,672 to 106,521.]

■ A school system is rightly termed *de jure* segregated even in those instances when facilities formerly all white under the dual system have become all black and when new racially identifiable schools with "neighborhood" or "free choice" assignment plans have been built and opened. For when individual schools are components in a segregated system, the thrust of the segregatory policy, officially instituted, affects them and the manner in which the community perceives them. It is anticipated that they will be "white schools" or "black schools." A white school, the student body of which gains a certain proportion of blacks, will be reclassified in the eyes of the community (often with the help of administrators who assigned to it more black faculty members) as black, whites will withdraw in large part, and an instance of resegregation will have occurred. This cannot but occur when systems are maintained on a segregated basis and the total population expands. Instances of transition of this sort are not rare in an expanding segregated school community. In the Richmond metropolitan area the outcome has been that the city's entire school system is at present identifiably black. This was not always the case, and it is so at present in substantial part because the policy of school segregation, continued to the present, contributed to pervasive housing segregation.

For white resistance to desegregation is undeniable. The State itself has argued in other cases that white opposition will make desegregation substantially more difficult to accomplish when the blacks constitute a large proportion of the school population:

Without community acceptance, public education as we know it now will not survive in those localities.

This brings us to the second major problem in Virginia as a whole. Ratio of population is of great significance in the solution to segregation. The study quoted above is emphatic on this point:

"The ratio of Negro to white population is not a final determinant of racial attitudes, but it is perhaps the most powerful single influence, for the practical results of desegregation depend heavily upon it. This, more than anything else, seems to account for the great variation in the degree of expressed concern in the South over the steadily rising status of the Negro in the last generation—which has led finally to the demand for admission to the white schools. The Upland South, for example, found little to alarm it in the Negro's successful legal battle for the ballot, for there his numbers are not sufficient to give him con-

trol of local politics. The whites in the Black Belt, however, have had to face the prospect of becoming members of a political minority and many of them are still resisting, although the only means left to them are extra-legal."

The question of ratio of population has particular significance in Virginia. The percentage of Negro school children ranges from zero in Buchanan, Craig and Highland Counties to 77.3% in Charles City County. Brief for appellees on further re-argument in Davis v. County School Board of Prince Edward County, November 15, 1954, in the United States Supreme Court, at 14–15.

## Demographic Patterns

The departure of whites, as has occurred in the City, in the face of an increasing black component was predictable, but it was only possible—and only had reason to occur—when other facilities, not identifiable as black, existed within what was in practical terms, for the family seeking a new residence, the same community. School authorities cannot but have been aware from their experience of the tendency of individual facilities within each segregated system to take on a label of racial identifiability. Given the shifting demographic patterns, it was fully foreseeable, and was foreseen, that more and more schools in the city, new and old, would become black and in the counties most facilities, including new ones, would be obviously white.

The decisions on school locations in the three metropolitan systems were matters for central as well as local control. Each new facility or addition was approved by the State Superintendent, and each played a role in molding the development of housing patterns in the metropolitan area. The expansion of the school plant, like the development of other public facilities, governs the rate of community development.[9] When they build upon and assist in the spread of segregated housing patterns, as has happened here, the school authorities create new state-enforced school segregation.

The maintenance of segregation in an expanding community therefore creates problems, when a remedy must eventually be found, of a greater magnitude in the present than existed at an earlier date:

The failure of local authorities to meet their constitutional obligations aggravated the massive problem of converting from the state-enforced discrimination of racially separate school systems. This process has been rendered more difficult by changes since 1954 in the structure and patterns of communities, the growth of student population, movement of families, and other changes, some of which had marked impact on school planning, sometimes neutralizing or negating remedial action before it was fully implemented. Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 14, 91 S.Ct. 1275.

## Governmental Agencies

In league with the defendant school administrators in perpetuating the dual school system to the extent that entire city and county school divisions have acquired the label of racial identifiability have been governmental agencies controlling the evolution of housing patterns in the area. Segregation in housing patterns, once established, perpetuates itself and expands. New residents adhere to established patterns; private realtors adhere to governmentally enforced practices; and the pattern, once set, acquires an impetus of its own. The public housing policy in the area has, by action and inaction of the governmental bodies involved, *contributed to school segregation.* County policy has excluded low income

---

9. See an earlier opinion in this case, Bradley v. School Board of City of Richmond, 324 F.Supp. 456 (E.D.Va.1971), and cases there cited. Most of these opinions emphasize the extremely long-term effect that school capacity and location have upon extent of segregation and the difficulty of eradicating it.

housing entirely; in the city itself such housing has been barred when it might contribute to housing desegregation, and efforts to place it in mainly white areas in the city or the counties have been abandoned.

Federal policy to perpetuate segregated residential development and the use of racially restrictive covenants have also forced the area's housing into racially defined patterns. It is not decisive that the sources of these forces now no longer promote them; the momentum of discrimination continues.

### Resistance to Desegregation

A firm policy of resistance at the state and local levels to consolidation or other methods of cooperative pupil assignment on any significant scale so as to bring about desegregation has been related at each level to racial motives. Witness, for example, the enthusiasm with which the State Department of Education explored consolidation techniques for all educational purposes save that of desegregation, and the alacrity with which the Chesterfield Superintendent invited county residents to return to county schools in the fall of 1970. At each level and in each sphere of school operation the question of desegregation has had a special status apart from other considerations of educational policy. There has been a discernible policy of refraining from taking such steps as would promote desegregation, thereby burdening the plaintiff class in attainment of their rights. Not only has this policy had a substantial impact on school segregation, but on the degree of housing segregation in the area as well. Under Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) such a deliberate classification, purposefully disadvantaging blacks, violates the Fourteenth Amendment. See Ely, Legislative and Administrative Motivation in Constitutional Law, Yale Law Journal, 1205, 1299–1302 (1970).

### State Central Actions

The educational system of the State of Virginia, like those of most other states, is operated both by officials of the State's central government, located in Richmond, and by local officials with geographically narrower authority. In numerous respects through the years the central administrators and policymakers have issued recommendations or regulations concerning both major and minor aspects of school operation. In the management of the State system the concept of local autonomy has several times received short shrift, especially in the matter of racial policy.

Earlier cases in this jurisdiction have established the deep involvement of Virginia's statewide officials in the administration of the State's public schools. This Court held in Allen v. County School Board of Prince Edward County, 207 F.Supp. 349 (E.D.Va.1962), that the operation of schools was a cooperative venture by local and central officials exercising powers of State law:

> [T]he Constitution of Virginia imposes a mandatory duty to establish and maintain an efficient system of public schools throughout the state . . . .

> The Court finds, and so holds, that the public schools of Virginia were established, and are being maintained, supported and administered in accordance with state law. These public schools are primarily administered on a statewide basis. A large percentage of the school operating funds is received from the state. The curriculums, school text books, minimum teachers' salaries, and many other school procedures are governed by state law . . . . Id., at 352–354.

In any event, no amount of delegation of authority pursuant to state law would deprive the system of the character, in the contemplation of courts enforcing the Fourteenth Amendment, of a structure formed, supported, administered, divided, and operated according to policies established and implemented by officials whose source of authority is state law.

The contention that the action and inaction of the foregoing state and county officials resulting in the closing of the Prince Edward County Schools was a local action, beyond the purview of the Fourteenth Amendment, is not well taken. County has been defined "as a body politic, or political subdivision of the state, created by the legislature for administrative and other public purposes." It is generally regarded as merely an agency or arm of the state government.

The United States Constitution recognizes no governing units except the federal government and the States. A contrary position would allow a state to evade its constitutional responsibilities by carve-outs of small units. At least in the area of constitutional rights, specifically with respect to education, a state can no more delegate to its subdivisions the power to discriminate than it can itself directly establish inequalities. *Id.*, at 352–354.

As this Court did in *Allen*, it does here again conclude that the public schools of the State and of the Richmond metropolitan community are administered by the State Board and State Superintendent in conjunction with their local delegates, the division superintendents, and locally chosen school boards. Other central and local officials, furthermore, have authority over certain aspects of school administration; most obvious is the local governing bodies' budgetary appropriation power.

Prior to the decision in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Commonwealth of Virginia maintained a thorough-going policy of segregation by race in the public schools. The doctrine was mandated by its Constitution, by statutory law, and was enforced throughout the state by policymaking authorities. Attorneys for the Virginia defendants, including the State's Attorney General, so represented in briefs filed seventeen years ago in *Brown:*

In general, education in Virginia has operated in the past pursuant to a single plan centrally controlled with regard to the segregation of the races. Brief for appellees, County School Board of Prince Edward County, et al., November 15, 1954, at 15.

In the years since, the powers of the State Board of Education and the State Superintendent of Public Instruction have varied but slightly; what changes in law have been made have principally been to expand its powers. Other State educational agencies have come into existence and disappeared in intervening years as well. For the major part of this seventeen year period the State's primary and subordinate agencies with authority over educational matters have devoted themselves to the perpetuation of the policy of racial separation. They have been assisted in this effort by new legislation creating such programs as the tuition grant and pupil scholarship systems, the pupil placement procedures, and, by enactment passed while this case was pending, placing new limitations on the power of the State Board to modify school division boundaries. They have employed established techniques and powers as well to perpetuate segregation.

Only very tardily and under the threat of financial coercion has the State Board of Education implicated itself in any respect in the desegregation process. In so doing it has conceived of its affirmative duty very narrowly, confining its efforts to those required by its compliance agreement with the Department of Health, Education and Welfare, and on occasion not even adhering to that.

The State Board, like other state educational authorities, cannot but have been aware of the strength of the State's policy of segregation and the manifold ways in which it was enforced at the state and local level. In recent years that central board has been kept constantly informed of the status of desegregation efforts in all school divisions. Nonetheless it has scrupulously separated its involvement in the desegregation process from its other extensive activities. It has failed to inject consideration of the contribution that it might make to the

dismantling of segregation into its decision-making processes of policymaking and review. It has instead, through administrators so motivated, intentionally perpetuated segregation, as for instance in the sphere of school construction approval. With knowledge of the impact thereof, it has refrained from taking such actions as were within its power to bring about a greater degree of desegregation. During the most recent era, when the 1964 Civil Rights Act began to force a reversal of the age-old dual system, there was only one man charged with the carrying out of the State's part of the job of desegregation, and all other functions within the State Department of Education appear to have gone on in disregard of his assignment. In striking contrast are the extensive affirmative efforts to promote segregation.

### Purposeful Frustration

Powers enjoyed by the State Board and State Superintendent before and after 1954 have been exercised openly and intentionally to frustrate the desegregation of the three school divisions of the metropolitan area and others throughout the state. The known and foreseeable impact of the manner in which school construction programs were administered, including site selection, choice of school capacity, and quality of facilities, has been to perpetuate the dual system in each school division. The approval process has been buttressed in this by the powers of the purse, liberally used. The foreseen result has been the continuation of separate and racially identifiable schools, administered by members of a single race, staffed by teachers of a single race, housing pupils of a single race.

Separation in faculty was cooperatively bolstered by separate orientation programs on the local level and regular conferences on the statewide level. Black faculty members have been demoted by local administrators from positions of authority to lesser posts in connection with attempts to desegregate schools by the closing of all-black facilities in the jurisdictions here involved. The State Board, of course, was informed of these changes in position. Similar practices have been condemned:

> [W]e feel that the Board's consolidation policy may not be applied to where, as here, a school is closed as a direct consequence of an effort to rectify constitutional defects in the method by which pupils and teachers have previously been assigned, where the effect is to impose, without some concern for qualifications to teach, the heavy burden of unemployment solely upon those whose constitutional rights were violated, and where an additional result may be to impede meaningful realization of the constitutional rights of others, that is, the pupils. Smith v. Board of Education of Morrilton School District No. 32, 365 F.2d 770, 780 (8th Cir. 1966.) See also, Stell v. Board of Education for City of Savannah, 387 F.2d 486, 497 (5th Cir. 1967); Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 516, 523 (C.D.Cal.1970).

The obvious and immediate impact, a "foreseeable consequence," *Id.*, 365 F.2d 779, of the policy is to convert a dual system into at best one run primarily for and by whites. There is no evidence that demotions were ordered after a full review of the qualifications of possible candidates for positions in merged schools. Such a policy as the authorities adopted can only discourage the recruitment of black personnel. In fact the black faculty component in each county system is very small. The result, readily perceived by pupils, contributes to the racial identifiability, in the legal sense, of the county school systems.

The State's central planning department for educational transportation performed surveys and formulated the most efficient means by which to maintain the white and black school systems. The pupil placement system, administered by a now defunct central state agency, with the aid and cooperation of the State Board, froze segregated attendance patterns for years. The tuition grant and later pupil scholarship programs made

available to any student desiring to escape desegregation in his home school division a ready refuge in a public segregated school system or a private segregated school, and this escape route was beyond the power of the localities to bar.

Transfer patterns and optional zones have been condemned in the past when used as devices to create or maintain segregation. See United States v. Board of Education, Independent School District No. 1, Tulsa County, *supra,* 429 F.2d 1260; United States v. School District 151 of Cook County, *supra,* 404 F.2d 1125, 1131; Board of Education of Oklahoma City Public Schools v. Dowell, 375 F.2d 158, 163–164 (10th Cir. 1967); Spangler v. Pasadena City Board of Education, *supra,* 311 F.Supp. 508–509, 512, 520; Bradley v. Milliken, *supra* (338 F.Supp. at 587); Monroe v. Board of Commissioners of the City of Jackson, Tenn., et al, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed. 2d 733.

Numerous times the State Department of Public Instruction issued written policy statements concerning the operation of joint educational programs of a general or specialized nature on a regional basis, treating the issue of school consolidation, adverting to the benefits of school division consolidation, discussing the merits of contractual school operation, and regulating the manner in which such administrative changes might be brought about. Many times the Board stated its support for one or another such move. It must not be forgotten that these publications emanated from the agency to whose regulations and directions local school divisions owed a duty of compliance. And, if locally initiated, the organizational changes were nearly all, at one point or another during transition, subject to State Board approval. Policy statements therefore had the effect of encouraging the pursuit of the aims endorsed by an office with special expertise and authority and of guaranteeing in advance its consent. At many times these statements supported the use of these techniques in order to preserve segregation. To this date the State Board has not endorsed them in order to achieve desegregation. Such reticence affirmatively gives rise to an inference of intention, for whatever reason, to preserve such amount of racial segregation as is possible and a rejection of any affirmative obligation to assume the task of desegregation.

As centrally-administered segregatory programs increased, from the days of the school closing activity which occurred in Virginia, through the pupil placement phase, and into the years of the tuition grant—pupil scholarship gambit, the State Board maintained an outstanding record of deference to local wishes to maintain racially separate schools. Central authority at once increased and lay dormant. The State Superintendent's authority to approve new construction was somehow construed not to apply to site selection despite express regulations to the contrary, although in extreme cases criticism was offered, but never of the creation of segregated facilities. With cautious regard for local autonomy—so flouted by pupil placement and tuition grants—the State Board several times sought the consent of all affected before modifying school division lines, recognizing the effect such actions had on attendance policies. This circumspection betokens, the Court is told, lack of authority. Unquestionably authority would exist in ample measure if only the State Board would promulgate the appropriate regulations authorized by its enabling legislation. The contention of want of authority is self-serving.

The officials of the State Department of Education, the State Board, the State Superintendent, and all officials implicated in the operation of the state educational system, have a duty owed to the individual members of the plaintiff class not to discriminate on the basis of race in the operation of the State's educational plant. This duty was made crystal clear by the Supreme Court in one of the first

school desegregation matters to come before it after the *Brown* decision:

> The controlling legal principles are plain. The command of the Fourteenth Amendment is that no "State" shall deny to any person within its jurisdiction the equal protection of the laws. "A state acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government, . . . denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning." Ex parte Virginia, 100 U.S. 339, 347 [25 L.Ed. 676]. . . . In short, the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this Court in the *Brown* case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted "ingeniously or ingenuously." Smith v. Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 85 L.Ed. 84; Cooper v. Aaron, 358 U.S. 1, 16–17, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958). See also, United States v. Jefferson County Board of Education, 372 F.2d 836, 873 (5th Cir. 1966), aff'd on rehearing en banc, 380 F.2d 385 (5th Cir. 1967).

That duty has here been violated by the State Board's continued involvement in the perpetuation of segregation by acts having the known or foreseeable effect of perpetuating the dual school system. These began with the announcements after the *Brown* decision that any action to implement its requirements would be postponed. They continued with the support of the school closing policies, in particular by the use of the tuition grant payment and special appropriation powers of the Board. They included the implementation of tuition grant and pupil scholarship legislation by numerous actions. Further, they encompassed the aid given the pupil placement system by promulgation of implementing regulations. They included as well, as the Court has pointed out, the approval of school construction programs deliberately and obviously planned to enlarge and entrench the dual system.

### Legal Effect

The legal effect of these actions by the body charged with the duty of supervising the State's schools, a body the directives of which would be complied with fully by local officials, was to buttress the existing dual system and prevent its dismantling.

The official position taken by the State's central educational authority communicated to all, black and white, public officials and private individuals, the depth and tenacity of the policy of segregation. This contributed to and compounded the damage itself done by segregated public education and rendered more difficult efforts by blacks to escape segregation by means of individual initiative. See, NAACP v. Patty, D.C., 159 F.Supp. 503 (1958), reversed on other grounds sub nom., Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959).

Federal courts in school desegregation matters may legitimately address their remedial orders to defendants with statewide powers over school operations in order to eliminate the existence of segregation in schools chiefly administered locally by subordinate agencies.

Franklin v. Quitman County Board of Education, 288 F.Supp. 509 (N.D.Miss. 1968) concerned a school construction program, subject to approval for partial funding by the state's Educational

Finance Commission. That body has power to determine whether a requesting locality has an adequate, efficient, and comprehensive plan for building construction. The court ruled that it had the duty to consider proposals with an eye to their contribution to the disestablishment of the dual system and to assist local boards to that end:

> Viewed in any light, the Commission is extensively involved in the business of public school education and is, therefore, not in a position to adopt a "hands-off policy" as regards the disestablishment of state-imposed segregation in a public school system. The affirmative obligation to seek means of disestablishing state-imposed segregation must be shared by all agencies, or agents of the state, including Educational Finance Commission, who are charged by law with, and who exercise, official public school functions. Neutrality must be forsaken for an active, affirmative interest in carrying out constitutional commands. *Id.*, at 519.

The State Superintendent of Public Instruction has violated this duty.

This is only one of the many respects in which the state educational authorities have abstained from taking measures to desegregate the state school system or have taken steps the obvious and inevitable effect of which was to frustrate that process.

In an analogous case, Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.1967), aff'd. sub nom., Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967), the district court was confronted with a state educational authority enjoying broad powers over educational policy, similar to those possessed by the state officials here. Historically, there as here,

the state's schools were segregated by law, and only recently had efforts begun to disestablish that pattern. In *Lee*, as in the instant case, central state officials, some in the education field and some with general executive authority, had by their various actions prolonged school segregation. "[T]he most significant action by these defendant state officials, designed to maintain the dual public school system based upon race, is found in the day-to-day performance of their duties in the general supervision and operation of the system." *Id.*, at 470. The court reviewed the central authorities' use of their power over school site selection and construction, their recommendations for and against school consolidation, their control over finances, their indirect influence over faculty assignment in authorizing the creation of new teacher posts in segregated schools and conducting separate statewide conferences, their creation, recommendation, approval, and financing of transportation policies designed to perpetuate uni-racial schools, maintenance of dual systems of higher education, and implementation of a tuition grant system the purpose and effect of which was to frustrate public school desegregation. The court remarked that in each of these areas there was an affirmative constitutional duty upon state officials to seek means to bring about desegregation. Indeed they had a further obligation not to conceal or belittle the duties of local school officials under their jurisdiction.[10] The state officials had violated this obligation to take positive action in each area and instead had exercised state authority to perpetuate segregation. On the basis of these violations, the district court directed the state officials to adopt a uniform statewide plan for school desegregation, applicable to each district in the state not under current court order. This remedy

10. "It should be noted that one of the most illegal methods adopted by these defendants to impede desegregation on a local level is that they have consistently attempted to obscure the fact that local school authorities have a federal constitutional duty to desegregate their school systems totally, notwithstanding whether a particular system is under a court order or whether that school system agrees to comply with the requirements of the Department of Health, Education and Welfare of the United States." Lee v. Macon Co. Bd. of Ed., *supra*, at 475.

98

included provisions among others, governing the assignment of students and faculty. As means of relief from prior violations, these requirements were legally proper, despite that the state authorities may have lacked specific authorization under state law to prescribe attendance rules or assign teachers. Moreover, the defendants there in fact had the necessary power to achieve these ends:

> It cannot seriously be contended that the defendants do not have the authority and control necessary to accomplish this result. Certainly the possibility of losing state funds for failure to abide by and implement the minimum constitutional requirements for school desegregation which this opinion and the accompanying decree require will, without any doubt, effect compliance. *Id.,* 478.

The Fifth Circuit has recognized implicitly in another case that the central educational authority of the state may be subjected to court orders for purposes of relief, that is to aid in preparing desegregation plans in cooperation with local agencies. United States v. Texas Education Agency, 431 F.2d 1313 (5th Cir. 1970).

Our own Court of Appeals has stated that, upon a proper showing of the existence of continuing *de jure* segregation, statewide educational officials may be directed, if the remedy is deemed appropriate, to withhold state funds from segregated local systems. Smith v. North Carolina State Board of Education, 444 F.2d 6 (4th Cir., 1971). That decision vacated an order, to be sure, directed against state officials, but only in a case where the defendants were not shown to have contributed to any existing segregation nor to have the authority acting alone to remedy it, and where those allegedly responsible for the maintenance of segregation were not parties.

Godwin v. Johnston County Board of Education, 301 F.Supp. 1339 (E.D.N.C. 1969), cited with approval in *Smith,* also supports the principle of the affirmative obligation of central educational administrators to dismantle a dual school system:

> These defendants urge that the Court impose a duty upon the local school board, an agency which is furthest removed from the seat of sovereignty and at the same time to insulate the State Board of Education and the State Superintendent of Public Instruction from a similar constitutional duty and obligation. Such a distinction makes no sense in logic, frustrates rather than promotes the Supreme Court's mandate that the public schools be desegregated "now" and is without support in the law. *Id.,* 1341.

The *Godwin* court relied on state statutory authority similar to that conferred by Virginia law to establish the central officials' power to act. It also took note of a history of unconstitutional centrally administered programs in the state, including relief from compulsory school attendance, tuition grants, and school closing provisions. The court did not deem it dispositive of the central authorities' duty, however, that they might actively have pursued discriminatory policies:

> Proof of these allegations, if there be any, might well be relevant as to the kind of relief to be afforded, if any be required. Whether or not the State Board of State Superintendent has actively discriminated does not affect their burden to actively seek the desegregation of the public schools in North Carolina. In this case the burden rests upon these defendants, as well as upon the local school board "to come forward with a plan that promises realistically to work, and promises realistically to work now." Green v. School Board of New Kent County, *supra* [391 U.S.] at 439, [88 S.Ct. 1689, 20 L.Ed.2d 716]. *Id.,* 1343.

### School Divisions

Before determining whether the existing city-county lines now used as school attendance boundaries possess any educational or administrative virtue save that of "natural" coincidence, the Court

deems it appropriate to attempt an analysis of the manner in which the State's central educational authorities have administered Virginia's system of school divisions. Governing bodies and school boards of existing school divisions by State law have been empowered to control to a significant extent the attendance areas within which residents of neighboring political subdivisions may be assigned.

Prior to 1971, under State law it was within the power of the school board and governing body of a city or county, along with the State Board of Education, to determine whether a consolidated school division, operating under a single school board, should be established for it and another political subdivision. Va.Code § 22-100.2 (1969 Repl. vol.). Under prior law the State Board could create a combined school division comprising more than one political subdivision without any statutory requirement of local consent. As these general and the more specific findings of fact indicate, in practice single division status centrally decreed has been highly conducive to the initiation of cooperative arrangements authorized under other provisions of State law for the operation of joint schools or education by contract, under which attendance areas are expanded beyond political subdivision lines. State Board policy pronouncements no doubt strongly encouraged the adoption of such forms, but local cooperation seems to have been essential, given the limited amount of pressure that the State Board has usually applied.

██ ██ Under current law the creation by the State Board of a single school division comprising more than one political subdivision automatically calls for the establishment of a consolidated administrative structure. Va.Code § 22-100.1 (1971 Cum.Supp.). Thus the State Board, empowered to divide the state into school divisions, may determine the bounds of attendance areas. What was given with one hand was taken away and more by the other, however. New Va. Code § 22-30, enacted since the joinder of state and county defendants in this case, bars the State Board of Education from creating school divisions composed of more than a single city or county without the consent of the local school boards and governing bodies.[11] No longer does the State Board possess the authority even to decree single division status for an area under the administration of two school boards. Authority to prescribe the bounds of the unit of school administration within which a child in a neighboring area may be assigned is therefore placed in part in the hands of local officials. Because courts recognize that the power to describe units of administration may well work to retard integration, its use is subject to judicial scrutiny. Wright v. Council of City of Emporia, 4 Cir., 442 F.2d 570, 572. To the extent that the State has delegated to local officials the power to determine the bounds of administrative units within the state, those local personnel must exercise their powers consistent with State's constitutional obligations.

### City-County Lines

If the city-county lines as attendance zone lines were drawn today by the State, it is extremely doubtful that they could withstand constitutional challenge. Cf. United States v. Board of Education, Independent School District No. 1, Tulsa County, *supra*. In view of the range of alternatives embraced by Virginia law to the organization of school attendance districts along strict political subdivision lines, in view of the past practices which show them far from inviolate, in view of the governmental acts, including those of state and local school officials, and private segregatory actions which have contained blacks on one side of the city

---

11. The prior Va.Code § 22-30 read as follows: "The State Board shall divide the State into appropriate school divisions, in the discretion of the Board, comprising not less than one county or city each, but no county or city shall be divided in the formation of such division."

line, and in view of the drastic effect on racial proportions of such bounds, the lines would fall as racially motivated. Furthermore, the lines in fact are newly drawn. For the State Board, pursuant to § 22–30, in 1971, declared Richmond, Henrico, and Chesterfield to be separate school divisions.

In reality, however, that action was no more than another in a series which perpetuated existing conditions; it illustrates the circumstance that under earlier self-imposed state custom, and now under state statute, relief of segregation in Richmond is dependent upon the compliance of neighboring jurisdictions as well as the State's central office. There is, by contrast with Wright v. Emporia, *supra,* no one instance of separation which one can examine to determine its legality. But there is no necessity that there be any one determinable moment when an act was performed which one can call illegal in order for the Court to determine that a merger of, or cooperative assignments between, school divisions is an appropriate and necessary remedy for the maintenance by State officials over generations of a dual school system in each of the areas involved. In the *Haney* and *Texas* cases,[12] similar orders were addressed to officials whose sole defaults were the maintenance of district boundaries which tended to perpetuate the dual system.

When a Board of Education has contributed and played a major role in the development and growth of a segregated situation, the Board is guilty of *de jure* segregation. The fact that such came slowly and surreptitiously rather than by legislative pronouncement makes the situation no less evil. Davis v. School District of City of Pontiac, *supra,* 309 F.Supp. at 742.

Here long years of maintenance of the dual system, many subsequent to formal legal declaration of its invalidity, massive and effective state-managed efforts to oppose desegregation under free choice assignment plans which caused more and more facilities in the area to become segregated by a process of white withdrawal and black occupation, have, together with forces heretofore discussed containing blacks in the city, produced a community school system divided into racially identifiable sectors by political boundaries. The problem has intensified with passing years, but its growth has been foreseeable, and all officials were well advised of its coming. At present the disparities are so great that the only remedy promising of immediate success—not to speak of stable solutions—involves crossing these lines.

### Racial Hostility

Rejection of such a solution by the county and state defendants is explicable principally in terms of racial hostility. Opposition to desegregation in the counties has been the historical pattern to the present date. State officials have been guilty of encouraging or condoning such sentiment. County officials have publicly disclaimed any obligation to play an effective role in the desegregation of schools in the area and declared their opposition to effective desegregation and disapproval of Supreme Court rulings setting forth the law of the land on the subject. Considering the historic flexibility of political subdivisions in the state and in this area in matters of pupil exchange across political boundaries and in the cooperative operation of other public utilities, in view of the several statutory patterns—part of the public policy of the state—under which cooperative ventures can be undertaken, and in view of the fact that school operation in the counties has always entailed transportation times and distances similar to those involved in the suggested metropolitan plan, resistance to the proposal appears clearly to be racially based.

Just as the City's geographic borders, viewed as limits upon pupil assignment,

12. Haney v. Bd. of Education of Sevier County, *supra* (8th Cir. 1969) ; U. S. v. Texas, 321 F.Supp. 1043 (E.D.Texas 1970).

do not correspond to any real physical obstacles, so also are they unrelated to any marked practical or administrative necessities of school operation. The boundaries of Richmond are less than eternal monuments to a city planner's vision. They have changed several times over the years with annexations, the latest as recent as 1970. Indeed historically all of the city has been created from the two counties. These additions have not, however, encompassed sufficient territory so that the racial identifiability of school facilities in the area could be eliminated by desegregation within existing political lines. The growth of the black and white population and their relative movement have advanced far faster than the city proper has expanded. In the meantime segregation has gone unrelieved, and the number of identifiably black schools in the city has increased, as official school segregation and housing segregation fostered each other and caused the areas of black housing to expand within the city to its borders by a process of accretion.

 The Constitution is violated by segregatory acts even though they were taken by officials responding to the wishes of their constituents, as they saw them. Community resistance to change affords no legal basis for the perpetuation of racial segregation. Monroe v. Board of Commissioners, Jackson, Tenn., *supra* (1968); United States v. School District 151 of Cook County, *supra*, 1133; Northcross v. Board of Education of City of Memphis, 333 F.2d 661 (6th Cir. 1964); Bradley v. Milliken, *supra*, 338 F.Supp. at 593; Johnson v. San Francisco Unified School District, *supra*, 339 F.Supp. at 1341. The consideration by officials of community reaction to desegregation is improper in formulating school zone lines:

> Where the Board is under compulsion to desegregate the schools (1st Brown case, Brown v. Board of Education of Topeka, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873] . . .) we do not think that drawing zone lines in such a manner as to disturb the people as

little as possible is a proper factor in rezoning the schools. Northcross v. Board of Education of City of Memphis, *supra*.

The evidence here indicates that a primary consideration in the refusal of county officials to establish cooperative school operation with Richmond has been their own concurrence with perceived constituents' opposition to integration efforts, which one county official termed "unamerican." This is not a legally cognizable objection.

Such an attitude is wholly at odds with considerations of one's affirmative obligation to exercise state-conferred powers affecting school administration so as to promote that end. The state and county officials equipped to alter the limits of attendance units unquestionably have that duty, their conduct affecting deeply the educational interests of many thousands of our youth and constitutional rights of the plaintiffs. Yet they have refused to act. Such conduct is the more iniquitous when one considers that there is under the law a positive mandate charging the State with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch. Green v. County School Bd. of New Kent County, *supra*.

### Pursuit of Segregatory Policies

 The fostering of segregation consists not solely of an invidious intention or racial hostility, on the part of certain officials, however. It is also inferable from the knowing pursuit of policies which cannot but produce racial separation. Johnson v. San Francisco Unified School District, *supra*. An official preference for a mode of school organization less effective than other choices in eliminating segregation gives rise to an inference of discriminatory intention. Brewer v. School Board of City of Norfolk, *supra*. The adherence to a zone system promoting segregation carries with it a logical presumption of the purpose to segregate. Spangler v.

Pasadena City Board of Education, *supra*, 311 F.Supp. 522. A consistent course of conduct producing segregatory results supports an inference that the outcome was intended. Davis v. School District of Pontiac, *supra*, 443 F.2d at 576: School officials in Virginia cannot plead ignorance of the crucial role race plays in education. When their acts perpetuate segregation or by new devices create it anew, their legality will be gauged by their natural, probable, and foreseeable effect. Bradley v. Milliken, *supra*, 338 F.Supp. 582 at 588.

Among all those in power there has been actual knowledge of the intensifying patterns of segregation in the Richmond area, and officials have been advised by studies and expert recommendations of the need to take steps to forestall its adverse impact.[13] This Court is not alone in inferring discriminatory intention from rejection of the advice of internal and external studies. Bradley v. Milliken, *supra*, 338 F.Supp. 582 at 589; Johnson v. San Francisco Unified School District, *supra*, 339 F.Supp. at 1318 (1971); Spangler v. Pasadena City Board of Education, *supra*, 311 F.Supp. 510–511; Davis v. School District of City of Pontiac, *supra*, 309 F.Supp. at 737.

Norris v. State Council of Higher Education, 327 F.Supp. 1368 (E.D. Va. 1971), aff'd Board of Visitors of College of William and Mary v. Norris, 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971), squarely supports the duty of one state institution to act so as not to obstruct the efforts of another to fulfill its constitutional duty to desegregate. There this Court enjoined the enlargement of a predominantly white junior college to four-year status when, were it expanded, it would compete for white students with a nearby black institution, thereby perpetuating segregation.

■ The State cannot escape its constitutional obligations by relinquishing or delegating to local officials the authority to discriminate, nor can it escape such obligations by dividing such power between them and others of statewide authority. It is axiomatic that if the power to violate constitutional rights cannot be conferred on a faceless electoral majority,[14] it cannot with impunity be placed upon local elective or appointive bodies.

Nor can local option enabling statutes be used as vehicles for the infringement of constitutional rights. Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Hall v. St. Helena Parish School Board, 197 F.Supp. 649 (E.D.La.1961), aff'd 5 Cir., 287 F.2d 376 and 368 U.S. 515, 82 S.Ct. 529, 7 L. Ed.2d 521.

■ The power conferred by state law on central and local officials to determine the shape of school attendance units cannot be employed, as it has been here, for the purpose and with the effect of sealing off white enclaves of a racial composition more appealing to the local electorate and obstructing the desegre-

---

13. In 1969 a retiring member of the State Board of Education, after eight years of service, placed in the minutes of the Board his sentiments on the future of public education, calling to the Board's particular attention the need for action to assist racial minorities: "A child may be disadvantaged for various reasons, but the term is generally used in relation to the urban and minority group crisis which so perplexes our nation. Although Virginia, with its smaller cities, has less of a problem than many other states, we do have serious imbalances which cause deep concern. In our larger metropolitan areas there are income deficiencies and a racial mix which result in serious educational disadvantages. The injustice, as well as the potentially disastrous social consequences of this situation, have prompted action by government at all levels as well as the private segment of our communities. There is no longer any debate as to the need for vigorous action to right this educational imbalance."

14. Lucas, et al. v. Forty-Fourth General Assembly of Colorado, 377 U.S. 713, n. 30, 737, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Bradley v. Milliken, *supra*.

gation of schools. The equal protection clause has required far greater inroads on local government structure than the relief sought here, which is attainable without deviating from state statutory forms. Compare Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Serrano v. Priest, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971).

In any case, if political boundaries amount to insuperable obstacles to desegregation because of structural reasons, such obstacles are self-imposed. Political subdivision lines are creations of the state itself, after all.

> [T]hey have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions. As stated by the Court in Hunter v. City of Pittsburgh, 207 U.S. 161, 178 [28 S. Ct. 40, 52 L.Ed. 151], these governmental units are "created as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them," and the "number, nature, and duration of the powers conferred upon [them] . . . and the territory over which they shall be exercised rests in the absolute discretion of the State." Reynolds v. Sims, supra, at 575, 84 S.Ct. at 1388.

Reynolds and its companion cases establish that denials of equal protection may not be justified by reference to the needs of a system of subordinate political entities, themselves the products of state action. A later case concerning local government apportionment demonstrates that some minor deviations from the strict standard of equal voting power is permissible when a state's representation system is dependent upon political subdivisions over which legislators exercise independent administrative functions. Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971). The instant case, however, involves a much more aggravated denial of equal protection if political subdivision lines are deemed sacrosanct. More important, in contrast to the history thought relevant in Abate, past events in the metropolitan area and in Virginia betoken a willingness—indeed an enthusiasm—to disregard political boundaries when needful to serve state educational policies, among them racial segregation.

## Effects of Segregation

The findings of fact herein and in the Court's earlier opinions concerning the conduct of the School Board of the City of Richmond amply demonstrate the defendants' resistance to the mandate of Brown. Each move in the agonizingly slow process of desegregation has been taken unwillingly and under coercion. The evidence indicates as well the manifold respects in which the dual school system affects the lives of persons educated therein and the development of the society in which it exists. Some such effects will endure long after the dual system may have been abandoned. Attitudes of whites and blacks, employment, income levels, housing segregation, and the direction of urban growth are all permanently shaped by school segregation. To the extent that segregation endured past 1954, it fostered these effects by reason of the defendants' defiance of the announced constitutional mandate. The task of disestablishing the dual system may therefore be much more difficult in 1971. The defendants ought not to benefit from such self-imposed hardships.

Against this background the "desegregation" of schools within the city and the counties separately is pathetically incomplete. Not only is the elimination of racially identifiable facilities impossible of attainment, but the partial efforts taken contain the seeds of their own frustration. As before, and as courts have seen happen elsewhere and sought to prevent, racially identifiable black schools soon became almost all black; Richmond has lost about 39% of its white students in the past two years. Time and again courts have re-

jected half-measures as insufficient to fulfill school authorities' affirmative duty, well aware that otherwise the achievement will be only temporary. That school authorities may even in good faith have pursued policies leading to some desegregation and may in fact have achieved some results does not relieve them of the remainder of their affirmative obligation. Clark v. Board of Education of Little Rock School District, 426 F.2d 1035 (8th Cir. 1970). If the existing assignment program, be it by freedom of choice, a pupil placement system, residential zoning, or some combination thereof, does not, upon consideration of alternative means, work effectively to abolish the dual system, it is legally defective. Green v. County School Board of New Kent County, *supra*; Davis v. School District of City of Pontiac, *supra*, 443 F.2d at 576–577 (6th Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); Bradley v. Milliken, *supra*, 338 F.Supp. 585 (at 591).

■ The institution within the three existing school districts of something which might in some other context pass for desegregation of schools is a phenomenon dating at best from the opening of the 1971–72 school year, which took place during the trial of this case. Prior thereto each system was in some respect nonunitary, and the Court is not fully advised as to the current status of the county system. Even were each existing system, considered in a vacuum, as it were, to be legally now unitary within itself, the question still remains whether a state policy having the effect of preventing further desegregation and foreseeably frustrating that which has been accomplished to date may be imposed upon a very recently achieved desegregated situation. Momentary unitary status—assuming it existed here, which has not been shown—will not insulate a school division from judicial supervision to prevent the frustration of

the accomplishment. Courts require school boards to take action to prevent resegregation by various means. Lemon v. Bossier Parish School Board, 446 F.2d 911 (5th Cir., June 17, 1971). See also, Louisiana v. United States, 380 U.S. 145, 156, 85 S.Ct. 817, 823, 13 L.Ed.2d 709, where the Supreme Court in a Fourteenth and Fifteenth Amendment case concerning voting rights speaks of a "need to eradicate past evil effects and to prevent the continuation or repetition in the future of the discriminatory practices. . . ."

■ It should be borne in mind that at the very least a fair interpretation of the burden placed by law upon those who by official action have created segregated schools is to utilize official action to desegregate them, as Mr. Justice Douglas has stated, at least until the force of the early segregation policy has dissipated.[15]

As the Court has already stated, school district lines within a state are matters of political convenience. The claim that the defendant counties have a right to keep their separate systems to be utilized solely by residents of the respective counties has little merit in the face of past discriminatory practices on the part of all of the defendants. Such a contention buttressed by the historical facts of gross discrimination against the blacks in almost all aspects of life, which have in the instant case proximately resulted in the white islands surrounding the City of Richmond, simply points up the immediate need for the relief sought. "Even historically separate school districts, where shown to be created as part of a state-wide dual school system or to have cooperated together in the maintenance of such a system, have been treated as one for purposes of desegregation." Lee v. Macon County Board of Education, 448 F.2d 746, at 752 (5 Cir. 1971). The Chief Justice, speaking for the Court in *Swann, supra,* points out the need for judicial action where state

15. From opinion denying stay in Lee v. Johnson, et al., Supreme Court of the United States, 1971, 404 U.S. 1215, 92 S.Ct. 14, 30 L.Ed.2d 19 (1971).

agencies have deliberately fixed or altered demographic patterns. Such patterns as shown by the racial composition of the respective political subdivisions in this case are an inevitable result of state action.

The consolidation of the respective school systems is a first, reasonable and feasible step toward the eradication of the effects of the past unlawful discrimination. All that is required of the defendants is that they take affirmative action to maximize integration in all feasible ways to the end that there will be the immediate establishment of a unitary school system resulting, as the Court finds from the expert testimony adduced, in the opportunity for the plaintiff class to secure that to which they are constitutionally entitled—equality of education.

The Court's specific findings of fact, based almost entirely on uncontradicted evidence, amply support the relief prayed for. In the solution of the problem of school segregation, federal courts have not treated as immune from intervention the administrative structure of a state's educational system, to the extent that it affects the capacity to desegregate. Geographically or administratively independent units have been compelled to merge or to initiate or continue cooperative operation as a single system for school desegregation purposes.

Although under governing precedents special deference is due a state's decision to adopt a particular organizational structure in pursuit of quality education, where adherence to any such plan is chiefly motivated by a preference for separation of the races, courts intervene to forestall any segregatory effect. Where the effect of maintaining a given organizational structure is to prevent the achievement of a substantially greater degree of actual desegregation otherwise attainable, school administrators must justify their decision by reference to predominantly nonracial educational motives. Cases outside this circuit have addressed themselves primarily to the issue of the racial effect alone, without regard to subjective intention, of creation or maintenance of separate school systems. However, in each such case where a search for invidious motive was undertaken, it was found.

The rearrangement of district boundaries where it will cause less than complete segregation has been enjoined where it would impede or frustrate the achievement of desegregation and no substantial state interest, save the desire to continue segregation, supported the change.

In Burleson v. County Board of Election Commissioners, 308 F.Supp. 352 (E.D.Ark.) aff'd. 432 F.2d 1356 (8th Cir. 1970), the nearly all white Hardin area sought to secede from the Dollarway school district; it had been made part of that district in an earlier consolidation move prior to *Brown*. The separation attempt followed desegregation decrees addressed to the entire area, but sentiment had been building for it beforehand. The trial court found that the effect on racial proportions in the district would not be insubstantial; the black percentage would go from 55% to 57% immediately, and further white flight could be expected. The court refused to permit the division in circumstances where it was readily inferable that the process of desegregating would be made substantially more difficult by the withdrawal of the Hardin area, and the change was at least partially motivated by a desire to escape integration. Motivation, however, was not the key to the *Burleson* court's decision; the crucial factor was the impact upon an area in the process of creating a unitary school system.

In Aytch v. Mitchell, 320 F.Supp. 1372 (E.D.Ark.1971), an effort was made to divide by referendum a school district in the process of desegregation; if successful, the resulting independent districts would be nearly all black and all white. As in *Burleson*, secession sentiment had existed before a desegregation decree was filed, but came near fruition thereafter. The court determined that

the division of the district was racially motivated and, regardless of motive, would almost completely impede segregation. Because of the impact of the separation on the local authorities' duty to desegregate the schools, the change was enjoined. *Id.*, 1377.

The city of Oxford, Alabama, had had an independent school system until 1932, when its schools became part of the Calhoun County system. During the 1969–70 school year, when Calhoun County schools came under orders to develop a desegregation plan, Oxford established its own school system. Its new board of education consented to a county board proposal which entailed the receipt of blacks in its schools, raising their student bodies to about 20% black in population. The city was about 5% black. The plaintiffs suggested an alternative, involving sending some Oxford residents to formerly black schools rather than closing them. The district court ordered a zoning plan covering county and city systems, the substance of which is not here relevant.

The Fifth Circuit rejected Oxford's contention that its separate status entitled it to keep its students within city boundaries and upheld the district court's decision to treat the city and county as a single unit.

> We hold that the district court's approach was fully within its judicial discretion and was the proper way to handle the problem raised by Oxford's reinstitution of a separate city school system. The City's action removing its schools from the county system took place while the city schools, through the county board, were under court order to establish a unitary school system. The city cannot secede from the county where the effect—to say nothing of the purpose—of the secession has a substantial adverse effect on desegregation of the county school district. If this were legally permissible, there could be incorporated towns for every white neighborhood in every city. . . . . Even historically separate school districts, where shown to be created as part of a state-wide dual school system or to have cooperated together in the maintenance of such a system, have been treated as one for purposes of desegregation . . . . .
>
> School district lines within a state are matters of political convenience. It is unnecessary to decide whether long-established and racially untainted boundaries may be disregarded in dismantling school segregation. *New* boundaries cannot be drawn where they would result in less desegregation when formerly the lack of a boundary was instrumental in promoting segregation . . . . .
>
> Oxford in the past sent its black students to County Training. It cannot by drawing new boundaries disassociate itself from that school or the county system. The Oxford schools, under the court-adopted plan, supported by the city, would serve an area beyond the city limit of Oxford. Thus, the schools of Oxford would continue to be an integral part of the county school system. The students and schools of Oxford, therefore, must be considered for the purposes of this case as part of the Calhoun County school system. Lee v. Macon County Board of Education, *supra,* 448 F.2d 746 (5th Cir. 1971).

Soon thereafter another panel of the same court rejected the attempt of another Alabama city, Pleasant Grove, to create a "splinter" school district, physically within but administratively separate from Jefferson County, with the effect of thwarting the operation of a unitary school system. As in the Oxford case, no study of the motivations lying behind the separation was made; it was deemed irrelevant. Any limitation, the court said, citing North Carolina Board of Education v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971), on a school authority's discretion which worked to prevent its fulfillment of the affirmative obligation to operate a unitary system could not receive judicial recognition. Stout v. United

States, 448 F.2d 403 (5th Cir. July 1971).

One further decision by a state court established the duty of the state's Commissioner of Education to prevent nearly all white Morris Township from withdrawing its students from the secondary school in Morristown, which it surrounded and which had a substantially greater proportion of black students. The two legal entities, the New Jersey Supreme Court said, realistically constituted a single community in fact, divided by arbitrary political boundaries. Jenkins v. Township of Morris School District, 58 N.J. 483, 279 A.2d 619 (June 25, 1971). They were interdependent in most municipal services. Black residences, however, were located mainly in the town, where housing costs were lower. The town's school population was 39% black, whereas that of the township was 5% black. Nearby schools of the two jurisdictions had disparate racial enrollments, readily perceived by the community. Township students attended the high school in the town, about 14% black. If they withdrew as planned the black ratio would double immediately and continue to rise. A township referendum had supported separation rather than merger of school systems, and plans were set in motion to create a separate township high school.

The commissioner foresaw the creation of segregated school systems, but thought that he lacked the power to prevent it. The state supreme court emphasized by contrast the broad authority given the commissioner over the state's school system and the firm statutory policy against segregation. In addition the court reviewed analogous cases, such as *Haney, supra,* and Reynolds v. Sims, *supra,* rejecting as barriers to the implementation of the equal protection guarantee existing political subdivision lines:

This does not entail any general departure from the historic home rule principles and practices in our State in the field of education or elsewhere; but it does entail suitable measures of power in our State authorities for fulfillment of the educational and racial policies embodied in our State Constitution and in its enabling legislation. Surely if those policies and the views firmly expressed by this Court in Booker v. Board of Ed. of City of Plainfield Union County (45 N.J. 161, 212 A.2d 1) and now reaffirmed are to be at all meaningful, the State Commissioner must have power to cross district lines to avoid "segregation in fact" (Booker, 45 N.J. at 168, 212 A.2d 1), at least where, as here, there are no impracticalities and the concern is not with multiple communities but with a single community without visible or factually significant internal boundary separations. *Id.,* 279 A.2d at 629.

The court adverted to a state-authorized program under which students might cross such lines for valid educational purposes and noted that the districts in question had used such a system. Administrative constructions by the state's central educational authorities of this pupil-exchange statute, which narrowed its application in favor of increased local power to terminate the program, were rejected, as had been earlier self-limiting constructions by the state officials. The New Jersey court concluded that the state commissioner in law possessed the power to prevent a termination of the exchange relationship whereby township residents were educated by the town. Furthermore, in the context of a single community divided into separate school districts, he was found to have the authority, in the power to withhold state funds, to direct a merger of the existing districts into one.

Courts have in other instances as well not merely forestalled the creation of new administrative units designed to enhance segregation, but have directed the reconstitution of existing districts so as to facilitate school desegregation.

In Haney v. County Board of Education of Sevier County, *supra,* an all black and an all white school district were ordered merged. Each separate district had its genesis in consolidations occur-

ring during the pre-*Brown* era of compulsory segregation. The bounds of each were very irregular; indeed one was composed of noncontiguous sections. No explanation for the shape of the districts came to mind save one; their bounds followed patterns of residential segregation:

> It is readily apparent that the Sevier County Board of Education approved reorganization of districts along district lines which facilitated the segregated system of public education then required by Arkansas law. *Id.,* 410 F.2d 924.

The evidence showed also that after the creation of the larger, segregated districts the few blacks resident in the white district were transported into the black district for their education.

Because the districts were formed under the dual system and in order to accommodate its operations, their continuation after *Brown* carried forward the effect of that policy and could only have the effect of perpetuating segregation. The *Haney* court relied in formulating relief on the statement in *Brown, II* recognizing that the process of desegregation might well entail the modification of "school districts and attendance areas," Brown v. Board of Education of Topeka, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083, (1955). The force of the mandate to desegregate requires sometimes the sacrifice of a degree of local autonomy in the formation and operation of governmental units; otherwise a state would be enabled to "evade its constitutional responsibility by carve-outs of small units," Hall v. St. Helena Parish School Board, *supra,* aff'd 287 F.2d 376 (5th Cir. 1961).

The court directed that the districts on remand be consolidated. On a later appeal from the decree, the court of appeals held that the manner in which merger was effected would not be restricted to those mechanisms of consolidation provided under state law.

> Appellees' assertion that the District Court for the District of Arkansas is bound to adhere to Arkansas law, unless the state law violates some provision of the Constitution, is not constitutionally sound where the operation of the state law in question fails to provide the constitutional guarantee of a non-racial unitary school system. The remedial power of the federal courts under the Fourteenth Amendment is not limited by state law. Haney v. County Board of Education of Sevier County, 429 F.2d 364, 368 (8th Cir. 1970).

Thus the administrative arrangement for a combined district was ordered altered from that fixed by Arkansas law, in order to provide for equal representation from the residents of merged segments.

In United States v. Texas, 321 F.Supp. 1043 (E.D.Tex.1970), aff'd. 447 F.2d 441 (5th Cir. 1971), plaintiffs relied on the action and inaction of defendant state and local educational officials in permitting to continue intact a number of all black school districts, survivals of the era of segregation. Those officials sued were empowered to bring about consolidation of the districts in question or were engaged in supervising and supporting them from the state level by the disbursement of state and federal assistance payments.

The administrators of the black districts had

> arranged for, approved or acquiesced in an assortment of detachments and annexations of territory and student transfer and transportation arrangements which have had the effect of transferring students between administrative units so as to create and perpetuate all-black districts. *Id.,* 1048.

The state's central officials had approved these exchanges of students and financed them without giving consideration to constitutional requirements. By annexation or detachment white and black districts were kept separate. Transfer and transportation policies worked to the same end.

The court held that "separate neighboring or overlapping school districts, one black and the other white, are unconstitutional when created and maintained to perpetuate a dual school system." *Id.*, 1050. Part of the *de jure* segregation found was traceable directly to the operation of the dual system. But the court deemed equally unlawful those segregated districts which resulted when "[b]y isolating racially homogeneous residential areas into formal political enclaves, district lines drawn prior to 1954 have entrenched segregation . ." *Id.*, 1050–1051.

Liability in officials with statewide authority was found where they "participated in the continued support of administrative units which were created under color of a State law requiring separate educational facilities or, at the least, were formed without regard to Constitutional standards of equality." *Id.*, 1052. Fulfillment of their affirmative duty and that of local personnel to take such action as is necessary to eliminate the dual system could not be reconciled with continued operation of district lines which resulted in continued segregation. The court so held in the context of available state-law mechanisms for the elimination by merger of the offending districts.

State officials were required by the court to reorganize the districts with an eye to considerations of equal educational opportunity, to cease permitting local officials to carry on policies which tended to foster segregation, and to enforce these new policies with the affirmative mandate of sanctions. After later hearings on the central authority's proposed plans, they were ordered to prevent transfers of students, changes in district lines, and decisions concerning transportation, extracurricular activities, faculty assignments, student assignments, or curriculum from promoting segregation and to back their policies with denials of accreditation and of state educational funds.

In other circumstances existing racially separate administrative units have been compelled to cooperate with others of overlapping jurisdiction or with districts located nearby for the purposes of achieving faculty and student desegregation, while continuing to exist as separate units for purposes of curriculum, administration and some financing. Consideration was given solely to the effect such a system would have as part of the effort to achieve desegregation. In United States v. Crockett County Board of Education, No. 1663—Civil, mem. decis. (W.D.Tenn. May 15, 1967), seven independent school systems were directed to collaborate in order to implement a free choice plan and to desegregate faculties. In Taylor v. Coahoma County School District, 330 F.Supp. 174 (N.D.Miss. Feb. 12, 1971), separate state agencies operating racially identifiable high schools were ordered to act jointly as one board to desegregate the faculties of each by reassignment between the two facilities and to accept students from within the county on the basis of geographic zones. The existence of separate legal entities for administration was held legally insufficient to frustrate required desegregation of the facilities.

In Robinson v. Shelby County Board of Education, 330 F.Supp. 837 (W.D. Tenn.1971), the district court ordered the joinder as defendant of the Memphis City School Board in order to desegregate county schools by pairing with a facility in the city system.

Further support for a court order directing the elimination of racially identifiable schools by means of cooperation between or consolidation of formerly separate divisions of a state's school system within a metropolitan area is given by United States v. Board of School Commissioners of the City of Indianapolis, *supra*. As in other jurisdictions the public schools in Indiana constituted a centrally operated state system. Moreover, several state agencies had historically pursued policies of repression toward blacks. Housing segregation enforced by private practices and state agencies was common through the years; as a result black housing reflected a pattern of

containment. Schools, too, had historically been segregated, although a 1949 statute had apparently ordered the gradual abandonment of that policy. The Indianapolis board, however, by construction and assignment policies deliberately preserved racial separation. Zone lines were imposed on known segregated neighborhoods. In 1954 and in 1968 the outlines of the dual system of 1949 were still clearly visible, maintained by a great variety of manipulative techniques. As a result in 1968 a great number of identifiably black schools existed, and in a system with a 36% black student body, 88.2% of black elementary students were in majority black schools.

From 1954 through 1970 the black proportion of the district's population had expanded rapidly, whereas the expansion of white population took place primarily in Marion County outside the district. New areas of black housing grew primarily contiguously to existing black housing in the city's core. Changes in housing racial composition of various areas were rapidly followed by dramatic changes in the composition of local schools. In some instances the changes in housing patterns could be traced directly to the location of public housing projects.

Furthermore, the state legislature had by special enactment frozen the size for practical purposes of the Indianapolis school district, while permitting the city to expand for other purposes. Recently the government of the city and Marion County had been merged for all purposes except school operation. Left separate from the Indianapolis school system were ten school units within Marion County, which units collectively had a school population of 73,205, 2.62% black.

The court therefore foresaw a process of accelerating advance of identifiably black schools, as resegregation took place in schools on the fringe of expanding black neighborhoods.

> [And] the entire central core of the involved city develops into a virtually all-Negro city within a city when, as in Indianapolis, the Negro residential area is largely confined to a portion of the central city in the first place. Id., 332 F.Supp. at 676.

Given the ability and inclination of whites to depart the jurisdiction of the defendants, and the likelihood that attempts to eliminate existing segregation within that restricted area would succeed only briefly, to be followed by resegregation, the court determined to consider exercising its broad equity powers to find a more lasting remedy. Nearby municipal and school corporations were joined as defendants in order to litigate the legality of their exclusion from the city system by special legislation and the necessity in any case of creating a metropolitan school district in order to relieve *de jure* segregation in the city.

Other courts have indicated that a modification of school district lines, including a consolidation of existing units, might be appropriate purely as a matter of relief from state-imposed school desegregation. In Calhoun v. Cook, 332 F.Supp. 804 (N.D.Ga., July 28, 1971), the district court discussed at length the history of efforts to achieve the final desegregation of the dual system in Atlanta. During the pendency of the lawsuit the city's school racial proportions had shifted from 70% white to 70% black and the system's enrollment fell from 115,000 to 100,000 pupils. In 1970 the system lost 7,000 white pupils and gained 1,000 blacks. Areas of black housing shifted outward from the center over the years, thirty-four schools, some built since 1961, located along the line dividing zones of white and black residency in an effort to foster integration, rapidly converted to all black occupancy. Twenty-nine schools built to serve federally funded housing were by 1971 mainly black.

The court attributed the failure to achieve lasting integration to housing segregation, but, in the absence of evidence to the contrary, determined that this was beyond official control.

In the absence of adequate facilities to implement a large-scale transportation plan, the court placed its hopes on a ma-

jority-minority transfer plan. Desegregation of each facility through transportation, the court feared, would only result in an accelerated departure of whites and the creation of an all-black school system; the very result *Brown* condemned. The court declined to order substantial further relief. As a result, of 152 schools, only 38 were left with student bodies made up of less than 90% of one race or another.

However, in a final section styled "Comment" the court noted that no serious attention had been given to the possibility of consolidating the city system with the independent one of Fulton County, in which Atlanta lies in part:

In terms of efficiency, taxes, and quality education, such consolidations normally produce long-range improvements. In terms of the current problem, such consolidation might produce partial, even though not perfect, solutions. Certainly for many reasons connected with this case, this one aspect ought to be studied without delay. *Id.*, 332 F.Supp. 809.

The Court of Appeals for the Fifth Circuit reversed, directing the lower court to consider the merits of a desegregation plan being prepared by the plaintiffs. It further directed the district court to enter supplementary findings of fact and conclusions of law on the proposal to consolidate the city and county systems outlined in the lower court's "comment." Calhoun v. Cook, 451 F.2d 583 (5th Cir., 1971).

In Bradley v. Milliken, *supra*, the district court determined that state-imposed segregation existed in the Detroit schools. Public and private racial discrimination had created a pattern of complete racial segregation in housing throughout the city. On this matrix the school authorities had superimposed an attendance zone system managed in several respects in order to promote racial separation. The state's central school administrators, further, had withheld funds which might have been used to break up the patterns of racial separation, and the state legislature had at-tempted to block a voluntary city desegregation plan.

In its legal conclusions the district court stressed that the obligations imposed by the Fourteenth Amendment fall upon the state and observed that Michigan's central educational administrators have extensive powers over the state's educational system, including that of school district reorganization, and that state law provided mechanisms for annexation and consolidation of school districts. The court did not direct the joinder of further school districts as parties, however, pending submission of proposed desegregation plans by local and state officials.

Thus in the Oxford and Pleasant Grove cases, in *Jenkins,* and in *Crockett County,* the achievement of desegregation and the prevention of resegregation were found to override state policies which might embody a preference for school attendance within the district of residence. At the same time courts did not consider the policy of parental control over their children's schooling of such telling importance as to require, necessarily, the abandonment of separate districts as financing and administrative units; that question might be resolved as the state officials and their constituents might wish. In *Haney, Texas,* and *Burleson,* however, consolidation or maintenance of unified status was considered the appropriate remedy.

Our Court of Appeals recently decided three "splinter" district cases: Wright v. Council of the City of Emporia, *supra;* United States v. Scotland Neck City Board of Education, 442 F.2d 575 (4th Cir. 1971); and Turner v. Littleton-Lake Gaston School District, 442 F.2d 584 (4th Cir. 1971). In two of the three cases the court upheld the creation of a new, smaller district of higher white percentage than the area from which it was taken.

 The rule which the Court adopted and by which the Court is presently bound, requires a two-level analysis. If the new area's population is sufficiently different in composition from that of

the parent district to support an inference of an aim to perpetuate segregation, the change should be enjoined. If no such drastic change takes place, the Court must fully analyze the circumstances to determine whether the paramount motive for the realignment is to preserve segregation, or is related to valid non-racial educational goals.[16]

In each instance of the three the new, small district had a student body about half black and half white. In *Emporia* the larger district changed from 66% to 72% black; in *Scotland Neck* from 77% to 80% black; in *Littleton-Lake Gaston* from 67% black to 72.5% black. In each case the change was assertedly made for the sake of providing better financing for the education of pupils in the withdrawn area. However, in *Littleton-Lake Gaston* the trial court found no such purpose in fact. Furthermore, in that case, the school district boundaries followed no pre-existing political boundaries which might have been deemed "natural" and free from segregatory intention. Finally, the legislative history of the bill creating the *Littleton-Lake Gaston* district betrayed such a discriminatory purpose. The last secession therefore was enjoined.

In both *Emporia* and *Scotland Neck* the Fourth Circuit relied in particular upon the innocent nature of pre-existing city boundaries as barriers which might legitimately be defended as the limits of assignment zones for small areas for which the state concededly had not yet succeeded in operating unitary school systems. The finding of nonracial purpose in creating and maintaining such zones appears greatly to have hinged upon this factor, which entails a number of unstated assumptions.

Before exploring those points, however, the Court reverts to the first stage of analysis: Does the effect alone of the lines' maintenance as assignment barriers support an inference of racial motivation? In the metropolitan area of Richmond the impact of the maintenance of school division lines is much greater than in the three earlier cases. The city system's racial composition would shift from over 65% black to about 33% black were a merger or other cooperative assignment plan adopted. The county systems at present are about 10% black; merger would more than triple this proportion. The evidence shows as well a history of county resistance to desegregation and to the aims of this lawsuit on racial grounds. This in fact is the attitude of those in the county and state hierarchies who have the power to permit or prevent consolidation.

That the dual level test of legality is applicable to mergers as well as secessions is illustrated by the citation in *Emporia* to *Haney*. The ample evidence that the Richmond area schools were maintained in segregated status as the city's black population grew, contained by private and public forces within the boundaries of the city as the area expanded, demonstrates that in this case the boundaries of the city in relation to the community have been maintained by state action in such a manner as to include much the greater part of the black population of the area. Brewer v. School Board of City of Norfolk, *supra*. On the primary analysis, therefore, an intention to preserve segregation or minimize desegregation is shown.

But further analysis indicates the speciousness of the conclusion that separate city or county status carries with it an explanation for the desire to remain separate for school attendance purposes. The record in this case, unlike that in *Emporia*, contains substantial evidence concerning the regard in which the State of Virginia and its central and local officials have held such political boundaries. Never until recent history have

---

16. The judgment of this Court in the *Emporia* case was reversed by the U.S. Court of Appeals for the Fourth Circuit. This Court found the motives of city officials to be mixed, but concluded that the question of motive was not controlling and enjoined the City from operating a separate school system. The case is now before the Supreme Court of the United States, as is the *Scotland Neck* case.

such boundaries been deemed barriers to student assignment. The separateness of political subdivisions as units of school administration might well be thought built upon a desire to preserve funds locally raised for the education of children of the locality [17] and to maintain for parents of the subdivision a voice in the administration of their children's schools. Thus it might be thought that the retention of school divisions coincident with political subdivisions indicated a dominant purpose to serve such goals.

Yet in fact throughout the state and in the Richmond area political subdivision lines have been ignored when necessary to serve public educational policies, including segregation. State law has permitted, encouraged, and even compelled such practices. Henrico and Chesterfield school authorities through the years have employed some tuition arrangements whereby their students were educated elsewhere and have unhesitatingly explored others. All three jurisdictions, of course, participated in the tuition grant and pupil scholarship programs. All three jurisdictions continue to engage in the operation of specialized joint programs.

Cooperative activities—voluntary and centrally imposed—have gone on in what is in practical terms a single community. The political subdivision lines have no significance by educational standards and have been ignored on several occasions to serve the ends of segregation. Such was the similar case in *Haney, Texas,* and the *Oxford* case, where merger or the disregard of district lines was ordered.

It is essentially a state-created system of local government of schools which is offered up as a justification for maintenance of separate attendance areas. The asserted fixed policy of retaining political subdivisions as units of assignment does not exist, upon examination. The interests served by the policy favoring local control time and again have been sacrificed to other educational ends. It is significant that in this case the School Board of the City of Richmond, which must well know the necessity *vel non* of separate operation for purposes such as financing and curriculum control, fully supports the plaintiffs' prayer for combined operation. Moreover, the reality of defendants' objections fades when one considers that urban government experts have studied the area extensively, noted the intensity of the prevailing segregation, and recommended a cooperative solution.

██ From the insubstantiality of nonracial reasons for adhering to political subdivision boundaries as attendance limits, the Court infers that insistence on such a policy must be predicated on its known racial effects. A purposeful, centrally compelled policy of segregation persisted in Virginia for many years; its effects endure today and affect the racial characteristics of the schools. Its abandonment has been gradual, piecemeal, and intentionally reluctant and is less than total today. No administrator can plead ignorance of these facts. At the same time, by means of repeated internal and outside surveys, reports, and recommendations, the magnitude of the problems of the depth of discrimination and its impact and the means to begin to alleviate it were presented to official bodies with the power to act. When their response was inaction or even contrary steps, it cannot be said that they acted without the intention of infringing constitutional rights. Informed of the consequences of past discrimination, they knowingly renewed or entrenched it. "[I]t was action taken with knowledge of the consequences, and the consequences were not merely possible, they were substantially certain. Under such conditions the action is unquestionably wilful." Keyes v. School District Number One, Denver, Colorado, 303 F.Supp. 279 (D.Colo.1969); see, Bradley v. Milliken, *supra*; Spangler v. Pasadena City Board of Education, *supra*; Davis v. School Board of City of Pontiac, *supra*.

17. See Serrano, et al. v. Priest, *supra*, (Supreme Court of Calif.).

**114**

### Need For Immediate Decree

That the constitutional rights of the plaintiff class cannot be subverted by the maintenance or desire to preserve county or city boundary lines is obvious. As the Court has pointed out, the maintenance of such lines has never been an impediment when used or maintained to subvert constitutional rights. See Sims v. Amos, 336 F.Supp. 924 (M.D. N.Div. Ala. 1972).

Not only is meaningful integration in a bi-racial community, such as we have here, essential to equality of educational opportunity, but it is required by the Constitution of the United States.

Public education, in this day and time, is perhaps the most important function of state and local governments. See, *Brown I, supra,* 347 U.S. p. 493, 74 S.Ct. 686.

In 1868 the Fourteenth Amendment to the Constitution was adopted. The purpose of the adoption of the Fourteenth Amendment, coupled with the Thirteenth and Fifteenth, was to remove the race line from our governmental systems. In effect, these amendments affirmatively required "that the law in the states shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the states, and in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color." See dissenting opinion, Plessy v. Ferguson, 163 U.S. 537, at 556, 16 S.Ct. 1138, 1145, 41 L.Ed. 256 (1896).

The basis of all prior decisions in school cases, at least since McLaurin v. Oklahoma State Regents, *supra,* and Sweatt v. Painter, *supra,* is that dual school systems are impermissible for they cannot provide equal protection of the laws. The principles enunciated in *Sweatt* and *McLaurin* were said by the Chief Justice in *Brown I, supra,* 347 U.S. p. 494, 74 S.Ct. 686, 691, to apply with added force to children in grade and high schools. The Court spoke of "those qualities which are incapable of objective measurement . . . . ."

Here, the educational experts in whom the Court has confidence point out that the plaintiff class, by reason of the acts of the defendants, or in some instances the failure of acts on the part of the defendants, are handicapped in their pursuit of education. The quest for equality of educational opportunity for Negroes has been going on for these many years without complete fruition, which is all the more grievous when one examines the clear and cogent language of the Fourteenth Amendment to the Constitution of the United States and the pronouncements of the Supreme Court from as early as 1938.[17a] The very purpose of the Fourteenth Amendment was to do away with discrimination between our citizens, and especially in those matters which are of fundamental interest.

The overwhelming evidence before this Court is to the effect that in a bi-racial community, as here, meaningful integration is an essential element of securing equality of education.

An analysis of the testimony of those experts who were called on behalf of the defendants shows that the primary objection arose from a fear engendered by the obvious need for financial stability. Indeed one witness, Dr. Hooker, upon being asked, "What is the importance to the maintenance of the high-calibre school division or school system of consistent financial support?", answered, "Well, everything depends on it." As the Court has previously pointed out, financing has not been an obstacle when consolidation of school systems was desired, nor is it anticipated to be so in this case.[17b]

---

17a. See Missouri ex rel Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 356, 83 L.Ed. 437 (1938)

17b. See Serrano v. Priest, *supra,* and Rodriguez v. San Antonio Independent School District, 337 F.Supp. 280 (W.D.Tex., Dec. 23, 1971).

If there is to be public education it must, under the Constitution, be afforded to all on an equal basis.

It is indeed a sad commentary that by reason of the tenacity with which state and local officials have clung to the ways of the past in an effort to keep the races apart in one of the most important functoins of government, i. e. the education of our children, that thousands and thousands of words have been written in judicial literature, when to this Court the following language, interpreted in the manner in which it was intended to be interpreted, that is giving effect to the ordinary meaning of the language contained therein, bespeaks it all:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. Section I, Fourteenth Amendment to the Constitution of the United States.

While the Court has concluded that under the circumstances existing the work of Dr. Little in formulating the Metropolitan Plan was exceptional, the Court is likewise satisfied that with the cooperative efforts of the other educators within the proposed Metropolitan Plan, perhaps an even better plan will emerge.

The Court feels it necessary, however, not to await any proposed modifications, but to order the plan to be implemented to the end that a metropolitan school system will be in effect for the commencement of schools in September 1972.

History shows that it is only since the mandate of *Green* that there has been any discernible response in Virginia to the eradicating of unitary school systems. In most instances any action taken has been done under threat of financial loss or court action.

We have, in the instant case, a situation wherein one of the witnesses has already been subjected to abuse, a political leader who speaks of revolt, another school administrator who by his suggestion that we would be better off if we could forget the past evidences to the Court a lack of understanding that the present is simply a culmination of the past and, unless affirmative action is taken, a prophesy of the future.

While the president of the State Board has recommended consolidation as a solution of some of the problems faced by smaller school districts, and while he was willing to endorse integration as a desirable educational goal, his endorsement was tempered to the extent that this should be done so long as it is not, in his terms, "disruptive." In addition he added the proviso that it should have the support of the community at large. He, as well as the political leader who gave voice to suggestions of revolt, may well have, in their views, been responsive to the community. It is the Court's view that the burden will be lessened somewhat on all of the defendants, at least insofar as they are concerned with what they perceive to be the community response, if the actions taken in implementing the Metropolitan Plan are done so by mandate of this Court. Indeed the Court decrees it its duty and responsibility to so do.

It should be pointed out that the Court in considering the testimony of the experts gives greater weight to those experts whose opinions were to the effect that equality of educational opportunity would flow from the consolidation of schools in the metropolitan area, and that the proposed plan is both reasonable and feasible, than to the testimony of those whose opinions differ. In considering the weight to be given to the testimony of all of the witnesses, the Court has considered their qualifications, experience, interest or lack of same in the outcome of the litigation, their bias if any, as well as their actions upon the witness stand, and the weight and process of the reasoning by which they sup-

ported their respective opinions and testimony, and all other matters which served to illuminate their statements.

The Court makes the following additional findings of fact as supplemental to its general findings of fact heretofore stated.

### State Involvement

The general supervision of the school system of the State of Virginia is vested in the State Board of Education, which has the power to adopt by-laws for its own government and to make necessary rules and regulations for the management and conduct of schools not inconsistent with law. Va.Code, § 22–11, 22–19 (1971 Cum.Supp.)

The State Board of Education establishes by regulation the duties and powers of division superintendents.

If a local school division delays beyond a certain date in appointing a superintendent, the State Board intervenes and appoints one. On May 23, 1969, the Board appointed superintendents in Chesterfield, Fairfax, and Prince Edward Counties, and the City of Colonial Heights.

The State of Virginia is divided into school divisions which report achievement test scores of their respective pupils to the Board.

The State Board establishes standards of teacher certification and precludes any school division from employing a teacher without such a certification, save when exceptions to the overall rules are made to meet emergencies. The control of that situation rests with the State Board. That Board maintains a list of personnel eligible to be appointed as division superintendents, and has taken action to do so where local school divisions have delayed such appointments.

For the school year 1941–42 the Board issued regulations reference state funds to school divisions paying salaries to supervisors of instruction and directors of instruction in black and white schools.

In the early 1940's the State Superintendent of Public Instruction partici-

pated in the creation of specialized libraries for black schools, supported in part by local contributions, private funds, and state appropriations.

The Board in 1949 authorized a contract for purposes of providing medical and dental training for black Virginia residents. The quota for the state was not to exceed 24 students per year.

At least for the last thirty years the State Superintendent has issued memoranda to division superintendents setting forth in detail changes in state law concerning the operation of schools. The State Board has considered and endorsed proposed changes in the school laws of the state. It has conducted through its various officials conferences for school principals. In 1962 such conferences were held, the theme of which was "Today's Challenges in Secondary Education." White secondary school principals were to meet in one section of the state and Negro secondary school principals in another.

The state compulsory attendance law became effective June 28, 1968. On July 17, 1968, division superintendents were advised of this change in the law by Superintendent's Memorandum. On February 13, 1959, the Assistant Superintendent of Public Instruction advised division superintendents of emergency school legislation passed in the recently concluded January 1959 special session of the General Assembly. These included the repeal of compulsory attendance law and the provision for tuition grants.

Regional meetings for certain teachers and conferences have been held under the auspices of the State Department of Education and have been segregated by race.

At least through 1966 the State Board administered scholarships financed by an endowment providing that the income from which was to be used in awarding scholarships to worthy white male students, born in Virginia and residents of Virginia, to attend colleges. A member of a three-man committee for regional scholarships concerning the awarding of

said scholarships was the then Division Superintendent of Schools from Chesterfield County.

School boards are required to report recommendations to the State Board of those extra-curricular activities which they believe should be carried on in the schools.

The State Board's finance committee has exercised its authority to grant from its discretionary fund sums of money to Prince Edward County upon the reestablishment of a public school system in Prince Edward County, the schools of which had been closed for five years.

The State Legislature has given the State Board of Education the power to prescribe standards of quality for education for the state's school divisions and they have established standards of quality.[18] For some years past the standards have been fixed for the accreditation of schools, certification requirements for teachers, and standards for new school construction or additions.

Under standards recently adopted, it is required as to each school division that "the percentage of the student population achieving at or above grade level norms or the equivalent as measured by approved standardized achievement tests, will equal or exceed the mean ability level of the student population as measured by appropriate scholastic aptitude tests."

Under present law, as interpreted by the Superintendent of Public Instruction, the General Assembly is empowered to fix, for each school division, the amount required to be appropriated in order to maintain state-mandated standards of quality education.

Under the procedures of accreditation formerly in effect, if a school was below standard, the State Board would so indicate to the local school authorities and would assist with its staff the local school board to bring the school up to par.

If a school division fails to meet the quality standards fixed by the State Board, it is so reported to the General Assembly.

If a locality does not provide that amount of financial support which is required by the General Assembly, then the State Board of Education commences legal procedures, through the Attorney General of the State, leading to a court order compelling local officials to raise the necessary funds.

The president, currently, of the State Board of Education is Preston C. Caruthers. The budget which the Board has proposed to the General Assembly for the next biennium is approximately $1.3 billion. Among the programs recommended for adoption are the provision of free textbooks at the elementary school level, an increase in elementary-level counsellors, and an emphasis on kindergarten programs.

Of some 871 million dollars received by school divisions in 1969–70, 91 million were from federal funds and 250 million were from central state funds, of which about 25 million were disbursed pursuant to rules and regulations of the State Board of Education. Other state disbursements handled by that authority are governed by formula set out in an appropriation act.

The State Board of Education has in the past adopted teacher education programs, programs in in-service training of teachers, special education programs, and others designed to increase the quality of education in the state. In addition, the State Board has adopted the policy of requiring a kindergarten program in all school divisions by 1974.

The State Board has administered for many years the literary loan fund for school construction.

In August of 1971, the State Department of Education distributed to the state's school divisions a bibliography of ethnic studies material. Its preface reads in part, "an important task for the public schools in Virginia is to provide in interdisciplinary, inter-cultural educational programs from kindergarten through

18. Va.Code § 22–19.1 (1971 Cum.Supp.)

grade 12, which builds understanding of peoples and American diversity."

That Board has been and is now charged with the duty of administering accreditation standards applicable to private as well as public schools. In the opinion of the President of the State Board, which the Court accepts as a fact, the loss of accreditation by a child's school would be detrimental to the school and to the child as well. Accreditation standards are fully within the control of the State Board, and a denial of accreditation is a substantial sanction.

In 1971, the State Legislature gave new authority to the State Board of Education to license proprietary schools.

In April of 1971, the State Board of Education, with reference to schools within the state, declined accreditation in some cases, accredited some with a warning, and gave unqualified accreditation to others. Standards for accreditation are continually becoming more stringent.

School site selection has been subject to review by the Superintendent of Public Instruction. School site selections, transportation policy decisions, assignment of teaching and academic-support personnel have not been made by the respective local school boards independently of central authority. The State Board of Education has provided services to develop, as it did extensively in Henrico, bus routes down to the finest detail. This is not to speak of the State Board's execution of policies designed to bring about the transfer of students from one school division to another. Teacher certification has been the province of the state. Likewise, the state has assigned division superintendents and reviewed proposals for the hiring of visiting teachers and study supervisors. The State Board sets the basic salary of school superintendents.

The minutes of the Henrico County Board of Education points up the dependency of school divisions on the State Department of Education. For example, in 1956 the Board authorized its chairman to apply to the State Board of Education for financial assistance in the operation of a free textbook system provided by Virginia law.

The State Board of Education in July 1957, at the request of the Division Superintendent of Schools of Henrico, submitted to the Henrico School Board the results of its study of white school transportation needs for Henrico. The report prescribed the specific routes to be followed by each bus. Interestingly, the report recommended the average daily mileage per bus to be around "forty."

In 1964 the State Board of Education had authority to condition state reimbursement of salary of a visiting teacher upon compliance with its credential requirements.

Henrico County in 1969–70 received the following distributions from state funds: Basic state school fund, $6,088,556.00; driver education, $67,204.57; foster home children, $53,675.00; general adult education, $1,980.00; guidance counselors, $77,400.00; in-service training, $16,642.00; local supervision, $38,400.00; pupil transportation, $267,838.00; special education, $184,535.33; summer schools, $42,432.00; supervising principals, $29,316.00; teachers' sick leave, $31,676.24; educational television, $38,895.00; vocational education, $306,765.18. The total is $7,245,315.32.

It is the practice of Henrico's school administration to honor any request from the State Department of Education.

On the request of the school board, the Chesterfield County Board of Supervisors approved the introduction of an adult education program, 90% of the cost of which would be met by the state.

On April 12, 1961, the Board of Supervisors of Chesterfield County joined in the school board's request addressed to the State Board of Education that the County of Chesterfield be designated a separate school division.

Henrico County's educational budget for 1970–71 was $28,283,905.00. The total county budget that year was $57,146,586.00. Roughly one third of the

county's total budget comes from state and federal funds.

Chesterfield County received in state funds during the 1969–70 year the following amounts: Basic state school fund, $5,951,637.00; driver education, $64,421.02; foster home children, $45,-957.00; general adult education, $1,-080.00; guidance counselors, $60,330.00; in-service training, $15,544.00; local supervision, $34,770.00; pupil transportation, $301,602.00; special education, $93,975.80; summer schools, $25,500.00; supervising principals, $22,218.00; teachers' sick leave, $36,735.57; educational television, $35,374.65; vocational education, $140,756.36. The total state funds received was $6,829,901.40.

Annually, the system receives from the federal government $624,883.00.

During 1969–70, the City of Richmond received the following amounts in state funds for education: Basic state school fund, $6,460,596.00; driver education, $45,774.00; foster home children, $55,-823.00; general adult education, $13,-362.00; guidance counselors, $104,640.-00; in-service training, $24,821.25; local supervision, $47,280.00; pilot studies, $13,641.87; pupil transportation, $16,-005.00; special education, $530,320.90; summer schools, $43,575.00; supervising principals, $40,722.00; teachers' sick leave, $42,323.47; educational television, $48,738.75; vocational education, $616,-948.62. Total state funds for that year were $8,104,571.86.

## School Divisions

Both before and after 1954 school divisions were created or dissolved by action of the State Board of Education.

In the minutes of the State Board of Education for August 24–25, 1944, the following appears:

The Superintendent presented a long-range plan for the consolidation of school divisions with a view to greater efficiency in the administration of school affairs. This plan would call for the creation of between 50 and 60 school divisions in the state to replace the present 110 divisions, and would involve the creation of division boards of education, the membership of which would be based upon the school population in the counties, or in the counties and cities, comprising a division. The board looked with favor upon the general plan, subject to the working out of details.

While the State Board of Education never imposed single division status upon two political subdivisions if those subdivisions did not wish to be so combined, the State Board did not, however, always consent to the dissolution of a school division comprising two political subdivisions, even though the school boards of each political subdivision might so request. On January 24, 1947, the State Board declined to separate the existing school division of King George and Stafford Counties, despite the request to do so of the Board of Supervisors of Stafford County. The school boards of each county desired to continue the existing arrangement. The State Board expressly acted in consistency with "the established policy of the Board to recommend larger units of administration."

On application of the school boards and boards of supervisors involved, the State Board of Education realigned school divisions among six Northern Neck counties. When citizens of Gloucester County protested, the State Board refused to reconsider its action.

The Board appointed a committee in 1952 to consider the separation of Prince George County from the City of Hopewell, the two then comprising one school division. Upon the committee's recommendation, no action was taken.

On April 23, 1953, the State Board of Education established Alleghany County and Covington City as a single school division. Records show that this was in accord with resolutions submitted by the school boards of each political subdivision. The positions of the governing bodies of these political units are not recorded. On the same day, Charles City County and New Kent County were established as a single school division, in

accordance with requests by both school boards, although James City County had been part of the division, but again the State Board minutes do not indicate the boards of supervisors' views. At the same time James City was combined with the City of Williamsburg, subject to the completion of arrangements by the two school boards.

The school division of Warwick City and York County was abolished and each political entity was made a separate school division in 1955, subject to approval by the legislative body of each subdivision.

In March of 1957, when so requested by the school boards and boards of supervisors of Amelia and Nottoway Counties, the State Board of Education abolished a joint school division comprising the two counties and created a single school division for each.

On February 25, 1960, the State Board of Education resolved that a new school division of Halifax County and the City of South Boston was created. The minutes show that the school boards of each political subdivision requested such action. Nothing is stated concerning the governing bodies of either subdivision.

In March, 1962, the governing bodies and school boards of Franklin City and Southampton County requested the formation of separate school divisions for each. The State Board of Education took no action on the request. "Concern was expressed over the further establishment of small school divisions, and Dr. Wilkerson was requested to suggest to the local school officials that the matter of the possibility of operating the schools for the city and the county under § 22–100.1 of the Code be carefully explored." Effective July 1, 1962, the State Board of Education divided the school division comprising the City of Franklin and Southampton County into two school divisions.

Upon application by the boards of supervisors and the school boards of Lexington and Rockbridge, in 1966 the Board created separate school divisions for each. Action was taken after a presentation by Lexington residents, including the factors of school population, minimum school size, and the city's willingness to accept county pupils in its high school on a tuition basis.

In 1968, the State Board declined to separate the Gloucester, Mathews County school division. Both the board of supervisors and the school board of Gloucester County had requested separation. However, the Mathews County school board opposed such a move. The State Board found that separation of the school division "might not at this time be in the best interest of the children of the two counties." (RSBX 82, at 19) However, effective July 1, 1969, the State Board, in January of 1969, established separate school divisions for Gloucester and Mathews Counties. The State Board, in its minutes, summarized its policies on the point of division consolidation:

> The State Board of Education is convinced that the size of an administrative unit is usually a major factor in determining the scope and quality of the instructional programs and related services. Certain operating economies are also often related to size and total pupil enrollment. The State Board, therefore, has favored in principle the consolidation of school divisions whether they viewed creating administrative units appropriate to modern educational needs. The Board regrets the trend to the contrary, pursuant to which some counties and newly formed cities have sought separate divisional status based on political boundary lines which do not necessarily conform to educational needs.

The Board related that, although state law empowered it to create and dissolve school divisions, still the operation of schools at a local level is within the control of the city and county school boards of supervisors or city councils. Under this arrangement, "it has been impossible for the State Board of Education to effectuate a satisfactory consolidation program or even to assure that school divisions consisting of more than one po-

litical subdivision would operate in a manner which effects economies or results in genuine educational benefits." In the light of the failure of Gloucester and Mathews Counties to develop cooperative programs, the State Board concluded to separate them.

On January 3, 1968, the State Board of Education resolved that, "effective consolidation of school divisions is a prerequisite to quality public education in many areas of the state." To this end the Board recommended some changes in the outstanding law. "The Board emphasizes the need, in any such plan, for adequate provision for the financing of consolidated school divisions, and urges early consideration of such constitutional and statutory changes as may be necessary to provide for effective consolidation and financing of the school divisions."

On February 7, 1969, the State Board considered the request of Bedford County School Board and Bedford City Council to establish a single school division comprising the county and city. The county school board specifically requested that no action be taken which might interfere with efforts of the county to educate children of the city under a contract system. "Dr. Wilkerson observed," the minutes relate, "that the establishment of one school division would certainly be in accord with such efforts." The Board so acted.

On request of all official bodies involved, the Board dissolved the school division composed of Richmond and Westmoreland Counties and established separate school divisions for each. Action was taken after an explanation of the minimal cooperation existing between the two counties.

Lancaster and Northumberland County School Boards, in March of 1969, petitioned for separation also. The Board refused to act at the time, in the light of the history of cooperation, the failure of the Board of Supervisors to take a position, and the divided community sentiment. At its next regular meeting it was learned that the legislative bodies joined in the request. The Board inquired of op-

position among black residents to the separation, and the delegation stated that apparently this was not a real factor, after further understanding of the problem. The delegation submitted a position paper to the Board which gave as one reason for the separation that additional efforts would have to be made by school authorities in the near future because in 1970 both counties were "faced with Total Desegregation." The Board ratified the separation.

At the State Board meeting of August 19–20, 1969, discussion was had as to the separation of the City of Emporia from the combined Emporia—Greensville County school division. The city officials proposed it, but the county school board opposed the move. The city children were then educated by the county school board under contract. City officials represented to the State Board that, after a recent school desegregation decree of this Court, they feared the county would not be able to provide for city children an acceptable level of education. Apprehension was also expressed that unless a separate school division were established, city children would be bused to county schools rather than permitted to attend the nearest school. The common school division had been established only twenty months before, over the objection of the county board of supervisors. Efforts to create a joint school system were fruitless, however, and the contract terms were unsatisfactory. The city recognized that the State Board's policy discouraged the creation of small school districts, but stated that separation in this case would foster quality education. The State Board denied the request, pending federal litigation. This action signifies that common division status was considered by all to have an impact not only upon the administrative structure but on the attendance patterns as well.

Currently the City of Fairfax and Fairfax County are separate school divisions, each with its own superintendent. They operate together pursuant to a contract, with the county educating the city children.

Section 22–100.9 of the Virginia Code provides that in the event a consolidated school division is created, operating costs and capital outlays shall be shared on a pro-rata basis on enrollment of pupils, or on another basis agreed to by participating political subdivisions. The State Board of Education never specifically recommended repeal or modification of this statute. This section was first enacted in 1954 and dealt with expenditures for capital outlay and incurring indebtedness for construction of school buildings. A 1956 amendment added "local operating costs." In 1957, while the creation of a consolidated school division embracing the City of Covington and Alleghany County was under consideration, the Attorney General of Virginia ruled upon the validity of a method of meeting capital and operating costs other than that set forth specifically in § 22–100.9. He stated that it was permissible for the political subdivisions to share such costs as to each school facility according to the number of residents of each subdivision educated in that school. Rep.Atty.Gen. 240 (1957).

In December of 1962, the Attorney General of Virginia endorsed a financing plan agreed upon by the school boards of Washington County, the Town of Abingdon, and the City of Bristol, whereby the city board would be reimbursed by the other two boards for the capital costs of enlarging the Douglas High School in Bristol. Douglas had since 1948 served as a central high school for Negro residents of the three areas, and it was proposed to expand the program. The state's chief legal officer held that capital outlay and debt service might be charged against Washington County and Abingdon according to attendance by residents of each. Rep.Atty.Gen. 230 (1962).

The State Board of Education has never promulgated regulations setting forth the financial plan of operation of schools within a consolidated school division as contemplated by Virginia Code § 22–100.8 (1969 Repl. vol.).

The State Board of Education has a policy with respect to consolidation of school divisions; in general, it has been to encourage the consolidation into a single school division of two or more sparsely populated rural counties. This policy would not be directed toward the consolidation of the City of Richmond or school divisions of its size and the two counties in issue here.

On April 23, 1971, the State Board chairman appointed a three-member *ad hoc* committee to consider the division consolidation of the schools of Buena Vista, Lexington, and Rockbridge County, and of other localities requesting such assistance.

The policy of the State Board of Education to encourage consolidation of school divisions has not been addressed to solving problems of desegregation.

The amended State Constitution gives the State Board of Education the power to divide the state into school divisions subject to criteria and conditions established by the General Assembly. This last qualification was not recommended by the Commission on Constitutional Revision nor was it proposed by the State Board of Education. It had its genesis in the General Assembly. A state school official testified that it was his assumption that the Legislature was conscious that the language that they inserted could have an effect on this federal litigation.

Section 22–30 of the Virginia Code was amended, effective July 1, 1971, during the pendency of this lawsuit, and after the motion for joinder had been granted. Pursuant to this recent legislative action to implement the provisions of the amended Constitution, the State Board of Education was divested of the power to create, without local consent, school divisions comprising more than one county or city, or so to divide any county, with certain exceptions made for existing special town districts, each of which had its school boards.

New Code § 22–30, setting forth the General Assembly's criteria, limits at

least provisionally the State Board's power to place two political subdivisions in one school division; it may not so act without the request of the school boards affected and the concurrence of the governing bodies of the counties, cities and towns affected.

In late 1970, Chairman Crockford of the Richmond School Board predicted in a letter to the Mayor of the City of Richmond a move, originated by the counties, to alter school division alignment statutes. This prediction, a state school official testified, and the Court agrees, came to pass. The same official testified that, in practice, when the State Board of Education created a single school division comprising two counties or more, the school board of each county would continue to operate its own schools. Twenty-eight such school divisions have existed in the past. Some of these continue still as single school divisions because the political subdivisions of which they were composed have been merged. However, those common school divisions shown on State Board Exhibit 10 as in existence as of the date of discovery, in fact no longer exist. For, as shown in Superintendent's Memorandum No. 6058 of June 29, 1971, the State Board of Education established school divisions within the state, effective noon, July 1, 1971, with the effect of separating political subdivisions formerly comprising a single school division, Essex and Middlesex Counties are not separate school divisions, as are King and Queen and King William Counties. James City County and Williamsburg City are now separate school divisions. Halifax County and the City of South Boston have been divorced. The State Board of Education has made Emporia City and Greensville County separate school divisions, although the Court takes judicial notice that the litigation concerning the common operation of schools of that city and county has not concluded. Salem and Roanoke Cities are now separate school divisions, as are Bedford City and Bedford County. Furthermore, Green and Madison Counties and Rappahannock and Warren Counties have been dismantled as common school divisions.

Significantly, the same memorandum notifying division superintendents of the creation of new school divisions within the state, advised them concerning the procedures to follow should two or more school divisions desire to employ the same person as superintendent. Such a practice requires the approval of the State Board.

On May 28, 1971, the State Board, in response to the enactment of an amended §§ 22–30 and 22–37, issued new recommended formulae for the computation of salaries of division superintendent serving part time for two or more school divisions.

A state school official stated that 17 common school divisions were dissolved by the State Board of Education on request. If this figure is gleaned from State Board Exhibit 10, it is out of date; as noted, effective July 1, 1971, several other common school divisions were separated.

The three political subdivisions principally in issue have been separate school divisions since 1871 at least. In 1971, however, the State Board of Education took action pursuant to the revisions of the Virginia Constitution and new statutory enactments, to divide the state into school divisions; at that time, it declared Richmond, Henrico and Chesterfield each to constitute a single school division.

### Self Imposed Restrictions

State school officials' testimony illustrates that many of the restrictions circumscribing the powers of the State Board of Education were essentially self-imposed. These would take the form of policy, not committed to writing save as they are reflected in the minutes related to particular office actions, or of regulations drawn by the State Board of Education itself. Mr. Blount of the State office testified that it was his understanding that the State Board of Education "interpreted" its powers, so that before a combined school division could be order-

ed there had to be requests for such action from the localities involved. The evidence shows that even with such requests, the creation of a single school division would not be automatic. The State Board of Education often took into account factors other than the economies involved in hiring a single superintendent. Often they appeared to have considered the impact, apparently a real one, that single division status had upon efforts to enter into joint or cooperative programs.

According to Blount, the State Board of Education never declined to place two political subdivisions in a single school division when so requested.

Blount stated that even assuming Richmond, Henrico and Chesterfield officials requested and obtained status as a single school division under prior law, the only result of such action would be that the three would retain a single superintendent in common, and each school board would continue to operate its own schools. The Court does not accept this essentially legal conclusion as the definitive statement of the powers or duty of local school boards and the State Board of Education under such circumstances.

The county and state defendants assert that when the State Board of Education has designated two or more political subdivisions as a single school division, "in every such instance the schools in each county and city remained under the exclusive management and control of the separate school board of each such county and city." That this is not the case is demonstrated by the several examples of the coincidence of common division status and the use of such cooperative techniques as the operation of joint schools or the provision of education to children of two political subdivisions by one of them under a contract. The State Board of Education has recognized that common division status will at the very least encourage such efforts.

The counties and state ask the Court to rule that the boundaries of the three political subdivisions in question have not been maintained for racial purposes. This is a school desegregation case, and therefore, in this action, when the Court considers the establishment or maintenance of political subdivision boundaries it is mainly for the purpose of testing their impact upon school segregation. Seen in that light, the existing boundaries between the city and the two counties have been maintained for racial reasons, in one sense, at the very least. What is important here is that they separate not the city and two counties, but three school divisions. The evidence shows clearly that the one power body in the state government with the authority to modify school division lines has shied from that option whenever desegregation might thereby be brought about. Scrupulously the State Board of Education has avoided incorporating into its policy, which, in some instances, expressly favors the consolidation of school divisions, any notions of bringing about a greater degree of desegregation. Such a policy obviously must have the natural, probable and eminently foreseeable effect of stifling the desegregation process. The president of the State Board of Education stated in open court that integration was if not the most important issue in education today, at least one of them. Yet, when crucial policy decisions are made by the State Board of Education, as in formulating requirements for quality of education, or establishing policies concerning school division, consolidation, or in promulgating regulations on the construction of new schools, or in dictating guidelines to local officials concerning the exchange of students between school divisions, the eyes of the state officials have been scrupulously averted from the irrefutable reality that each of these decisions will have a wide impact upon the degree of desegregation existent in the schools of the Commonwealth.

School Construction

In February of 1947, the State Board of Education issued a policy statement

concerning school consolidation. This paper reads, in part, as follows:

It is the policy of the Virginia State Department of Education to render assistance to the local school divisions in developing an adequate program of education as follows:

1. Upon request of the local school board to provide survey services of buildings and transportation needs and to recommend specific consolidations where practical in keeping with a regulation of the State Board of Education which provides that when a school division plans to erect buildings, in submitting plans, and specifications for approval, it must first determine its school building needs through a long time planning program of not less than 10 years based upon a careful education study of the division and that such a school survey and long time planning program shall be definitely determined before beginning the plans and specifications.

After a 1948 survey of the school building needs of each locality, the General Assembly created a state school construction grant fund, known as the Battle Fund. In order to participate, a school division was required to project its future building needs for at least four years.

Under a regulation distributed to division superintendents in 1949, governing approval of new school construction, the Superintendent of Public Instruction asserted his competency to approve or reject the construction of new school facilities on the basis of site location and size of a proposed facility. Construction regulations read in part:

Approval by the division superintendent of schools and the superintendent of public instruction shall include the approval of the type of construction, the location of the site within the community, the desirability and need of the new building, the size of the building, the educational and functional planning, the strength of materials and construction, maintenance, cost of in-surance, and such other pertinent factors that should be considered in cost of planning and erection of school buildings.

On March 3, 1950, Arthur E. Chapman, supervisor of school buildings for the State Board of Education, transmitted Superintendent's Memorandum No. 2434 to division superintendents, styled Criteria for Selection of School Sites:

1. General Location

a. Distribution of school population—number and location of pupils to be served.

b. Geographical location — distance pupils must walk or be transported.

c. Accessibility to public highway, transportation or common carrier routes.

d. Probable future residential and commercial developments, including improvements or changes in highways and transportation routes—check with State Highway Department and public utility company.

e. Long range educational and consolidation plans. Future trend in population and other developments should be studied and considered.

f. Use of the school for community purposes.

In the early fifties a special school construction fund was distributed through the State Board of Education to local school divisions. Chesterfield County received $305,723.01; Henrico received $368,222.46; the City of Richmond received $1,316,339.63. There was a further allocation of approximately half the size of the first distributed in the succeeding year.

The State Board of Education, immediately following the 1950 session of the General Assembly, requested that each school division submit a program summarizing its school building needs for the next four years.

As long ago as 1936, the State Board of Education required that local school divi-

sions submitting applications for state construction funds adopt a ten-year school construction program, "based upon a careful educational survey of the division."

Application for state construction funds were required to designate, until approximately 1965, the race of the students for whom the school was to be constructed.

Although in 1968 the State Department of Education cautioned all division superintendents to consider the effect on desegregation of new school construction, this factor was not incorporated by the state department into its procedures for review of construction proposals submitted to it. In this respect the state department confined its duties to "advice and help." The contribution that each new proposal would make to the elimination of the dual school system was not considered.

The State Board's regulations on new school construction apply to the purchase and location of temporary units as well as permanent structures. On request, the State Board of Education will provide services to survey and project the construction needs and transportation needs of a school division. Also on request, the State Board will investigate the desirability of consolidation of schools within a division.

By Memorandum of July 28, 1970, division superintendents were still further advised that approval by the State Superintendent of Public Instruction was necessary for the relocation of mobile classroom units.

### Racially Designated Schools

In 1955 the Board approved applications for state school construction monies for the building of racially designated schools.

In 1956 the State Board approved variations from school construction regulations for a projected Negro elementary school in Roanoke.

By Superintendent's Memorandum No. 3400, of May 21, 1957, the Superintendent of Public Instruction requested a survey of school building needs by local school officials covering the period July 1, 1957, through June 30, 1962:

Three separate sheets for reporting survey of needs are being sent you as follows:

White copy—for white schools (Page 1)

Pink copy—for Negro schools (Page 2)

Yellow copy—for summary (Page 3)

In November, 1959, the State Department of Education issued a bulletin canvassing state school construction needs. Enrollment figures, property values, and future needs were all determined on the basis of the assumption that segregation would continue. Three year need projections were made on that basis. Whites were anticipated to need $182,652,548 in new construction, and blacks $51,882.809, over that period.

Evidence of the competency of the State Board of Education to advise and criticize concerning site selections is a letter from John P. Hamill, Assistant Supervisor of School Buildings, to Fred Thompson, the Chesterfield Superintendent, in January of 1961. In response to a proposal to expand the Grange Hall High School, Hamill wrote that the existing facility was quite small and the pupil population in the immediate area was not expanding at a great rate.

Given existing deficiencies in staff and library, the state official pointed out that it would be unreasonably expensive to provide a program of high school education at the Grange Hall site comparable to that in other Chesterfield schools. He pointed out that it was his assumption that most pupils going to Grange Hall lived within 15 miles of one of the other Chesterfield schools.

By Superintendent's Memorandum No. 4155, of August 21, 1962, division superintendents were advised that trailers and other portable school facilities could not be purchased or constructed without the approval of the State Board of Education.

On May 25, 1965, the literary fund had outstanding loans to school boards of $11,924,415.07. Cash on hand was $2,994,634.94. Loans approved by the State Board and held in abeyance pending release of funds amounted to $10,586,650.00.

In February of 1967, the State Board of Education took a survey of division superintendents in order to determine school building needs throughout the state for school enrollment through June 30, 1970.

By memorandum of July 14, 1967, division superintendents were again reminded by the State Board of Education that Virginia law required the approval of the Superintendent of Public Instruction for the acquisition of all types of school facilities, "including temporary and relocatable units; remodeling, alteration, and major renovation of school buildings; and the relocation of movable units at other schools." Again on July 28, 1970, division superintendents were still further advised that approval by the State Superintendent of Public Instruction was necessary for each public school building project.

Pursuant to the request of the director of the Office of Civil Rights, Harry Elmore of the State Board of Education circulated to division superintendents on May 17, 1968, excerpts from a memorandum to chief state school officers concerning the "affirmative obligation upon local school officials to eliminate dual school systems through location and construction of schools." The excerpts from the memorandum do not employ the word "local." They do, however, state that formerly segregated school systems "have a positive obligation to see that school construction is deliberately used to eliminate the separate school system." A quotation from a judicial opinion is included, wherein the Court states, *"It is necessary to give consideration to the race of the students."*

The Literary Loan Fund is a source of low-interest loans to localities for the construction of school buildings, administered by the State Board of Education. In some instances, loans from the Literary Loan Fund cover the entire cost of construction of school buildings.[19]

In August of 1971, there were $17,018,360.00 worth of loans to localities which had been approved by the State Board of Education, the funds for which were held in abeyance pending availability.

Unless a proposed item of new school construction meets standards established by the State Board, the submitting locality is denied state funds for the purpose.

In the current State Board regulations concerning school facility site selection, desegregation is not referred to either in recommendations or binding regulations. Much is said, however, about anticipating the growth of areas of new settlement and cooperating with public and private agencies to coordinate school plant construction and expansion.

*Henrico School Construction:*

In 1949 a committee was appointed to seek a location for a consolidated Negro school in the Tuckahoe district of Henrico County.

In November, 1951, the Board contracted to construct the Varina white elementary school and reviewed the white housing patterns with an eye to future school needs. They also talked of Negro school construction, without arriving at any decision, save to consider, on a request from black P.T.A. members, the installation of indoor plumbing in the Union Negro School. At a subsequent meeting white and black building needs were determined by specific resolution.

In July, 1952, a white census was authorized by the School Board.

The P.T.A. of the Gravel Hill School, a black school, petitioned the Henrico

---

19. In May of 1957, the Attorney General of Virginia, in the face of the *Brown* decision, ruled in an official opinion that Richmond County officials might use Literary Loan Fund and Battle Construction Fund monies to construct a consolidated elementary school designated for Negroes. Rep.Atty.Gen. 229 (1957).

School Board in March of 1953 to replace the outdoor toilets and other defects.

In 1953, the Henrico School Board requested the State Board of Education to rule that certain thickly populated areas be ruled a "metropolitan district equivalent to a city," and therefore exempt from site area requirements imposed on counties. School plans were submitted to the State Board before final architectural drawings were made.

The Henrico School Board passed a resolution in favor of a subdivision ordinance requiring the dedication of a school site by developers, the location to be chosen by the developers and the capacity to be over 275 and preferably over 500.

Revised state construction regulations were issued, effective April 1, 1955. State regulations required the School Board to enlarge the Sandston Elementary School site by five acres in 1955.

In 1955 the School Board selected names for the two "Negro schools under construction,"—the Vandervall School in Tuckahoe District, and Henrico Central in Varina District.

In July of 1955 the School Board appointed a committee to formulate school zones within the district.

In August 1955, the School Board requested the Superintendent to prepare a spot map showing the home of each Henrico pupil, the school which he attended, and his race.

In February of 1956 the School Board invited the Planning Commission to cooperate with it in choosing sites for new schools.

In February, 1956, the School Board instructed its Superintendent to discuss with the State Superintendent the matter of constructing temporary classroom buildings to alleviate overcrowding at five existing schools. The approval of the State Board was solicited. On the same day the Henrico Supervisor of Transportation was requested to make a detailed study of the entire transportation system; to this end, he was authorized to confer with the Division of Transportation in the State Department of Education.

In February, 1956, the Henrico Board appointed a committee to confer with the State Department of Education in an effort to get speedy approval of plans for emergency classroom buildings. The same day, five contracts were awarded for the construction of annexes to existing schools.

In March of 1957 the Board directed the Superintendent and other officials to request that the State Board of Education approve the construction of emergency units at Highland Springs and Hermitage High Schools in order to relieve overcrowding.

On June 10, 1957, Superintendent Moody of the Henrico school division made application to the Supervisor of School Buildings in the State Department of Education for permission to add four classrooms to Henrico Central Elementary School. Moody projected an enrollment of 290 for the building in the school year 1957–58. He remarked that, "when constructed, the Henrico Central facility had been designed to be easily expanded." He requested a waiver from space requirements for the library. A handwritten notation on the letter to the State Department identifies Henrico Central as the "Varina Negro School." Moody attached to his letter a "statement of need." He told the State Board that "the Negro school population increase has been definite and steady, although not so pronounced as the white.

"The Henrico Central Elementary School has eight classrooms and is now using the library as a classroom. The pre-school survey indicates some increase in the first grade for next session. To reduce combination grade arrangements and free the library from classroom use will require two classrooms for the session 1957–58. To further prepare for expected enrollment increase over the next few years, another two classrooms will be required.

"It is therefore proposed that four classrooms be added to the Henrico

Central Negro Elementary School as soon as possible. We believe such addition will satisfy the needs for classroom space in this school for the foreseeable future."

The four-room addition to Henrico Central School was built in 1958. Henrico Central is the current Varina Annex and is located about 1.2 miles from the Varina school.

On May 8, 1957, Moody applied to the Supervisor of School Buildings for leave to expand the Vandervall School in Henrico County, a black elementary school, by adding six classrooms. He foresaw an enrollment of 336 for the school in 1957–58. The Vandervall School had then only recently been built with eight rooms, and had been designed for easy expansion.

Moody wrote to the school building service of the State Board of Education on March 4, 1958, to request leave to make additions and alterations to the Virginia Randolph Combined Elementary-High school. The purpose of these renovations was to "furnish adequate facilities" for all Negro high school students in the County, and the elementary students now living in the Glen Allen area." An entirely new elementary school plan was proposed. This would contain 14 classrooms and another 20 classrooms would be added to the existing buildings for the use of high school students.

Moody's statement of needs related to the Virginia Randolph project reads as follows:

The population increase among the Negroes of Henrico County has been less spectacular than has that of white residents. However, the Negro school population has increased and recent trends indicate this increase will continue. It is, therefore, thought advisable and necessary to provide for expanding the present facilities for Negro school pupils in Henrico County.

At the present time classrooms are being added to the Henrico Central and Vandervall elementary schools which will help solve some of the problems of increased enrollments in those areas. It is believed that a need for more adequate facilities exists at Virginia Randolph High and elementary schools.

Present trends point to an estimated elementary enrollment at Virginia Randolph Elementary of 340 by 1963 and a high school enrollment of approximately 665 by the same time. If the above estimates are borne out the addition of 12 to 14 new elementary classrooms and a rather extensive renovation of existing high school facilities, plus some added classrooms, will be required to meet this growth and provide for improvements in the curriculum offering.

On November 19, 1959, Superintendent Moody submitted to the Supervisor of School Buildings a plan for a 900-pupil elementary school in the Central Gardens subdivision of Henrico County. His statement of need cited overcrowding in the one existing school in the Central Garden area and the two outside the zone, to which pupils were being transported. Moody noted that the Central Gardens area was being developed rapidly. "The majority of homes constructed are in the low-price field and are being sold as rapidly as completed." He noted further, "Since 1955, when Ratcliffe Elementary School was constructed, 350 homes have been constructed in the Central Gardens subdivision, of which 300 homes are occupied. In Glenwood Farms, which is adjacent to Central Gardens, 56 homes are being built. This does not include individual homes which have been built in this area. Ratcliffe School is operating at full capacity, and children which would normally go to this school are being diverted to Glen Echo and Glen Lea Elementary Schools. In Hechler Village, near Glen Echo School, 197 homes are under construction, which will shortly saturate the school, unless relief is provided by construction of the Central Gardens Elementary School."

On June 3, 1960, Moody stated to the School Building Service of the State De-

partment of Education that although Virginia Randolph School had been completely renovated in 1958 by the addition of a 14-classroom elementary unit, still the School Board was of the opinion that the high school facilities there "must be modernized and made equal to other secondary school facilities recently constructed in the county." At this all-black high school, he noted, enrollment currently stood at 470. He expected this figure to rise to 566 in the next five years. Moody hoped to complete the task of renovation with funds from a pending bond issue.

An exhibit in the 1962 annexation proceedings between the City of Richmond and Henrico County shows then existing schools in the city and Henrico. The legend distinguishes between white and Negro facilities. Fairfield Court School in 1962 was classified as a Negro elementary facility. Other exhibits from those proceedings designate city and county schools by race.

A proposed four-classroom addition to the Fair Oaks Elementary School was submitted for approval by the State Board of Education by Moody, Superintendent of Henrico, on *March 28, 1963.* The cover letter bears the hand-written notation "negro." The Fair Oaks School, in the eastern end of Henrico County, was built in 1951 with an intended capacity of 210 pupils.

The statement of need contains the following summary of a survey conducted by Henrico school authorities:

Negro housing starts: a subdivision between Cool Lane and the Central Gardens area is under construction, consisting of 33 units, which would add approximately 40 pupils of the elementary school level to the Fairfield District. In addition, Negro residents have moved into the Glenwood Gardens area which is near this new subdivision and have added 12 elementary school pupils to the county. At the present time these pupils are being transported to the Virginia Randolph Elementary School in the Brookland District.

It is contemplated assigning the elementary pupils from the Glenwood Gardens and Cool Lane areas to the Fair Oaks Elementary School. This, together with the present overcrowding, will require a total of four additional classrooms to the seven existing classrooms, which will adequately house a maximum of 330 pupils for the next five years.

The State Board of Education, on the basis of this submission, approved the proposal. The additions would enable the school board to cease transporting new black residents in the area to the Virginia Randolph Elementary School in the far north of Henrico.

The State Board of Education, however, cautioned the Henrico School Board to look beyond its immediate future needs. Rather than constructing an addition to accommodate Negro residents, the state official raised the possibility of an entire new school. Moody responded, "With the 330 pupil enrollment possible in the expanded Fair Oaks School, it is felt that there will be little additional growth of the Negro population in this community of the Fairfield District within the conceivable future, and from this projection no planning for a new elementary school to house Negro pupils would be necessary."

The approval by the State Superintendent of Public Instruction for new construction was never automatic.

In February of 1965, the Henrico School Board received a revised population study and predictions, including rezoning proposals for the school year 1965–66. The study included separate projections for Negro and white population and under the rubric "Negro population," projected occupancy for the Fair Oaks, Henrico Central, Virginia Randolph Elementary, Vandervall and Virginia Randolph High Schools.

Prior to the 1966–67 school year the school board considered a pupil population study presented by the director of research and, on the basis thereof, directed some double shifting of grades 1 and 2 and modifications of zone lines.

For 1966–67 the school board altered zones for Highland Springs Elementary School, Fairfield Junior High School, Glen Allen Elementary School, Maude Trevvett Elementary School, Pinchbeck Elementary School, and Ridge Elementary School.

In February of 1967 new school zone lines were drawn for Tuckahoe Elementary School, Ridge, Pinchbeck, Maybeury, Carver, Short Pump, Highland Springs, Adams, Montrose, Sandston, and Seven Pines Elementary Schools.

On March 20, 1968, the Henrico Board of Supervisors met with the school board to discuss construction plans for the Harry Flood Byrd High School and the annual financial plan for school operation for 1968–69.

In March of 1968 school zone lines were redrawn for Holladay, Chamberlayne, Lakeside, Dumbarton, Trevvett, Glen Allen, Adams, and Seven Pines Elementary Schools.

For 1969–70 the Henrico School Board modified zone lines for Davis, Longan, Longdale, Glen Allen, Laburnum, Chamberlayne, Maude Trevvett, Dumbarton, Adams, Highland Springs, Sandston, and Seven Pines Elementary Schools.

Per the request of the Director of Recreation for the County of Henrico, the school board transferred the Coal Pit Elementary School site to the County of Henrico for recreational purposes. Consideration was in the amount of $1.00.

For the 1970–71 session, new school zones were established for Fair Oaks School, Varina Elementary School, Fairfield Junior High School, Laburnum Elementary School, Seven Pines and Chamberlayne Elementary Schools. The former Henrico Central Elementary School was reopened as the Varina Elementary School Annex.

On February 25, 1971, the director of construction reported on progress of the school building program.

In March of 1971, zone changes were made for the following Henrico secondary schools: Douglas Freeman, John Randolph Tucker, Hermitage, Henrico,

Highland Springs, and Varina High Schools; Byrd, Tuckahoe, Hermitage, Fairfield and Brookland middle schools.

Currently, Henrico County does not have any applications pending for Literary Loan Fund monies.

From the year 1954 to date, Henrico County School Board bond issues total $49,530,000.00. There have been eleven issued. Fifty-two percent of these funds have been acquired in three issues made in 1967 through 1970. No construction has been done in the county of new schools since 1959 without bond financing.

From 1954 through 1971, 31 new schools were built in Henrico County and 36 additions were made to existing schools. Fifteen schools were built in the years 1954 through 1960; ten of these were overcrowded when they opened. In these years, 15 additions were made; 12 of the schools involved exceeded their capacity when they were opened. To meet rapid school population growth, Henrico County used temporary facilities and a double-shift system in the primary years. The county kept tract of the predicted movements of population, foresaw the completion of new subdivisions, predicted overcrowding, and located new school sites accordingly, attempting to build the facilities as near as possible to the centers of population. New classrooms were built at the rate of about one for every 3.1 working days.

Racial considerations have definitely played a part in the school construction program of Henrico County.

A comparison of construction data and racial enrollment information shows that over the years, by a combination of site selection, decisions on capacity, and choice of attendance methods, the Henrico school division has achieved segregation in most of its new facilities. In 1966, Tuckahoe Elementary School opened with a new addition; its racial composition was then 3.3% black. That year an addition was made to J. R. Tucker High School, and it opened that Fall

with a student body of more than 1900, of whom 20 were black.

In 1967, the Adams Elementary School was newly opened; it served 21 blacks and 774 whites. Carver Elementary School was new that year as well; it housed 7 blacks and 589 whites. Highland Springs was a third new elementary school in 1967; its student body was .4% black, composed of 3 blacks and 706 whites.

Elizabeth Holladay Elementary School opened in 1968. Two blacks and 649 whites were in attendance. That same year an addition to Glen Lea Elementary was put into use. Glen Lea was 1.9% black, with 8 black students among 411 whites. Douglas Freeman High School opened a substantial addition in 1968; the school was attended by 1,654 whites and 6 blacks. Laburnum Elementary School, with a 20.4% black student body in 1970, is the only school with a noteworthy black enrollment, the year new construction was completed, to the extent the data discloses.

Although school by school racial composition figures are not available prior to the 1966–67 school year, it is possible to determine on the basis of available data that many of the schools built since 1954 did not contribute to the desegregation of the system. Douglas Freeman High School, built in 1954 and with additions in 1961 and subsequent thereto, was in 1966 .7% black. Lakeside Elementary School, which had a substantial addition completed in 1954, was all white and under capacity in 1966–67. Crestview Elementary built in 1955 and with an addition in 1956, by 1966 had no black students and was likewise under capacity. Glen Lea Elementary opened with a substantial addition in 1955. By 1966 it had an all-white enrollment. Henrico Central Elementary opened in 1955 and was added to in 1958. In 1966 it was 100% black. Laburnum Elementary School, built in 1955 and expanded in 1960, housed a 4.7% black student body in 1966. Montross Elementary expanded in 1955, was all white in 1966. Ratcliffe Elementary, dating from 1955,

housed only white students in 1966. Sandston Elementary School, enlarged in 1955, was all white still in 1966. Short Pump Elementary School, enlarged in 1955, taught 8 blacks and 270 whites in 1966. Vandervall Elementary was opened in 1955; in 1966 it was 100% black. Tuckahoe Elementary School, built in 1956, ten years later had a 3.3% black enrollment. Baker Elementary School, built in 1957, was 3.1% black in 1966. Hermitage High School and Highland Springs High School were each expanded in 1956 and 1957; in 1966 Hermitage was .7% black and Highland· Springs 1.6% black. Skipwith Elementary School, built in 1957, was .7% black in 1967.

1958 saw the opening of Trevvett Elementary School, Bethlehem Elementary School, Fairfield Junior High School, Maybeury Elementary School, and Tuckahoe Junior High School. In 1967 Trevvett was all-white, Bethlehem had 1 black and 735 whites, Fairfield Junior High was 4.6% black, Maybeury was .6% black, and Tuckahoe Junior High .7% black. 1958 also saw additions to Henrico Central and Vandervall Elementary Schools; these facilities were all-black throughout their existence.

In 1959 Seven Pines Elementary School opened and was enlarged in 1965; no blacks attended it in 1966. In 1959 Virginia Randolph Elementary School was opened; this was all-black in 1966–67. Brookland Junior High was built in 1959, expanded later, and by 1966 it housed 10 blacks and 1,586 whites. Central Gardens Elementary School opened in 1961 with a capacity of 810 students; in 1966 it was 62.6% black and only 522 students were in attendance. Chamberlayne Elementary School opened in 1961 and in 1966 was .7% black. Pinchbeck Elementary School also opened in 1961; it was all-white in 1966. An addition was made to the Ridge Elementary School in 1961; and in 1966 it was 2.2% black. Virginia Randolph High School, all black throughout its period of operation, was expanded in 1961.

In 1962 Jackson Davis Elementary School was opened; four years later its

enrollment was 703 whites and 1 black. Varina High School, opened in 1962, was 11.1% black, substantially desegregated in terms of the county-wide ratio in 1966, but it was operating over 150 pupils under capacity. Henrico High School also opened that year had .8% black enrollment in 1966. J. R. Tucker High School opened that year as well and had less than 1% blacks in its student body four years later.

In 1965, R. C. Longden Elementary School opened; the next year it had two blacks and 691 whites in a building with a capacity of 810.

*Chesterfield School Construction:*

In 1940 the Chesterfield Superintendent recommended to the board that Centralia and Kingsland Negro schools be consolidated.

At the August, 1940, meeting of the Chesterfield School Board the Superintendent reported that the State Board of Education had approved Chesterfield's applications for literary fund loans totalling $200,000 for construction at two white high school sites. The State Department conditioned its approval as to the Manchester project on a change in site.

At the board meeting of October 28, 1942, black residents of the Kingsland area requested the board to replace the Kingsland school with a modern brick building. At a subsequent meeting a committee reported that no real fire hazard existed at the present Kingsland school.

In 1945 the board directed its Superintendent to secure the approval of the State Board of Education of plans for a black high school for all blacks in Chesterfield County, "including those now attending D. Webster Davis High School."

In March 1945, a delegation of black citizens called the board's attention to alleged inadequate facilities at the Kingsland colored school. The board accepted the petition and assured the group that plans for improved facilities were in progress.

In 1945 or 1946 the Superintendent recommended and the board approved a county school building program, including a Negro high school for 300 students, three Negro elementary schools, and additions to two white elementary and two white high schools.

In 1946 the board decided upon a site for the black high school and authorized the Superintendent to purchase it at a price of $100 per acre or less. At a later meeting, upon learning that the owner would accept only $150 per acre, the board deferred the construction plans.

In September 1946, a delegation of the Kingsland P.T.A. requested that the board relieve overcrowding in that school. The board directed that their petition be received and filed and stated that steps would be taken to relieve the situation.

In March of 1947 a delegation of blacks from throughout the county requested the board not to build the proposed black elementary schools before the high school. The board resolved to begin construction on the new elementary schools and the high school immediately and concurrently. Subsequently, application for literary loan funds were made for the four black schools.

The Board of Supervisors, on July 8, 1947, approved a building program for county schools presented to it which included additions to the Manchester High School and Midlothian High School, the Thomas Dale High School, the Beulah Elementary School, the Broad Rock School, and the construction of a new Negro elementary school to replace Union Grove and Union Branch Schools.

In 1948, the Board of Supervisors authorized application for additional loans for school construction, the funds received from the Literary Loan Fund having proved insufficient to meet the lowest construction bids.

In 1948 construction of the Negro high school was under way.

On April 8, 1949, the Board of Supervisors approved the School Board's application for loans to construct four

Negro schools, consolidated elementary schools at Midlothian, Winterpock and Kingsland, and a consolidated high school.

In 1950, on recommendation of the Superintendent, the board resolved to close the Gravel Hill School at the end of the then current session and transport its pupils to the Hickory Hill School. They also directed the Superintendent to complete repairs at Hickory Hill before the beginning of the 1950–51 session.

In March 1950, the State Superintendent requested the Chesterfield School Board to adopt a plan of construction through the year 1954. The board, in response, adopted a program of additions and new construction. The only new construction for Negro pupils was to be the Union Branch Elementary School, capacity 150. The board planned to build three new white elementary schools and to make additions to four white elementary and secondary schools.

On the Superintendent's recommendation the school board, because the Hickory Hill frame building was not in good enough condition to warrant extensive renovation, decided to make only minor repairs to that facility.

In 1950 the board directed that arrangements be made as soon as possible to relieve overcrowding at the Kingsland School.

In 1950 the board purchased additional land for the site of the new Union Branch School to conform with minimum acreage requirements of the State Board of Education.

In January 1951, Hickory Hill citizens requested that the school board commence construction of a planned addition to the brick building at the Hickory Hill School. The board stated that other construction jobs had to be taken care of first.

In early 1951 the Superintendent advised the board that the Matoaca P.T.A. "desired to know definitely whether or not toilets would be installed in the first grade classroom." The board declined to act.

On May 3, 1951, the Board of Supervisors approved the school board's application for Literary Fund loans for construction of a Jonestown School, a Bensley Village School, and an addition to Hickory Hill School.

In November 1951, the Hickory Hill P.T.A. again requested relief from overcrowding on the bus and in the school facilities. The board stated that another bus would be assigned and that construction would begin as soon as the state provided the money.

In January 1952, black patrons of the Midlothian School requested permission to use a room in the building for a kindergarten class. They stated that all expenses would be paid by the community. The Board denied this request.

In 1952 a telephone was installed in the "Midlothian colored school."

The State Board of Education allocated $172,415.56 as Chesterfield's final portion of the Battle Construction Fund due July 1, 1953.

The Chesterfield Board of Supervisors on January 28, 1953, ratified the county school board's resolution determining that certain school construction programs were immediately necessary. The facilities listed were as follows: Jonestown, $95,000.00; Kingsland and Carver, $100,-000.00; Bensley, $350,000; Broad Rock, $45,000.00; Hickory Hill, $100,000.00; Enon, $225,000.00; Grange Hall, $225,-000.00; additional schools in Manchester District, $700,000.00; Forest View, $175,000.00; Midlothian, $250,000.00; Bon Air, $125,000.00; Union Grove, $40,-000.00; Beulah, $100,000.00; Ettrick, $20,000.00; Matoaca, $25,000.00; purchase of land, $75,000.00; equipment, $190,000.00; sewage disposal, playgrounds, athletic fields, et cetera, $160,-000.00.

At the same meeting the Board of Supervisors adopted a resolution previously adopted by the county school board to issue $3,000,000.00 in county bonds to finance new school construc-

tion. This was a necessary preliminary to a bond referendum.

In late 1953 Hickory Hill patrons requested further repairs to that building and a higher priority for new construction on the site. The Superintendent advised them that minor repairs had been made, electrical problems would be investigated, and that "it shouldn't be very long" before the construction was commenced.

In 1954 the Hickory Hill P.T.A. again called to the board's attention alleged unsafe conditions at the school and on the buses. The school board promised to study and correct the conditions.

Under a decision of a Virginia state circuit court it was impossible for Chesterfield County to validate unsold school construction bonds in the amount of $1,500,000 for the reason that the referendum authorizing such bonds was conducted prior to the ruling in *Brown*. That decision "brought school construction in Chesterfield County to an abrupt end."

On March 22, 1956, the Board of Supervisors adopted a resolution determining the necessity for $3,500,000.00 in new school construction, preparatory to the holding of a bond referendum.

In early 1956 the school board requested its Commonwealth's Attorney to solicit an opinion by the Attorney General of Virginia as to whether school bonds, for which a $3,500,000 referendum was impending, would be used for integrated or segregated schools. The school board desired to know whether it would be legal to spend the money for integrated construction without the consent of state authority.

The Matoaca P.T.A. pledged support of the bond issue.

At the Board of Supervisors' meeting of April 3, 1956, R. J. Britton, a supervisor, stated that in his belief the bond referendum would achieve citizens' support if "safeguards were effected to prevent the integration of races in the county schools."

The bond issue failed at the referendum of May 29, 1956.

On September 6, 1957, the Board of Supervisors passed a resolution confirming the necessity of $4,500,000.00 in new school construction and of the issuance of bonds in the amount.

On October 15, 1957, the voters of Chesterfield County ratified the $4,500,000.00 bond issue presented to them.

The Chesterfield School Board has consistently received the approval of the State Board of Education for construction projects designated for the white or the black race. By letter of March 20, 1958, Superintendent Fred D. Thompson of the Chesterfield County school division notified Arthur E. Chapman, Supervisor of School Buildings of the State Board of Education, of the school board's having contracted with four architectural firms for school construction. Four elementary school projects and one high school project listed, as well as additions and alterations to another elementary school, were not designated by race. However, Thompson further noted that architects were to perform work on alterations to the Carver High School, the Kingsland Elementary School, and plans for a new elementary school in the Ettrick area. Each of these projects was designated "(N)."

On January 7, 1959, Thompson sent to Chapman further information for a proposed four-room Negro elementary school to be placed in the Ettrick area. He noted that for years many Chesterfield County residents attended the Matoaca Laboratory School, operated by Virginia State College. That school could accommodate no more than 100; additional facilities for blacks in the area, therefore, were required.

Further information concerning this Ettrick area school was transmitted to the State Board on December 18, 1959. Thompson noted that the site previously selected "is unacceptable to many of the Negro citizens," and therefore the project was held up. The proposed school, said Thompson, would absorb en-

rollments from the area for the next five years. Thompson added, "It is conceivable that the enrollment in ten years would reach 360, but with the problems of the day, I find it entirely foolish to try to project my thinking for so long a period as ten years."

On October 28, 1959, there was a fire in the frame building on the Hickory Hill School premises, causing damage in the amount of $2,713.50.

In 1958, a school board member offered a resolution that the county refrain from awarding contracts for new construction until state funds for those purposes could be guaranteed. He feared the termination of state funds in the event the schools were integrated. The school board carried the matter over for discussion.

In early 1959 a delegation from the Ettrick area requested that a more suitable site be acquired for the Negro school planned for the district.

In October 1959, a delegation of the Matoaca Laboratory P.T.A. presented a petition to the board expressing its concern about the future outlook for elementary children in the Ettrick area. They restated their objections to the board's construction plans and "urged the board to select another site and to erect thereon a school large enough to provide adequate facilities."

In early 1960, the county school board requested the State Superintendent of Public Instruction to waive site acreage requirements for the proposed Union Grove Elementary School addition. The State Superintendent granted a waiver until the necessary additional land became available.

On December 7, 1960, the superintendent reported to the Chesterfield board on a recent study made by his staff on space requirements for September, 1961, in the white elementary schools where overcrowding was anticipated. To cure this, the superintendent proposed transferring sections of grades between buildings, renting additional teaching spaces, and using temporary housing.

It was the superintendent's intention in 1961 to open the Ettrick area school to all area residents, with the Matoaca Laboratory School's admissions covered by Virginia State College.

In late 1961 the superintendent announced to the board plans to open the school on Dupuy Road and advised them that children now attending Matoaca Laboratory School and Union Grove School would be transferred to the new school.

The school board was advised that upon the opening of the Ettrick area elementary school, the Laboratory School's enrollment would be reduced to 100 pupils, the enrollment of Union Grove would be cut to 150 pupils, and the Ettrick School would accommodate 120 pupils.

In May of 1962, the Chesterfield School Board transmitted to the State Board of Education its projections as to county school enrollment over the succeeding years. Over the previous seven years, it was indicated, white elementary enrollment rose 601 per year; white high school enrollment rose 415 per year; Negro elementary enrollment rose 32 per year; and Negro high school enrollment rose 11 per year.

The 1962 data evidences an anticipation that white high schools would continue to be operated separately, at least through 1966, from the county's Carver Negro High School. The report also gave September 1961 enrollment figures for all grades in the county's elementary schools, listing white and Negro schools separately. High school figures were also listed.

Based on the trends documented, the Chesterfield County School Board stated that two additional classrooms at Midlothian and Hickory Hill Negro facilities would be required in the then immediate future. At each, furthermore, a room each year for the succeeding five years would be necessary. The Negro high school, the board stated, needed an auditorium and would require two new classrooms within five years. Under separate headings Chesterfield listed the neces-

sary additions and new construction for its inventory of white high schools. Projected new classrooms needed at the elementary level were given through the year 1966–67.

Attached to the figures on new construction needs was a status report on the current Chesterfield $6,000,000.00 school construction program. Each facility listed, 26, either for renovation or as new construction, was designated by race.

In early 1964, the Chesterfield School Superintendent presented each board member with a copy of a recent population study of the Richmond, Chesterfield and Henrico area.

On June 1, 1964, Fred Thompson of Chesterfield wrote to Arthur E. Chapman in the State Department of Education, concerning expansion of the Carver black high school. Thompson proposed to add two classrooms and an auditorium. Need for the new facility was predicated upon enrollment projection through the year 1974. Carver was at that time and for several years thereafter an all-black school.

On March 25, 1965, the board of supervisors passed a resolution determining the need for $10,000,000.00 for capital school improvement purposes, preparatory to a bond referendum.

On May 31, 1965, Thompson again wrote Chapman concerning an elementary school proposal for the village of Ettrick. He suggested placing a new 15-room elementary school on the site then occupied by an elementary school building dating from the early 20's. The old Ettrick Elementary School had historically been an all-white facility. Thompson sought a waiver of site area requirements by the State Board. By a later letter Thompson advised Chapman that he thought the new school should be placed on this marginal site partly because the community had developed a strong attachment to the school as a social as well as a cultural center. "Although they are finally resigned to the fact that the building must go, we feel that there would be strong resentment to our relocating the school."

On September 8, 1965, Roy A. Alcorn, Chesterfield School Division Superintendent, transmitted to the State Board a revised request concerning additions to the Carver High School. He asked for waivers of state requirements on a few minor points. Concerning enrollment projections at this all-black high school, he made the following statement:

I feel that although not substantiated by past data, as a result of relatively recently enacted federal legislation, a leveling off, if not decline, in enrollment at this all negro high school will be experienced. A new library and conversion of the existing facility into two classrooms would be in order if the next two years proves our judgment incorrect. Present library space and acreage would not be a serious detriment in the meantime. (PX–93)

On September 26, 1967, the voters of Chesterfield County passed a $14,600,000.00 bond issue for school purposes which had been supported by the school board and board of supervisors.

Each year between 1958 and 1968, Chesterfield County built a considerable number of school classrooms.

In 1967, the Chesterfield School Board requested that the State Department waive minimum acreage requirements for the J. B. Fisher School and the Matoaca Elementary School for the construction of kindergarten units.

As of August 20, 1971, it was the policy of the Chesterfield County School Board to receive and transmit state funds, computed on the basis of average daily membership, to Virginia State College for the support of the Matoaca Laboratory School. In addition, Chesterfield provides bus transportation for Matoaca Laboratory pupils.

None of the construction projects currently under way in Chesterfield County was planned with a view to assisting the desegregation of various county schools by a strategic location of the site.

The current Chesterfield Superintendent was unaware of a memorandum distributed by Harry Elmore, of the State Department of Education, to division superintendents on May 17, 1968, which advises division superintendents of HEW's requirement that they make site selection decisions with an eye to the effect of the location of new facilities on desegregation.

In September of 1971, two new schools were opened in Chesterfield County. The Salem Junior High School has a zone comprising the Meadowdale section, the Beulah section, and the Bensley section. The Robious Junior High School accepts students from the Bon Air and the Crestwood sections of Chesterfield County. These schools have been in planning for at least two years, and were financed by a recent Chesterfield County bond issue.

In November of 1970, a 17.7 million dollar bond issue passed in Chesterfield County. Funds from such bonds will be used to construct three elementary schools and a new middle school. Major renovations to about a dozen other schools are also planned. The three elementary schools will serve the Chester area, Beulah-Bensley, and the Green Hill areas. The middle school will be in the Ettrick-Matoaca area, in the southern portion of the county.

In the past twenty years, 33 new school facilities have been constructed in Chesterfield, and since 1953 each building constructed has been within 5% of capacity on its opening.

Racial considerations have definitely played a part in the school construction program of Chesterfield County.

*Period of Massive Resistance*

As of December 29, 1956, the power of enrollment of pupils in public schools in the state became vested by state law in the Pupil Placement Board, which continued as an official body until 1968.

One of the more striking examples, by way of illustrating that the central state officials have for many years past maintained degrees of state-wide jurisdiction of the local school authorities, is illustrated by an exhibit in the form of a letter written in 1958 by the then Attorney General of Virginia to the Honorable Robert F. Baldwin, Jr., a Norfolk resident. The Attorney General's letter referred to matters of then current concern to the Norfolk City Council, as well as to the School Board. The pertinent parts are herein quoted:

> We are doing everything we can to take the pressure off the city council and the school board and trying to resolve as quickly as possible the problems that they present to this office.
>
> You will recall that the state pupil placement board was designed to remove the assigning powers from local boards and because we knew the confusion and pressure that would be on these boards when integration was attempted in any area. I am still hopeful that maybe we can channel this phase of the school problem—the assignment powers—back to the state board and away from the localities. As long as possible it is important that we maintain a state-wide policy, and this can certainly be best accomplished through a central assigning agency.
>
> The next time you are in Richmond, please call by the office.

The period of resistance to the law of the land as enunciated by the Supreme Court of the United States in 1954, had begun to achieve effective momentum.

On May 28, 1954, the State Superintendent issued Memorandum No. 3025 to division superintendents and chairmen of local school boards. This related that the State Board of Education had sought an opinion of the Attorney General of Virginia concerning the effect of the United States Supreme Court's recent ruling declaring segregated educational facilities to be unconstitutional. A copy of the opinion was enclosed. In addition, the State Superintendent advised his sub-

ordinates, the State Board issued the following policy statement:

> The local boards of education are hereby advised to proceed as at present and for the school session 1954–55 to operate the public schools of this state on the same basis as they are now being operated and as heretofore obtained.

At the time, state law required segregation.

In the summer of 1954, the then Superintendent of Public Instruction publicly stated his concern over the *Brown* decision. Some of his statements were transmitted by memorandum to local school division superintendents. On July 6, 1954, Memorandum No. 3038 was issued. He quoted some recent remarks of his:

> I have previously stated my awareness of the grave concern of many prompted by the decision of the Supreme Court
>
> . . .
>
> The responsibility of my office is to administer our program of public education in keeping with the policies of the State Board of Education and in compliance with Virginia's constitutional and statutory provisions. In doing so I shall keep in close touch with our local division superintendents of schools who have a grave responsibility on the local level. Their advice and counsel is of inestimable value and will be sought continuously. Their concern must continually be my concern.
>
> It is my conviction, however, that it is not appropriate for me, at this time, to make public statements regarding specific procedures to be followed.

On June 23, 1955, the State Board discussed procedures to be followed in the light of the decree issued in Brown v. Board of Education.

Unanimously, and with the concurrence of the Governor, the Board resolved that steps to desegregate the schools could not be taken until the General Assembly enacted appropriate legislation. Consequently it was adopted as "the policy of this Commonwealth that the State Board of Education will continue to administer its functions, in cooperation with the local school authorities, to the end that the public schools of Virginia open and operate through the coming session as heretofore."

The June 1955 resolution of the State Board calls for a deferral of effort to desegregate the state's schools until the General Assembly were able to enact legislation to facilitate the move. No such legislation was ever passed. Therefore, the State Board of Education, according to witness Blount, did not initiate procedures to require integration. The Board operated pursuant to the laws of the State of Virginia, according to him, until 1965. Since that time, it has been under a compliance agreement with the Department of Health, Education and Welfare.

In December of 1955, the State Board, in explicit response to the *Brown* decision, endorsed proposals by the Commission of Public Education, endorsed proposals by the Commission on Public Education providing for "a high degree of local autonomy in the operation of their schools." The Board declared at the same time its opposition to "enforced integration of either white or Negro pupils in mixed schools against the will of their parents," and noted that a tuition grant system might be "of great value."

On October 7, 1957, the then Attorney General of Virginia transmitted to the Governor a memorandum concerning the operation of certain acts of the extra session of 1956. "This memorandum will, I believe, serve as a basis for laying plans for a course of action in the event any school becomes integrated," he wrote. The memorandum, set out in full in a footnote, provided a brief resume of the early massive resistance laws. He gave his opinion as to the wisest manner in which to apply this legislation.[20]

---

20. Copy of Memorandum referred to is appended, as Appendix "B" and marked as portion of PX–144–I.

On August 5, 1958, the Attorney General of Virginia responded to a request for an official opinion by the Governor of Virginia. The Governor had asked for an opinion as to the time at which the Commonwealth of Virginia assumes control over any public school in the state if white and Negro children are enrolled in such school. The Attorney General reviewed the 1956 enactments of the General Assembly providing for such assumption of control and construed § 22–188.5 of the Code of Virginia:

> The making of such an assignment, and the enrollment of such child, or children, shall automatically divest the school authorities making the assignment and the enrollment of all further authority, power and control over such public school .* * *; and such school is closed and is removed from the public school system, and such authority, * * * shall be, and is hereby vested in the Commonwealth of Virginia to be exercised by the Governor of Virginia in whom reposes the chief executive of the State.

The Attorney General construed the term "enrollment." This occurred, in his opinion, as soon as a pupil's assignment becomes final.

> If thereby the school becomes an integrated school it is automatically closed by operation of law and is removed from the public school system. It then becomes the duty of the Governor to assume control over the school, make every reasonable effort to reopen or reorganize the school, and return it to the public school system as soon as possible, provided its return can be accomplished without disturbing the peace and tranquility of the community and without enforced integration of the races therein.

In September of 1958, 17 black students were assigned by the Norfolk School Board to six formerly all-white schools. The division board ordered those schools to open. On September 28, 1958, the Governor of Virginia transmitted a letter directing that those six schools were closed and removed from the public school system. State police converged on the facilities and ordered everyone to leave.

Two days after the effective date of the act which vested in the Pupil Placement Board the power to enroll pupils in Virginia public schools, the Superintendent of Public Instruction sent to division superintendents a memorandum which quoted and interpreted a directive by the Pupil Placement Board, which gave, as the Superintendent read it, to each school board the discretionary power to permit a child to attend school pending final action by the Pupil Placement Board.

A further memorandum went out shortly thereafter, styled Superintendent's Memorandum No. 3360, from the Superintendent of Public Instruction, and transmitted at the request of the Pupil Placement Board, setting forth the procedures which the board would follow.

A then special assistant in the State Department of Education in charge of federal programs, while so employed served on the Placement Board.

On May 24, 1965, the Executive Secretary of the Pupil Placement Board wrote to the Superintendent of Henrico County Schools to certify that the Pupil Placement Board had the policy of cooperating with local school boards presenting desegregation plans to HEW by placing pupils in accordance with the proposals and recommendations of the school board.

By memorandum of February 14, 1961, the then Assistant Superintendent of Public Instruction notified division superintendents that the State Board of Education, at its meeting of February 3, 1961, had promulgated rules and regulations to be employed by local school boards in making placements of pupils under §§ 22–232.18 through 22–232.31 of the Virginia Code, enacted in 1960, which enabled local school boards to resume the authority theretofore exercised by the Pupil Placement Board upon the

condition that they comply with regulations of the State Board of Education. Criteria, which the State Board was required by statute to promulgate, governing the assignment of pupils were as follows:

"1. The following criteria shall be used in the placement of pupils:

(a) The scholastic aptitude, academic achievement, and mental ability of the pupil;

(b) Availability of facilities and instructional personnel;

(c) The potential effect of the specific placement of pupil upon his own educational progress and the educational progress of others in the same grade;

(d) Restriction of disruption of the individual educational process, limitation of disorganization of the public schools and achievement of maximum continuity in pupil placement by avoidance of any general or unnecessary reallocation or reassignment of pupils heretofore entered in the public school system;

(e) The validity of the reasons given by a pupil's parent, guardian or other persons standing in loco parentis for the particular placement requested.

2. The school board may adopt other regulations not inconsistent with the foregoing."

Superintendents of divisions electing to be bound by the State Board regulations were required to transmit to the State Superintendent a copy of the school board resolution recommending adoption of a local ordinance to that effect and a certified copy of the ordinance itself. Notice of that election was also to be sent to the Pupil Placement Board. When such procedures were followed, the State Superintendent transmitted to the division superintendent sufficient copies of the pupil placement application forms.

*Tuition Grants*

J. G. Blount, Jr., has been with the State Board of Education since 1931. He has been an assistant superintendent since 1961, in charge of administration and finance. For the years 1952 through 1961 he was Director of Finance. It was his task to prepare budgets, approve accounts payable and tuition grants.

In 1952 the State Board promulgated regulations allowing the admission of children from other counties, cities and towns and establishing the maximum tuition rate.

In the past, the State of Virginia has provided scholarships to enable black students to attend institutions of higher learning in other states, when state institutions were closed to them by law.

The Virginia state tuition grant program was originally a product of the 1956 special session of the General Assembly. The State Board of Education adopted regulations governing eligibility for tuition grants, in conformity with the legislation.

On September 5, 1958, the State Board of Education distributed to division superintendents regulations, adopted by it at a special meeting seven days prior thereto, governing the payment of tuition grants. These regulations, in part, read as follows:

Availability of tuition grants.

Tuition grants will be available for pupils under the following conditions:

(1) When all schools in a county, city or town are closed and not reopened by operation of law or by order of the Governor.

(2) When one or more schools or parts thereof in a county, city or town are closed and not reopened by operation of law or by order of the Governor.

(3) When a child or children assigned to or are in attendance at public schools wherein both white and colored children are enrolled and the parents of such child or chil-

dren object to the assignment of such child or children and/or attendance at any school wherein both white and colored children are enrolled.

(4) Upon the direction of the Governor in the discharge of the responsibilities imposed upon him by law.

Tuition grant payments were made payable by local school boards, "On the basis of an approved application, the school board shall authorize the issuance of school board warrants or checks drawn on the county or city treasurer for the amount of the approved application for tuition-grant aid at such times as are stated above." In addition, the regulations set forth minimum requirements for the schools which one using a tuition grant might attend. The application form, by regulation, also must show that, "If tuition grant aid is requested for a child who has been withdrawn by the parent or guardian from a public school in which both white and colored children are being taught, then such parent or guardian shall also certify that he objects to sending such pupil to a school in which both white and colored children are being taught." Local authorities in addition were advised that the State Board of Education would reimburse local school boards for the state's share of tuition-grant payments, as fixed in the state law.

Tuition grants were available to enable students resident in one school division to attend public schools in another school division. On occasion the number transferring from one school division to another one became considerable. On August 19, 1959, the State Superintendent issued Memorandum No. 3713 to division superintendents addressed to problems occasioned by these transfers:

Whereas the nature and degree of transfer in attendance of pupils from the public schools of one locality to those of another can occasion undue hardship to the operation of public schools so affected, and

Whereas the exchange of students between public school systems on the long recognized tuition basis is still effective and desirable,

Be it Resolved that the school boards and division superintendents of schools of the sending and receiving localities confer on this matter and such understanding as will give priority to the transfer of students on the well established tuition plan which has been in effect for many years and thereby maintain the integrity of this practice, with due regard to the intent of the statutes governing the pupil scholarship program.

The foregoing passages are from a resolution of the State Board of Education.

In February 1959, tuition grant applications from 502 Norfolk resident pupils were approved, permitting them to attend school in South Norfolk. In March, 1959, statewide, 5,000 applications had been received. Grants were sometimes made despite nonapproval of the schools to be attended, on account of "emergency conditions." Summer school grants as well were made for Norfolk residents. By June, 1959, 6,453 applications had been approved on the school-closing eligibility principle.

A committee of the State Board of Education had been appointed to formulate regulations to implement the tuition grant statute. They met with the Office of the Attorney General of Virginia and members of the staff of the State Department of Education and presented their report to the State Board on February 4, 1959.

After their enactment, the State Board of Education distributed to local school divisions copies of the state's legislation setting up the pupil scholarship system. This statute was based upon the legislative finding that, "It is desirable and in the public interest that scholarships should be provided from the public funds of the state for the education of the children in non-sectarian private schools in or outside, and in public schools located outside, of the locality where the children

reside, and that counties, cities and towns, if the town be a separate school district approved for operation, should be authorized to levy taxes and appropriate public funds to provide for such scholarships." Section 5 of the act reads as follows:

> The State Board of Education is hereby authorized and directed to promulgate rules and regulations for the payment of such scholarships, and the administration of this act generally. Such rules and regulations may prescribe the minimum academic standards that shall be met by any nonsectarian private school attended by a child to entitle such child to a scholarship, but shall not deal in any way with the requirements of such school concerning the eligibility of pupils who may be admitted thereto. The State Board of Education may also provide for the payment of such scholarships in installments, and for their pro ration in the case of children attending school less than a full school year.

Localities essentially had no choice in the matter of adopting a scholarship program. Section 6 of the Act read as follows:

> If the governing body of a county, city or town authorized by Section three of this Act to provide local scholarships fails to provide minimum amount of such scholarships for those entitled thereto, the State Board of Education shall authorize and direct the Superintendent of Public Instruction, under rules and regulations of the State Board of Education, to provide for the payment of such scholarships on behalf of such county, city, or town to the extent hereinafter mentioned. In such event the Superintendent of Public Instruction shall, at the end of each month, file with the State Comptroller and with the governing body and school board of such county, city, or town a statement showing all disbursements so made on behalf of such county, city, or town, and the Comptroller shall, from time to time, as such funds become available, deduct

from other State funds appropriated for distribution to such county, city or town the amount required to reimburse the State for expenditures incurred under the provisions of this section, provided that in no event shall any funds to which such county, city, or town may be entitled under the provisions of Title 63 of the Code or for the operation of public schools be withheld under the provisions of this section.

The State Board of Education adopted regulations governing pupil scholarships on August 1–3, 1960. These, like the tuition-grant regulations set forth minimum criteria for schools attended by applicants.

In October of 1960, the State Board approved tuition grant applications from residents of areas which declined to appropriate funds for the purpose. Prince Edward County residents submitted 204 applications; all were approved.

In 1961, the State Board of Education transmitted to local school divisions forms upon which they might request reimbursement from the pupil scholarship fund for the state's share of tuition grant payments. Reimbursement was available on the basis of $125.00 for pupils in elementary schools and $150.00 for pupils in high schools.

In June, 1962, new regulations on pupil scholarships were adopted by the State Board, pursuant to 1960 legislation. Minimum requirements for schools attended by scholarship recipients were set forth. Local school boards were required to pay out the tuition money, if appropriated, and in any event to process applications. For 1962–63, $2,252,995.07 in grants were disbursed, excluding payments to Prince Edward County. The State Board recovered, of this, $65,595.-85 from the State Comptroller; this money was taken out of state aid funds otherwise payable to areas which refused to pay tuition grants.

At a special meeting on July 1, 1964, the application deadline for tuition grants was waived for Prince Edward County

residents for the past school year. On advice of the Attorney General of Virginia, solicited by the State Board of Education, that a federal court order against the processing of grant applications was no longer in effect, the Board unanimously allowed retroactive applications.

On September 23, 1964, the Attorney General of Virginia advised the division superintendent of the county school board of Amherst County concerning an Amherst resident's entitlement to a state tuition grant. The question posed concerned an Amherst resident to whom the school board of Amherst County had provided transportation within 100 yards of his home and for whom space is available in a "grade-A" Amherst County school. The individual, however, desired to attend a Nelson County school. The Attorney General stated, "It is my opinion that there is no question but [the Amherst pupil] is entitled to a scholarship grant." A blind copy of this opinion letter was sent to J. G. Blount, Jr., of the State Board of Education.

In 1964, the Attorney General of Virginia advised the Commonwealth's Attorney for Sussex County concerning the tax consequences of tuition grants. He wrote:

> Moreover, I am of the opinion that receipt of a tuition grant under the provisions of Sec. 22–115.69 et seq. [22–115.29 et seq.], of the Virginia Code would not prevent the recipient thereof from being eligible to receive a tax deduction or credit under the provisions of Art. 3.1 of Title 58 and implementing local ordinance. In this connection, tuition grants authorized by the above-mentioned provisions of the Virginia Code are in no sense paid "directly or indirectly as a result of such contributions" to a private school within the scope of Sec. 28–19.4 of the Virginia Code.

In October, 1965, the Superintendent of Public Instruction transmitted to division superintendents a memorandum advising them of this Court's ruling in Griffin v. State Board of Education, under which payments in the form of tuition grants could not be made to pupils attending segregated schools predominantly maintained through such grants.

The Attorney General of Virginia wrote to a Norfolk resident on May 9, 1966, concerning the administration of tuition grants for the Norfolk school division:

> As I am sure you are now aware, tuition grants for the school year 1965–66 will not be paid by officials of the City of Norfolk, and such payments will be made on their behalf by the State Board of Education pursuant to the provisions of the Virginia tuition grant law governing such situations. Information is currently being obtained with respect to the various private schools in the Norfolk area whose students are eligible to receive tuition grants, and it is hoped that payment of such grants can be authorized this week with disbursements actually made on or before May 20, 1966.

On August 12, 1966, by Superintendent's Memorandum No. 4877, J. G. Blount, Jr., director of the division of finance, issued instructions governing the use of pupil scholarship forms during the up-coming school year. He instructed division superintendents that if the local governing board makes no appropriation for scholarships, the School Board should nonetheless check applications and send the originals to the State Board of Education. Blount further advised local authorities that they could make no payments to a pupil attending a racially segregated private school, if such school was predominantly maintained through pupil scholarships.

In a memorandum of September 16, 1966, Blount requested the Virginia superintendents to submit to him a list of private schools attended by pupils from their divisions who had submitted applications for tuition grants. Blount stated that he would notify local officials "as soon as possible after we receive information which will enable us to clear the private schools insofar as predominant support is concerned."

By memorandum of September 27, 1966, Superintendent Wilkerson advised division superintendents of a new regulation concerning pupil scholarships. If local funds were not appropriated for the payment of a locality to share pupil scholarships, division superintendents were instructed to receive, process and forward applications to the State Board of Education.

In July of 1967, further revised procedures for processing applications for pupil scholarships were instituted.

By memorandum of July 3, 1970, division superintendents were advised by J. G. Blount, Jr., that the General Assembly had not appropriated further funds for pupil scholarships, "and, therefore, this program terminated as of June 30, 1970."

The Richmond School Board approved payment of pupil scholarship grants as a matter of course over the years. For all practical purposes, they had no choice.

No State Board of Education regulations prohibit the exchange of pupils on a tuition basis between two political subdivisions.

From the time of the first *Brown* decision to the present, $830,377.68 was paid in the form of tuition grants or pupil scholarship grants to residents of Chesterfield County. The state paid something over half this amount. From 1965–66 to the present, tuition grants in the amount of $461,659.53 were disbursed to Chesterfield residents. Again, the state reimbursed the county for over half of this amount.

From 1954–55 to the present, Henrico residents received $527,849.91 in tuition grants. The state paid $249,320.60 of this total. From 1965–66 to 1970–71 the state paid $150,021.30, and the county $136,093.64, for a total of $286,114.94, in tuition grants to Henrico County residents.

Richmond residents, from 1954–55 to 1970–71, received $339,102.07 in public tuition grants. Nearly $115,000.00 of this was paid by the state. From 1965–66 to 1970–71 the state paid to Richmond residents $49,863.68, and the city paid $97,096.55, for a total of $146,960.23.

During the period of the tuition grant and pupil scholarship programs state and local agencies paid out $24,699,019.23 in such grants.

During the 1960–61 school session it was the estimate of the superintendent that 460 Chesterfield residents might apply for scholarship grants available under Virginia law. He also estimated that the cost of such scholarships to the county would be $47,150.00.

In late 1960, the school board approved payment of 143 applications for pupil scholarship grants for 1960–61. A substantial number of the applicants were to attend Richmond City public schools, and about fifty were to attend private schools.

For the 1961–62 session the superintendent estimated that 522 pupils would apply for scholarship grants. The estimated cost to the county would be $57,681.00.

In November, 1961, the Board of Supervisors approved the school board's request for $25,928.28 for pupil scholarships for the then current semester. Funds allocated by the Board of Supervisors for the payment of these scholarships were to be kept "separate and distinct from funds appropriated for the operation of the public schools."

Exhibits PX 112, 117, 118 and 120, which the Court accepts as accurate, reflect the substantial number of pupil tuition or scholarship grants made by the respective county defendants. In addition, the exhibits disclose amounts appropriated by the governing bodies for these purposes. PX 112 in particular shows the funds expended by state and local officials for tuition grants. Some of the grants were to students attending non-public schools.

Henrico County as well as Chesterfield approved grant applications by their residents. In many instances the grants were used by the recipients to attend Richmond City schools. In 1966–67 al-

most half of the grants used for Henrico students were to be used to attend city public schools.

In September of 1967 the school board approved further applications for scholarship grants for the 1967–68 year. Again, a large proportion of these were used to attend Richmond city public schools.

In October of 1968 the school board approved applications for scholarship grants by Henrico residents. A substantial number were to be used in Richmond schools.

In 1960, two blacks and thirty-two whites from Henrico attended Richmond public schools under the state tuition grant program. In 1961, six blacks, fifty-one whites, and twenty-seven of unknown race, residents of Henrico, came to Richmond public schools under the state tuition grant program and the special education program. In 1962, the figure was ten blacks, forty-nine whites and twenty-seven of race unknown. In 1963, seventy-two whites, ten blacks and twenty-eight of unknown race, Henrico residents, attended Richmond schools under the two programs mentioned. In 1964, the number was fifty-seven whites, ten blacks, and twenty-two of unknown race; in 1965, sixty-three whites, thirteen blacks and thirty-four of unknown race; in 1966, seventy whites, fourteen blacks and fifty-five of unknown race. In 1967, under the tuition grant program, eighty-four white and eleven black Henrico residents attended Richmond public schools. Forty-nine whose race is not reflected in the record attended such schools for special education purposes. In 1968, forty-eight Henrico citizens enrolled in Richmond special education programs; that year seventy-five whites and twelve blacks from Henrico attended Richmond schools under the tuition grant program. In 1969, forty-nine blacks and one white from Henrico attended Richmond's special education classes, and seventy-three whites and twelve blacks from Henrico attended the regular Richmond schools under tuition grants. Commencing in 1970, use of the tuition grant was

terminated. That year, however, eighty-seven whites and six blacks attended Richmond special education courses; and in 1971, one hundred and thirteen whites and ten blacks did so. Since 1962, Henrico County has also sent its residents, all white, to other school divisions than Richmond, in small numbers. Henrico residents have gone to Newport News, Chesterfield, Arlington, Virginia Beach, Martinsville, Williamsburg, Hanover, Bedford and Powhatan schools.

*State Department of Education Attitudes and Efforts re Desegregation*

Since 1960, Harry R. Elmore has been a deputy superintendent in the State Department of Education. Since July of 1964 it has been his duty to administer the state's compliance with the 1964 Civil Rights Act. Shortly after the passage of the Act, Elmore went with the State Superintendent to a briefing in Washington in the office of the United States Commissioner of Education. Afterwards, he was assigned by Dr. Wilkerson to the compliance task. Thereafter, Elmore, the only one in the State Department of Education assigned to desegregation matters, conducted a series of regional meetings with division superintendents of schools in the state.

Prior to the passage of the Civil Rights Act, in July 1964, no person in the State Department of Education was assigned to perform any functions or assume any responsibility relative to desegregation, nor was any affirmative action in this regard taken.

On November 9, 1964, Superintendent's Memorandum No. 4547 was issued to division superintendents from the Superintendent of Public Instruction, concerning a special report. Dr. Wilkerson requested that the forms enclosed be returned within a week. Information on the integration of public schools was requested. Division superintendents were asked to advise the state of the number of schools in which only white children attended, the number of schools in which only Negro children attended, and the number of schools which were "integrat-

ed." To clarify matters, the form added that the total of the three classes should equal the total of the number of public schools in the school division.

In January of 1965, Woodrow W. Wilkerson distributed materials to division superintendents related to Title 6 of the Civil Rights Act of 1964. Thereafter a series of meetings of division superintendents was set up in order to acquaint them with the requirements of the Civil Rights Act. Simultaneously, the State Department of Education organized a conference for white teachers of high school chemistry in early 1965. At the same time, it organized the tenth annual health and public education conference for Negro teachers and school administrators in Norfolk. In February of 1965, the State Department of Education sponsored the fourth annual conference for white teachers of foreign languages, in Natural Bridge, Virginia.

On January 22, 1965, for the expressed reason that otherwise loss of federal funds might result, the Board authorized its Superintendent to execute a statement of compliance under the 1964 Civil Rights Act.

On February 12, 1965, Woodrow W. Wilkerson signed, on behalf of the Virginia State Board of Education, an assurance of compliance with HEW regulations under the Civil Rights Act of 1964, Title 6. This document guaranteed non-discrimination in general terms in the practices of the state agency. The State Board of Education committed itself to make no new commitments of federal financial assistance to school districts with desegregation plans under submission until so notified by the United States Commissioner of Education. The document continues:

> The state agency will take steps to secure an assurance from any agency to which commitment of federal financial assistance has been made prior to January 3, 1965, on which installment payments are requested and, in the case of the refusal or failure on the part of any such agency to furnish the assurance, (or the Court order or plan where applicable), the state agency will promptly notify the United States Commissioner of Education.

Under the agreement the state agency also consented to keep records and submit reports from time to time as required by the United States Commissioner of Education to insure compliance. The department agreed to maintain all sources of information pertinent to ascertainment of compliance available for inspection at any time by federal officials.

The state agency, in addition, agreed to suspend the practice of holding separate state level conferences for Negro and white school personnel as of September 1, 1965. Under the rubric "Methods of Administration to Assure Compliance," the State Superintendent was given the authority to "advise with and secure from each state institution receiving federal funds under programs administered by the state agency, the necessary and proper compliance form before further disbursement of federal funds are made, with the exception of commitments made prior to January 3, 1965." He also agreed to keep the State Board of Education's Director of Finance advised on the compliance status of all school divisions.

The State Superintendent agreed also to inform and advise local school officials receiving federal financial assistance of the Civil Rights Act and the Board's procedures for indicating compliance therewith. Another commitment was to "attempt to secure funds and employ such personnel as may be needed in the administration of the Act."

Under the assurance given, any person could advise the State Superintendent of Public Instruction of an instance of discrimination, giving a full report thereof. Upon receipt of such a report the State Superintendent promised to request an explanation from the local school officials and to "advise with" the local board on procedures to alleviate any deviation from a compliance agreement filed by the local officials.

Annexed to its assurance of compliance under the Civil Rights Act of 1964, is a specific assurance that after July 1, 1965, all administrative and supervisory personnel at the state level will have been assigned office facilities without regard to race.

Until September of 1965, the State Board of Education still called racially segregated state-wide conferences for teachers, principals, and staff.

In the latter part of March, 1965, private attorneys were retained by the Attorney General to render assistance to the Commonwealth and its localities in compliance with Title VI of the Civil Rights Act. An Assistant Attorney General was also assigned to assist the State Department of Education in meeting compliance requirements.

By Superintendent's Memorandum of April 2, 1965, division superintendents were advised of the organization of secondary school principals' conferences for 1965. The "first" conference was scheduled for June 16–18 at Hampton Institute, in Hampton, Virginia. The "second" conference was set for June 21–23, at Madison College, in Harrisonburg, Virginia.

On April 19, 1965, Superintendent Wilkerson sent additional material concerning compliance with the 1964 Civil Rights Act to division superintendents. He advised local school districts that it was improper to file a Form 441, as several had done, if the school division was still segregated.

On April 22, 1965, Superintendent Wilkerson distributed to all division superintendents a paper prepared by Gordon M. Foster, Jr., a consultant to the United States Office of Education, concerning southern school desegregation. Therein, Dr. Foster stated that "desegregation plans based on freedom of choice are perhaps no more than transitional devices that ultimately will give way to unitary zoning." He also said that, "desegregation of teachers and professional staffs is ultimately in the picture."

The Superintendent of Public Instruction delivered to division superintendents copies of a speech by the Governor, objecting to certain aspects of the HEW guidelines. The then Governor had stated that HEW criteria, established to measure the effectiveness of free choice plans, in effect, worked to require a "racial balance." He also objected to "sweeping provisions with respect to faculty and staff desegregation."

On May 7, 1965, the Fairfax City school division superintendent advised the director of the equal educational opportunities program of the Department of Health, Education and Welfare that the City of Fairfax provided education for its residents under a tuition contract with Fairfax County. "The school board of Fairfax County," he added, "determines all policy relative to the education and transportation of pupils resident in the City of Fairfax." Fairfax County's plan having already been accepted, the superintendent therefore solicited approval of it insofar as it affected city pupils.

On May 24, 1965, Harry Elmore was advised by the superintendent of the Fairfax City school division that he had advised the United States Commissioner of Education that students resident in the City of Fairfax would attend schools under the desegregation plan of Fairfax County.

On June 1, 1965, Harry Elmore transmitted to Dr. Wilkerson a memorandum concerning HEW regulations governing program grants. He was critical of the federal department for its alleged interference in the administration of the state program. Concerning the "program analysis form" he stated, "This is another example of HEW assuming the role of judging a state program. Federal control is very evident. Section 504 of Title V sets forth four criteria for approval by the Commissioner of state applications for funds, all of which are routine except sub (a), which astoundingly places upon the Commissioner the determination of whether the state educational agency possesses the "ability" to

participate effectively in meeting the educational needs of the state.' " Elmore continued, "In summary, I feel that the information requested in support of the state application for funds under Title V goes beyond the purview of the Commissioner's authority provided in the Act and constitutes federal control which is prohibited under Section 604 of the Act. You probably will not want to say these things; however, I would suggest that the forms be reduced in amount of detail which is non-essential to giving the Commissioner a reasonable basis for the approval of state plans."

On June 2, 1965, the Attorney General responded to a letter sent him by an attorney concerning the application of HEW desegregation guidelines, and said:

In Virginia, the question of whether or not a locality will comply with the directions of HEW is being left to each locality. This office has been trying to find out from HEW exactly what their requirements are and then passing this information on to the localities, most of which are represented by their own counsel. The decision is then that of each locality.

I have serious doubt as to whether any locality would want to initiate proceedings itself to get under a Court order. If a locality refused to comply with the requirements of HEW and an independent suit is brought against the locality, . . . the locality may be better off in Court than in complying with the regulations of HEW. This, however, is the decision of each locality acting in accordance with the advice and recommendation of its local counsel.

I might add that a good many of the localities have employed counsel from the City of Richmond who are familiar with previous litigation in this field.

On June 4, 1965, Harry Elmore forwarded to Francis Keppel, then Commissioner of Education, copies of desegregation plans for Henrico and Tazewell Counties. He stated that the Henrico County plan had been reviewed by Mr. Edward A. Mearns, and solicited the plan's approval.

On June 21, 1965, division superintendents were advised by the State Superintendent of state assistance in negotiating desegregation plans. He advised them that private counsel as well as an Assistant Attorney General would be available to assist localities in the event that they were invited to confer with the United States Office of Education, concerning compliance with the Civil Rights Act. Wilkerson added, "The Commonwealth of Virginia will pay the costs incident to such legal services."

In July of 1965, division superintendents were advised by the State Board of the various technical services available under Title IV of the 1965 Civil Rights Act to assist them in the desegregation process.

In June and July of 1965, the State Board of Education held school lunch conferences at Radford College, for white school personnel, and at Virginia State College for Negro school lunch personnel.

By memorandum of July 30, 1965, Superintendent Wilkerson requested that division superintendents engaged in correspondence concerning desegregation plans with HEW, transmit copies of such materials to Harry R. Elmore, Assistant Superintendent of Public Instruction, and also to whichever of the three state-assigned attorneys advised the local school division in conferences with HEW. Wilkerson stated that he needed this information "to assure closer liaison with the school divisions in meeting compliance requirements."

On August 19, 1965, Tinsley L. Spraggins, of the technical assistance branch of the Equal Opportunities Program, wrote Dr. Wilkerson concerning the possibility of a program, previously discussed between the two, to acquaint division superintendents with the services available under Title IV of the 1964 Civil Rights Act. He requested another meeting in order to establish the procedures for such a conference. Dr. Wilkerson re-

plied by letter of August 25, 1965, that it would not be feasible to hold such a conference during August, September nor October. He did state that he had advised division superintendents of the technical assistance available by means of a memorandum. Copies of Dr. Wilkerson's letter went to the state attorneys.

In 1965, an attorney who had been designated by the Office of the Attorney General of Virginia to assist Virginia school divisions in meeting the compliance requirements of the Department of Health, Education and Welfare, wrote Superintendent Wilkerson the following letter:

As we end the ordeal of negotiating compliance plans for the various school divisions in Virginia, there is one matter that is giving me considerable concern. You will recall at all of the group meetings, we have told the various supervisors that in our opinion the free choice plan was calculated by HEW to be an interim solution that would give way in the not too distant future to geographical zoning. I am now more concerned about this than ever and I see signs in Washington that lead me to believe that HEW will push for unitary school systems without much further delay. For this reason, it occurred to me it might be well to suggest to the various superintendents and the school boards that they give consideration to one or two alternatives.

First, make sure that their plan is a complete, uninhibited free choice with no vestige of discrimination and prepare themselves to support such a plan in the federal court, or, two, begin to plan toward the establishment of a unitary school system based on non-discriminatory geographical zones.

If you wish to discuss this matter more fully, I will be glad to meet with you at your convenience. Also, if you think it might be helpful, you may enclose a copy of this letter with your communication to the various divisions.

Dr. Wilkerson responded to the effect that during regional meetings held with division superintendents, it had been clearly stated that compliance on the basis of a free choice plan was regarded by the Office of Education to be a transitional step. Therefore, he stated, he had tentatively decided not to transmit to division superintendents a memorandum concerning compliance in the future.

In December of 1965, a state senator wrote to the Governor concerning the experience of his school division in having to negotiate directly with the Department of Health, Education and Welfare concerning compliance with Title VI. "In doing so, the superintendent, the chairman of the school board, and another member of the school board, made several trips to the Department of Health, Education and Welfare in Washington, and, I may say, Hampton was one of the first school divisions to receive approval for its plans and disbursements of its funds. The writer added, "It would appear to me the state government should take the leadership in this matter and frankly, I think I can state the Hampton school board would have preferred to work with the state in this problem and not have been forced to take unilateral action by going directly to Washington." He asked that a full-time official be assigned from either the Department of Education or the Attorney General's Office for liaison with the local school boards.

The Governor replied that special counsel had been retained for these purposes, rather than employing a regular staff member from inside the government; and stated, "The threat to the continued operation of the schools should federal funds be cut off posed a most serious problem which, in my judgment and that of the Attorney General, fully justified the immediate employment of special counsel."

George Moody, the then Superintendent of Henrico County Public Schools, wrote Woodrow Wilkerson on April 14, 1966, concerning the desegregation of the

Henrico County schools. "During the current session," Moody stated, "under a combination of geographic zones around white schools and a freedom of choice, 19.7% of the Negro pupils are enrolled in predominantly white schools. No choice made by any Negro parent for his child was denied." Moody expressed dismay that representatives of the Office of Education had informed him that Henrico would no longer be able to use a freedom of choice plan. The county's position was that one more year of operation under such a plan would be necessary; otherwise, because an $11,000,-000.00 school construction program was soon to be completed, a change in attendance plans at that point might mean that some children would attend three different schools in three successive years. Moody accused the United States Office of Education of acting "arbitrarily" and without regard to the specific problems "we are facing."

In 1966 the United States Commissioner of Education distributed a memorandum on April 25th to chief state school officers concerning nondiscrimination in the operation of summer school programs. Commissioner Howell noted, "If a school district plans to conduct the same or similar activities at more than one location, an evaluation must be made to determine whether this separation is justified on same basis other than the maintenance of segregation." He added, "In making this evaluation the state educational agency should consider the racial composition of the teaching staff, whether the school at each location is thought of by the public as being for white or Negro children and whether the activities could be conducted at one location where members of both races would feel free to attend."

On April 29, 1966, Harry Elmore distributed an informational release to all division superintendents concerning civil rights compliance in summer programs, and included a copy of the Commissioner's communication aforementioned.

On September 1, 1966, Harry Elmore circulated to division superintendents a copy of the Governor's statement to the Secretary of HEW and the United States Commissioner of Education, wherein the Governor protested the conduct of HEW "review teams," who made "demands on the very eve of the opening of the school session, threatening to disrupt plans already perfected or force delay in opening the schools this Fall." The Governor specifically urged the Office of Education to withdraw or defer the review team's demands for the school year, and to institute further review by teams of "broader experience and greater maturity."

In September, 1966, the State Board deferred transmission of federal funds, on instructions from the United States Office of Education, to seven counties not in compliance with the Civil Rights Act. No further action was recorded.

When Elmore received a letter from Superintendent Moody of Henrico, of September 28, 1966, informing him that Henrico would not cooperate with HEW in the matter of faculty desegregation, he took no action. "I did not take action because the compliance under Title VI, the effectuation of a desegregation plan, resides with the local school board. We come in upon request." In September of 1966, the State Board requested that division superintendents supply them with copies of all letters sent to and received from the Office of Education.

On April 20, 1967, apparently in answer to an inquiry, Harry Elmore wrote an Assistant Attorney General to advise him that after review of the State Board's files concerning Title VI, he was unable to find "anything in writing which relates to unreasonable demands placed upon the local school authorities by the H.E.W." Mr. Elmore added, "Our office has maintained a liaison relationship with the school divisions and H.E.W. We have attempted to keep local school officials informed with respect to H.E.W. regulations and instructions pertaining to compliance with Title VI and to assist those localities desiring to meet the requirements of H.E.W. for receipt of federal funds."

Peter Libassi, the Director for the Office for Civil Rights of the Department of Health, Education and Welfare, sent a memorandum of February 27, 1968, to chief state school officers of southern and border states where free choice desegregation plans might be in effect. He discussed procedural matters and added, "It should be understood that the free choice plan is an acceptable means for eliminating the dual-school structure, only if it is effective in accomplishing that objective."

On June 20, 1968, Lloyd R. Henderson, Education Branch Chief for the Office for Civil Rights, advised Superintendent Wilkerson that administrative enforcement proceedings were being commenced against the Henrico County public schools and asked him to instruct the staff to commit no further federal assistance until further notice. Dr. Wilkerson also received a copy of a letter from Ruby G. Martin, Director for the Office of Civil Rights, to Mr. Moody, the Henrico Superintendent, advising Moody that after a study she had concluded that Henrico's desegregation plan "is not adequate and is not working effectively to accomplish the elimination of the dual school system."

According to Elmore, there was "very close liaison" between the Department of Health, Education and Welfare and his department, although Mr. Elmore said he wouldn't subscribe to the word "cooperation" in describing the spirit with which he and HEW worked. The facts show, however, that even in the minor area of transmission of information this liaison had its limits. In early 1969, the Justice Department, through HEW, sought to secure statistics and maps concerning three Virginia school divisions. Elmore advised the recipient of this request, "Call Severson (of HEW) and suggest that requests be made in writing from the Justice Department or her office to divisions to furnish specific information, sending copies to the Superintendent of Public Instruction. If the localities refuse, write the Superintendent of Public Instruction requesting that our department furnish the information. In this event, we would supply items 3 and 4 and say that we do not have 1 and 2; that the department does not keep such detailed records, that the same are available only through the local school authorities." In fact, the State Board of Education did have student and faculty desegregation figures for the preceding Fall. Elmore assumed that they wanted later facts. His memorandum continued, "Should Severson insist that we secure the data from the local districts, state that the compliance agreements are between HEW and the local school districts, and if they refused to supply the Justice Department or HEW, our department is not in any position to coerce the districts into supplying the data. Coercive action should be applied by the federal government for whatever ends are justified and lawful under the Civil Rights Act and federal regulations." Elmore was reluctant to use the State Board's authority to secure such data because he did not want the office to "adopt a stance or posture of being a means of getting information that HEW should get from the locality." He feared that some division superintendents might resent such action. Thus, the State Board bowed to considerations of internal administrative politics and failed to perform this slight affirmative act to facilitate the process of desegregation.

Elmore expanded his memorandum:

In addition, I have the following thoughts:

The State Board's compliance agreement does not require our collecting data from the school divisions for transmittal to HEW. Our role with localities is to advise, consult, inform and encourage compliance. We are required to submit information as may be requested by the Commissioner as it affects the Board's compliance in its department operations.

The guidelines (regulations of HEW) require that localities submit supplementary information as may be requested by HEW.

I do not think it is sound, politically or otherwise, for the department to assume the role of a coercive collection agency for the federal government in instances where local school systems refuse to supply the information and are willing to forego federal aid. The federal government has ample authority to exercise over localities if it desires to institute suit through the Justice Department to place such localities under court order desegregation plans. It would be ill-advised, in my judgment, for our department to align itself with the federal government in this confrontation with Accomac, Nansemond and Westmoreland.

The attitude of the sole man in charge of desegregation efforts in a State Department of Education, therefore, was consistent with compliance with the contract agreement his office had signed, no more. Activities beyond the scope of that agreement were to be governed by considerations of political wisdom, or at the very least the attitude was that school divisions, if they complied with Title VI of the Civil Rights Act, did so "simply to get federal funds," and if they didn't want federal funds they didn't have to submit information HEW wanted, and he found it diplomatically sound not to do any more than absolutely required.

On January 4, 1970, the Department of Health, Education and Welfare distributed an analysis of 1968 national school attendance patterns. This publication came to the attention of Mr. Elmore and others in the State Board of Education. It shows that in the Fall of 1968 although 23.5% of the total students in the schools of the State of Virginia were black, 58% of them were in 100% minority schools; 65.8% of them were in 99 to 100% minority schools; 73.1% were in 50 to 100% minority schools; and only 26.9% of them were in schools with a minority component below 50%. The survey also showed that 54% of "non-minority" students in Virginia were in schools containing 95 to 100% "non-minority" students. Only

seven-tenths of a percent of that group were in schools with less than 50% "non-minority" pupils.

On February 20, 1970, the office for civil rights of the Department of Health, Education and Welfare advised Superintendent Wilkerson to make no further commitments for federal assistance to the School Board of Newport News.

On February 26, 1970, Mr. Elmore wrote to the Superintendent of the Newport News city schools that the State Department of Education had been notified that no new commitments were to be made to the Newport News city school system for new elementary and secondary education activities until the Office for Civil Rights advised otherwise.

On July 2, 1970, the Assistant Attorney General in charge of the Civil Rights Division of the Justice Department wrote the State Superintendent of Education to call his attention to the responsibility of the state and its agencies in insuring school desegregation. He stated that the Attorney General had received complaints from five (5) school districts in Virginia concerning racial discrimination and considered the State Board of Education to be the "appropriate agency to be called upon to adjust the conditions of unlawful segregation." He asked Dr. Wilkerson to assure him that procedures have been established to insure that full desegregation plans would be implemented within the five-named school districts in 1970 and 1971.

Dr. Wilkerson replied to Jerris Leonard's letter of July 2, 1970, advising him that the State Board would work with officials of the school divisions complained of, and that he hoped that in a reasonably short time the areas would be committed to full desegregation. He asked that the nature of the complaints of discrimination be set forth in greater detail.

In the case of Suffolk, Elmore conferred with the division superintendent concerning an all-black elementary and junior high school to which HEW had objected. Elmore studied the situation

and recommended reconstituting the all-black school as a junior high school. In August of 1970, the Suffolk City School Board took action in conformity with the recommendation. Subsequently, it was found in compliance with the Civil Rights Act by HEW.

On July 15, 1970, Elmore advised Jerris Leonard of his progress in discussing desegregation matters with the Newport News school officials. That day Elmore had suggested that the school board undertake, in lieu of a free-choice plan for high schools, to assign pupils by one of three zoning systems. One of his suggestions was "Non-contiguous zoning whereby a block of Negro children would be transported from the ghetto area into the suburbs." Mr. Elmore, however, was careful to emphasize that this was not a recommendation of the Department of Education. It was solely a suggestion that emerged from discussions.

The State Department of Education did not apply for a federal grant in order to set up a central staff to give technical assistance to local school districts in desegregation until late 1970. It was Elmore's judgment that the desegregation task had to be divided into two parts. First, the State Board undertook to bring about formal compliance with the Civil Rights Act; only after this had been accomplished, in the State's view, throughout the state, were people brought in to help the school divisions solve the educational problems involved in desegregation.

Elmore described a "good working relationship" which he attempted to preserve between the State Department and division superintendents:

I must say that some of them were extremely sensitive throughout this whole period. They did not appreciate one bit the Department's attempting to thrust any part of the plan upon them until they were prepared to accept it. We encouraged them. We worked with them. We advised. We informed. But we never once moved in and said, "You have got to do this or you have got to do that."

This might have been a little thing, but it could have triggered something in a community that could have backfired on our good working relationships.

Elmore's conception—and it must not be forgotten that he was the only man in charge—of the State Board's duty was confined strictly to the terms of the assurance of compliance that his department had signed. This bound him, as he saw it, solely to assist and inform localities in effecting compliance.

Robert T. Green has been special assistant in the State Department of Education for desegregation since February 1, 1971. He was the first employee in the Title IV unit of the State Department of Education. Funds for such an official have been available for approximately five years now. He has a staff of three and a secretary; his office is funded in the amount of $77,000.00.

He assists and advises local school districts in solving desegregation problems. He has not had occasion to utilize the services of the State Department of Education in making transportation surveys in connection with desegregation.

In applying for the grant which funded Green's office, the State Department of Education represented to the United States Office of Education that it would assist in drawing school bus routes. Dr. Green's office would be available to work with a hypothetical metropolitan area school authority, utilizing all the technical services of the State Department, to assist it in desegregating the schools within his jurisdiction. Federal funds are also available for this purpose.

The State Board of Education and the Superintendent of Public Instruction laid great emphasis upon their consistent policy of informing local school divisions of requirements of the Department of Health, Education and Welfare concerning school desegregation. Of course, this was a requirement of the assurance

of compliance executed on behalf of the State Board. During the massive resistance years, the State Board of Education zealously and speedily communicated to local school divisions the most recent state enactments designed to frustrate desegregation. By contrast, during the years from 1965 on, during which the State Board was assertedly working to bring about compliance with HEW requirements, it did not undertake to disseminate to division superintendents the substance of the requirements of even the most important decisions of the United States Supreme Court in the field of school desegregation, much less those of lower federal courts.

Elmore could recall very few instances in which the State Department of Education had advised division superintendents of the gist of recent Court decisions on desegregation, as opposed to transmitting memorandum concerning changes in HEW regulations. For example, no release, apparently, was issued after the United States Supreme Court decided the Green v. County School Board of New Kent County case.

Although the assurance of compliance itself required the State Board to "secure" compliance agreements by school divisions, its work with them fundamentally was initiated only upon request of local authorities. More important, apparently, than desegregation, was the preservation of a smooth working relationship with the localities.

The Court has already noted that the State Board of Education would provide the services of one of three attorneys retained for the purpose to any school division involved in negotiations over compliance with HEW requirements. In addition, the state, by statute, makes provision for payment from public funds of litigation expenses incurred by public agencies in defending lawsuits concerning school segregation. From 1955 to 1971 the state has paid in total legal fees and expenses (compiled from records of the State Attorney General) the sum of $769,932.53.

John F. Banks, Associate Director of Secondary Education in the State Department of Education, reported to a United States Senate Select Committee on Equal Educational Opportunity in mid-1971 concerning the process of school desegregation and the decline in the number of black secondary school principals in Virginia:

> In 1965, ten years after the 1954 Supreme Court decision, there were still 77 black secondary schools in 73 counties, and 30 black secondary schools in 27 cities of Virginia. Each of these 107 black secondary schools had a black principal.

> Today there are only four counties in which the black secondary school plans are even used to accommodate all secondary students, and the number of black principals has dwindled to 17.

> The greatest change occurred in 1969, when school divisions, either by Court order or apparently because of pressures from the Department of Health, Education and Welfare, went to unitary school systems. The usual pattern was to close or to reorganize the black secondary school. This meant, in most instances, a change in the status of the principal. Sometimes he was reassigned, "demoted" to an elementary or junior high school principalship. More often he was removed entirely from policy-making positions. Many reassignments were to the classrooms. Often, the black principal was given a pseudo-promotion to the central office, which in reality is only a "dead-end street."

> The impact of these changes is of particular concern because of its debilitating influence on educational aspirations of the black community.

The State Board of Education is informed at least yearly by school census reports of the racial composition of faculties in school facilities.

*Regional Schools:*

On January 11, 1946, the State Board of Education tentatively approved a

grant of $75,000.00 from the vocational capital outlay fund for purposes of constructing a regional Negro high school for Orange, Madison, Green, Rappahannock and Culpeper Counties. On February 21, 1946, the Board took final action to recommend the appropriation to the Governor. At the meeting of July 15, 1947, the State Board of Education granted the request of the school boards of Albemarle County and the City of Charlottesville for aproval of a plan to establish a joint school for blacks in accordance with the State Board's regulations covering joint school operation.

Subsequent to the decision in Brown v. Board, the State Board of Education took no action to withdraw its approval of the operation of these joint schools nor of the transportation programs used in connection with them.

The State Board of Education never expressed any disapproval of the practice of crossing political subdivisional lines by students attending these regional schools.

By memorandum of January 8, 1947, the State Board of Education endorsed, among other things, the creation of a number of regional vocational schools. For such purposes the Board proposed that groups of school divisions cooperate to own and operate such facilities as joint schools. Such facilities were to be open to whites only, and their sites were selected upon that premise. The memorandum states:

Nine centers have been tentatively selected on the basis of geographical distribution and concentration of industries in which the practicability of establishing and operating such joint schools for white students will be fully explored.

In order to develop vocational training for blacks, the State Board proposed to use funds from the Special State Vocational Capital Outlay Fund to establish vocational training centers at regional high schools for blacks, at proposed comprehensive high schools in areas of the state with more concentrated black population, "with the regional vocational schools for Negroes probably limited to not more than one or two centers."

In a document published by the State Board of Education in 1947, entitled "A Comprehensive Program of Education for Virginia's Public Schools," regional high schools of general curriculum were discussed. The following is an extract from that document:

Regional high schools. In certain areas of the state, particularly in the Shenandoah Valley, northern Virginia, and the southwest, on account of the small and scattered Negro population regional high schools serving groups of school divisions will be necessary in order to provide comprehensive programs of education on the secondary level for Negro boys and girls. Negro high school pupils may be transported daily to those schools from adjoining counties and cities when practical and when the distances involved are not too great. However, if all of the Negro secondary school pupils in such areas are to be served, comfortable and adequate dormitory and boarding facilities must be provided at these regional high schools with the parents and school boards sharing in the boarding expenses for such pupils.

The movement to provide higher educational opportunities for Negro youths through this development of regional high schools in those areas with small and scattered Negro population has the endorsement and support of the State Department of Education. Considerable progress has already been made in this direction, yet much remains to be done to meet more adequately the educational needs of Negro youth in these sections of Virginia.

The regional Negro high schools at Manassas and Christiansburg have pointed the way, and the recent cooperative action by the counties of Culpeper, Madison, Orange, Rappahannock and Greene in approving such a regional high school to be constructed in Culpeper County in the near future for their Negro youths is worthy of

commendation to other sections of the state facing the same problem.

On May 6, 1949, the Superintendent of Public Instruction transmitted to division superintendents, for their information, a copy of the opinion of the United States District Court for the Western District of Virginia in Corbin v. County School Board of Pulaski County, 84 F. Supp. 253, "which establishes the legality and constitutionality for jointly owned and operated high schools which do not have to be within the geographical boundaries of the county." Interestingly, Judge Barksdale, in that opinion, points out that some "buses transporting white children * * * have scheduled trips of more than an hour and a half each way."

The State Board approved the salary of the Superintendent of Christiansburg Industrial Institute in 1949.

The State Board in 1949 promulgated detailed regulations for the operation of jointly maintained and financed schools. These covered the selection of members for the committee of control, the selection of staff, budgeting, and financial support.

The Board approved for recommendation to the Governor such special appropriations as were necessary to equip a joint high school for Negroes run by Charlottesville and Albemarle County.

In 1950, the Board approved the construction of segregated joint schools by Lancaster and Northumberland Counties.

In July of 1955, the State Board gave specific approval to the expansion of facilities at the Carver black regional high school, serving Culpeper, Madison, Orange and Rappahannock Counties.

The approval of the State Board of Education was required by law for the establishment of joint schools. (Va.Code Sec. 22–7)

On January 26, 1956, the Board of Education approved a contract between Rockbridge County and the Town of Lexington for the establishment and operation of a joint high school.

From 1940 through 1968, at least four regional all-black schools were operated in the State of Virginia. These were joint schools, requiring the approval of the State Board of Education. For the most part, black students were bused to these schools, although in some instances, dormitories were employed. Students at these schools apparently were at home only on weekends.

The enrollment at these regional black high schools is set forth in plaintiffs' Exhibit 109. This information was amassed by means of the State Board of Education's usual procedures of statistical compilation, and the Court finds it to be reasonably accurate.

As it did in other instances when buses were used to transport students to school, the state financed a substantial part of the pupil transportation. Approval was required on an annual basis before such disbursements are made.

### Pupil Exchanges

Since 1960, there has not been a school year in which several Richmond City residents did not attend school in a division other than Richmond. Thirteen Richmond students attended Henrico schools in 1962; ten in 1963; seventeen in 1964; twenty-four in 1965; twenty-six in 1966; eighteen in 1967; twelve in 1968; and fourteen in 1969. Since that year, Richmond has sent students only to Chesterfield County, in connection with the recent annexation. The race of each of these students is unknown. Since 1962, Richmond has sent a small number of students, race unknown, to Chesterfield County schools.

Annexations to the City of Richmond have been brought in the following additions to the City's school population:

```
1906—1,245 white, 6444 black
1909—1,082 white, 541 black
1914—2,565 white, 308 black
1942—1,721 white, 307 black
1970—6,616 white, 237 black
```

In addition, 136 blacks and 3,251 whites, residents of the area annexed in 1970, currently attend school in Chesterfield County under an agreement be-

tween the two jurisdictions, which has been discussed in prior memoranda of the Court.

The defendants point out that the City of Richmond rejected in 1965 an annexation award which would have brought into the City 8,047 white and 125 black students. This is true. The rejection, of course, was made by the city council of the City of Richmond, a defendant herein. It was also made at a time when the schools of each political subdivision here involved, including Chesterfield, were undeniably segregated.

The Chairman of the City School Board was, at trial, unaware of the current position, if any, of the Richmond city council on the issue of school consolidation, and there has been no evidence in this record sufficient to enlighten the Court.

The decision of the Richmond School Board to seek quality education in the Richmond metropolitan community, by means of desegregation involving the adjoining counties, sprang partly from this Court's earlier desegregation orders addressed to the Richmond City School Board alone and partly out of a history of cooperation between school divisions in the area.

Richmond, Henrico and Chesterfield have cooperated in the establishment of a training center for mentally retarded trainable children. It is funded on a per pupil basis. Currently facilities operate in the Virginia Randolph School in Henrico County and in the Hickory Hill School on the south side of the James River, both formerly all-black schools.

The three school divisions also cooperate in operating a mathematics-science center along with two other school divisions, Goochland and Powhatan Counties. It also is housed in the Virginia Randolph School facility.

Children are taken to each of these programs from all over the metropolitan area by school bus.

A technical center also operates in Richmond under a cooperative scheme involving the three school divisions, and others.

The Richmond public school system has always had difficulties maintaining high quality education in majority black schools.

During Mrs. Crockford's tenure on the Richmond City School Board, that body has always felt a duty to comply with policies directed by the Virginia State Board of Education. If that body directed the local school division to take action to alleviate segregation in the public schools, local officials would have complied. However, the State Board took no affirmative steps to direct desegregation.

Guidance from the state level instead took the form of the creation of the pupil placement board and the tuition-grant system. Under the latter procedure, as the Court has found, the City of Richmond has exchanged students with Chesterfield and Henrico Counties and has sent some to private schools. On November 21, 1967, the Richmond School Board approved a tuition grant for a resident to attend a facility operated by the Prince Edward School Foundation in Farmville, Virginia.

The School Board of the City of Richmond has never requested that the State Board of Education direct the consolidation of school divisions in the area. As Mrs. Crockford stated, it seemed rather a hopeless effort. Board members felt that the adjoining counties would not respond positively. In such a situation, Mrs. Crockford stated, opinion was that the State Board of Education would not be responsive to Richmond's request, and the Court having heard the evidence, concurs in this conclusion.

In spite of all parties having been given ample opportunity to prepare for the case, and in spite of the opportunity to do so none of the defendants have suggested any consolidation plan in lieu of the one developed by Dr. Little, the Court

is satisfied from the evidence that given the attitude of the defendants the securing of the constitutional rights to which the plaintiff class are entitled will not be accomplished except under the supervision of the Court.

*Transportation:*

In 1942, when wartime conditions led to a shortage of school bus units, the State Board of Education suggested to division superintendents that if schools were operated on a staggered schedule, a more economical use might be made of existing equipment.

In October of 1946, in a policy statement concerning school consolidation, the State Board of Education recommended that high school students be transported no more than 90 minutes, one way, and that for elementary students the maximum should be 50 minutes.

In 1955, the State Board issued detailed recommendations for the operation of school bus systems.

In 1957, the State Supervisor of Elementary Education undertook to survey the state to determine the number of school children in each division whose school day was extended because they had to await bus transportation by virtue of their bus having to make the circuit of several routes prior to transporting them. All superintendents were requested to complete a form giving information on the topic.

In December 1960, the Board issued its mandatory general regulations and recommendations on pupil transportation. Included in the regulations was one that permitted children to stand in the aisle back of the driver's seat for trips of short distances.

On February 4, 1966, Woodrow Wilkerson advised division superintendents of a new regulation concerning distribution of state pupil transportation funds. Thereafter, reimbursement by state funds for transporting pupils from an adjoining school division would be available when the procedure had been established by mutual agreement of the school boards of the two school divisions.

Crossing State, City and
County Lines

From the school year 1954–55 through the beginning of 1970–71, Virginia students have attended both public and private schools in other states, both within and beyond commuting range of their homes, with tuition and/or transportation payments made from public funds. Compilations secured from replies of local school boards to the State Board of Education are found in PX 110 and 111. Where the race of the respective student can be ascertained from the exhibits, it is apparent that with rare exception blacks and whites have been assigned to separate schools.

The purpose of the practices aforementioned, including the transporting of students great distances, were, except in those instances involving special situations such as the Washington, D. C. Private School for the Handicapped, to preserve segregated schools.

Children have been transported to and from North Carolina, West Virginia, Washington, D. C., Maryland and Tennessee.

Obviously some of the instances were by virtue of the tuition grant and pupil scholarship programs. Others have been by virtue of arrangements made between a local school board and the school authorities in another state, but all with at least tacit approval of the State Board of Education. No expression of disapproval of the practice of transporting students across state lines has ever been made by the State Board of Education.

From 1940 through 1965, black school children in Frederick County attended schools in Winchester for the stated reason that there was no black high school available in the county, and also for reasons of proximity. In 1961 through 1969, white students from Cumberland County were sent to school in Powhatan and Prince Edward Counties, their tuition paid by Cumberland, for the purpose of avoiding integration.

From 1948 through 1967, black high school pupils of Orange County were

sent to George Washington Carver regional high school, in Culpeper. About 200 students were sent each year. Each year from 1953–54 through 1964–65, Dickinson County sent approximately 23 black pupils to secondary school in Russell County, because Dickinson County did not have a high school for blacks. Simultaneously, beginning in 1962, white Dickinson elementary pupils went to Russell County schools for reasons of proximity. The transportation of white pupils continued at least through 1970–71.

From 1950 through 1965, approximately 20 black pupils each year were sent out of Bland County into Tazewell County to attend public schools. This was because Tazewell County operated the nearest school open to people of their race.

From 1945 through 1965, about 20 Bath County black residents were regularly sent to school in Alleghany County on a tuition basis because, according to Bath officials, there was "no high school" available for them in Bath. From 1965–66 on, none were sent out of the county, for the stated reason that schools were "fully integrated." Bath County also sent white pupils out of its jurisdiction in 1958 and 1959 for reasons of proximity.

From 1948 to at least through 1964–65, Greene County black residents were sent on a tuition basis to school in Albemarle County because there was "no Negro high school in Green County." At the same time lesser numbers of white pupils attended schools, tuition paid, in counties surrounding Greene by reason of parental choice. After 1964–65, Greene County officials are unable to supply the information on attendance outside of the county. For these years they report solely, "pupil scholarships sent directly to state." (PX 94, at 25–26) During this period the State Board issued the grants. From 1940 through 1966 black residents of Buena Vista City attended the Downing High School in Lexington under a contract arrangement.

From 1940 through 1963, Shenandoah County blacks desiring to attend high school were sent, on a tuition paid basis, to the City of Winchester, the City of Charlottesville, Prince William County, or the City of Harrisonburg because Shenandoah County did not operate a high school for Negroes.

From 1941 through 1959, small numbers of blacks were resident in Giles County and were sent to Montgomery County to attend high school because there was no program for blacks in Giles County beyond the tenth grade. In the meantime, larger numbers of whites attended school in Bland County, tuition also paid by Giles County, for reasons of proximity. The transportation of whites into Bland County continued at least through 1971.

According to a very recent report submitted to the State Board of Education,

> Prior to 1958, Alleghany County and the City of Covington comprised one school division. When they separated in 1958, the county was left with no high school and consequently sent all secondary students to Covington, Clifton Forge, or Bath County on a tuition basis. In 1963, Alleghany High School opened for white high school students only. Negro high school students continued to attend the Negro high school in Covington. Also, a few other students, white and black, continued to attend school in Bath County, Covington or Clifton Forge because nearby Alleghany County facilities were not yet available.
>
> In 1965 such facilities were ready for use and both school divisions at the same time completely integrated.

Ninety to 100 black residents of Alleghany County attended school in Covington.

From 1948 through 1964–65, about 150 black high school pupils per year were sent on a tuition basis to high school in the Town of Lexington because Rockbridge County offered no high school program for blacks. Rockbridge County also sent about 125 white pupils to Lex-

ington schools through 1960 to relieve overcrowding.

From 1960 through 1968–69, Powhatan County public schools sent small numbers of white pupils, tuition paid, to public schools in Chesterfield County, the City of Richmond, and Goochland County, on the request of parents.

From 1959 through 1964, about a dozen Tazewell students, all white, attended Russell County schools for reasons of proximity. During the period 1959 through 1970 about 45 Tazewell white residents attended Smyth County schools, again for reasons of proximity. From 1959 through 1964, Tazewell County black students, at a rate of about 10 per year, attended Excelsior High School in McDowell County, West Virginia; Tazewell County reimbursed McDowell County for their per pupil cost.

Under a freedom of choice plan in 1965 and 1966, black residents of the Town of West Point attended school in King and Queen County.

Henrico and Chesterfield Counties have been transporting school children to and from school by bus for many years.

## Henrico

In 1957, the school board of Henrico adopted transportation policies which included the requirement that bus routes shall be established in such manner as to require approximately one and one-quarter hours' running time. The white bus routes, formulated with the assistance of the State Department of Education in 1957, included recommendations that buses travel routes ranging from 11 to 20 miles, in certain instances.

In 1962 a committee from the Westwood Civic Association appeared before the Board to request a change in the Westwood boundary line to permit their children to attend schools other than those into which they had been zoned. One reason presented in support of the application was that Westwood children "have attended twelve different schools

in fifteen years." The Board denied the request.

Until 1969, black high school students in Henrico County had the choice of attending the Virginia Randolph High School in the northern section of Henrico, or the nearest formerly all-white school. Black children would go to the Virginia Randolph site from the Varina area by bus. The evidence fails to disclose the length of time the trip took.

In 1969–70, the County of Henrico transported daily an average of 22,484 pupils, of whom 9,694 were secondary pupils and 12,790 were elementary pupils. A total of 199 buses were used. Of these, 180 were in daily operation. They transported pupils a total of 1,139,006 miles. On an average, each bus carried 113 pupils. The total cost of Henrico's busing operation that year was $638,-745.18.

Of 456 bus trips scheduled in Henrico County in 1970–71, 436 take less than thirty minutes to complete. Twenty trips take between one-half hour and one hour. A single trip takes slightly over one hour.

Henrico has used a transportation system requiring students to transfer buses; in at least one instance students were required to wait until 4:15 p. m. for their transfer bus on their homebound ride.

## Chesterfield

The Chesterfield School Board minutes of January, 1940, record that the chairman named a committee to investigate the possibility of extending a contractor's bus route "on Stockton Street to accommodate pupils in that congested area, thus making it unnecessary for the children to wait in the cold for the bus."

On November 22, 1939, the Chesterfield County School Board appointed a committee to investigate the advisability of transporting Negro high school students to D. Webster Davis High School. The committee reported in early 1940 that since the county furnished high school facilities at Hickory Hill for

blacks, the board should refuse to provide transportation to the Davis High School. The board approved that recommendation.

In 1941, black patrons again requested that the county furnish bus transportation for black high school students going to Hickory Hill and D. Webster Davis High Schools. A committee was appointed to investigate. At the next meeting the request was renewed. The committee, composed of the superintendent, requested further time for study.

In October, 1943, a delegation of black patrons appeared to request that their children be furnished transportation to the Beulah School. A committee was appointed to make arrangements.

On October 9, 1951, the Board of Supervisors were receiving complaints concerning overcrowding on school buses. Applicants stated that they had gotten no relief from the Superintendent of Schools and the School Board.

On October 24, 1962, a group of Midlothian District parents protested to the superintendent the removal of their children from Southampton School to Bon Air School on the ground of inconvenience caused by the transportation distance.

In August of 1963, parents of fifteen children on Beechwood Avenue protested their transfer to Matoaca High School for the new session. There was a discussion of the busing distances involved; the board determined to adhere to its plan of assignment. Some of the parents whose children were transferred to the Matoaca High School brought suit to enjoin the assignment. The individual parents asked the board to reconsider the transfer, stressing the number of railroad crossings, mileage to Matoaca High School, and their personal desire to have their children continue at Thomas Dale. The School Board agreed to study the matter.

The Virginia Pupil Placement Board reassigned to Thomas Dale School thirteen of the Beechwood residents. The School Board decided to give the seven remaining a freedom of choice, subject to the decision of the Pupil Placement Board.

In the opinion of the Chesterfield School Superintendent, there are no harmful educational effects attributable to the bus ride experienced by pupils in the Grange Hall area who are transported to Midlothian High School in order to take advantage of programs not available at the Grange Hall School, and the Court so finds.

The transportation practice in Chesterfield County has included transfer buses which wait at pick-up points for students to arrive on other buses.

The Carver School is about two miles from the Curtis School. Carver was a black school through June of 1970, attended by students from all over Chesterfield County. The longest bus route to it took about one hour and forty-five minutes to cover.

The Chesterfield Superintendent of Schools was not aware of the maximum time that Chesterfield pupils might spend on a bus going to and from school each day. As an educator he felt confident in relying upon the transportation division people on his staff. He did not believe that a transportation time of one hour would be inordinate.

In 1970–71, 85% of Chesterfield County pupils transported by the school board traveled less than 30 minutes. Of the 376 trips, 47 were between 31 and 45 minutes, and 8 were between 46 and 60 minutes. Three trips were 61 minutes or more. One bus trip takes about two hours, however. This accommodates students going to Manchester and Midlothian High Schools from the Grange Hall area.

In 1969–70, Chesterfield County transported daily an average of 24,715 pupils, of whom 8,088 were secondary pupils and 16,627 were elementary students. There were 228 buses operated; of these, 180 were in daily operation. They carried students a total of 1,516,085 miles. The total cost of Chesterfield's busing program that year was $804,962.79.

There is no evidence before this Court that would give rise to any conclusion other than that the time and distance contemplated by the proposed plan would not be so great as to either risk the health of the children or significantly impinge on the educational process, and the Court so finds.

The Court finds that the transportation contemplated will in no event be for a longer distance or time than the maximum now utilized by the respective county defendants.

In reference to the transportation needs called for, the consolidation of the Richmond, Henrico and Chesterfield school systems under the plan proposed by the Richmond School Board will not require additional buses.

*Chesterfield:*

From 1941 to the present, Chesterfield County has sent substantial numbers of pupils to school in the adjoining cities of Petersburg and Richmond. In 1949, 1950 and 1951, about 100 black students attended school outside the county. In other years, all students transferring were either white or of race unknown to the Court, save for 80 blacks taking vocational training in 1971. At one time several hundred white Chesterfield students went beyond their county for an education. Since 1964, however, no more than about 50 per year, on an average, do so. Reasons for the transfer of these fairly substantial numbers of Chesterfield children to adjoining school divisions were proximity and access to special education facilities, from 1949 through 1964.

In late 1942 the superintendent requested and secured from the Board of Supervisors a supplemental appropriation to pay for the instruction of Negro high school pupils in the D. Webster Davis High School outside the county system and elementary pupils in the Matoaca Laboratory school.

On November 10, 1942, the Chesterfield County Board of Supervisors acceded to the school board's request and appropriated a supplement of $4,650.00 for the instruction of high school pupils at D. Webster Davis High School and elementary pupils at Matoaka Laboratory School for that session. Further requests, on October 9, 1945, for appropriations to pay for instruction at Webster Davis and Matoaka Laboratory School were denied by the Board of Supervisors, for the stated reason that the year's budget had been completed.

For the 1945–46 session, at the request of two officials of Virginia State College, the Chesterfield School Board directed that $3,000.00 be added to the budget for instruction of students attending the Webster Davis High School.

On October 25, 1948, the Colonial Heights School Board requested the Chesterfield County School Board to enter into a contract to furnish school facilities for city children during 1948–49. The county school board agreed to do so. Under the terms of the contract the County School Board of Chesterfield County agreed to operate and maintain the public school facilities in the City of Colonial Heights upon the condition that the city school board reimburse the county for all expenses, including those of sending city high school pupils to the Petersburg High School and to Thomas Dale High School in Chester, Virginia.

In 1949 two Negro high school students who registered in Petersburg schools requested the board to pay their tuition "on the same basis as white pupils." Board minutes relate the following action: "Since the county has provided an excellent Negro high school with modern facilities and transportation is available to the school . . . the request for tuition was denied." The Chesterfied School Board resolved that beginning in the Fall of 1949, all Chesterfield residents would be required to attend county schools, and no tuition would be paid to other school divisions for the education of Chesterfield residents.

In January of 1949, a delegation requested that Ettrick and Matoaca High School pupils be permitted to continue to attend the high schools in Petersburg.

The board refused to so allow. However, on request at the same meeting the board resolved to allow elementary pupils in the Virginia State College community to continue to attend the Matoaca Laboratory School on the basis that the school board would reimburse the college in an amount equal to the average daily attendance of such pupils.

In February of 1949, the board directed its superintendent to submit a bill for $28,450.98 for the costs of educating Colonial Heights pupils through December 31, 1948, for payment by the Colonial Heights School Board.

On March 8, 1949, the Board of Supervisors, after conference with the Chesterfield County School Board, resolved to request the school board to continue to pay tuition for high school students in Matoaca area desiring to go to school in Petersburg for a period of three years.

On June 22, 1949, the Chesterfield Board of Supervisors entered into a contract with the City of Colonial Heights to use an elementary school building in the city, commencing July 1, 1949, and until litigation between the city and the county terminated.

In June of 1953, the Chesterfield School Board resolved to cooperate fully in establishing a school for mentally retarded children in Richmond, Henrico and Chesterfield, in cooperation with school authorities of the neighboring jurisdictions. Soon thereafter the board authorized its superintendent to make a survey of Negro mentally retarded children in the county with an eye to using space then available at the Hickory Hill School. The school board resolved to educate mentally retarded Negro children at the Kingsland School.

In February of 1954, Lucian Adams, currently Superintendent of Schools of Richmond, appeared before the Chesterfield County Board of Supervisors to discuss the possibility of the city's acquiring a site in the county on which to build a white high school. Adams then stated that no good site was available within the city.

On March 13, 1957, the school boards of Colonial Heights and Chesterfield met jointly to elect a division superintendent of schools.

In 1957–58 the City of Richmond provided special education facilities for Chesterfield County pupils. The city continued this service in 1958–59, although it was unable to accommodate additional applicants.

The City of Richmond public schools advised Chesterfield school authorities in December of 1959 that special education facilities theretofore provided would not be available in the 1960–61 session. The school board directed its superintendent to confer with the Richmond superintendent in an effort to "continue the services we now enjoy on a tuition basis."

In 1961, 160 white and 63 Negro pupils from Chesterfield attended Petersburg High Schools by tuition.

In 1961 the Chesterfield School Board unanimously requested the State Board of Education to constitute the County of Chesterfield a separate school division, and requested the concurrence of the Board of Supervisors.

In March, 1962, the Chesterfield School Board made arrangements with Dr. Thomas Little of the Richmond City schools for the transportation of Chesterfield pupils to the cooperative training center.

In 1963, the School Board accepted non-resident pupils for enrollment on a tuition basis, subject to final decision of the Pupil Placement Board.

In late 1963 the School Board approved admission of out-of-division students to certain Chesterfield schools, subject to their placement in such schools by the State Pupil Placement Board.

Just after the opening of school in 1964, Mr. Fulghum, a school official, advised the board that he hoped soon to begin transportation of Chesterfield pupils to the cooperative training center in Richmond.

On August 10, 1966, the Chesterfield School Board authorized the superintend-

ent to handle each case on applications for tuition students "on its own merit and bring any special cases to the board."

In the spring of 1968, the Chesterfield County School Board approved the policy of admitting seniors who had moved out of the county but wanted to finish their senior year at their Chesterfield school on a tuition basis.

For the school year 1968–69, Chesterfield permitted three Powhatan County students to attend its schools in exchange for three Chesterfield residents' possibly being admitted to Powhatan schools.

As part of the resolution of the annexation suit between Richmond and Chesterfield, which concluded during the summer of 1969, the Chesterfield School Board and the Richmond School Board agreed on terms on which educational services would be provided during the transition. Chesterfield would provide classroom space and instruction on a tuition basis for the residents of the annexed area for whom the city could not provide in the 1969–70 and 1970–71 school years. Chesterfield, in addition, would teach junior and senior high students in the annexed area whom the city could not accommodate for 1971–72.

In the fall of 1970, the Chesterfield Superintendent of Schools explained to the board his actions in response to the requests of Chesterfield residents to transfer their children to county schools from those in the newly annexed area. The board agreed completely with his actions and directed that further requests for transfers would thenceforth be on a space available basis.

Currently, Chesterfield County sends some pupils to a training center in Petersburg for the educable mentally retarded.

According to a survey taken of Chesterfield County school children recently, 1,299 white students and 36 black students attended Richmond city public schools in the year previous to their enrollment in Chesterfield schools.

Chesterfield

In 1949, the superintendent advised the board that attorneys on behalf of Negro patrons in the Harrowgate Road area had requested equal facilities for Negro and white children. The superintendent stated that he had answered the petition, stating that full transportation facilities were then being offered. The board resolved to approve the superintendent's action.

On February 25, 1961, the Board of Supervisors appropriated about $285.00 per month to the Health Department in order to employ a "colored dentist, who would work in the colored schools of the county."

As of September 30, 1963, the superintendent reported enrollment to the school board, classifying the pupils by race.

On February 12, 1946, the Chesterfield Board of Supervisors received complaints concerning the condition of a trash dump near the Hickory Hill School. Rats from the dump, allegedly, had become a menace in the neighborhood. The board urged a committee, earlier appointed, to find a suitable alternative location. When the Principal of the Hickory Hill School complained of the rats, the board resolved to post "No Dumping" signs and appropriated $500.00 for extermination purposes.

On October 12, 1948, the Board of Supervisors resolved to resume use of the dumping area near the Hickory Hill High School.

In early 1949, the superintendent advised the board that property to the south of the Hickory Hill School might be rezoned for business purposes. The board took no action, not objecting to such a change.

On January 8, 1952, a citizen complained to the Chesterfield Board of Supervisors about the health hazards due to mosquito breeding in the general area of Hickory Hill High School. The board referred this matter to the Health Department.

On August 26, 1955, the United Civic Association of Chesterfield County appeared, by counsel, before the Board of Supervisors, to complain of the condition of the land fill operated in front of the Hickory Hill School. Their attorney complained of rat infestation and stagnant water. On September 23, 1965, another delegation complained to the Board of Supervisors concerning the Hickory Hill land fill. The board requested the City of Richmond to reduce the elevation of the land fill.

On November 12, 1946, the colored farm agent and the colored home demonstration agent appeared before the board and requested office space. The board referred the matter to the buildings and grounds committee for "action as early as possible."

On February 12, 1948, the colored farm agent appeared before the Board of Supervisors to repeat his request for office space for himself and the colored home demonstration agent. The board referred the matter to the buildings and grounds committee.

In October of 1948 the Board of Supervisors gave the colored farm agent and the colored home demonstration agent permission to use the lower end of the Red Cross Building on the county fairgrounds.

Between 1946 and the securing of office space in October 1948, the colored agents made several requests for same, and on at least one occasion the colored county farm agent requested that, since the county had not provided him with office space, it at least meet the bill for the telephone which he had had installed in his home. The Board of Supervisors refused.

On June 22, 1949, the Board of Supervisors, on request, authorized the executive secretary to purchase two desk lamps and one fan for the office of the colored farm agent and the colored home demonstration agent.

On June 11, 1957, the Chesterfield Board of Supervisors voted to employ M. J. Edwards as the colored agricultural agent for the county.

Writing in mid-century, an historian of the region remarked, "So, counting only from 1607, Chesterfield looked back with certainty to almost three and one-half centuries of white occupancy."

On January 31, 1940, a delegation of Negro citizens addressed the Chesterfield County School Board, requesting the establishment of a regular pay scale for black teachers based on training and experience, and an increase in black teachers' salaries up to a certain minimum level. The salary of the Negro supervisor for 1940–41 was $1,200.00.

In 1940 the Chesterfield School Board rejected the requests of the principals of Union Grove School and Kingsland School for raises in salary on the ground that they had not been anticipated in the current budget.

In 1940, again a delegation of black citizens petitioned the Chesterfield School Board to act immediately to equalize black teachers' salaries with those of whites. The board accepted the petition and filed it for future consideration.

At the school board meeting of March 26, 1941, a delegation of black citizens again appeared before the Chesterfield board and urged that their request presented in December, 1940, be answered. The board resolved that it would be its policy to adopt a single salary schedule beginning with the 1942–43 session.

In October, 1947, a delegation of patrons of the Union Grove Negro school complained to the board that their children were not receiving adequate preparation for high school and that the school was being run in an inefficient and undisciplined manner. The board directed the superintendent to investigate.

In early 1949 the Chesterfield School Board adopted what appear to be uniform salary scales for classroom teachers.

In 1952 the board authorized the county's single Negro music teacher to be reimbursed $10 per month for travel. The board, however, declined to pay half of

the purchase price of a piano for Carver High School.

The opening day calendars for 1962–63, and 1963–64, scheduled segregated meetings of principals and teachers.

When the Dupuy School was closed after the 1969–70 school year, its principal, who was black, was transferred to a position as associate principal at the Ettrick building. Subsequently, the principal at Ettrick retired, and currently the former Dupuy principal is principal at Ettrick.

In October of 1970, the Department of Health, Education and Welfare, Office of Civil Rights, expressed its concern to Superintendent Kelly over the system's performance of recruitment of black professional staff.

When the Union Branch all-black elementary school was closed at the end of the 1969–70 session, its black principal was made associate director of Title 1 project for the county.

When the Carver School was closed, its principal, who was black, was transferred to the central administration office and made a planning principal.

*Desegregation efforts after Brown:*

In 1954, the following notation appears in the Chesterfield school board minutes:

A motion made by Mr. Wells asking that members of this board, as individuals, seek the advice of our legislators on the recent Supreme Court decision, died for lack of a second.

In mid-1955, the Chesterfield School Board incorporated superintendent's memorandum No. 3164 of June 28, 1955, in the minutes of its meeting. This is the memorandum wherein the State Board of Education adopted as "the policy of this commonwealth" that Virginia public schools would operate in the coming school session as before.

The Chesterfield County School Board resolved that it favored the convening of a constitutional convention to amend Section 141 of the state's organic law in accordance with the proposal of the Commission on Public Education appointed by the then Governor. The resolution stated:

The school board specifically favors the proposals providing for a high degree of local authority in the schools with particular regard to the assignment of pupils and teachers and also to the proposal making possible tuition grants to those parents who are unwilling to have their children attend integrated schools.

On December 13, 1955, the Chesterfield Board of Supervisors approved that Section 141 of the Constitution of the State of Virginia be amended as recommended by the Gray Commission and endorsed the calling of a constitutional convention.

On August 14, 1956, the Executive Secretary of Chesterfield County read into the minutes of a Board of Supervisors meeting a letter from the Governor and a State Senator, "Thanking the board for its approval of the proposed action on the school problem." The board, at its July 24th meeting, had passed a resolution commending the Governor for having recommended to the General Assembly a proposal to continue segregation in the state's public schools.

On January 29, 1959, the Chesterfield Board of Supervisors passed a resolution urging the members of the General Assembly of Virginia, which was then in special session, to enact such laws as "will hold the line against integration of the races in the public schools of this commonwealth."

The Board of Supervisors expressed its previous stand against what they considered to be usurpation of the state's sovereignty by the Supreme Court of the United States, and pledged to the Governor and to the Attorney General of Virginia their continuing support in "this fight to preserve constitutional government." They also stated, . . .

if it is necessary in order to preserve segregation in the public schools of this Commonwealth, that all public schools in this state be declared in vacation, or placed under the super-

vision and control of the General Assembly until a plan can be devised to prevent integration of the races in our public schools.

The Court finds that the officials of the City of Richmond, Counties of Chesterfield and Henrico, as well as the State of Virginia, have by their actions directly contributed to the continuing existence of the dual school system which now exists in the metropolitan area of Richmond.

On December 29, 1956, the Pupil Placement Board of the Commonwealth of Virginia transmitted the following telegram to the Chesterfield-Colonial Heights Superintendent of Schools:

Under the provisions of Chapter 70, Acts of Assembly, Extra session of 1956, effective December 29, 1956, the power of enrollment or placement of pupils in all public schools of Virginia is vested in the Pupil Placement Board. The local school boards and division superintendents are divested of all such powers. Within a reasonable time you will be furnished a supply of application forms, placement forms, and such other forms and instructions as may be necessary for the proper administration of the Act. In the interim, and pending official placement by the Pupil Placement Board, under the terms of said statute and such regulations as may be promulgated, the pupils who may be entitled to be placed in a school under Section 4 of said Act may, in the discretion of the school board and division superintendent, and in conformity with your practices, be permitted to attend school on a temporary basis, subject to placement by this board. You will please make proper distribution and publication of this notice.

This telegram was placed in the school board minutes. Superintendent's Memorandum No. 3360 of January 11, 1957, follows immediately in the minutes. Therein the Superintendent of Public Instruction states that upon the request of the Pupil Placement Board he is advising local school boards of the procedures to be followed in assigning pupils. The school board resolved that it desired to assist the Pupil Placement Board in its tasks.

On June 28, 1962, the Pupil Placement Board wrote Dr. James H. Brewer of Ettrick, Virginia, to advise him that they declined his request to place his son in Ettrick Elementary School and had placed him in the Matoaca Laboratory School instead. Factors considered included the homogeneity of the neighborhood, and the Matoaca Laboratory faculty and facilities. The Pupil Placement Board also noted that school bus transportation was provided to the Laboratory School, but not to Ettrick. An ore tenus hearing to review this decision was required to be advertised in a Richmond newspaper once a week for two consecutive weeks. Obviously the purpose of such a requirement was to inhibit blacks from seeking transfers to white schools.

The present Superintendent of Chesterfield schools agreed that the school environment plays a role in developing children's attitudes. At the elementary level he hoped that children would gain a sense of the geography of their own community while in or near their school. He stated that perhaps some areas in Chesterfield were homogeneous as to race. He thought racial homogeneity was not a proper basis upon which to develop assignment patterns; and the Court concurs. That factor, however, was used in Chesterfield County in connection with the Pupil Placement Board.

In early 1965, the Chesterfield School Board directed its division superintendent to submit to the Department of Health, Education and Welfare a copy of the order of this Court in McLeod v. County School Board of Chesterfield County, of November 15, 1962, and inform that department that the school board of Chesterfield County was in compliance with that order.

In March of 1966, the Department of Health, Education and Welfare trans-

mitted desegregation guidelines to the Chesterfield School Board.

On April 7, 1966, the school board discussed a desegregation plan required by Title VI of the 1964 Civil Rights Act and adopted a freedom of choice proposal.

In late 1966, the school board determined to defer consideration of operating a Head Start Program in the county because HEW guidelines restricted the operational authority of the school board.

During the school year 1967–68, under a freedom of choice plan, 710 Negro children were anticipated to attend formerly white schools.

In the spring of 1968, new school desegregation guidelines were received by the superintendent, and he shared this information with the school board.

The Chesterfield School Board was informed in March, 1968, of the results of the freedom of choice plan for the 1968–69 school year.

Dr. Eloise Severinson of the Department of Health, Education and Welfare wrote Superintendent Alcorn on July 16, 1968, concerning possible termination of federal aid. Dr. Alcorn advised the board of this possibility and discussed desegregation plans for the coming year. Approximately $900,000 in federal funds were at stake.

On August 20, 1968, a special meeting was held concerning desegregation matters. The board met in executive session with its counsel. After public discussion the board decided to propose to HEW a plan of total desegregation by September, 1970.

In August of 1968 the Chesterfield School Board approved a new desegregation plan for submission to HEW. The board proposed to close Bermuda, Hickory Hill, Kingsland, Midlothian, and Winterpock Elementary Schools prior to the 1969–70 session, and to close Carver High School, Dupuy Elementary and Union Branch Elementary the succeeding year. After the closing of these black schools all pupils would be assigned by geographic zones. The Department of Health, Education and Welfare approved the plan as submitted.

On April 23, 1969, the Chesterfield Board of Supervisors requested the school board and the superintendent to reconsider the school plan that they submitted to the Department of Health, Education and Welfare for the reasons that the plan would necessitate some overcrowding, the use of temporary facilities, and that the annexation case then pending might require further redistribution of students.

After the opening of schools for the 1969–70 session, when Richmond City schools were operating under an interim desegregation plan ordered by this Court, and at a time when, under agreement ancillary to the recent annexation of additional territory, a number of Chesterfield County residents were to be educated under agreement in the Richmond City schools, the Chesterfield Superintendent of Schools publicly offered any such Chesterfield resident a place in the county school system. Dr. Kelly recommended this action to the chairman of the school board, and thereafter extended an invitation to any Chesterfield County student to come to Chesterfield schools, not restricting his announcement to those who had specifically so requested.

In 1970–71, Dr. Kelly stated, and the Court so finds, that some Richmond residents attempted to enroll in Chesterfield County schools. This was the first year for substantial desegregation at some levels in the city schools.

In 1969–70 there were nine Chesterfield County schools without any blacks on their faculty.

Richmond residents have rented apartments in Chesterfield County and used such address in an effort to enroll in Chesterfield schools.

In 1969, under a freedom of choice plan, Carver High School accepted students from all over the county. Black students were bused to Carver High School from all points of the county. In

the school year 1968–69 there were nine schools with all black student bodies in Chesterfield.

It seems obvious that desegregation by means of a freedom of choice plan was and will be impeded if various schools within the system are identified by such terms as "formerly all black," "formerly all white," or are allocated faculty members entirely or predominantly of one race.

In the years 1966–67 through 1969–70, the student body at the Carver Middle School and at the Carver High School was 100% black, and the faculty was over 90% black.

The Chesterfield County Superintendent of Schools testified that he would not know, as Superintendent, the percentage of the number of black elementary teachers at each of his schools or the number of Negro students in various extra-curricular activities.

In 1970–71 there were 13,586 elementary students in Chesterfield County schools, of whom 1,189 or 8.75% were black. In 1966–67 there were 1,467 black pupils in Chesterfield County schools. The absolute number of black elementary students has been falling gradually at least since 1966–67. In 1970–71, 44.5% of the students and 42.1% of the faculty at the combined Ettrick and Ettrick annex school were black. At the Matoaca Laboratory School, in the same year, 99% of the students and 100% of the faculty were black. Substantially the same racial proportions prevailed in this school over the preceding four sessions.

The popular reaction in Chesterfield to the phasing out of all-black schools has been highly tolerant.

Racial enrollments for the Chesterfield County public schools in 1969 and 1970 showed that out of 27 facilities, 14 have either the same black enrollment or a smaller one in 1970–71 than during the previous session.

Chesterfield County defendants argue that, under the definition of Dr. Pettigrew, all the schools of Chesterfield County are racially non-identifiable.

This is not the case, for one of the criteria of integration applied by Dr. Pettigrew, hereinafter referred to, is the requirement that black students, though they might be in a minority, participate fully in the life of the school. Chesterfield's own Exhibit CX–32 illustrates that as the proportion of black students rises from about 3% to well over 10%, in a particular high school, the number of extra-curricular organizations in which blacks play a part rises dramatically. The Court has in mind the comparison between Thomas Dale High School and Meadowbrook High School. In Thomas Dale there are 191 blacks and 1,506 whites; this school has 26 active extra-curricular clubs—21 have participants of the black race. By comparison, in Meadowbrook High School, where 33 blacks attend school with 1,102 whites, 27 such clubs are active—blacks take part in only six of them. Of nine active sports, blacks participate in seven at Thomas Dale and only three at Meadowbrook.

The Matoaca Laboratory School historically has been operated on the grounds of Virginia State College with financial aid from the state flowing through the Chesterfield County School Board. The county school board, in addition, has provided some teaching materials, bus transportation for pupils, and some food service.

Chesterfield defendants assert that the sole connection between Chesterfield County and the Matoaca Laboratory School, which has historically been and is to this date all black or nearly so, has been that Chesterfield provided transportation for its students and passed on to the Virginia State College state funds to be used in operating the school. In fact, Chesterfield school officials have always relied upon the laboratory school to absorb some of the black residents in the Ettrick area of Chesterfield County. When it appeared that the capacity of the Matoaca Laboratory School was inadequate for this purpose, new black schools were built instead of assigning

the overflow to existing white facilities or expanding them.

When the Dupuy Elementary School was under construction, the Superintendent of Chesterfield County Schools wrote to parents concerning transfers from the Matoaca Laboratory School and the Union Grove School to the new facility. He wrote:

> As you well know, the Matoaca Laboratory School has been overcrowded for a number of years, and those of you who are long-time residents will recall that a number of years ago we transferred all seventh grade children to the Union Grove School, and on other occasions requested some of the children who lived not far from the college to attend the Union Grove School in the lower grades.

He went on to relate that, after conferences with Virginia State College officials, new enrollment quotas for Matoaca Laboratory had been fixed. This correspondence demonstrates the close working relationship existing between Chesterfield and Virginia State in the operation of the laboratory school.

Recently Dr. Severinson of HEW advised Dr. Kelly that the continuation of Chesterfield's connection with the Matoaca Laboratory School might conflict with HEW compliance requirements. Therefore, during the hearings in this case, the Chesterfield County School Board attempted to disassociate itself from the school's operation by severing all connection. In fact, it appeared from Dr. Kelly's testimony, Chesterfield will continue to afford some services to this facility, if permitted. In any event, the most that can be said for the defendants' position as to this school is that Chesterfield County and the State of Virginia have operated an all-black school for many years, with varying degrees of participation by each.

### Henrico

Four years after *Brown*, the Henrico School Board was still scheduling sep-arate meetings for Negro and White principals.

To open its school session of 1961–62, there were scheduled separate orientation meetings, x-rays, and meetings of incumbent teachers for Whites and Negroes.

For the 1964–65 session the Board reappointed principals for all its schools, classifying the Negro schools separately.

In September of 1964, the Henrico coordinator of special education submitted a report on special education to Superintendent Moody. Therein he noted that, "inasmuch as there are more Negro people getting certified in the area of special education, it may be necessary to consider employing a few."

The session calendar for 1968–69 of the Henrico public schools, in providing for a superintendent's meeting with principals and staff, does not provide for racially segregated meetings.

Henrico has in the past differentiated in the pay scale for White and Negro teachers.

### Henrico

Subsequent to a 1942 annexation which gained for Richmond a portion of Henrico County, the city temporarily took into its schools about 300 Henrico children. The county leased to the city two spare school buses for that year's transportation needs at the Westhampton School.

In 1953, Henrico voted to join with Richmond and Chesterfield in the operation of a joint school for the mentally retarded.

From 1944 through 1947, about 90 Henrico students, all white, attended Richmond public schools, pursuant to an agreement ancillary to an annexation. Beginning in 1959, Henrico students regularly began to attend Richmond schools for special education classes. In 1960, Henrico began to send pupils to Richmond and other jurisdictions pursuant to the state tuition grant program. The implementation of this state tuition grant program entailed large expendi-

tures both from the county and from the state.

John F. Kennedy High School, operated by the School Board of the City of Richmond, is located in Henrico County. Fairfield Court Elementary School, also operated by Richmond, is located partly in Henrico. Both have historically had predominantly black enrollments.

In 1957, the Henrico School Board requested its superintendent to confer with Richmond school officials on the possibility of some Negro pupils in eastern Henrico attending high school in the city.

In 1961, the board discussed in executive session the possible effect of a merger of the County of Henrico and the City of Richmond on the Henrico County school system.

In 1962, the board directed the Superintendent of Schools to handle applications for admission by non-resident pupils on an individual discretionary basis.

In its submission to the Department of Health, Education and Welfare in August of 1965, Henrico County explained its policy with respect to the admission of non-resident students. One justification for admission of such pupils in the past, the plan stated, occurred when a child lived just over the county line and much closer to a Henrico school than to his own. Dr. Campbell testified that this, under current policies, would not be considered sufficient "hardship" to justify admission, and the Court so finds.

During 1970, the superintendent informed the school board that non-residents were making increased efforts to enroll their children in the county schools, and the Court so finds. He told them also that in his opinion, under the Civil Rights Act of 1964, Henrico could be "required to justify" enrollment of non-residents. In response, the board agreed to "continue our traditional policy of enrolling non-resident pupils on a very limited basis where there is a justified cause established. Otherwise, non-resident pupils cannot be admitted even on a tuition basis." The administration

was advised to inform principals that "extreme care must be used in enrolling non-resident pupils."

In the school year 1970–71, there were 34,331 pupils in the Henrico system. Of these students, 2,035 had transferred, immediately upon leaving the Richmond system over the past ten years, to the Henrico system.

*Desegregation efforts after Brown*

In February of 1956, the School Board directed its superintendent to advise the Congressman from its District that the Henrico School Board opposed further federal aid to education.

On October 18, 1956, the Henrico County School Board accepted a voluntary contribution by pupils of the county's Negro schools to the Virginia Randolph Foundation.

Virginia Randolph High School, prior to its closing at the end of the 1968–69 school year, had an attendance zone covering the entire county of Henrico.

The Henrico Board of Supervisors did not leave educational matters to the school board. On April 12, 1961, they passed the following resolution:

Whereas, it is recognized that the education of our children is a basic necessity in order to preserve an intelligent and progressive democracy, and

Whereas, the services, facilities and methods most effectual to this end differ from place to place, and are best known by the localities themselves, and

Whereas, in recognition of this fact, education has been, from the earliest history of our country, the responsibility of the individual states, and

Whereas, federal encroachment in many areas is being viewed with increasing distaste, and

Whereas, federal aid in any undertaking implies a degree of federal control.

Now, Therefore, Be it Resolved, that this board expresses its opposition to the establishment of any further federal aid to schools or federal interven-

tion in the educational affairs of the several states.

Be It Further Resolved, that the Clerk be instructed to send copies of this resolution to the Honorable Harry F. Byrd and the Honorable Willis A. Robertson, United States Senators from Virginia, and the Honorable J. Vaughan Gary, Representative in Congress from the Third Congressional District of Virginia.

In 1965, the Henrico School Board authorized or directed its chairman to sign on behalf of the school board an assurance of compliance with HEW regulations implementing Title VI of the 1964 Civil Rights Act. Copies of the assurance document were forwarded to the Superintendent of Public Instruction of the State of Virginia.

In May of 1965, the Henrico School Board prepared a general statement of policies under Title VI for the United States Office of Education.

The Henrico School Board proposed to comply with the 1964 Civil Rights Act by means of a plan which gave each pupil the right to apply for a transfer by parental request to a school other than that to which they would normally be assigned. Choice was restricted to either the nearest formerly all Negro school or the nearest formerly all white school.

On October 10, 1965, the Superintendent of Schools submitted a modified plan to the United States Office of Education. "The choices made by the white population made it impossible to operate the school system under the previous plan," he said. He therefore requested approval of a plan based upon zones and freedom of choice, which gave each parent the option to enroll his child either in the school within the zone of residence or in the nearest formerly all Negro school.

The Assistant Superintendent of Schools presented to the Board a proposal for the summer of 1966 for four "target area" schools to receive federal financing under the Elementary and Secondary Education Act. The project would serve pupils in grades 1 through 3 in Fair Oaks, Central Gardens, Henrico Central, and Virginia Randolph Elementary Schools. The board voted to authorize transmission of the application to the State Board of Education for approval.

In 1966 the board authorized its superintendent to "take all steps to secure HEW approval to continue the present plan of desegregation as revised to include some faculty desegregation."

At a special meeting on May 6, 1966, at which the chairman and two members of the county Board of Supervisors and the County Manager were present, the school board discussed a meeting at the United States Office of Education the previous day, at which the Superintendent of Schools, the chairman of the school board, the chairman of the county board of supervisors, and the county manager were present. The school board "reaffirmed its position desiring to operate on the basis of the plan of desegregation" as previously adopted.

On May 10, 1966, at a special meeting of the school board, the board reaffirmed its position as to the desegregation plan theretofore adopted, authorized the superintendent to file that plan with the Office of Education, together with Form 441–B, with the notation that the board believed the plan in compliance with the HEW guidelines, and declared its opposition to participation and further conferences with the United States Office of Education except those necessary to pursue administrative remedies. The board further instructed the superintendent to proceed with the plan it adopted for the coming year.

Prior to the opening of school for the 1967–68 session, the Henrico School Board met in executive session, following which it is recorded in the minutes that it was the recommendation of the superintendent of schools that the Henrico public schools continue to operate under the current desegregation plan for the forthcoming year. The board authorized the superintendent to file Form

441–B, without special covenants, with the United States Office of Education.

On February 16, 1968, the Henrico Board of Supervisors unanimously passed a resolution rejecting charges by the Department of Health, Education and Welfare that sufficient progress toward school desegregation had not been made, "and more specifically, that officials are maintaining small inadequate schools, and that the educational program of Virginia Randolph High School, in particular, is 'demonstratively inferior' to other schools in the system." The Board of Supervisors stated its support for the "democratic principle of complete freedom of choice for every child," and noted that "over 42% non-white students are presently attending integrated facilities; 27 of the county's 41 schools are now desegregated." They were, in fact and law, operating a dual system.

On October 24, 1968, the school board was advised by counsel that in the light of federal court decisions the school board "has no choice except to close the four Negro schools and eliminate a dual school system," according to the minutes of the board. Thereafter the board resolved that beginning September, 1969, the Fair Oaks, Henrico Central, Virginia Randolph Elementary Schools, and Virginia Randolph High School should be closed and students now attending those schools should be reassigned according to geographic zones. The board resolved also to assign teachers and staff personnel from such schools on an objective, non-racial basis, beginning in September, 1969. The board made its resolution contingent upon the dismissal by the Department of Health, Education and Welfare of pending enforcement proceedings.

On January 2, 1969, Mrs. Ruby G. Martin, the Director of the Office for Civil Rights of the Department of Health, Education and Welfare, wrote to Superintendent Moody that the desegregation proposal theretofore submitted, which included the closing of the four all-black schools and the reassignment of their staffs, would be acceptable. She added that she understood that the system would be operated on a non-discriminatory basis in all other aspects and directed the superintendent's attention to HEW regulations covering non-discrimination in the reduction of professional staff. Mrs. Martin stated that the State Department of Public Instruction would be advised of Henrico's eligibility for federal financial assistance.

At the beginning of the 1969–70 school year, five black schools were closed by the County of Henrico as part of its compliance effort. The former principal at the Fair Oaks black school was made an assistant principal at Brookland School. Henrico Central Elementary School's former black principal was made an assistant principal at Varina Elementary School. The Virginia Randolph Elementary principal was made a visiting teacher. Virginia Randolph High School's black principal was moved to the position as Assistant Principal at Hermitage High School.

On the request of the Division of Recreation, the school board authorized continuation, during the summer of 1969, of the recreation program at Fair Oaks, Henrico Central, Virginia Randolph High Schools and Virginia Randolph Elementary School.

The defendants suggest that the so-called terminal desegregation plan adopted by Henrico County School Board for 1969–70 entailed the "temporary closing of certain schools which had remained all Negro schools under the interim desegregation plan." In fact, the proposal made to HEW does not indicate that the shut-down of all-black schools was a temporary measure, and HEW officials expressed reservations about effecting desegregation by closing all-black schools. In fact, some of the schools were reopened after a year of idleness. The Virginia Randolph facility, however, became a special program center. Others are now operated as annexes to formerly all-white schools, after a change in name.

On November 28, 1969, Dr. Campbell, Superintendent of Henrico County Schools, was notified by the regional civil rights director for the Department of Health, Education and Welfare, of her concern that the Central Gardens Elementary School appeared to be becoming an all-black facility on account of the racial composition of its attendance zone. She asked to be informed of steps to avoid resegregation. On December 10, she reiterated her concern with the composition at Central Gardens. Additionally, she urged the school division to recruit black staff members to increase the minority component, then at about 4%.

In 1970–71, Central Gardens School had a 95.7% black student body and a 40.7% black faculty. In 1969–70, that school had a 94.6% black student body and a 44% black faculty. In 1968–69, Central Gardens had a 90.73% black student body and a 47.82% black faculty. In 1967–68, the Central Gardens student body was 77.7% black; and its faculty was 46.4% black. In 1966–67, Central Gardens' student body was 62.6% black. Its faculty was then 17.4% black Thus, it is clear that, either by design or by permssive inaction, the Henrico County School Board increased the proportion of black faculty members at this facility as the student body became increasingly black. The administration, in other words, whatever the cause of the change in student body proportions, made a separate contribution to the racial identifiability of this facility.

On May 26, 1971, Superintendent Campbell advised Dr. Severinson of HEW that the Henrico School Board had approved a new zone system which accomplished the desegregation of the Central Gardens' student body. The facility was combined with four other elementary schools. Some former Central Gardens pupils now go to a school, Highland Springs, 8.3 miles distant from their former school. In the opinion of the Henrico County Superintendent, however, the change constitutes no deviation from Henrico's "traditional"

neighborhood school concept. All of the schools in the Central Gardens' desegregation arrangement will be from 69 to 81% white.

Dr. Campbell said that he chose to desegregate Central Gardens School by introducing students from four other elementary facilities partly in order to establish a core of a future middle school in the area. He said, however, that he would have used a similar desegregation technique in any case. To pair Central Gardens with, say, Ratcliffe School would have given a result of 62% black student bodies in each school. In his opinion each school would still be racially identifiable. The plan eventually adopted, although it employs a greater degree of transportation than simple pairing, still does not incorporate what Dr. Campbell considers excessive or disruptive transportation. The Court is in agreement with him on that point.

Dr. Campbell understood the nature of the continuing duty to eliminate racial identifiability of school facilities as it was expressed to him by HEW. Speaking as an educator, however, he testified that he would consider a school identifiable racially when the school board had officially tried to keep it that way.

On April 29, 1971, HEW requested information on Henrico's assignment of its faculty and staff so that the minority group proportion is substantially the system-wide ratio, to be submitted within 15 days after receipt of the correspondence. An attached memorandum brought to Campbell's attention that HEW would inquire when it appears that a district is assigning teachers or staff "to particular schools on the basis that tends to segregate." Campbell replied on May 13, 1971, to the effect that he was unable to submit the requested information because reassignment of teachers was in progress. He noted, however, that "a large part of meeting the ratio involves re-assignment of the black teachers at Central Gardens Elementary School. These teachers have already been re-assigned for the next

school session or have been informed that they will be re-assigned."

By letter of July 30, 1971, Campbell advised HEW that redistribution of faculty personnel had been accomplished, so that during the school session 1971–72 each of the 43 school facilities will have at least one black.

Out of an administrative staff of 134, only three were black.

While Dr. Campbell stated that one of the indicia of racial identifiability would be faculty composition of a particular school, numerous Henrico schools in 1966–67 through 1970–71 were without any black faculty members. In 1970–71 at least ten schools had all white faculties.

Reassignment of faculty in an effort to eliminate the racial identifiability of Henrico school facilities was not achieved until after the county officials had been made parties to this lawsuit. Subsequent to those reassignments, Henrico officials took their further steps to desegregate Central Gardens School.

When asked why Henrico had not sought to establish parity in teacher assignments by race during the 1970–71 school year, Dr. Campbell replied that the directive from HEW had not come to them until January of 1971. Apparently, he had no other source of information on the desegregation requirements.

During the current school year, 25 schools in Henrico have only one black faculty or staff member. Even this figure, as to certain schools, may include a guidance counsellor or a librarian. No effort has been made to insure that one black classroom teacher is in each school.

In the school year 1970–71, Henrico received $766,776.00 in federal educational assistance funds.

The records of the Henrico school system and of the State Board of Education demonstrate that in several instances the attitude of Henrico officials was less than cooperative, in complying with HEW requirements.

The Court accepts plaintiffs' Exhibit 116 as an accurate compilation of the Henrico County schools' student and faculty composition over the years.

*Public Resistance*:

Under Virginia state law, school divisions lack taxing authority. School boards are not directly responsible to the electorate.

In Henrico and Chesterfield Counties, bonds for new school construction may only be issued if an affirmative vote is cast in a referendum. No such vote is required in the City of Richmond.

As of July 1, 1970, the bonded debt of the Chesterfield County School Board was $37,794,869.26. An additional issue for $17,700,000.00 was approved in November of 1970; at the date of trial the bonds had not yet been sold. Since 1950 one bond issue was disapproved by Chesterfield County voters; this was in 1956.

As part of the most recent bond proposals submitted to referendum in Henrico County, an issue intended to support a kindergarten program failed of passage. The November 1970 bond issue in Chesterfield County passed by a scant 200 votes.

The Chesterfield Superintendent voiced the opinion that if a metropolitan solution were found to the school desegregation problem in the area, the result would be a loss of Chesterfield's fine spirit of innovation and willingness to sacrifice for quality education. Such doom has been prophesied in desegregation litigation since the *Brown* argument, of course.

The Court finds that the causal relation between new facilities and improved attitudes and achievements has not to date been shown to be strong.

Dr. Britton of Henrico stated that if consolidation of school systems took place, bond issues for new school construction would not pass in Henrico. He based his opinion upon his own perception of public opinion in the county. Henrico citizens, he thought were opposed to this lawsuit and would not be

willing to pay for new schools if Henrico residents would be denied access to them in large numbers.

Mr. Burnett expressed fear that Chesterfield citizens would be reluctant to approve bond issues for construction of schools throughout the Richmond metropolitan area. His fear is that citizens would be unconvinced that the county got its fair share of the returns for such indebtedness. This need be no great obstacle, however, for Virginia law enables a consolidated division school board to arrive at an equitable arrangement for the sharing of costs of debt service, either on a prorata basis keyed to pupil population or on some other agreed upon formula. Va.Code § 22–100.9 (1969 Repl.Vol.). The Court is aware that in 1956 a Chesterfield school bond issue failed of passage, and that one member of the Board of Supervisors, prior to the referendum, voiced the fear that citizens might be reluctant to vote in favor of a program to construct integrated schools. The mandate of the Constitution will not, of course, cede to hostility to its dictates.

If there is such a "national taxpayers revolt" as some defense experts suggest, against the raising of revenues for the maintenance of public schools, it has not yet spread to the Richmond metropolitan area. Each of the two counties has a remarkable record of success in achieving passage of bond issues at referenda, and, the state and county defendants admit, the City of Richmond, although not submitting such issues to referendum, taxes itself, by national standards, at a fairly high rate for the maintenance of public schools. Richmond's tax effort, in fact, is higher than that of Henrico. Moreover, as President Caruthers testified, school authorities face a continuing struggle, issues of integration aside, to persuade their constituents that additional revenues are necessary. It is difficult to see how any court could judge and weigh such financial perils of consolidation, separating voters' permissible motives from the impermissible.

It is clear from testimony by experts and local political figures that a substantial factor motivating the opposition to consolidation expressed by officials of both counties and reported to be shared by their constituents is resistance to desegregation. Objections addressed to the proposed administrative and financial do not appear substantial. In any event, if the consolidated school system under financial arrangements dictated by state law proves unworkable, it is within the power of present parties to this lawsuit to suggest an alternative mode of organization.

The Court, from its own experience in desegregation cases, notes that wherein strong leadership is offered on the part of school, county and city officials in effectuating the law, desegregated school systems work to the benefit of all citizens.

President Caruthers stated, and the Court finds, that the State Board of Education was capable of assisting a consolidated school system, such as that sought in this case, to operate successfully, whatever the origin of such a system. While he feared a lack of popular support for such a consolidated system he did state, based upon his experience both upon the State Board of Education and the Arlington County School Board, that school districts everywhere, whatever may be the issue of the day, faced dissatisfaction among their constituents.

When asked whether efforts of the State Board to improve quality education should be restricted by existing school district boundaries, President Caruthers of the State Board stated that he and his board had to recognize certain "practicalities." Nonetheless, he stated that if programs could be made more effective by crossing school divisional lines, arbitrary boundaries should not be permitted to stand in the way.

The community or neighborhood school as it exists today does not, by its proximity to pupils' homes, materially assist to accomplish educational goals. It is primarily a matter of convenience.

At least one witness, a school official of Chesterfield County, who although unsympathetic to the plaintiffs' position, and who was first called to the stand by the plaintiffs, testified responsively to the questions propounded. The evidence indicates that shortly thereafter, during the course of this trial, he was subjected to abuse concerning the nature of his testimony, which resulted in a meeting being called at which the attorneys for at least some of the county defendants apparently explained the witness' previous testimony.

The Court would be very much surprised if much of the public resistance to the desegregation of schools would not dissipate if the general public were cognitive of the full measure of discretionary practices to which members of the plaintiff class and their parents and grandparents have been subjected. It is regrettable that every fair-minded person who will be affected by this Court's action did not hear what was virtually uncontradicted evidence.

*Richmond Metropolitan Data:*

The Richmond Metropolitan Area here involved contains 480,840 persons according to the 1970 census. The City of Richmond covers 63 square miles and has 249,621 people; Henrico County has 244 square miles and 154,364 persons; and Chesterfield County covers 445 square miles and 76,855 persons. The three political subdivisions cover 752 square miles.

In 1967, the most recent year for which data is available, Richmond contributed 76% of the value added by manufacturing in the region. Chesterfield had 20% and Henrico 4%. In retail sales, in 1970, Richmond did 62.5% of the area's business; Chesterfield, 5.4%; and Henrico 32.3%.

Retail sales employment is generally lower-paying than manufacturing or office employment. Generally, tobacco workers are paid less than workers in the textile and chemistry industries.

The former jobs are in Richmond, the latter in the counties.

Richmond School Board Exhibit No. 55 shows that in the region, 12,868 people are employed in Chesterfield; 22,872 in Henrico; and 129,590 in Richmond. Mr. Burnett stated that his data showed that there were 30,000 jobs in Chesterfield. His information included employees who would not be covered by State of Virginia unemployment compensation. The City school board's exhibit concerned "covered" employment. Burnett conceded that all of the figures on Exhibit No. 55 would be increased substantially if employment not "covered" were included as to each political subdivision, and the Court so finds.

The Public Administration Service Report of 1959 was financed by the three jurisdictions belonging to the Richmond Regional Planning Commission. The PAS Report stated that, "Joint meetings of any combination of the three governing bodies are rare, and there have been a number of instances of failure in efforts to work out mutually agreeable solutions to regional problems."

> Orderly development of the Richmond region and the capital area through effective government is dependent on maximum cooperation and coordination. (RSBX 89, at 4–1)

The PAS Report focused attention upon the inefficiencies involved in managing the school systems of the three governmental units on a separate basis:

> With each school operation going its separate way, more optimum efficiency in management and best planning, location and utilization of the expense of school plans are difficult, if not impossible of achievement. Whatever may be the outcome of the current controversy over public education in Virginia, it does not seem likely that it will result in the scrapping of the $60,000,000.00 school plan that now exists in the region, or in the discontinuance of its expansion and its need for unified management.

The region's economic community of interest was recognized by the Public Administration Service:

Evidence of local belief in the need for further modification of the accepted pattern in the tri-jurisdictional area is found in the establishment of the Regional Planning Commission in 1957. Recognition was thereby given to the fact that many governmental problems need something other than rural treatment or urban treatment; rather, they need a comprehensive plan patterned to fit the varying conditions that continue to plague the governing bodies and executive heads of the local governments.

The PAS Report noted that characteristics "common to the city and the counties are at least as striking as are their differences." The three areas were found similar in governmental functions, in the amount of state supervision and control and assistance. The local governing bodies were found more alike than different in their use of appointive executive forms of organization and "judicious use of advisory and subordinate policy-making bodies in the conduct of local services."

Over a period of time a recognition has been growing on the part of all three jurisdictions of their community of interest in common problems. This recognition has taken a variety of forms, including exchanges of information, joint meetings of officials, and agreements to cooperate in certain service areas and to collaborate in the provision of facilities. Most recent and most important among these developments is the creation of the Richmond Regional Planning and Economic Development Commission. This body, though entirely advisory, manifests by its composition and its designation a clear official recognition of the essential unity of the region and of the need for broader joint endeavors in the future.

A 1967 report, prepared at the request of the Boards of Supervisors of Chesterfield and Henrico Counties and completed by the Space Utilization Associates, recognized, like the PAS Report, the community of interest of the three jurisdictions of the Richmond metropolitan area. Richmond School Board Exhibit No. 47 is the SUA Report dated June 1, 1967. The later version of this report, that of June 12, is Henrico Exhibit No. 25. Changes were made in the document at the request of the Boards of Supervisors of the two counties, who commissioned it. The first version of the SUA Report recommended that the state government insist upon regional solutions to metropolitan problems, backing its position with sanctions, if necessary. Henrico County Manager Beck characterized the SUA Report as at least in part a brief intended to advocate the County's position before the Hahn Commission, a state-level commission, which was at the time in the process of preparing a report recommending changes in governmental structure.

Based on commuting patterns, the SUA concluded that there was a relation of mutual dependency between the three jurisdictions. The SUA reporters stated:

The central city is an essential element of the region as a major place of employment, the center of commerce, and the state capital, and, consequently, the problems affect the entire region. The other jurisdictions cannot dictate the affairs of the central city nor can they refuse to cooperate in the solution of its problems.

The SUA Report concluded that consolidation of governmental units would be the "idealized" solution to the problems of the area. However, they stated, that "without a change in attitudes or a crisis of major proportions, it would not receive the necessary voter approval."

Dr. Gross stated that an aerial photograph of Chesterfield County which he viewed did not resemble, as the question was put to him, the Richmond school community. He was quick to state, however, that he was referring to the City of Richmond proper. The photograph,

for which has now been substituted one bearing county boundary lines, shows a great deal of undeveloped land. It also shows a considerable portion of suburban growth, as might be expected. Parts of the photograph resemble that park land which, citizens have complained before to boards of supervisors, is so scarce in the Richmond area.

In 1960 census figures indicate that 26,121 Chesterfield County residents reported as to their place of work. Of these, 12,053 or 46.1% worked in Richmond; 638 or 2.4% worked in Henrico County; 9,916 or 38% of the total, worked in their home county.

In 1960, 44,500 Henrico County residents reported their place of work to the census: 9,959 or 22.4% worked in Henrico; 1,632 or 3.7% worked in Chesterfield; and 31,023 or 69.7% worked in the City of Richmond.

Richmond city residents reporting a place of work in the 1960 census came to 83,734: 91.8% of these worked in the city itself; 3,186 Richmond residents worked in Chesterfield in 1960; this is 3.8% of the force. That year, 2,144 or 2.6% of the city work force, worked in Henrico County.

There has been much dispute about the percentage of inhabitants of the two counties who now work in the City of Richmond. Witnesses such as Burnett attempted to demonstrate, for example, that Chesterfield County, in fact, must be importing workers from outside the jurisdiction because, based on his statistics, the county has more jobs available than it has workers. It strikes the Court that if the City of Richmond and Henrico County are in fact bedroom communities for Chesterfield, which to some extent, of course, they must be, it is all the more true that the area is a single urban community.

The 1970–71 survey of Henrico residents as to place of employment tended to show that 45% are employed in Richmond, whereas the figures in previous years has been much higher. In fact, the survey indicated that another resid-

ual portion of those polled might also work in Richmond. Furthermore, new industrial development within the past five years in Henrico can be expected to draw, as in the case of Chesterfield, Richmond residents into the county to new places of employment. Because a shift in the direction of economic dependency occurs, does not mean that it has ceased to exist.

The defendants assert that the speed and growth of cities generally depends upon the mode of transportation available. As a general fact this is true. However, it is important to note that the testimony of those experienced in municipal development was that the so-called thirty minute travel line, which moves outward as each new advance in transportation techniques is made, fixes not the area of necessary urbanization, but the bounds of possible growth. It strikes the Court as simply irrelevant that portions of the tri-jurisdictional area here in question, even large portions, are accessible within thirty minutes, from such cities, as say, Colonial Heights, Petersburg, or Hopewell. That fact shows only that those cities might have been developed that far in that direction. It does not show that this has come to pass. In fact, of course, it has not.

It is also of doubtful relevance that the thirty minute travel line, thanks to recent interstate highway developments, drawn about the Capitol Square area in Richmond, extends far into Hanover, Goochland, Louisa, Caroline, Charles City and New Kent Counties. Again, such a line shows the area of potential urbanization, but not necessarily its reality. What it does tell the Court is that the area within such bounds, if it is highly developed, is that much more likely to form an integrated urban whole.

Officials of each county testified at length over the difficulties they had experienced in negotiating with Richmond officials over solutions to common problems. Several of the studies of local government in the area remarked on this

as well. Such governmental infighting, in the Court's opinion, is not indicative of a lack of interdependency, of the non-existence of common interests in the solution of regional problems, or that citizens of the area do not regard it as a single entity for purposes of the fulfillment of economic and social needs. Indeed, the thrust of the plaintiffs' complaint and that of the Richmond School Board is that those charged with governing the three jurisdictions have been unwilling or unable to tackle essential common problems.

Most of the suburban growth in the area up until 1954 took place in Henrico County. Thereafter, Chesterfield County has experienced most of the rapid urbanization. By far most of the population of Chesterfield has settled there since 1950.

It is conceded by the Executive Secretary that in a sense Chesterfield County is an urban area. He so stated in the recent annexation proceedings. No longer does the county, bounded by rivers on north and south, sit in isolation. Under definitions applied by the Chesterfield County Extension Agent, based on U.S. Department of Agriculture data, there are 40,100 acres of built-up urban land in Chesterfield County; 209,000 acres or 73% of the county's area, is woodland. There are 24,131 acres in use as farmland.

The Executive Secretary of Chesterfield conceded that in his opinion those parts of Chesterfield County enclosed within subdivisions four and five of the Richmond Metropolitan Area School Plan could be considered suburbs of the City of Richmond. So they appear on the land use map, used to project development in that area of Chesterfield County. These areas are principally projected to be zoned R–1 or R–2, intended for residential use in the future.

Chesterfield's Exhibit No. 20, which depicts the area of the county within thirty minutes travel time of the center of the city, illustrates that vast parts of subdivisions four and five are within such limits.

The Court is satisfied that some areas of Chesterfield County are indeed wild land, suitable for sporting and recreational purposes. The inference is logical, however, that it serves as a recreational source for the entire Richmond metropolitan area.

The Manchester and Midlothian Magisterial Districts of Chesterfield County, the two districts most accessible to the core of the City of Richmond, enjoyed their greatest period of population growth in recent years in the years 1950 to 1960. In 1950 the population of Midlothian District was 4,371; ten years later it was 10,759. In the same period, Manchester District grew from 13,016 to 31,892. In 1968, using the definition employed by the Bureau of the Census, in the area of Chesterfield County adjacent to the City of Richmond, there was not "urban" area outside of the annexation area sought. The annexation suit, however, did not result in the award of all of this territory to the City of Richmond. Moreover, these annexation case exhibits do not illustrate the full county area.

Furthermore, analysts addressing themselves to the specific characteristics of the Richmond metropolitan area have employed definitions of those areas which are distinctly not rural, and are in transition to urban status, which would include a much greater proportion of the county's area than that considered urban under census bureau standards.

Under the 1970 census date, the population density of the Chesterfield Magisterial Districts are as follows: Midlothian, .43 persons per acre; Clover Hill, .14; Dale, .45; Bermuda, .41; Matoaca, .21; average for the county, .27.

The defendants argue that the annexation absorbed into the City of Richmond a group of Chesterfield residents who, much more than those remaining in the county, tended to work in the city. Thus, the argument runs, if 48% of Chesterfield residents worked in Richmond prior to annexation, the figure is

now much lower. In fact, according to one expert's testimony, the proportion of the annexed area residents working in the city was not much higher than 48%, and therefore the 48% figure has not been much altered by the annexation.

Chesterfield County does have a community of interest with the City of Richmond. One witness suggested perhaps Chesterfield's common interest with three cities to the south was even greater. In support of this he mentioned long-term utility contracts with two of them. These facts indicate to the Court that these small cities may in part be dependent upon the county for certain public services. By no means, however, are these factors demonstrative of anything like the economic interdependency of the individual citizens of the three jurisdictions of the metropolitan area. A view of the map shows that, whereas urban development of the City of Richmond has extended deep into Chesterfield County, that of the three cities to the south is almost entirely confined within their borders.

On May 8, 1963, the Chesterfield County Board of Supervisors passed the following resolution:

Whereas, the various localities in the Richmond-Petersburg area have expressed a desire to invite new industrial plants into the area; and

Whereas, there are several separate organizations attempting to accomplish this end at this time; and

Whereas, it would seem that each locality would benefit from a centralized, cooperative effort in the attraction of industry;

Now, Therefore, Be It Resolved, on motion of Mr. Goyne, seconded by Mr. Driskill, that this board of supervisors hereby respectfully requests the Richmond Regional Planning Commission to attempt to form a regional industrial commission composed of as many localities as possible to take such steps as are necessary to accelerate the industrial development in this area.

In the minutes of the Chesterfield Board of Supervisors of February 14, 1968, there appears the following resolution:

On Motion of Mr. Martin, seconded by Mr. Purdy, it is Resolved that the Executive Secretary be directed to write a letter to the County of Henrico informing them that Chesterfield desires that any relocation outside the city on the proposed merger of the Medical College of Virginia and the Richmond Professional Institute be made in Chesterfield County.

In the middle of 1968, Chesterfield County joined in forming the Capital Regional Park Authority with Henrico and Richmond.

The County of Chesterfield enjoys reciprocity in business licensing with all four cities on its borders, with minor exceptions.

On January 1, 1970, with the annexation of 23 square miles of Chesterfield County territory, Richmond acquired about 70% of the retail sales then made in the county.

On August 9, 1961, the Chesterfield Board of Supervisors declined to appoint an advisory committee to negotiate a consolidation agreement with the City of Richmond. They obviously were reacting to a threatened annexation suit.

A county official explained that Chesterfield County citizens banded together to oppose annexation efforts because they desired to keep low the cost of welfare and governmental administration, and knew they could achieve this living under their county government.

On October 28, 1970, there was a discussion during a regular meeting of the Board of Supervisors of Chesterfield County of proposed amendments to the Virginia Constitution. C. J. Purdy, a member of the board, predicted that "Richmond" would ask for a merger of the school districts. The board unanimously passed the following resolution:

Whereas, the Board of Supervisors of Chesterfield County has determined

that the consideration by the voters of this county of the proposed revised Constitution of Virginia is very important; and

Whereas, the Board of Supervisors has considered the proposed revised Constitution, and believe that approval of that revised Constitution would be highly detrimental to local school systems throughout the Commonwealth, and particularly in Chesterfield County, and would be detrimental to local government in Virginia;

Now, Therefore, Be It Resolved, that the Board of Supervisors of Chesterfield County, meeting in regular session this 28th day of October, 1970, urge all the citizens of Chesterfield County to vote "No" on question number 1 of the proposed revised Constitution on November 3, 1970.

Irvin G. Horner, currently Chairman of the Chesterfield County Board of Supervisors, commended to his citizens

a revolt in the form of a school boycott, separate private school system, or even freedom of choice school assignments and letting federal troops see what they can do about it, rather than integrate the schools in Chesterfield County with the City of Richmond.

This statement, he explained, was made shortly after the decision of the Supreme Court in the *Swann* case. Moreover, he said,

Chesterfield residents at the time were bitter at what they saw as continued harassment by the city to the north. * * *

And when this Charlotte-Mecklenburg case was handed down the people of Chesterfield County were fit to be tied. I acted or re-acted in a manner that I am confident that the people of the political jurisdiction felt because I was registering their feeling.

Horner characterized the *Swann* decision as contributing to un-Americanism in that it might lead to the destruction of community schools. The thrust of his statement was to dramatize his opposition to consolidation of the county school system with that of Richmond, leading the Court to the obvious conclusion that the constitutional rights of the plaintiff class will, if left to the consensus of the political leaders of the areas involved, with rare exception, continue to be abridged.

From 1951 to 1960, the County of Henrico increased in population from 57,000 to 116,000, a growth of 104%. The 1970 figures for Henrico show a total population of 154,364. There are 144,258 whites and 10,106 blacks.

In 1957, the Henrico Board of Supervisors voted to join the Richmond Regional Planning Commission because they thought indeed that regional problems existed, and desired, in a spirit of cooperation, to attempt to solve them on that basis.

The Henrico Board of Supervisors created a body known as the Henrico County Metropolitan and Government Study Committee to examine and recommend solutions for metropolitan area problems. In addition, the board directed the county manager to engage the Bureau of Public Administration of the University of Virginia in an advisory capacity. These actions were taken on January 13, 1960.

On July 28, 1960, the Henrico Board of Supervisors, in response to the recommendation of the Public Administration Service report that the City of Richmond and the County of Henrico be consolidated, appointed an advisory committee to consult with such a body from the City of Richmond and to negotiate a plan of consolidation. The City responded in kind. A favorable report was submitted by the committee on July 31, 1961, and the Henrico Board of Supervisors approved the agreement on October 10, 1961, providing for the merger of the county and the City of Richmond. When submitted to referendum, however, the merger plan failed because a majority of Henrico residents voted against it.

Thereafter, the City of Richmond commenced a lawsuit in the state circuit

court to annex a large portion of Henrico County. The city sought 168 square miles; the Court awarded the city about 16 square miles for which the city was to pay the county approximately $41,000,-000 and on which the city would be required to spend $13,000,000 in introducing capital improvements. Had Richmond accepted the annexation award of the Henrico Court, there would have been added to the city school system 124 black and 8,047 white school children as of that date. There was, however, no high school located in the annexation area awarded by the Henrico Court. Richmond, in 1965, rejected the annexation court's judgment, as it may do under state law.

The City of Richmond and Henrico County entered into contracts concerning water and sewerage utilities on an intermittent basis over a number of years after World War II. In 1968 they signed a 20+ year contract covering these utilities. In the past, by agreement, Richmond Bureau of Fire Protection had been extended to certain sites in Henrico County.

In 1962, approximately 66% of employed Henrico residents worked within Richmond City. In the last five years Henrico has enjoyed substantial industrial growth, primarily in the east end of the county.

Currently, plans exist to build a new bridge at one of two possible locations to facilitate transportation directly between Henrico and Chesterfield County.

Henrico Exhibit No. 36 illustrates thirty minute travel time from the center of the City of Richmond, making use of interstate highways. The thirty minute travel zone extends further on this exhibit than on those offered by the City of Richmond. The Court does not consider such demonstrations to be dispositive of very much at all. Once the point has been made that economically and socially the County of Henrico is very much integrated with the City of Richmond, it matters little at this date what the possible boundaries of future expansion may be.

On January 25, 1967, the Henrico Board of Supervisors passed a resolution stating its opposition to any modification in the state laws controlling merger or consolidation of political subdivisions which might allow a majority vote of the entire area in question to decide the issue. At present, the law requires a majority vote of each area involved in a proposed merger.

On February 14, 1968, the Henrico Board of Supervisors passed a resolution stating its opposition to a bill pending in the General Assembly to merge, without popular vote, the City of Richmond and the County of Henrico.

On November 25, 1970, the Henrico Board of Supervisors directed its Clerk to advertise for public hearing an ordinance repealing that which established the Capital Region Park Authority.

On December 23, 1970, the Henrico Board of Supervisors voted that it would no longer consider remaining as a member of the Richmond Regional Planning District Commission unless the City of Richmond were actively to promote legislation to prohibit the use in a court of law as evidence cooperative undertakings of that nature "to the detriment of any political subdivision."

The City School Board has one school in Henrico County, and owns a site for one in Henrico on which no facility stands.

*Richmond Metropolitan School Data:*

In 1919, the Richmond school system was 29.9% black and 70.1% white. Twenty years later the system was 63.9% white, and in 1949 it was 59.2% white. In 1954–55, the year of the *Brown* ruling, it was 56.5% white, and presently is approximately 30% white.

The freedom of choice plan implemented in 1966 in an effort to desegregate the Richmond city schools did not achieve that aim, and by 1970, schools in the Richmond system still retained their segregated character. This was evident both from figures showing student body composition to vary greatly from the system-wide and community-wide ratio

of racial distribution, from the fact that many of the facilities were occupied by students nearly all of one or the other race, and by segregated patterns of faculty assignment. In September of 1969, the Richmond system was 70.5% black.

In September of 1970, the Richmond school system, because a recent annexation had brought into the city an area populated principally by whites, was 64.-2% black and 35.8% white in student body population. This was the year in which the School Board was directed by this Court to implement the so-called interim desegregation plan. Enrollment figures under that plan are shown on the chart.

The white student population in the Richmond public schools has fallen from a 1954–55 total of 20,259 to a 1969–70 total of 12,622. After the Chesterfield annexation in 1970, it was predicted that there would be 20,400 white students in the Richmond schools. Instead, 17,203 enrolled. For the current 1971–72 school year approximately 13,500 whites are enrolled.

During the corresponding period, 1954–55 through 1969–70, the black student population rose from 15,598 to 30,-097. In 1970–71 there were 30,785 black students in the Richmond public schools. During the current 1971–72 school year, 29,747 are registered.

Therefore, in the last two sessions Richmond schools lost over 7,800 white students from their projected figure.[21]

In the school year 1960–61, the Henrico County school system was 93.33% white and 6.67% black. Ten years later the pupil population was 91.87% white and 8.13% black. During that decade, the pupil population rose from 24,059 to 34,470. Currently Henrico operates 43 school facilities. In 1971–72, Henrico enrolled 31,299 white and 3,018 black students.

Chesterfield's school system in 1966–67 and in 1970–71 was about 90.5% white. The proportion of whites in this county has been steadily growing; at one time the Chesterfield system was well over 20% black, and in 1955, it was 20.4% black. In 1971–72, Chesterfield enrolled 21,588 white and 2,166 black students.

Taking the three jurisdictions together, the Court observes that in the past ten years, although the total number of pupils enrolled has risen from 82,761 to 106,521, the racial proportions have remained quite constant, at about 67% white and 33% black. The Court finds that the statistical information contained on Richmond School Board Exhibits Nos. 75–78 is correct.

The Court adopts the findings in its prior opinions as to the racial composition of Richmond city schools in 1969–70, and in 1970–71. Attendance data for 1971–72 are also in the record; the Court finds those for September 24, 1971, the most reliable index of the schools' composition throughout the remainder of the year.

Undoubtedly, the white school divisions of Henrico and Chesterfield contributed to the apparent white flight. The two counties have had a rapid gain in white school attendance in the years 1955–70; it rose from about 23,000 to nearly 60,000. Their black total school population has risen slowly, not going far above 5,000. Richmond city has experienced a much faster rise in black than in white membership.

In 1950, the population of Chesterfield County was 20.9% black. In the school year 1953–54, Chesterfield County public schools were 20.4% black; there were 7,429 whites and 1,903 blacks in the county's schools. In 1950 Henrico County was 9.9% black. In 1953–54 Henrico schools were 10.4% black; this reflects 1,371 black pupils and 11,771 white.

21. See RSBX Substitute Exhibit 30, and comparison compilation submitted by Richmond School Board, pursuant to order of April 5, 1971. Marked "Appendix."

*Richmond Metropolitan School Plan:*

Dr. Thomas Little, Associate Superintendent of the Richmond City public school system, supervised the preparation of the proposed Richmond metropolitan area desegregation plan. The objectives are summarized as part of the plan. Within the context of administrative and operational feasibility, the planners sought to achieve a "viable racial mix" for each school within Richmond, Henrico and Chesterfield. The source data upon which the plan was built consisted of attendance figures for September of 1970 for the county systems and figures calculated from spot maps and proposed zones prepared by the Richmond school authorities. The proposed metropolitan plan is based upon the September, 1970, patterns of school organization and grade structure within each of the separate units.

Each subdivision of the metropolitan school division, with one exception, itself contains a racial mix of pupils fairly close to that of the system as a whole. The total pupil population of the subdivisions varies from 9,387 in subdivision 6 to 20,059 in subdivision 2. Subdivision 6, comprising the southern area of Chesterfield County, is much the most sparsely populated.

Under the attendance plan devised, not all students will attend a school located within subdivision of residence; 7,668 pupils will attend schools the zone lines of which are cut by subdivision boundaries. In each case, their school zone will be contiguous to their subdivision of residence. That some would cross subdivision lines would be necessitated by the fact that the plan is predicated upon existing school zone lines, which are not congruent at the elementary, middle and high school levels. Some of the zones, therefore, have to be split between two subdivisions.

In order to determine the "viable racial mix," [22] the Richmond planners re-

fer to the over all racial proportions in the community.

As Dr. Gross put it, and as it was phrased by all those who testified in support of the metropolitan plan, "the theory upon which that desegregation proposal was based, was to distribute the pupil population the way they would be if no other factors were operating." He rejected the interpretation placed upon the goal of placing 20 to 40% black students in each school as the imposition of a "fixed racial quota," and the Court so finds. Rather, he saw that ratio as established by the existing demographic proportions in the Richmond area. If the goal were achieved, Negroes would be in a minority in each school. But again, this corresponds to reality in the Richmond metropolitan area and in the nation as a whole, in fact.

No educational expert testified that it was repressive or inhibiting of educational development for a black child to see himself as a member of a numerical minority in his school.

From an educational standpoint, Dr. Little supported the idea of a distribution of faculty and staff in each school according to the overall system's ratio. It is of educational benefit to both white and black children to maintain black administrators in positions of authority as the system undertakes desegregation. Indeed, it would be most beneficial to the students if the percentage of black teachers in the system were raised, by affirmative hiring policies, to a level approximating that of the black pupils in the system.

Working from the average percent of capacity utilization in each subdivision, the capacity of each building, and the current enrollments therein, the planners calculated, by computer, the number of white and black students required in each facility in order to deliver the racial mix they sought. The latter ratio was established by the overall subdi-

---

22. The term "viable racial mix" was defined by Dr. Little as "It is a racial mix that is well enough established that it

will continue to prosper. It will be a desirable, reasonable mix for educational purposes. . . . "

vision ratio at each level. From this data they calculated the number of students of either race who would have to be assigned into and out of each particular school in order to achieve the enrollment goal.

They attempted to insure that no building would be required to house more students than its rated capacity or than it had held the previous September, whichever was larger. This capacity limit was exceeded only slightly in four schools.

As to each school with a surplus of pupils of one race or another, it was determined to which other facilities within the subdivision they might be assigned. The choice among these was made on the basis of proximity. The distances between the possible receiving and the sending school were calculated. Then the average distance for all transportation combinations was found. Based upon that figure, the pupil exchange combinations to be proposed were selected by a computer, which had been instructed to pick out those combinations with school-to-school distances closest to the average. The computer was also programmed to deviate no more than 50% above or below the average. In some cases it was necessary to deviate further from the average, but in nearly all instances the variation was on the low side. As to each school it was then calculated the number of buses needed to transport the students being reassigned.

As noted, the metropolitan plan for pupil assignment is based upon a zone plan. Because some students from nearly every zone must be transported to a school outside that zone, a method of selecting whom to transport has to be devised. Conceivably a system of satellite zoning could be employed. Under such a system a portion of the sending school's attendance zone would be designated as the area from which residents would travel to the more distant school. For administrative reasons, in order to use a more impartial system and in order to avoid any possible unintended effect upon property values within a particular area, the School Board of Richmond expresses a preference for a lottery method of assignment. The Court is of the opinion that, so long as the method chosen does not materially threaten the success of the plan, the particular assignment technique adopted is within the discretion of the school authorities. The lottery technique sacrifices something in speed and efficiency of transportation because bus pick-ups must be made throughout an attendance zone, rather than in a small satellite zone carved therefrom. For that reason Richmond officials modified their proposal as written to the extent that in some of the sparsely populated areas, a satellite zoning arrangement might be used. Foreseeably, subjectively designated areas from which pupils will be transported to more distant schools will prove acceptable in those areas, as well, because appreciable-distance busing is an established fact there now anyhow.

Under the lottery program developed by the Richmond officials, whether a child is among those normally assigned to the school in his attendance zone who would be transported elsewhere is determined by birth date. A single birthday or 366 might be picked out of a hat. Then, starting with the first picked and taking all born subsequently, or following the list of 366 in order drawn, sufficient pupils are chosen to meet the quota of those to be transported out. After the child's status is determined according to the lottery, he would remain with his fellows during his tenure at each level of school. A new lottery would be conducted for him as he moved into middle school and later into high school.

The Richmond administration developed considerable expertise in setting up transportation systems when they created the one in use the current year. Problems turned out to be less than anticipated. In fact, by fixing three different opening times for schools, so-called staggered hours, they were able

to use their bus fleet more efficiently than expected and in fact discovered that they had surplus equipment on hand. Estimates of busing times turned out to be accurate in most instances, and sometimes substantially higher than the time actually required. The transportation distances involved in the proposed metropolitan plan are roughly comparable to those under the desegregation plan now in effect in Richmond, which the Court finds reasonable. The only area in which appreciably longer routes are proposed is subdivision 6, where long-distance transportation is a fact under the independent Chesterfield County program now in effect.

Operation of the Richmond metropolitan plan will entail the transportation to school of approximately 78,000 of the 104,000 pupils in the system. Of these, 42,000 will be pupils taken from near their homes to a school in their attendance zone of residence; 36,000 will be pupils exchanged between schools—that is, they will travel to schools outside their zone of residence. A little over half of that 36,000 would be white pupils. Currently in the three school divisions, operating independently, 68,000 pupils are transported to school.

Based on an average bus capacity of 66 elementary pupils or 44 secondary pupils, and predicated upon a daily schedule using three different opening hours in each subdivision except subdivision 6 with two opening times, 524 buses would be necessary to meet the transportation needs under the metropolitan plan. Opening times would be spaced at 45 minute intervals, save in subdivision 6 where a one hour interval would be used. The current bus fleets of the three existing school divisions are adequate to meet transportation requirements. Assuming that buses can be used at 90% of capacity, this is a realistic possibility. Under the plan currently in effect in the city and under the metropolitan plan, it would also be possible to schedule buses to return to school in the late afternoon

to pick up those who wish to remain to participate in extra-curricular activities.

Under the metropolitan plan busing times would be limited to one hour. Outside of subdivision No. 6, travel times would be held to a maximum of 45 to 55 minutes. The precise travel time cannot be ascertained until the distribution of students to be transported is known. It is obvious, however, that the time will not exceed that which each county has required of their students for many years past. Most students would travel for a much shorter time than 45 minutes to one hour, the maximum in different sections of the division. The busing times estimated by Dr. Little do not cover merely transportation from the sending school to the receiving school, but include also an allowance for time to pick up children near their homes.

If, in some instances, the lottery method results in a bus route that is so tortuous or extended as to take an excessive amount of time, it may be in whole or in part abandoned. The entire metropolitan plan does not stand or fall with the lottery assignment technique. Although the law of averages indicates that those picked to be assigned outside of their residence zone would be distributed about the zone approximately as is the total population there, if in certain instances a small number of children are picked who live in a remote area, administrators will be free in their own judgment to determine whether their presence in the assigned school is worth the added time and expense of transporting them there. Or, if a transportation route over a large area proves inordinately round-about, those in charge may determine that this area would more feasibly be divided into satellite zones. These administrative decisions can be made without impairing the basic structure of the metropolitan plan.

As in all school systems, too, as population movements occur and new schools are built it would be necessary to change zone lines. There would be some consequent reassignment of students from one

school to another, as is always the case when this occurs. Another proviso is that if the lottery as applied to a particular school zone picks a group of children to be transported who are not evenly distributed according to grade level, the lottery method might have to be applied to grades individually, selecting from each level the number required to be subtracted in order to bring that level toward the desired racial mix. The need for this is unlikely, because the greater the number of students to be taken from a particular zone, the greater is the likelihood that the lottery will choose pupils randomly distributed according to grade; and the fewer to be taken from any one school zone, the less important will be any non-random distribution.

The proposed Richmond metropolitan area plan deals separately and differently with the rural southern portion of Chesterfield County, which would be administered as subdivision 6 of the metropolitan school system. Such a scheme gives recognition to the more rural character of this area and out of considerations of practicality eschews the long distance transportation which would be required if students in this area were taken into the core city. On account of the area of the southern portion of Chesterfield County, Dr. Little would recommend that this portion of the proposed subdivision 6 be treated on a different basis than the rest of the metropolitan system, which is desegregated by means of a lottery plan. Some of the facilities in this area are currently desegregated. However, the Curtis and Bensley schools still have nearly all-white enrollments, and the Matoaca Laboratory School is almost all black. Simple pairing might solve the problem. Were the latter facility to be divorced from the Chesterfield system, the integration of those white schools would become substantially more difficult.

A county school official utilized the techniques suggested by the Richmond School Board in its metropolitan desegregation plan in application to the Grange Hall area of Chesterfield County. According to the plan, one busload of Grange Hall students would attend the Curtis School. The test route developed required an unreasonable degree of time to traverse, and the Court would not approve any such facet of the suggested plan. However, in testing the feasibility of the Richmond metropolitan area plan, there was selected the most rural section of the county for the experiment. It would be possible, of course, even using the county's experimental route, to reduce the travel time by using more than one bus to cover the route. Moreover, some 22 of the 57 students picked up live in close proximity to one road.

Concerning the lottery experiment performed by Chesterfield school officials in the Grange Hall area, Little said, and the Court finds, that substantially shorter busing rides could be accomplished by the use of smaller buses. In any event, if the lottery system results in too long transportation times, simpler means could be used. An island zone could be formed in the Beaver Bridge Road area. The Bensley School could be desegregated by a simple alteration in zone lines. Curtis then could be desegregated by pairing it with Matoaca Laboratory School.

Henrico County school officials performed a hypothetical "birthday lottery" to a group of students who would be assigned to a core city school under the Richmond metropolitan area plan. They currently attend the Varina Elementary School and Varina Annex. Using two buses, Henrico officials, with the assistance of experts from the State Department of Education, experienced in the formulation of transportation routes, developed routes of 45.6 and 54.4 miles in length; travel time was unreasonable. Dr. Little noted in his own testimony that the transportation out of the Varina Annex area under the lottery plan might best be done by some other means than two standard size buses. Three smaller ones might be more efficient.

In addition, the area chosen for this experiment is one which Dr. Little stated might best be approached by the use of

an island zoning technique. Using that tool, he easily developed a plan to take the required number of Varina residents into the Richmond schools in probably less time than is required to carry them to the Henrico schools they currently attend. Unquestionably a school administrator is bound to exercise his judgment rather than adhering blindly to a uniform system. Dr. Little obviously has an open mind as to the use of the lottery system in a district such as Varina if transportation times proved prohibitive there.

The Court finds that the use of an island zone would solve the desegregation problem in the Whitcomb Court School rather easily.

The Henrico school official stated that his staff did have the skills to prepare a desegregation plan encompassing the Varina area of Henrico County. He suggested that it might be most economical to assign all children within walking distance to their neighborhood school and then transport the rest by bus either to nearby Henrico schools or to other facilities as necessary to achieve the desired racial ratios. It is to be recognized that Dr. Little in preparing the suggested plan, which the Court finds reasonable, has done so without the benefit of any cooperation from the respective county school officials. Their cooperation and expertise will undoubtedly make the task easier.

In numerous instances Richmond City and Henrico County schools of extremely divergent racial composition are located a very short distance apart. The following table illustrates this and gives the black occupancy of each facility, showing, for Richmond schools, the 1970 and 1971 percentage figure as of September 17, 1971, and the white occupancy of the Henrico facility as of the 1970–71 school year.

| RICHMOND SCHOOLS: | | HENRICO SCHOOLS: | DISTANCE |
|---|---|---|---|
| 1970 | 1971 | 1970–71 | Miles |
| 1. Armstrong High School 75% black; | 72% black | Highland Springs High School 86.8% white | 5.0 |
| 2. Armstrong High School 75% black; | 72% black | Varina High School 84.2% white | 6.2 |
| 3. Kennedy High School 93% black; | 88% black | Highland Springs High School 86.8% white | 5.7 |
| 4. Kennedy High School 93% black; | 88% black | Henrico High School 96.1% white | 4.9 |
| 5. John Marshall High School 73% black; | 78% black | Henrico High School 96.1% white | 1.4 (8 blocks) |
| 6. Mosby Middle School 95% black; | 86% black | Fairfield Junior High School 81.9% white | 3.6 |
| 7. East End Middle School 68% black; | 67% black | Fairfield Junior High School 81.9% white | 3.6 |
| 8. Fulton-Davis Elementary 53% black; | 50% black | Montrose 100% white | 1.8 |
| 9. Mason 100% black; | 83% black | Adams 86.4% white | 3.1 |
| 10. Highland Park 90% black; | 85% black | Glen Lea 99.8% white | 1.3 |
| 11. Stuart Elementary 91% black; | 79% black | Laburnum 79.6% white | 2.2 |

A pupil's achievement is not likely to be affected adversely by the assignment system used under the metropolitan plan proposed; no research indicates that it would be. In any event, the proposal is not just to transport a few individuals, but rather very large groups of pupils from one area to another; thus, they would not be totally separated from their neighborhood peers.

The evidence preponderates that a bus trip of an hour for elementary children is not educationally harmful.

There is no substantial adverse effect on the black child caused by an awareness that he is being transported, with other black children, by reason of his race. As well as can be predicted, his perception will be that restraints have been lifted and he is permitted to attend school with white children. More important than the means of transportation is the goal: a school which is perceived neither as superior nor inferior. In short, if the goal is a positive one such as integration, busing certainly as to blacks will not be viewed negatively, for such a practice denotes relief from containment rather than a perpetuation of it.

For administrative purposes, Dr. Little recommends adherence to the state law pattern which now requires a single school board for each school division. If a nine-member board is used and its membership is allocated on a population basis, the city would choose four members, Henrico County three, and Chesterfield two. Several other educational experts testified in support of the single-board plan, and the Court finds that for the coordination of school policy in general it is the preferable system.

The three political subdivisions in the Richmond metropolitan area now appoint school board members by different means. Richmond school board members are appointed by city council for a term. Chesterfield County school board members are picked by a school trustee electoral board. Henrico's school board members are chosen by the Board of Supervisors and serve at their pleasure.

The pupil population of the combined system is estimated to be 104,000.

The consolidated system is to be divided into six subdivisions. The proposal includes the delegation of administration and curriculum decisions to subdivision heads. This practice would be in conformity with the generally accepted educational practice to delegate certain functions to be discharged by smaller units in school districts above a certain size, in order to make the system responsive to the special needs of smaller areas.

Duties of the subdivision directors would principally be in the area of supervision of instruction, decisions concerning curriculum, and maintenance of close contact with parents of children in their schools. It is suggested that a lay-advisory subdivision school board be set up in each subdivision in order to involve local residents in the decision making process. No precise decision as to what authority such boards would have has been made.

The suggested decentralization will, from the evidence adduced, lead to better communication between the patrons and the administrators.

The metropolitan plan as now formulated is based on attendance figures from September of 1970. It demonstrates, however, the feasibility of the techniques employed. Furthermore, its current form can be brought up to date rapidly to conform to current attendance statistics and capacity figures with a few hours' work with the computer.

Approximately three to six months would be required to implement all aspects of the metropolitan plan, including updating and determination of transportation routes.

Any one of the school administrations involved herein could design a desegregation plan to achieve roughly equal racial proportions in schools throughout the Richmond metropolitan area. Neither of the defendant counties has undertaken to develop any proposed desegregation plan in cooperation with the city. It is apparent that the combined efforts of the city, the counties and the state authorities can lead to an even better plan than the one now before the Court—nevertheless the plan now proposed will be acceptable and the Court will be readily available to consider suggested modifications.

The metropolitan system would be smaller than the Fairfax, Virginia, system.

In the fall of 1970, only about 28 school "districts" existed with a school population of 100,000; 163 districts existed with a population of 25,000 to 99,999.

The Fairfax, Virginia system has sub-units of about 25 to 30 thousand pupils and provides, in the words of Dr. Kelly, quality education. The Richmond metropolitan plan contemplates subdivisions of approximately 20,000 pupils.

Current studies on optimum school district size focus principally on the minimum size required for a particular purpose. As new educational imperatives come to light, the minimum practical school district's size may change and rise. One such goal which educators currently recognize is the necessity, for pupils who will live in a bi-racial community, to include the component of meaningful integration in their education.

The capacity to deal with desegregation problems is one factor by which to test the merits of the proposed merger.

Educational and Administrative experts have testified that the proposed plan is a sound and feasible one, educationally and administratively, and the Court so finds.

The Public Administrative Service report in 1959 brought attention to the need for coordination in the development and operation of the area's school facilities:

The possibility of annexation has caused the counties to be hesitant about building schools in areas which might possibly be taken into the city; yet, it is in these areas that the schools are most needed. Plate 2–5 shows the distribution of schools throughout the region, by type. [In this illustration the schools are racially designated.] Table 2 shows total enrollments and annual increases in enrollment for the three jurisdictions during the period from 1950–51 to 1957–58. In this period, the maximum growth in Chesterfield and Henrico Counties took place in 1955–56, whereas it occurred in Richmond earlier, in 1952–53. The present composite rate of growth is about 3,000 per year.

Shortages of physical plants are causing both of the counties to have fairly extensive "shift" operations in their school buildings, and Chesterfield County is using a number of rented facilities. Richmond is "double-shifting" only in the beginning grades.

With the combined school enrollment of the two counties rapidly approaching that of Richmond, and the combined annual expenditures of the three school jurisdictions now in excess of $20,000,000.00, there is special need for achieving maximum economies in the management of the public education system of the region. Administrative costs of the three systems total about $300,000.00 annually, or about $0.75 per capita.

The PAS reporters did not recommend the combination of Chesterfield County's government into a consolidated Richmond-Henrico one. They based this judgment on such factors as the independent utility development of Chesterfield County, the existence of recently constructed county administrative facilities, the traditional maintenance of a low level of governmental service, and the county's ties to the three southern cities, Colonial Heights, Hopewell and Petersburg. Most of these distinguishing factors do not bear upon the question of whether school systems alone should be combined. The finding of disparity in levels of governmental service, in addition, is certainly incorrect if one focuses upon educational expenditures. Chesterfield in the recent past has devoted very considerable resources to new school construction.

Although the point is disputed, and is of collateral importance, it seems probable that some educational tasks can be carried on at less cost by the combined unit than by the existing three separate school divisions.

The minimum school district size to achieve substantial integration and to

eliminate the effect of state-imposed segregation, would be that of the division created by the merger of the systems of Richmond, Henrico and Chesterfield.

The county and state defendants assert that, if consolidation is brought about, the resulting Richmond metropolitan area school division will be racially identifiable, surrounded as it is by several political subdivisions of strongly disparate racial proportions. To begin with, racial identifiability depends to a great degree upon the individual's perception of the community within which comparisons are to be made. Richmond natives do not contrast the make-up of their schools with the composition of schools located a great distance away. Simply, the notion does not leap to mind that an alternative pupil assignment arrangement, attaining greater racial parity, could be made of pupils attending a Richmond school and one in southwest Virginia. Identifiability is a matter of contrast and the perception of obvious alternatives.

Furthermore, none of the defendants asserting the identifiability as white, of the consolidated division, has moved to alleviate that result by appropriate remedial action. It may be in the future one or more of them will do so. It may also be that, due to the sparsity of population in some of the adjoining counties, the task will not be difficult. Such steps are not barred by the order of this Court; in any event, the Court stands ready to amend or modify its order as necessary.

Dr. Pettigrew conceded that the proposed metropolitan system would have on its borders some counties with black school populations far above the proportion in a combined Richmond, Henrico and Chesterfield. He saw this as no barrier to the action he recommended. These counties are sparsely populated. He would recommend, consistent with his position, that the State Board of Education examine the possibility of incorporating some of these other jurisdictions into a metropolitan system.

It has been stressed, particularly by Henrico, that Hanover County might well be considered, along with the other three jurisdictions, to be properly a part of the Richmond metropolitan area. It is included within the Standard Metropolitan Statistical Area of Richmond established by the Bureau of the Census. It is also part of the Richmond Regional Planning District. It is, moreover, not distant from the city and many of its residents may find employment there. Some of its schools are closer to Richmond city schools than are the Henrico schools to which the Richmond School Board proposes to transport Richmond residents now attending city schools. None of those defendants, however, has sought to bring Hanover County officials into this lawsuit. The decision of legal questions flowing from any such action will abide the event.

*Integration:*

Social scientists generally concur that one of the most vital elements of equal opportunity in education is the effective integration of schools. This is essential for children of both major races. The evidence seems clear that the benefits of an integrated education are most attainable if it is available to the child from the earliest grade.

To remove the racial identifiability of individual schools creates the opportunity to bring about in students attending them self-perception and aspirations not colored by notions of artificial advantage or disadvantage related to race.

Attitudinal effects made attainable by the desegregation of schools are very likely to have a positive effect on achievement. Access to inter-racial education engenders in black pupils the ability more realistically to perceive the relation between their own efforts and attainable goals, which effect in turn boosts achievement.

In order to determine whether a school has, in the full sense, granted its pupils an equal educational opportunity, it is necessary to observe not only how they perform on achievement tests while in school, but also how well they were able to grapple with American society and

participate in its life. Education should give the student an opportunity to participate fully in American society. This opportunity is denied when the pupil is exposed to the sort of segregation existing in the Richmond area, just as it was by that which drew the Supreme Court's condemnation in *Brown*.

The performance of a particular school is not measured solely by its pupils' performance on achievement tests. It has become accepted among educators that attitudinal development is a legitimate and necessary part of the educational process. The development of realistic attitudes toward members of the opposite race requires a racially integrated school environment, something which is not at all equivalent to the mere presence of members of two races in the student body, but which cannot be achieved without that.

To achieve "integration", in Dr. Pettigrew's terms, one must have the "mix plus positive inter-action, as we would want to say, between whites and blacks." Current research indicates that in order to achieve these benefits there is an optimum racial composition which should be sought in each school. Dr. Pettigrew placed this at from 20 to 40% black occupancy. These figures are not at all hard and fast barriers, but merely indicate to the racial composition range in which inter-action of a positive sort is the more likely to occur. Social science is not such an exact science that the success or failure of integration depends upon a few percentage points. The low level of 20% fixes the general area below which the black component takes on the character of a token presence. Where only a few black students are in the particular school, there simply are insufficient numbers for them to be represented in most areas of school activities. Such participation would be crucial to the success of integration. The high level of 40% is linked not to the likely behavior of the students so much as it is to the behavior of their parents. When the black population in a school rises substantially above 40%, it has been Dr.

Pettigrew's experience that white students tend to disappear from the school entirely at a rapid rate, and the Court so finds. This is only possible, of course, when alternative facilities exist with a lesser black proportion where the white pupils can be enrolled. The upper limit, then, relates to stability. Dr. Pettigrew noted that the Central Garden School, in Henrico County, had experienced such transition when its black population rose to near 60%, it rapidly turned to nearly all-black in a very few years.

Dr. Pettigrew's objections to the existence of a school with an over 40% black population relate both to the foreseeable instability of such a facility and the perceived inferiority in the eyes of the community. Dr. Pettigrew's upper limit of 40%, determined as it is by considerations of stability, varies with local circumstances affecting the tendency to instability. He would not adhere to a 40% guideline in a metropolitan area where the black population in school was above 40%.

In schools with the optimum racial mix across the country there seems to be beneficial effect upon community perceptions of the facility, the teachers' expectations, and even administration. The impact upon teachers' expectations is particularly significant, since social scientists have been able to demonstrate that students' performance tends to rise when teachers are confident of their students' learning ability. This seems to be linked to the natural inclination of the teacher to expend greater effort upon those perceived as likely to succeed.

Based upon projected enrollments under the current assignment plan for Richmond city schools, very few students will be in schools with a black population of 20 to 40%. At the elementary level, 3.04% of the black students and 9.43% of the white students will be in such schools. In middle schools, 9.2% of blacks and 26.7% of whites will be in schools in that range. There will be no high school students in such schools.

In Henrico County, based upon 1970–71 attendance patterns, 14.7% of the

black students will attend schools with a 20–40% black enrollment; 5.4% of white students in the elementary level will do so. At the middle school level, 1.3% of black students and .2% of white students will attend such schools. Again, there will be no high school students in such schools.

In Chesterfield County, based upon similar data, 34.24% of black elementary students and 9.6% of white elementary students will be in 20 to 40% black schools. At the middle school level 47.-2% of black students and 7.6% of white students will be in such schools. As in Richmond and Henrico, there will be no high school students in schools of this range.

If the Richmond metropolitan area consolidation plan were implemented, 97% of black students in the area would attend schools in the range of 20–40% black; the remainder would be in 15–20% black schools. Under that plan 92.-5% of the white students in the area would be in schools of the optimum mix determined by Dr. Pettigrew, and 7.5% would be in schools with a 15–20% black enrollment.

As best we now know, and as best as can be proved, opportunities for achievement and healthy attitudinal development for all pupils would be substantially raised if the school systems in the Richmond area were organized under a metropolitan plan. Members of each race would have a substantially greater opportunity to develop realistic attitudes toward the other race, productive of friendships and positive social behavior. The likelihood of inter-racial hostility will substantially diminish. These are all accepted as legitimate educational goals.

One of the measures of socio-economic status, often used by social psychologists, is parental educational attainment. In areas like Richmond, this is largely a function of educational opportunity available in previous years to black parents. One expert described the phenomenon as a generational cycle: "[D]iscrimination of the last generation against black parents in effect ends by damaging the black child today because of (the) inability of his parents to have received an adequate education as a child."

Because they were subjected to deprivations, such as a segregated educational system imposes, the social class factor is to a major degree traceable to state action in the past which denied equal educational opportunity.

Between the school years 1925–26 and the year 1963–64, the ratio of white to black pupils enrolled in state public schools rose from 2.6 to 1, to 3.1 to 1. In 1933–34 in white schools of the State of Virginia, there were 33.8 pupils per teacher. In 1957–58 there were 26.6 white pupils per teacher. In 1933–34 there were 41.3 black pupils per teacher, and in 1957–58, 28.2. In 1925–26 the ratio of school property values between white schools and Negro schools of Virginia was 9.4 to 1, whereas the ratio of white to Negro pupils was 2.6 to 1. In 1963–64, the ratio of white school property value to Negro school property value was 3.9 to 1, and the ratio of whites to Negro pupils was 3.1 to 1.

On the national level, housing segregation is the principal basis for school segregation. School segregation has likewise given rise in some circumstances to the growth of segregated housing patterns. Employment, education, and housing discrimination foster each other in the United States; the effects of one are causative of the others; they are interdependent phenomena.

On the basis of research which indicates that blacks in the Richmond metropolitan area have historically received an inferior education, Dr. Pettigrew, rightly in the Court's opinion, viewed the social class effect here as directly, on the one hand, causing educational deprivation in current pupils and, on the other hand, being caused by past educational discrimination against their parents. Limitations imposed upon a parent perceived opportunities, especially employment opportunities, will affect the child's perception of his own opportunities and social status. Such long-term effects of discrimination are cumulative in nature,

and continue from generation to generation, and will so continue in the Richmond area unless and until it is recognized that the benefits of the Constitution are not limited to a particular race.

It is the view of the Coleman Report that the more important determinant of academic achievement is socio-economic status; that is, economic class. But in the United States today race and class are corelated to a large degree, but not completely. The social class effect is of primary importance both in the individual achievement, as it relates to his social class, and in overall school achievement, as it relates to the social class predominant in a particular school. One of the desirable effects of the implementation of a metropolitan plan would be the opportunity for social class integration, as well as racial, but in Dr. Pettigrew's mind, and in the Court's, the principal argument is that racial desegregation would be made possible.

Dr. Pettigrew is also an advocate of class desegregation. That is, he would prefer to incorporate in each school facility some from the lower economic echelons and some from the higher. He has been unable to determine the optimum mix in class-desegregation terms with anything like the precision he has been able to employ in the field of race. He believes that this is because class is not so salient a factor, not so observable, as race.

The beneficial effects upon attainment of racial integration, as compared with social class integration, are most strongly observable in the early grades.

## Anti-Metropolitanism

Based upon his learning as a social psychologist, Dr. Pettigrew stated, and the Court accepts his view, that a major cause for urban school segregation today is anti-metropolitanism, which tends to give rise to segregation across school district lines rather than intra-district.

The Cincinnati Report took to task school officials' lip service to the goal of desegregation:

School administrators have declared that they favor non-segregated education, but at the same time they continue to endorse the neighborhood school attendance arrangement. That is roughly equivalent to endorsing the idea of compensatory education but rejecting the notion of spending more on some students than others. In a city of Cincinnati's size, with its intense residential segregation, school desegregation would require significant and substantial modifications of existing school attendance patterns.

The report advocated positive efforts, at least on an experimental basis, to bring about desegregation on a continuous basis from the primary grades on.

Second, the total student population of the sub-system should be economically and racially integrated, and should roughly reflect the city's population. The consequence of this would be that any given school, or all, in the subsystem could be between 25–40% Negro and/or disadvantaged and 60–75% white and/or advantaged.

\* \* \* \* \* \*

If such a sub-system were established, and a serious effort made to provide improved quality education for all children involved, experience elsewhere suggests that whatever initial anxiety and questions there were would turn to acceptance and enthusiastic support.

The report recognized the profound impact upon blacks of school segregation:

Segregation always has been the chief fact conditioning the educational situation of Negro Americans. Its impact has been profound, encompassing everything from the psychological to the political dimensions of schooling. Typically, it pervades public education systematically, affecting not only the patterns of pupil attendance, but also the character and the distribution of teachers and other educational resources to students. In Cincinnati, as elsewhere, racial segregation in the public schools is intense.

*Compensatory Education:*

Experience has shown that the goals served by an integrated school environment cannot be obtained through the use of such compensatory educational techniques as are available today.

Dr. Gross, an educator of much experience, did not say that he could not, as an educator, teach disadvantaged children in a school with a majority of black student population. He did say, however, that he could not teach them as much, and as well, as he could if they were in a racially integrated school.

As Dr. Gross said too, there is a very tenuous cause and effect relationship between a new building as opposed to an old one, or between the level of teachers' preparation on the one hand, and excellence in instruction. Teacher attitudes can be modified to an extent by training, but this is not a major determinant of their expectations. Whatever the training, he receives, an instructor's attitude will be highly affected by the situation in which he operates.

The Cincinnati report which Dr. Hooker helped to prepare concluded that, "locally, the inequalities are metropolitan in scope and character, and any lasting solution will have to be cast in those dimensions." A very recent and well-evaluated remedial education program, the report stated, had turned out to have affected achievement very little. The report suggested other measures, based upon recent research indicating that the school environment is "salient for cognitative development." "There is very persuasive evidence that social class and racial desegregation is associated with higher achievement for Negro children."

The composition of the schools in the Richmond system is not likely to be stable as it is now administered. Nor will the white students in racially isolated schools in the county systems be able to avail themselves of the benefits of an integrated education in any substantial numbers.

One of the necessary ingredients for "integration" in Dr. Pettigrew's terms is a degree of stability. Research tends to indicate that truly equal educational opportunity cannot be offered by schools which are desegregated only to resegregate. The transitional process is rarely productive. The effort to desegregate turns out to have been only a temporary gesture.

The phenomenon of white flight from schools over 40% black always occurs, when it does, in cases where there are other nearly white or all white schools in a community which provide a form of refuge. This is always true because there is no metropolitan area in the United States with more than 40% black population.

What declines in white achievement in majority-black schools are observable, in Dr. Pettigrew's view, are attributable both to the fact that such schools are likely to be in a process of transition and instability, and also to the related fact that such schools begin to be perceived as inferior. Instability, in other words, adversely affects educational success, but there is a separate negative impact attributable to perceptions of identifiably black schools in a community with identifiably white schools, as inferior facilities. Such perceptions induce some whites to depart, and they also diminish the chances of educational success in the black schools.

After the adoption of the current plan, Plan 3, for the desegregation of the Richmond city schools, educational experts foresee that the black percentages in the city system will become larger at an even faster rate than heretofore. However, even if the Richmond system maintained its current racial distribution and did not continue to lose white students, educational consequences of the continued separation of the city system from those of the counties are bad. For even now the systems are identifiable as black and white, inferior and superior, with consequential harm to their students. Pupils in each school division would perceive the systems as segregated. The problem remains so long as disparity does.

In essence, there is no appropriate substitute for desegregated schools. Those that are not desegregated are simply not equal to those that are.

### Dr. Hooker:

Dr. Clifford Hooker, called on behalf of the state and county defendants, is an expert in educational finance, reorganization and racial aspects of the latter problem. He did not consider himself, by his own judgment, to be an expert on school desegregation. His principal expertise is administrative and organizational.

Dr. Hooker confirmed that when consolidation of school districts occurs it is necessary to "level-up" the standards of each of the merged components so that the services, programs, pay schedules, and equipment of the combined system are equivalent to the best of any of the former systems. This witness, it appeared on cross-examination, in a recent study, gave his professional opinion that the correlation between school districts' size and the cost of education per pupil is not very high.

Given the size of the proposed combined school division, Hooker said that a decentralization plan of some sort would have to be utilized. Most witnesses agreed on this. Hooker feared, however, that this might impede racial and economic integration. A central authority, in addition, would necessarily remain. Therefore, he thought, regional administrators might serve only as conduits of local grievances, and the school principals would be subject to two sources of authority.

Dr. Hooker stressed the importance of a secure financial base for any school operation. Educators, he said, "are terribly sensitive about fluctuations in the support for the schools. Small changes in the amount of money available can result in fairly dramatic changes in the program because most of the school costs are in terms of personnel, you know, up to 80% in many school districts. These commitments are made by contract over long periods of time." (The Court notes

the apparent conflict here with Dr. Campbell's testimony). Dr. Hooker was of the opinion that it would be extremely difficult for a combined system to operate, in reliance on three separate tax-levying agencies. Deadlocks, for example, might develop over the decision on where to locate a new school. It occurs to the Court that deadlocks may well develop, and have in Virginia between school boards and governing bodies in a single-county school division. If there is disagreement on the location of a new school, there is now no clear and simple way to resolve the problem. In Henrico, the Board of Supervisors might simply remove some or all of the school board members, but in Chesterfield and most other counties, the board has no such power. Yet somehow they manage and have decided to retain the system.

Dr. Hooker was not familiar with the practice in Virginia of operating joint schools financed by separate political subdivisions. Some of the other difficulties which Dr. Hooker described with respect to joint school operations might be alleviated in the Richmond metropolitan area plan by the existence of a single school board.

Conflicts over appropriations, he conceded, might well be much less heated if race were not a question.

Hooker said that, based upon his investigations, it appeared that each of the three constituent governments of the proposed merged system already was within the range of optimum school district sizes. He was quick to state, however, that optimum size may differ with the educational goals pursued. Still, in his opinion, each existing school division had the capacity to offer its students an inter-cultural experience.

Dr. Hooker recently wrote an article upon school district organization in which he stated that an over-abundance of local school districts, gerrymandering of district lines, and the departure of affluent families to suburbs, together with faulty state aid distribution of formulas, have introduced "social, economical and racial stratifications as well as geographic sep-

aration." These are his current views. He is an active proponent of the reorganization of school districts, which he views as subject to modification by state authorities for valid educational ends.

Hooker's professional recommendation that a merger of the school divisions in the Richmond area not take place rests on very slim grounds. The weight of his objections is markedly undercut by recent expressions concerning the merits of school district consolidation in similar circumstances. He recently collaborated on a study of cooperation between school districts in the metropolitan area of Minneapolis-St. Paul. He observed that in the area economically disadvantaged individuals were increasingly concentrated in central cities, which themselves were growing more and more impoverished. Meantime, as the metropolitan area expanded, the inter-dependence of old city and new suburbs increased. Seven points were made:

1. Suburban residents rely heavily on the economic reservoir which the city's employment opportunities provide.

2. Suburban residents are strongly dependent upon the cultural and recreational attractions in the two central cities.

3. Suburban residents rely upon the central cities to carry a substantial welfare load, the beneficiaries of which, in many cases, are the parents of suburban citizens.

4. Suburban areas have become readily accessible to the cities as a result of massive freeway and urban transportation programs which have, to some degree, reduced urban tax potential by their extensive land usage demands.

5. *Suburban communities, regardless of their emotional posture on the subject, have received enormous subsidization by the central cities during their periods of rapid growth as a result of differential revenue allocation programs, particularly in the form of state educational aid.*

6. Urban areas are increasingly dependent upon the youthful vision, drive and leadership qualities of of the suburban population.

7. Urban areas, because of the lure of suburban locations for commercial and industrial expansion, are in need of a fiscal partnership with the affluent and youthful families in the suburbs.

In Dr. Hooker's opinion these problems and inter-dependent relationships are found in most central cities.

The same article concludes:

Will educators be capable of responding effectively to the challenges of metropolitan planning? What wisdom and social inventions will be used? Metropolitan areas throughout the country are seething with unrest and disquiet to which inadequate and inappropriate educational efforts are alleged to have contributed. Islands of educational and economic affluence exist in a sea of poverty and ignorance. There is no single solution to this problem. A variety of approaches will be needed. Many of the "sacred cows" in education will need to be eliminated or at least modified. Neighborhood schools, local control, and local school districts should be retained or rejected on the basis of their capacity to deal with metropolitan problems rather than for their sentimental value. The application of cooperative research and development approaches seems to hold promise as a means of managing changes of this magnitude.

A revision of the statutes controlling education is needed in most states. Just as permissive legislation never achieved effective school district enlargement in rural areas, metropolitan planning for education will never achieve its objectives until the state recovers some of the authority which it has delegated to local boards of education. The state may choose to transfer some essential functions, such as

planning and financing of education, to a "super-board," or it may elect to establish a single metropolitan board of education. While these options may lack appeal to many educators, the alternative of continuing existing school districts with their individual incapabilities for solving educational problems of metropolitan areas cannot be defended. The probability of legislative and judicial review of public school operations in metropolitan areas increases in proportion to the inability and unwillingness of educators and boards of education to attack problems cooperatively. An illustration of what could happen was provided by Judge J. Skelly Wright of the United States Court of Appeals for the District of Columbia. While delivering the Sixth Annual James Madison Lecture at New York Law School, he observed that the Supreme Court might require that city and suburban school districts merge their operations to achieve racial balance.

Dr. Hooker did agree, too, that the preparation of children to live and work in a multi-racial society is a valid current educational goal. He conceded the findings of the Coleman Report as to the improved performance of black children in other than all black facilities. He thought—though he was uncertain—that the explanation lay in class differences: where black children are in the minority in a school, they tend to be middle-class, given the nation's housing patterns; but he admitted that the Coleman Report, in determining that educational performance varies greatly with socio-economic status, suffers from a defect common to the regression analysis technique, when used in an effort to separate the effect of variables which in fact co-vary with each other. He was quick to agree that this factor co-varied with race very strongly in most circumstances.

Dr. Hooker admitted that it was bad as well for white children in Henrico County to know that they attend a white school, and that because of jurisdictional boundaries black children are being kept in the City of Richmond.

He conceded that a child, observing two schools on different sides of a jurisdictional boundary, with widely disparate racial compositions, would not be sufficiently sophisticated to know most of the forces and factors which brought forth such racial composition, but would simply perceive the existence of black and white schools.

However, school organization is a matter of compromises, he said. Goals may conflict. Pure feasibility in some areas limits the attainment of complete desegregation. He would not say that this was the case in the Richmond metropolitan area. He thought that it might well be administratively and economically feasible to resolve the admittedly bad situation of racially identifiable schools by having the jurisdictions remain, for school administration purposes, separate and intact, but initiate an exchange of pupils on some tuition contract basis. That system, Hooker said, had the fault that parents would be sending their children to be taught by a system over which they had no control. This is the same phenomenon which prevailed under the tuition grant system. It also prevails now in other areas of Virginia where children from one political subdivision are educated in another under contract.

Despite his recognition of the demonstrated benefits of integrated education, Dr. Hooker, based on limited expertise, had the idea that the redistribution of pupils in the Richmond metropolitan area, based upon the overall community racial ratio, would appear insulting and paternalistic to the black pupils and their teachers and would diminish their achievement. The overwhelming weight of the informed testimony is to the contrary.

In fact in the survey he conducted of the St. Louis area, Hooker recommended the combination of an all-black school district with 2,000 pupils, with two white districts. The total population of the re-

sulting district was 22,000. Blacks, therefore, were in the small minority, but Hooker denied that such a plan was racist. The Court accepts his testimony on that point. Still he suggested that the metropolitan plan, by suggesting that blacks must be in the minority in order to have a good education, is a racist proposal. In this, the Court believes, that he misconstrues the premises of the plaintiffs' case. Experts testifying in support of the proposal stated that whatever the black racial proportion in the metropolitan area, they would still advocate a redistribution according to rough parity. In fairness, Dr. Hooker conceded this point.

Dr. Hooker also supported those measures taken to date in an effort to desegregate schools within the bounds of the city. Educationally speaking, from the information he had, he said, it had probably been a sound decision to desegregate 19 all black or all white schools during the current session in the City of Richmond by means of crosstown transportation, entailing distances of six to eight or nine miles, of about 7,500 students.

In Hooker's opinion, expressed in this Court, a public school is desegregated when it excludes no one because of race. He would not add the requirement that it in fact have a bi-racial student body. Under his definition, he said, the schools in Richmond currently are desegregated. Such restrictions as exist upon access to schools with a different racial mix, to Hooker, are only those which necessarily ensue when some form of assignment plan is employed.

Hooker said that he might be much more willing than he was to term the area school community segregated were there some indication that the existing jurisdictional lines were imposed with the intention of separating black children from white.

He acknowledged the contributing factor to the problem of inadequate education was the failure of suburban areas to participate in programs to make available to lower income groups housing sites outside the central city.

Hooker conceded that segregation in his terms might exist if school authorities had "failed to take affirmative action with respect to additions to schools or the modification of attendance areas to obtain or maintain some reasonable balance." Segregation might also occur, he said, if a board fails to use the pupil assignment power enjoyed by it to dismantle a dual system. Hooker stated further that the development of dual systems with schools located to accommodate population groups on a separate basis, would quite foreseeably produce segregation, although formal racial legal barriers were lifted.

A history of continued resistance to desegregate, including school closings, central administration of pupil placement, tuition grants, and general state interference with any effort to desegregate, was also highly relevant to Hooker as an educator in determining whether a particular pattern of school assignment was segregated, in his terms.

Nonetheless, he maintained that the pending proposal to be a "racist" plan. This exchange ensued:

Q. You think that black plaintiffs who have alleged in this case that they have been artificially confined in the city limits of Richmond, that they have been confined to segregated schools, that they have been confined to this community within the City of Richmond because of deprivations in economic opportunity, educational opportunity, and a whole structure of segregated society in Richmond, in Henrico, and Chesterfield and the State of Virginia by State Constitution until commanded by acts of the legislature; do you think that it is paternalistic for blacks now to seek schools, just schools, that reflect the distribution of blacks and whites or proportions of blacks and whites in this area?

A. If I were certain of the condition that you established, I would obviously answer the question "No", but I don't accept a lot of assumptions that you built into your question.

Sad to say, the assumptions stated by counsel in the question have been proven to be accurate.

Had the doctor's studies of conditions in the area and their historical origins—factors he thought relevant—been somewhat deeper, he would have acquired sufficient knowledge to support the stated assumptions. It should be remembered, however, that his expertise excluded school desegregation. His preparation was to the finance, administration, organization—including organization and reorganization, of multi-racial districts.

Hooker thought that the consolidation of schools in the Richmond area would in some way "disenfranchise" black residents by preventing them from achieving control of the system. He conceded that some of the expressed desire for black control of school systems may represent a reaction something like frustration to the failure of those in control to achieve long promised equal education opportunity. He felt that such rhetoric represented a disparity "on the part of people who have fought for a long time and have been denied total access to this culture and this economy." While the Court is in accord with his view on the referred to rhetoric, the Court disagrees with his conclusion that black residents would be in some way disenfranchised. In any event, any such fear will be dissipated in a much shorter period of time than that period of time which has given rise to any such supposition, once blacks receive that which our Constitution says is the due of all citizens.

Hooker thought that decentralization might tend to conflict with goals of integration because in most cases it results in the division of the larger jurisdiction into homogeneous areas. If the Richmond metropolitan plan were utilized, Hooker would recommend that sub-district areas be drawn to include a heterogeneous population.

Dr. Hooker agreed that, generally speaking, black and white school children are reasonably close together in achievement levels when they begin school. As they progress, however, differentials appear and increase.

Hooker acknowledged that the Lorge-Thorndike ability tests generally measured the same things as do scholastic achievement tests. They do not measure innate ability and in fact have some cultural bias, built in them as well.

He stressed the contribution to educational progress made by parental influence.

Dr. Hooker felt that where hostility or fears with regard to race existed, as a practical matter, that a school administrator was not free to desegregate his schools.

In substance Dr. Hooker's objections to the Metropolitan Plan were reached on the basis of less than a full appreciation that this was a desegregation suit with its genesis rooted in purposeful discrimination, coupled with what he perceived to be possible problems pertaining to securing some degree of agreement on the various aspects of school operation. Not the least of his concerns was financing. In view of the current state of the law, and Virginia's permissible methods of handling the financial aspects of a consolidation of school divisions, the Court finds his objections insofar as they go to the merits of this suit and the proposed plan to be unpersuasive.

### Dr. McLure:

Another defense expert on educational administration, organization and financing, Dr. William McLure, gave his judgment as to the merits of the metropolitan plan. His principal work in recent years has been to conduct state-wide educational studies.

McLure found no educational advantages to a metropolitan plan. He found disadvantages in that, as he said, the plan was too rigid and mechanical in re-

shuffling pupils and resources. Administration, he said, would become more complex and expensive and less responsive. He feared that merger would do away with school communities of sufficiently small size that pupils would be able to identify with them. Perhaps most vehemently Dr. McLure objected to what he termed the creation of an "arbitrary, dehumanizing racial mix," unpromising of constructive racial integration. McLure feared that in the larger system children would become disoriented and educational policies would tend toward uniformity. Likewise, he foresaw a loss of public support as citizens became isolated from those governing the merged system.

The Court has considered McLure's testimony in light of the fact that he was offered as an expert in administrative and financial matters rather than in the sphere of social science or educational psychology. Dr. McLure gave as one of the roles of public education the perpetuation of society's values. He would not count segregation as one of those values to be fostered; but when asked whether he thought affirmative action by public educators should be taken to eliminate segregation as a social value, Dr. McLure said that he thought the issue had been settled. He was not aware that schools in this area had been very recently operated on a strictly separate basis.

In his testimony, McLure set forth various educational goals which he thought might be promoted by consolidation of public schools. In publications concerning alterations of other sorts in educational structure McLure has listed similar factors as educational desirables. One factor from an earlier article, however, was left out of the testimony: Integration of cultural groups.

On cross-examination he agreed that integration was a necessary goal. In many areas, McLure showed himself to be conscious of the need for school districts to be constantly improving by developing new education techniques to fit changing social patterns and meet new economic needs. He saw the creation of regional educational centers and other techniques of cooperation between school districts as examples of modern advancements. Fourteen years ago he recommended the reorganization of intermediate school districts, recognizing that the initiative in this had to come from the central state government. In such a restructuring, political subdivision lines would be given, he then said "secondary importance." In this case he stated that school division boundaries served no educational purpose.

Dr. McLure conceded the value, as an educational goal, of preparing young citizens to live in a multi-racial society and acknowledged that improvement of educational climate is a possible goal of school division consolidation. Further, he agreed that the optimum educational climate would not be obtained if a district boundary line separated the schools that were, on the one side, nearly all white, and on the other side, nearly all black. He said that there might be some way to optimize the climate in each school, but he did not elaborate. He made the same statement concerning school systems with such differential enrollments. These conclusions were, in the Court's opinion, inadequately based in research.

Dr. McLure thought that pupils transported out of their home neighborhoods would lose peer contact and become disoriented. The child's relation with his peers he linked to his identification with a particular school community. McLure's objections, however, would be greatly reduced if children were taken in groups with their peers, to the school to which they were assigned. He conceded that a strictly "community" or "neighborhood" assignment policy would result in a great number of segregated schools.

McLure said that the Richmond metropolitan area plan created an "arbitrary" racial distribution. He conceded, however, that the ratio of black to white throughout the metropolitan area was not itself arbitrary, but rather an established fact. He seemed, nonetheless, to be under the impression that the purpose of the

plan was to impose exactly that ratio in each school. In fact, the overall ratio is used merely to establish general upper and lower limits on racial distribution in each facility. Even the 20% to 40% black and 60% to 80% white guideline is violated in certain instances. Nevertheless, McLure would have preferred to leave school racial composition to natural forces of population distribution. He was not aware to what extent discrimination has affected those patterns in the Richmond metropolitan area.

Although he considered integration to be a desirable educational goal, McLure thought that continuing inter-racial contact was not crucial, and that the same benefits might be gained in other ways. He was unable to suggest any, except to say that he saw good prospects for meaningful integration in a school housing 800 whites and two black students.

Although Dr. McLure objected to merger on grounds of cost, he had no information on the amount of money the state might have spent since the *Brown* decisions in promoting segregation by means of tuition grants, regional segregated schools, or legal defense of segregation.

*Dr. Whitlock:*

Dr. James Whitlock was offered by defendants as an expert in educational administration, organization and finance. In the past he had done studies of the administration of the two county school systems and performed a fiscal analysis of Richmond city schools.

Generally, Dr. Whitlock said, consolidation of school systems seeks to achieve better quality education by increasing financial resources and making achievable economies of scale. Administrators seek to take advantage of supporting services possible only with a certain minimum size, to make better use of staff skills, and to, in general, provide the optimum educational climate for children.

At the same time, in consolidation, Dr. Whitlock stressed the need to maintain the strong components of the merged units. Because of the leveling-up required when three systems with varying levels of services are combined, Whitlock predicted a rise in overall expenses. He saw no significant savings, on balance. Whitlock foresaw the decentralization program as requiring some additional staff people. His own research led him to the conclusion that a school division of twenty to fifty thousand pupils is optimum.

Whitlock objected to the proposed metropolitan plan here principally because the existence of a single school board and administration, answerable to three fiscal sources, would make financing too uncertain, he thought, and the revenue raising bodies, boards of supervisors and city council, would not be answerable to all of the people they served. Whitlock foresaw constant differences between the three components, with consequent impact upon citizens' willingness to tax themselves. Despite the region's good record for tax effort, it was Whitlock's opinion that bond issues subject to referendum would be unlikely to pass.

He conceded that his arguments against merger in this case would not come to much if the proposal included a continuation of tax bases. The comparison of costs and tangible benefits, to him was the essence of his approach to evaluating the merits of a merger. He admitted too, however, that certain educational benefits are not subject to this method of evaluation.

He thought that it was essential to provide a single consolidated school board, as Virginia law now does. Overall, he would prefer that school boards be empowered themselves to levy taxes; this, however, is not the governmental structure that the Commonwealth has embraced for many years.

Whitlock was not aware that any expert had recommended consolidation plans which entailed relying on separate tax bases. It immediately occurs to the Court that any form of joint school operation, which has been practiced in the State of Virginia for a long time now,

is exactly that. In several areas, in fact, a joint high school has constituted a consolidated secondary school system for blacks, in effect. Moreover, when schools are divided by one political subdivision for pupils from another by contract, the first is dependent upon two fiscal sources for support. Both of these modes of organization have been recommended by the State Board of Education in the past.

He anticipated that Henrico and Chesterfield would require one hundred million dollars in bond issues over the next ten years for schools.

Whitlock conceded as well that patrons in each political subdivision would have a common interest in securing cooperation between the three governing bodies to provide financial support. At base, Whitlock's concerns appeared to focus upon the "taxpayers' revolt" against school expenditures which he observed in other areas. Whatever may have happened in other jurisdictions, however, it is undeniable that citizen support for education in the Richmond metropolitan area has been strong and continuing.

It was Whitlock's judgment that there were no educational advantages to be drawn from the metropolitan plan, aside from that of achieving desegregation, a subject upon which he admittedly had no expertise.

It appeared on cross-examination that this witness had given his endorsement in the past to detailed recommendations of school district consolidation in a report which relied in substantial part on the increased feasibility of desegregating schools on a metropolitan basis. This was the product of a detailed examination of Raleigh and Wake County, North Carolina schools. The foreword to the report gives as one premise that "adequate opportunity for all children and youth means that it should not make too much difference where they live. In Raleigh and Wake County it does make a difference—too much of a difference as the evidence shows."

In the report this witness was not so pessimistic as he seemed in court as to the possibility of some economies of scale in an enlarged school district. These were Whitlock's words:

It has been commonly accepted for some time that economies of scale exist in education, and it seems reasonable to expect that larger districts would bring with them the greater efficiency due primarily to the advantages of purchasing, and the more efficient utilization of personnel, school facilities, and other resources. Research, by and large, seems to substantiate the existence of such economies.

\* \* \* \* \* \*

The existence of the boundary line between county and the city school districts presents a serious deterrent to sound school facilities planning. Because of the ever-present possibility of annexation, school plants in the county often are not located in proper relationship to the population that they serve. Distribution of tax revenues for capital outlay and proceeds of bond issues on a basis other than need encourages uneconomical practices in capital outlay expenditures. The merger of the school districts would make possible the more efficient utilization of buildings, transportation equipment, data processing facilities, and both certificated and non-certificated staff personnel.

The report also indicated that new industrial development in the area would depend greatly upon the existence of a well-educated labor supply. Unified educational planning would assist in attaining that end. Moreover, the expanded school system recommended it could more economically provide vocational and technical educational facilities.

The report in other sections took note of the 40% increase in Raleigh's non-white population between 1940 and 1960. During the same period, the county population of whites increased nearly four times faster than the non-white population did. "The implications of these phenomena for changes in the prevailing school organization should be of

concern to the Wake community as well as its two school systems."

With changing population trends, the Raleigh-Wake County report noted, blacks are increasingly housed in "subcommunities," particularly in the city, of compact size and dense population.

Dr. Whitlock conceded that if phenomena of this nature were present in the Richmond metropolitan area as well, the findings and recommendations of the Raleigh-Wake County report might well be relevant here. He registered no dissent from the conclusions of the report when it was published.

The Court finds it somewhat surprising that this witness did not search for similar factors, so important to the earlier study, in his several examinations of the Richmond area. Had he looked, he would have found them.

The report also gave great weight, to the exclusion of certain negative factors, to the assistance in desegregation afforded by an expansion of the jurisdiction.

The report based its recommendation of consolidation in part on the finding that "a single school system would make it easier to meet racial integrational requirements in the schools. Virtually all school desegregation in both the city and county systems has occurred in the predominantly white schools." "School planning within a single district and coordinated with general community planning could result in a superior capability for desegregating schools."

The Wake County report relied in part upon the common interests between the city and the county, and the city's position as a source of cultural and economic opportunity for citizens of both communities. Although the merged system would have a pupil population of about 48,000 students, near the maximum of Dr. Whitlock's estimate of optimum school district size, and, significantly, no decentralization proposal was discussed, the consultations endorsed the view that "bigness" should not "impede the value to be derived from merger even though such a merger will produce large school districts." They noted that the average school bus route one way was below 17 miles, which they found reasonable by educational standards. At the same time, and concurrent with merger, the consultants recommended certain modifications in the state aid program, which they called upon central authorities to make.

Emphasis in the report was laid on the practical value to residents of one political subdivision of guaranteeing adequate education for all persons in the metropolitan area.

Whether Raleigh school district citizens should be willing to pay more taxes to improve the level of educational opportunity for Wake County school district pupils is not solely a philosophical question. It has certain practical considerations. Philosophically one could argue that county school district children deserve the same educational opportunities as city children, and vice versa . . . . Education opportunities for children and youth should not be dependent on where they happen to reside within Wake County. Then, practically, Wake County and Raleigh comprise a unified social, economic and cultural area. The concern of Raleigh citizens for the education of Wake County children and the concern of Wake County citizens for the education of Raleigh children should be a very practical one.

Some of the "leveling-up" costs which Whitlock foresaw would be incurred in any event. For example, Henrico County will be required to adopt a kindergarten program in a few years by the State Board of Education whether it is part of a metropolitan system or not.

This witness, while asserting an opposition to the suggested merger, did so without a sufficient recognition that the instant suit is a desegregation action and, in the Court's opinion, without a valid basis for his assumptions that the necessary revenues would not be forthcoming.

Undoubtedly the people of the respective counties may well be opposed to any merger of the school systems, but there is no credible evidence to base any assumption that they would do or fail to do anything which would adversely affect the quality of education to be accorded the children of the communities involved.

### Dr. Lucas:

Robert E. Lucas, Superintendent of the Princeton City School District, Cincinnati, Ohio, testified to the success with which he is currently operating a school district formed by means of a consolidation imposed without the consent of the population of any of the constituent parts. The Princeton district was formed originally in 1955, by the forced consolidation of eight smaller districts. Recently it underwent a second enlargement when it was merged with a neighboring all-black school district to form a unit comprising about 30% black and 70% white pupils. Concurrently with that merger, Lucas and his staff have undertaken to desegregate all the schools in the combined system. The all-black school district was very poor; 40% of its population was on welfare. It had a high crime rate and was surrounded by mostly white, wealthy school districts. It suffered from insufficient funding and an overall lack of educational attainment. The merger was directed in early 1970 by the Ohio State Board of Education, which was itself partially motivated by pressure from the Department of Justice to bring about desegregation.

Initially, citizens of the Princeton district were greatly upset. There was absolutely no public support for the merger. He described it as a time of "excitement, threats, and all sorts of things;" including threats on his life. Lucas sought to implement the transition by appointing an advisory council composed of citizens of each unit. He advised the teachers under him that he hoped that they would undertake the challenge with him, but that if they had no sympathy for the desegregation process, they should seek other positions.

Very few staff members left (3 out of 600), and the advisory council, after several stormy sessions, proceeded to negotiate compromise arrangements for the dovetailing of the two school structures, including athletic and extracurricular activities. Staffs for each school were desegregated, and in-service workshops were set up for teachers and other school employees.

In the meantime, Lucas sought to muster public support for the move by disseminating information releases stating firmly his intention to maintain quality in instruction. He had a series of open meetings, and also met with business and political leaders of the communities affected. He set up a speakers' bureau and even a "hot-line" telephone to deal with rumors. He enlisted the support of ministers.

The result, Lucas said, was "the most excitement in education" he had ever seen. The programs of his former district, 90% white, have not been damaged. White students are doing as well as they did before, and the achievement of blacks has been raised. Community relations have been improved, and the teaching staff has been stimulated.

There has been no loss of white students from the district, although the opportunity exists for many to move out. Black students have done better. In the former Princeton system, which had about 12% black enrollment, there had been little interaction between the races. The 10 to 12% black component in the high school went nearly unnoticed. With the current 30% black ratio, there is a much greater chance for communication.

Community use of the school district buildings for non-school activities has not diminished. In fact, it has increased.

To an even greater extent than the school divisions here involved, the Princeton school district is dependent upon voter approval for financial support. Not only capital but also most operating funds are subjected to referendum. One such operational levy has been put before the voters since the

merger, and it passed by a 57% margin, a larger vote margin than has carried any of the last four.

The Princeton district has a transportation program employing about 80 buses; the average bus trip is about thirty minutes.

The area of the district is about 36 square miles, and has about 11,000 students.

Based on his experience, Dr. Lucas said that a pupil population of about 10,000 is the minimum size for an efficient school district. Above that number, size is not really important to the education of the individual.

Lucas had not advocated the merger. As a subordinate official in the state educational system, he was constrained by political considerations from recommending a consolidation, although he had recognized for some 15 years previously the advantages of consolidation. The current Princeton district is about 12 miles distant from downtown Cincinnati and two miles away from the Cincinnati city border. Based upon his experience as an educator and an administrator, Lucas gave the opinion that there never would be quality education in the metropolitan area of Cincinnati unless desegregation were brought about there on a broader basis than is currently the case. To attain this objective, he said, he would willingly sacrifice his own position.

While the area and school population which was the specific subject of Dr. Lucas' testimony was much smaller than the one here involved, the evidence adduced lends weight to the Court's ultimate conclusion that a merger of the school divisions here involved is both required and feasible.

*Perceptions and Inferior Education*:

Dr. Thomas Pettigrew is a long-time student of social psychology and, in particular, on the impact of perceptions of race upon education. He assisted in the preparation of the Coleman Report, "Equal Education Opportunity," and that of the 1967 study, "Racial Isolation in the Public Schools." The Coleman Report, a water-shed study in social science, is based upon a survey of over 600,000 public school children taken in late 1965. Subsequent studies have demonstrated certain inadequacies in the manner in which data was compiled and analyzed, but regardless, the report is a landmark in social science, a document the conclusions of which must be considered by any student in the area. Pettigrew based his opinion on these reports and other studies.

Calvin Gross is an educational administrator with experience in operating school systems of widely varying sizes. He has been superintendent of schools in Weston, Massachusetts, a 1,000 pupil system; in Pittsburgh with 70,000 students; and in New York City with over a million. His educational experience includes the teaching of racial minorities in large cities and the use of assorted techniques to increase their achievement level.

Dr. Robert L. Green is a professor of educational psychology at Michigan State University and is director there of the Center for Urban Affairs. He has published numerous articles and papers on race and education and participated in one particularly significant empirical study made for the United States Office of Education, that of the educational status of school children in Prince Edward County, Virginia, from 1963 through 1966. For the five previous years public schools were not operated in that county.

Lochran C. Nixon, Jr., is Executive Director of the Midcontinent Educational Development Laboratory. He is experienced in the development of instructional programs for pupils and teachers in urban schools. He has served as an area school superintendent and director of secondary education in Florida schools and as assistant director of a survey of public education in Alabama.

Benjamin E. Carmichael, currently Director of the Appalachia Educational Laboratory, has been a student of the problems of school segregation for nearly twenty years. In the years before

*Brown* he participated in a study, for publication, of the dual school system. He was Superintendent of Schools in Chattanooga for six years, while that system began to dismantle the dual schools, and also served on the advisory committees directing the preparation of the Coleman Report and Racial Isolation. He testified on the basis of his experience in organizing and administering school systems and from extensive personal contact with black and white school children.

Like other educators, Carmichael saw as one of the responsibilities of a school system the development of attitudes and aspirations which equip the individual to fulfill his desires, to act as a responsible citizen, and to carry on the values of his society. The properly educated person should be able to function without restraint with a sense of having control over his own life, and to deal with his environment from a posture of self-confidence and self-reliance. It is the duty of a school system to develop both the academic and the attitudinal sides of its class, its pupils.

Focusing upon the question of racial integration, Dr. Carmichael stated that his idea of quality education would be attained only if the school environment were such that each individual was not made conscious that restrictions were imposed upon him and his aspirations on the basis of race. Nor should artificial notions of advantage, traceable to race, be inculcated.

In a racially identifiable school, that is, one which does not in its enrollment roughly equal the racial proportions of the community as a whole, the minority student would sense that he is not expected to achieve much. If he is moved to a racially non-identifiable school, factors which repress and inhibit his self-development are removed, and "he can seek his own level," as Dr. Gross put it.

Crucial to attitudinal and academic achievement, and much affected by the racial ratio within a particular school, is the individual student's perception of himself. Self-perception is affected by a pupil's notion of how he is being dealt with by the persons in power. Adverse impressions are not greatly affected by political or historical explanations for the origins of segregation. The negative impact of segregation is not dissipated by the explanation that the cause lies in the placement of school division lines.

As Dr. Gross put it, "segregation of school children does two things. In the minority group children it creates spurious feelings of inadequacy or inferiority. In the majority group children it creates equally spurious feelings of superiority or inflated personal worth." Such a situation, he said, is equally harmful to black and white children. In terms of these harmful effects, Dr. Gross viewed the Richmond school community as one containing racially segregated schools.

Education in segregated schools impinges strongly on the development of white children as well as black. Deprived of contact with minority groups, whites tend to develop unrealistic self-perceptions, as several of the experts noted.

School segregation, even when brought about by the manipulation of attendance boundary lines, has a very negative impact upon self-perceptions, and consequently development, of black children. This flows to a great extent from children's awareness that they are contained on account of race within a particular area and school facility. It affects motivation and, therefore, achievement. The sense of containment, of being confined by a hostile majority, imposes a sense of limited possibilities and decreases ambition. As Dr. Green put it, "one soon develops the impression that no matter how hard you work in life your ability to move freely in American life is yet controlled by the dominant community in a very negative manner and I think segregated school systems highlight this very significantly."

Students' attitudes are picked up from fellow pupils and from teachers and administrators in their schools. When, in

the course of desegregation, for example, black administrators are demoted, children readily understand it as an act of discrimination.

The Cincinnati Report, on which some defense experts collaborated, recognized that the teachers' conceptions of the schools in which they hold classes are affected by the racial and economic status of their schools. There is a "much stronger tendency toward a negative view of school and students in the mostly black and deprived schools than in the mostly white and advantaged schools." The report found as well that racial composition varies closely with achievement status of particular schools.

Social scientists generally agree that one of the most important features of equal education for black and white children alike is the effective integration of schools, for which desegregation is a prerequisite. No paternalism is implied in this judgment, at least no more than is usual in any statement about the best manner to prepare young children for life. For the question in 1971 is not whether separate schools might provide inadequate education in a nation without a history of discrimination, but rather where, as here, given the repressive policies of the past whereby deliberate isolation was achieved and accepting that the enduring effects of such policies are not wiped out by the simple act of legislation or judicial decision, students of either race can be prepared to participate in the public and private life of a multi-racial society if their education proceeds in isolation.

As an educator, Dr. Carmichael could only approach the Richmond school system as it exists today in terms of those historical factors which led to the present situation. He spoke of the context of past discrimination. In this environment, to Dr. Carmichael, and as the Court finds, the black child in a racially identifiable school will continue to feel that he is a victim of discrimination and has been labeled inferior. Whites in the surrounding counties, under present arrangements, would continue to "live the

lie" by being taught an artificial sense of superiority. Neither result is consistent with the kind of attitudinal development that is an educator's responsibility. Educators, quite simply, perceive the current situation as involving two white systems and one black.

Dr. Pettigrew stated, and the Court finds, that the educational harm to children from the racially separated schools in the area involved herein, is to the black child similar if not identical to the harm incurred prior to the *Brown* decision of 1954. Indeed the calculable harm to children about which the Court spoke in *Brown* may now have the additional negative component of perception by blacks that the law has spoken and the situation is the same.

When the schools were closed in Prince Edward County, Virginia, black parents of children shut out of public facilities were forced to send their children to such distant places as Michigan, Florida, and the District of Columbia for an education. The Prince Edward school closing had long-enduring effects on the attitudes of blacks throughout the State of Virginia. As Dr. Green testified,

It has a very long-range, again a very long-range, unhealthy and negative impact upon the perception that individuals have about the control they can in some way direct toward their lives. And when the state, any state, takes official action, official action toward a given minority group which is highly related to the whole concept of containment, the community does not forget that for a very long period of time.

We can make a distinction between a small body of individuals using their power to oppress people, but when a state takes official action directed toward a particular minority group in order to contain, manage and oppress that group, educationally, politically, socially,—it has a long-range and very unfortunate impact upon self.

Dr. Campbell of Henrico stated that, in his opinion as an educator, the best

education can be afforded children if administrators try to "develop the finest program possible and do all you can for those children in that neighborhood." He would do nothing to change the racial characteristics of adjacent schools, one with a 65 to 75% black enrollment, and the other with 3 to 4% black pupils. Taken purely as an educator's expert opinion, and divorced from legal requirements, the Court finds this judgment to be so at variance with current opinions as to the components of quality education, and so completely unsupported by empirical data, as to be unworthy of serious consideration.

Academic development is closely related to attitudinal development. Particularly does the individual's development of a healthy attitude toward himself tend to bolster academic achievement. As Dr. Pettigrew said, "It is really one ball of wax and we are pulling out parts of it for analysis, but we should never forget that it is one ball of wax." Dr. Carmichael also stressed the fact that it is impossible to develop fully the academic skills of an individual without first modifying his attitudes of self-perception. Dr. Nixon also supported the proposition that the affective and cognitive development of a child are interrelated and interdependent.

Generally, white students in all white schools and in the majority white schools achieve at approximately the same level, when one eliminates the factor of socioeconomic status. There is very little reliable data on the performance of whites in majority-black schools, which one can use to make a comparison with those in the other two situations. What data there is seems to indicate that their achievement is lower in such situations.

Black students' achievement levels seem to follow roughly those of white; it rises significantly as one examines performance in majority-white schools, as compared with that in majority-black schools.

Generally speaking, black and white children enter school at about the same level, as measured by achievement tests. Thereafter, black academic achievement declines over time in segregated systems.

The social psychology of the Richmond area is such that schools with black enrollments substantially disproportionate from the racial composition of the area will be perceived by the community as bearing a stigma of inferiority. Black pupils of such schools will achieve less by reason of such perceptions by the community at large, their teachers, their parents and themselves. Perceptions affect expectations, and the expectations of such persons have a notable impact upon the achievement of individual students.

In terms of the accepted educational goal of equipping each student, both in the academic and the affective spheres, to develop his maximum potential, the operation of the three school divisions as they are now run will not be a success. This is traceable to the racial identifiability of the three systems. Dr. Nixon, as an educator, would recommend the metropolitan plan or something similar to it as a solution to such deprivation.

The effect of various assignment plans on the child's perceptions must be judged in terms of existing alternatives. If a metropolitan proposal is not implemented, black children in the City of Richmond will attend black schools in the foreseeable future.

Currently observed differences in achievement levels between students in Richmond and the counties are entirely consistent with observed effects of segregation in other areas.

In 1960, in the City of Richmond, the median education level was 10.1 years. In 1950, it was 9.9 years. This figure was lower than comparable levels for standard metropolitan statistical areas in the southern region. In 1960, the median education level in the surrounding counties was 12.2 years. "This level was the highest of the state's SMSAs, higher than the USSMA median, higher than the medial level in the southern SMSAs, and most importantly, was 2.1

years higher than the City of Richmond."

Superintendent Adams stated that he did not believe under the current school divisional arrangement that Richmond pupils' academic achievement could be brought up to grade level, and the Court finds the greater weight of the evidence to support this conclusion.

The housing of a great majority of the black children in the metropolitan area within boundaries which place them in 70% or more black schools, at a time when 90% white schools are operated just across the line, has the same impact upon self-perception and consequent effect upon academic achievement as that of official segregation as it existed in 1954.

The children of the three areas involved cannot, under existing conditions and as the school divisions are now operated, receive an equal education.

Dr. Carmichael was hopeful that educators would not become wedded to any particular system of school organization so that they were unable to alter existing forms to attain valid educational objectives. He considered the alternative of the metropolitan plan to be a sound and feasible approach administratively; that it would contain 107,000 pupils did not concern him. Indeed, he, Little, Nixon and others thought its size beneficial in that it might make possible student services, such as an adequate system to evaluate educational performance, not attainable now by the separate systems.

## HOUSING

Statistical surveys of the Richmond area demonstrate that residential segregation, both in the city and the area comprising Richmond, Henrico and Chesterfield, is intense and increasing.

Karl E. Taeuber, a sociology professor for the University of Wisconsin, studied United States census data as to racial occupancy by city block and census tract in the area. He expressed his findings numerically, in terms of indicies of dis-similarity. These figures give an objective measurement, for purposes of comparison, of the distribution of two classes of persons over space. Under this system, the higher the number, approaching 100, the greater the deviation from a totally random distribution of the two types of persons. Complete segregation receives a score of 100.

Dr. Taeuber applied his system both to census tracts and to city blocks, when the latter data was available. To calculate using blocks gives a finer measure of the degree of segregation, because census tracts are larger, containing 4 to 5,000 persons, and may contain within their bounds patterns of segregation not disclosed by an examination of overall racial proportions. Block data for the 1970 census, however, was not available to Dr. Taeuber.

Taeuber's technique avoids subjectivity and gives a convenient tool for longitudinal study.

Taeuber has studied more than 200 cities across the country, and in each one has found pronounced and pervasive racial segregation. Most ethnic groups other than blacks, groups determined by national ancestry, are segregated in housing in the range of from 50 to about 30. Segregation corresponding to differences in income group ranges, in the United States, up to an index of about 28 or 29. A study of the City of Richmond, as it was in 1960, reveals that very little, 15% in Dr. Taeuber's view, of the residential segregation he found between blacks and whites, is traceable to the fact that blacks generally seek lower cost housing. (I–14)

Dr. Taeuber also studied, as a sociologist, the factor of choice and its influence upon racial housing segregation. It is difficult to apply this factor within an objective framework, he said; nevertheless, his studies revealed, and the Court finds, that generally the large majority of blacks state a preference for living in integrated neighborhoods.

Analyzing distribution by census tracts, the index of residential segrega-

tion in the City of Richmond in 1970 was 82.1. This is an increase from 1960, when it was 79.3. (PX 131)

Dr. Taeuber explained that this conclusion, in lay terms, means that, in order to achieve random distribution of residents, in 1970, it would be necessary to move 82% of black residents out of the census tracts in which blacks are over-represented. Or one could move 82% of the whites out of the census tracts in which they are over-represented, in order to achieve random distribution.

An analysis on the basis of city blocks gives a 1960 measure of residential segregation in the city of 94.8. This is an increase from the 1950 figure of 92.2.

In 1970 the index of dissimilarity based on census tracts showing residential segregation in the combined area of Richmond, Henrico and Chesterfield is 79.7, an increase over the 1960 figure of 76.1.

These figures depart sharply from the index of perhaps 28 or 29 that can be attributed to differences in income levels, or, more precisely, the amount paid for housing. Clearly, other factors are contributing a substantial amount to existing segregation. Dr. Taeuber estimates that perhaps 15% of existing segregation is attributable to income differentials, because in fact, economic status and race do not correspond in each individual. That is, not all whites are rich, and not all blacks are poor. Whether the figure of 15% is precisely true is not important. For it is clear that non-economic causes lie behind at least a very substantial amount of the segregation. As best as can be determined, furthermore, blacks who gain economic mobility tend to prefer to move into mixed neighborhoods. Dr. Taeuber, and the Court, are led to the conclusion that publicly and privately enforced discrimination accounts for the remainder. Furthermore, much of the segregation force

of the factor called "economic" is in truth attributable to discrimination in access to the means to economic well-being. Based upon the weight of evidence from research, on the basis of which this expert testified, the Court finds that discrimination in job opportunities and in educational opportunities has a great and lasting impact on the individual's economic status. In addition, the element labeled choice or preference, insofar as it contributes to segregation, is also composed in part of attitudes produced by past experience with discrimination.

Dr. Taeuber in addition computed indicies of dissimilarity to measure racial segregation in schools of the metropolitan area. In Richmond alone, based on the projected results of the current desegregation plan, as to the elementary schools, he found an index of dissimilarity of 16.2. In the metropolitan community, assuming the same projected enrollments for the city and the continuation of the 1970 enrollments in the two counties, he arrived at an index of dissimilarity of 63.8. Even with zone changes planned for 1971–72 in Henrico, the index is 60.3.[23]

Thus, the result of imposing the current school division and zone lines upon the existent housing patterns within the Richmond metropolitan area, patterns attributable in large part to public and private discrimination, is to produce a situation in which the results of a hypothetical completely random distribution of the races in housing can only be achieved by moving approximately 60% of one or another race (or a lesser number of both) to other facilities than those to which they are now assigned.

It is true that the housing segregation in Richmond corresponds to a widespread national pattern. One would expect so when, as Dr. Taeuber testified, many of the same causal factors are present everywhere.

23. Dr. Taeuber, in explaining the index of dissimilarity, said, "one way to help understand what this figure means is to say that it gives the percentage of one race that would have to be moved in order to achieve desegregation." I–54.

With respect to persons moving into a community as new residents, as opposed to persons seeking relocation within the area, who might have attachments to a particular neighborhood, Dr. Taeuber stated, and the Court finds, that such people are very much governed in their decision upon housing sites by existing patterns of customs and restrictions. (T–64)

There is an observable tendency for blacks who can afford better housing not to make, for various reasons, the long jump to a suburban homesite, but rather to move to a peripheral, transitional area. (I–64–65)

Spot maps showing the residences of pupils by race in the two county school systems illustrate with particular clarity the segregated housing patterns prevailing in the two counties. At each grade level the same locations in each county show a concentration of black or of white residency with very little mixing or overlap. Dr. Taeuber termed a study of such distribution maps a subjective manner of determining the degree of housing segregation. Perhaps this is so when comparisons over time or from place to place are attempted. But in this instance, the maps adequately demonstrate the current impact of housing segregation upon the distribution of pupils in the counties.

Dr. Jeanne C. Biggar, a specialist in human ecology and demography, performed a study of 1970 census figures to compare population trends in the Richmond standard metropolitan area with those in others in various regions of the country. From 1960 to 1970 the City of Richmond lost about 8% of its population. But with the annexation of January 1, 1970, the city's population came to a level 13% above that of 1960. In that decade the white population of the city rose 12.7%, and the black population rose 13.9%; both figures take into account changes attributable to the recent annexation. The gain in blacks experienced by Richmond was somewhat less than that experienced in most cities in the southern region, where black population rose on the average by 23%.

Dr. Biggar's studies revealed that the city of Richmond experienced a net loss of white population to other areas within the SMSA [24] greater than that of 18 of the 65 largest SMSAs in the United States and lesser than that in 46 others. It must be recalled, however, that these figures, insofar as they show actual physical movement of population, are affected by the bringing into the central city of 23 square miles and about 44,000 residents, formerly in Chesterfield County. The same observation bears upon her finding that only eight SMSAs showed a lesser degree of black concentration.

The Court considers that more appropriate data might have been provided had the areas studied over time been held constant in their physical boundaries, for as Dr. Biggar stated, while she did analyze Richmond without annexation, she had nothing to compare it to.

Dr. Biggar has lived in Virginia for the past two years and knows of the existence of racial segregation in communities of the Commonwealth from personal observation.

Martin E. Sloane, an expert with respect to the relationship between housing, school segregation, and federal programs and policies, and now acting deputy staff director of the U. S. Commission on Civil Rights, has held positions over the past decade in the federal government which gave him first hand knowledge of the impact of federal policies on housing discrimination in the country. In addition, in 1966, he had federal responsibility for the Civil Rights Commission's study, "Racial Isolation in the Public Schools."

During the last two years, while Sloane has been assistant staff director, the Civil Rights Commission has issued re-

24. Standard Metropolitan Statistical Area. The Richmond area is made up of the City of Richmond, Henrico, Chesterfield and Hanover Counties.

ports of federal installations and equal housing opportunity, Section 235 program of home ownership for lower income families, and evaluation of the civil rights enforcement effort in more than 40 federal departments and agencies, and a follow-up study based upon a prior report. Sloane's background renders him an especially valuable source of information on the formulation and modification of federal housing policies, the difficulties of making a policy change effective in fact, and the impact of such policies upon housing patterns and, in consequence, on school segregation.

When the Federal Housing Administration was created in 1934, the federal government entered into a role it had not previously assumed. Because of the size of the effort undertaken, the impact of federal policies, it was anticipated, would probably be very broad. Events have shown this to be true.

Beginning at least in 1935, the FHA underwriting manuals included among the criteria by which the desirability of the particular subdivision was to be estimated, and therefore its value judged, something called "protection from adverse influences."

"Protection against some adverse influences is obtained by the existence and enforcement of proper zoning regulations and appropriate deed restrictions."

The Court accepts those administratively promulgated regulations as an accurate statement of the policy of the agency which issued and applied them, and also as a sound judgment of the effectiveness of the means recommended to attain the agency's policy goals.

The 1935 manual continues, "Important among adverse influences besides those mentioned above, are the following: Infiltration of inharmonious racial or nationality groups . . . "

"All mortgages on properties in neighborhoods protected against the occurrence or development of unfavorable influences, to the extent that such protection is possible, will obtain a high rating of this feature. The absence of protec-

tive measures will result in a low rating or, possibly, in rejection of the case."

"The appeal of a residential neighborhood results from a general condition and attractiveness of the properties located therein; the kind and social status of the inhabitants . . . " (PX 128)

"(W)hen fullest advantage has been taken of available means to protect the area against adverse influences and to insure that it will develop into a homogeneous residential district, possessing strong appeal to the class of persons expected to desire accommodations in it, a high neighborhood rating will be warranted." This passage is from the 1936 manual.

The 1936 FHA Underwriters' Manual states, "Deed restrictions are apt to prove more effective than a zoning ordinance in providing protection from adverse influences. Where the same deed restrictions apply over a broad area and where these restrictions relate to types of structures, use to which improvements may be put, and racial occupancy, a favorable condition is apt to exist." (PX 128)

"If, in addition to physical attraction of the neighborhood, the present class of occupants is of such quality as to make the area desirable to the social group which will form the prospective market, additional appeal is created."

"Of prime consideration to Valuator is the presence or lack of homogeneity regarding types of dwellings and classes of people living in the neighborhood." (PX 128)

The FHA manual of 1936 recognized that the existence of school facilities and their location may strongly influence the development of a neighborhood, many years before the Supreme Court took note of this same process in *Swann*:

"The social class of the parents of children at the school will in many instances have a vital bearing. Thus, although physical surroundings of a neighborhood area may be favorable and conducive to enjoyable, pleasant living in its locations, if the children of people living in

such an area are compelled to attend school where the majority or a goodly number of the pupils represent a far lower level of society or incompatible racial element, the neighborhood under consideration will prove far less stable and desirable than if this condition did not exist. In such an instance it might well be that for the payment of a fee, children of this area could attend another school with pupils of their same social class. The question for the Valuator to determine is the effect created by the necessity for making this payment upon the occupants of the location. Under any conditions the rating could not be as favorable as if the desirable school were available without additional costs. In many instances where a school has earned a prestige through the class of pupils attending, it will be found that such prestige will be a vital element in maintaining the desirability of the entire area comprising the school district."

The 1936 FHA manual recognized that the impact of its policies would primarily be upon newly developing areas at the outskirts of the city proper.

"Successful new areas are recognized as the best mortgage-lending areas. To be successful a new or partially developed area must reach a stage of being substantially built up within a period of a very few years. Due to the fact most outlying residential areas will be developed as a result of the decentralization movement rather than as a result of population increases, the economic background of the community assumes great importance, since those communities which will experience a prosperous future will decentralize much faster than those for which a less advantageous future is forecast."

"Protection from adverse influences. —the Valuator should realize that the need of protection from adverse influences is greater in an undeveloped or partially developed area than in any other type of neighborhood and, in general, a high rating should be given only where adequate zoning regulations or effective deed restrictions exist, inasmuch

as these provide the surest protection against undesirable encroachment and inharmonious use."

The manual continues to recommend particular deed restrictions, deemed most effective in maintaining the status of the neighborhood.

"Recorded deed restrictions should strengthen and supplement zoning ordinances and to be really effective should include the provisions listed below. The restrictions should be recorded with the deed and should run for a period of at least 20 years. Recommended restrictions include the following:

\*　　\*　　\*　　\*　　\*　　\*

(G) Prohibition of the occupancy of properties except by the race for which they are intended.

(H) Appropriate provisions for enforcement."

The 1938 manual advises the underwriter to examine the location to determine whether natural barriers might be effective in forestalling the incursion of adverse influences:

"Natural or artificially established barriers will prove effective in protecting a neighborhood and the location within it from adverse influences. Usually the protection from adverse influences afforded by these means includes prevention of the infiltration of business and industrial users, lower class occupancy, and inharmonious groups."

"Areas surrounding a location are investigated to determine whether incompatible racial and social groups are present, for the purpose of making a prediction regarding the probability of the location being invaded by such groups. If a neighborhood is to retain stability, it is necessary the properties shall continue to be occupied by the same social and racial classes. A change in social or racial occupancy generally contributes to instability and a decline in values."

By deliberate policy the Federal Housing Administration encouraged the institution and perpetuation of segregated housing. This was the avowed FHA policy from its beginning until well after

the end of World War II. Only in 1947 did the FHA remove the caveats in its underwriters' manual advising appraisers about the dangers of "inharmonious racial groups." Somewhat disingenuously, the phrase "inharmonious user groups" was substituted. No policy change was intended, nor did one occur at that time. (K–26)

The Veterans Administration loan guarantee program commenced at least 10 years after the FHA mortgage insurance program, and the VA never openly advocated segregated housing. It struck a neutral pose, allowing builders or lenders to discriminate if they wished.

At times the combined share of the new housing market assisted by FHA and VA came near to 50%. The impact, therefore, of the policies which they favored or condoned was huge.

From the close of World War II until 1959 approximately 2% of all the housing covered by FHA mortgage insurance was occupied by blacks. (K–33)

Moreover, their policies drastically influenced the private lending market. This was not only true of the lending vehicles introduced, for the federal discriminatory policies spread as well to private builders and lenders. Such a tendency was bolstered by the exchange of personnel between the FHA and the private lending industry. The current FHA Commissioner formerly was president of the National Association of Home Builders. (K–28)

Policies fixed during the initial years of the FHA spread and have endured to have a substantial effect on the current housing market practices.

Other federal agencies, such as the Federal National Mortgage Association and the Federal Deposit Insurance Corporation now assist by indirect means most current housing construction. They aid, and at the same time, regulate private lending institutions. The Civil Rights Commission studied the practices of such agencies and found that they had no objection to the private discriminatory policies of their beneficiaries. Even subsequent to the passage of the 1968 Civil Rights Act, agencies in a position to restrict private housing discrimination by means of their regulatory functions have not seen fit to do so. (K–32)

In response to the Supreme Court's decision in Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), the Federal Housing Administration and the Veterans Administration ruled, over a year later, that they would not assist the development of property carrying racially restrictive covenants dating after February 15, 1950. Up to that date, however, they offered assistance. In addition, even after that date, they would aid construction plans with discriminatory covenants, provided such covenants were dated prior to February 15, 1950. (E–18)

Congress has directed all governmental agencies to carry out their programs and activities relating to housing in a manner to affirmatively further the purposes of fair housing, yet the Federal Home Loan Bond Board, although advising those private lending institutions whom they supervise of the prohibition against discrimination, has failed to implement the prohibition by an examination process that would assure against such policies.

The Federal Home Loan Bank Board regulates most of this country's savings and loan associations. They, in turn, handle some 40% of the home financing in the United States. As early as 1961 it was urged by the Civil Rights Commission to adopt review procedures to guard against discrimination by the private associations which it supervised; this has not been done. The FHA abandoned the policy of positively encouraging discrimination and adopted a neutral position in late 1949 or early 1950. (K–57)

Dr. Sloane stated as well, and the Court finds, that existing patterns of segregation substantially influence the choice of housing site by a new entrant into a community.

Given the history of governmental policies which encouraged segregation, and given the current, visible facts of such

policies, it would be several generations before one could discern progress in the elimination of segregated housing patterns, even if the most imaginative and affirmative federal enforcement programs were undertaken. Families move rarely—on the average, about every seven years. A change of residence, moreover, has historically been a voluntary act. The nation now possesses approximately 70 million housing units, built and occupied. Each year sees about one and one half million housing starts. A policy of non-discrimination would have to be applied in instances of occupancy of new developments or turnover in old units. So confined, progress would be slow indeed.

Like Dr. Pettigrew, Dr. Sloane perceived the immense contribution that housing segregation makes to school segregation. The former he attributed in large part to the effect of federal policy.

Dr. Biggar stated that nationwide, persons who move tend to give as their motive reasons related to economics and convenience. It is more difficult to determine why certain others do not move. Studies tend to show that younger people are more willing to move, whereas families with children established in a particular school are less inclined to do so.

Plaintiffs' Exhibit #127, taken from the records of the Federal Housing Administration, and from covenant books of Lawyers Title Insurance Company, is illustrative of examples of racially restricted subdivisions in Chesterfield and Henrico Counties. These developments were all insured by the Federal Housing Administration.

Plaintiffs' Exhibit #130 shows the current racial occupancy of the FHA-assisted developments. Of the four completed projects as to which information is available, three are almost entirely uniracial. Fair Hills Apartments has one white-occupied unit and 223 black-occupied units. Jefferson Townhouses has 276 units, of which only two are occupied by whites. The Town and Country Apartments, 202 units, has 198 white-

occupied units. Coventry Gardens, 176 units, is occupied by 25 black and 151 white families.

Plaintiffs' Exhibit #129 corresponds to plaintiffs' Exhibit #129–A. Data given on Exhibit #129 is the racial occupancy of FHA sponsored housing projects in the Richmond metropolitan area. All are either in Richmond City or Henrico County. To the extent that information is available, it portrays a pattern of almost complete segregation. The map shows that the projects with largely black occupancy are placed towards the center of zones of that racial composition.

The Section 221(d) (3) program and the Section 236 program contemplate the development of market-rate housing for low and middle-income families. Only if a rent supplement component is added to the project is it possible to charge levels of rent comparable to those in public housing.

The federal rent supplement program is aimed at roughly the same individuals who are eligible for public housing. Development is done by private builders. However, the federal government requires occupants to devote one-quarter of their income to rent and the rent supplement meets the remainder of the bill. By federal law, before appropriations can be used to pay the rent supplement, the area in which the program is to be used must have adopted a "workable program for community improvement" or, at least, there must be an endorsement of the rent supplement program by the local governing unit. Most central cities have "workable programs," generally for urban renewal purposes. Seventy-five percent of suburban jurisdictions do not. With this limitation, the rent supplement program has function to maintain concentrations from the poor within central cities and to prevent access to suburban areas. Exactly this phenomenon is visible in the Richmond metropolitan area. Neither of the two counties has a "workable program;" neither has resolved to permit the operation of rent supplement programs within its borders, and conse-

quently none of the federally assisted housing developments in either county has a rent supplement component. The rent they charge, therefore, is the market rate.

In March of 1971, the Federal Housing Administration waived the requirement that the local governing bodies, in order to permit the operation of a rent supplement program within their jurisdiction, pass a resolution to that effect on a jurisdiction-wide basis. Instead, it would be sufficient to restrict permission to operate rent supplement programs to a small area.

In November of 1962, President Kennedy issued an executive order directing all federal agencies with authority in the field to cease discrimination in the operation of housing programs. Excluded from the order, however, were financial regulatory agencies supervising private lenders.

From 1937 until 1962, federal officials administering public housing programs made no objection if local public housing authorities planned developments and assigned tenants on a racially segregated basis.

As of October, 1970, the Federal Department of Housing and Urban Development had taken almost no affirmative action to implement the federal fair housing law. In Sloane's words, "the zeal with which this agency and its constituent agency had carried out policies of discrimination in earlier years was not being matched by a similar enthusiasm in carrying out its newly created fair housing activities." (K–37)

Up to 1962, site selection for public housing projects was almost entirely unrestricted by federal authorities. Choice was left to the discretion of the local housing authority.

Nationwide, given the federal policy and permitting discriminatory assignments of tenants and failure to control site selection, the public housing program has been an important factor in entrenching patterns of racial segregation in housing. Only in 1967 did the Public Housing Administration insist on a policy of "balanced" site selection by local housing authorities. Such policy requires that for each development placed in a black community, one also be located in a principally white area in order to deconcentrate areas of minority occupancy. Even this policy, however, is not likely to contribute substantially to the elimination of housing segregation.

It is unlikely in the extreme that housing segregation could effectively be dealt with within municipal boundaries, given the existing segregation in most metropolitan areas. Much greater advances could be made by housing authority equipped to plan and carry out policy on a basis not confined, geographically, to a single jurisdiction of a metropolitan area.

The Richmond Redevelopment and Housing Authority is the city's public housing agency. It has operated since 1940.

According to the most recent estimate of the agency's executive director, about 23% of the city's housing supply within the pre-1970 boundaries is substandard, according to its criteria. About 1,600 families are now on the waiting list for admission to public housing. In 1970, Chesterfield had 4,518 substandard units, or 11.7%; Henrico had 5,886, or 11.2%.

Richmond now has eight low-income public housing projects in operation. They are principally occupied by blacks and are located in predominantly black areas. (H–163) (PX 130a) Likewise, projects under Section 221(d) (3) are located principally in such areas.

Prior to 1962, it was required by the Federal Housing Authority that public housing be classified for occupancy by a particular race. Only one Richmond development, Hillside Court, was built for whites.

Within the City of Richmond, there are inadequate numbers of sites currently available to house those now in substandard housing and those displaced by public condemnation. (H–164)

In recent months the Federal Housing Authority has made efforts to secure sites in the city for low-income housing in areas without heavy concentrations of minorities. Of 523 proposed apartment units, 112 were finally approved. A proposal for 100 units of housing for the elderly in the newly annexed portion of the city was rejected by the City Council. According to the executive director, there was "violent citizen opposition" to this proposal. Three other developments in predominantly white areas, comprising 311 units, likewise were rejected in early 1971.

There are no public housing authorities in Henrico and Chesterfield. Legally, the Richmond Redevelopment and Housing Authority might construct developments in those areas. Both counties have stated their opposition to public housing within their borders. Richmond officials, therefore, thought it a vain act to seek their permission. (H–167)

In the opinion of the executive director of the Redevelopment and Housing Authority, given the attitude of those who determine the location of public housing and the scarcity of sites within the city, there is no realistic possibility that current racial segregation and housing in the Richmond community might be disestablished by the placement of public housing units. In fact, segregation is enhanced, in his opinion, which the Court accepts, by the construction of projects in all black or transitional areas. The difficulty in dispersing public housing units throughout the Richmond metropolitan area by placing them on sites within the City is not solely one of non-cooperation by the City Council, although that is a major factor. The City Council asserted in the annexation case against Chesterfield a need for land for projects of low and middle income housing. Enough open space was acquired from Chesterfield for the purposes ascribed, yet when application by the Richmond Redevelopment and Housing Authority was made for approval of City Council, City Council, as the witness Fay said,

"reacting to pressure from residents of the area", refused to give its approval. Even considering the newly-annexed area, the City of Richmond has hardly sufficient areas suitable for development to accommodate more than a small fraction of the estimated 5,500 units of low and middle income housing needed to alleviate the substandard housing problem.

The Housing Authority currently is limited in its choice of sites by HUD regulations requiring placement that will not contribute to housing segregation, and by popular feeling in black communities that other areas should accept a fair share of housing for the poor.

From 1900 through 1942 population growth in the three jurisdictions took place almost entirely in the city. From 1942 to 1968, however, 99% of the added population settled in the two counties. Over the past ten years the net immigration of blacks and other minority races into the City of Richmond was 782 persons. In the same time about 14,300 whites entered the city; these figures are affected by the 1970 annexation of approximately 44,000 people, formerly residents of Chesterfield County.

In 1959 a consulting firm, the Public Administration Service, contracted to perform a study and recommend changes in the government system of the Richmond metropolitan area. The product of its efforts is the so-called PAS Report.

On February 24, 1958, the Chesterfield Board of Supervisors agreed to meet with Mr. Howe Todd, Executive Secretary of the Metropolitan Planning Commission, for an explanation of the report prepared by the Public Administration Service.

On April 16, 1959, Howe Todd appeared before the Board of Supervisors of Chesterfield on behalf of the Regional Planning Commission to seek guidance as to the action to be taken in response to the PAS Report. The Board requested the Commission to "continue the study of the PAS Report and make specific recommendations on some future date."

The PAS Report was brought to the attention of the governing body of Henrico County.

The total white school enrollment was exceeded by the total black enrollment in Richmond first in September, 1958. The PAS Report advised the jurisdictions of the Richmond metropolitan area about the out-migration of white families from the city: "The migration of young white families from Richmond into the counties is changing the racial characteristics of the city to the extent that non-white school enrollment exceeded white school enrollment in Richmond for the first time in 1958. The non-white birth rate is also higher than the white birth rate in the city. School transfers reflect a net loss of white students in Richmond schools and a net gain of non-white students. The opposite effects are noted in the counties."

Mr. Edward Councill, Executive Director of the Richmond Regional Planning District Commission, like numerous other witnesses, had no doubt that lending and insuring practices carried on by the Federal Housing Administration and the Veterans Administration were the major factor leading to racially identifiable residential patterns. (F–29)

In addition, he cited low income as a factor restricting access to many neighborhoods.

The Regional Planning Commission, in 1964 or 1965, studied factors governing the choice of new homes by those 1,-300 families displaced by a city urban renewal project. It found that preference, seen as a combination of convenience, past associations with friends, proximity to jobs, stores, and schools, was a major factor governing the decision of where to relocate. (F–31)

Councill noted, nonetheless, that several areas in Richmond are predictably closed to black families, regardless of their income or choice. (F–32)

According to a recent study by the Regional Planning District Commission, there is no evidence to support an inference of racially discriminatory zoning practices in the Richmond, Henrico and Chesterfield area. (F–36)

The Richmond Regional Planning District Commission is the successor agency to the Richmond Regional Planning Commission. The former was set up in 1969, under the Virginia area development act. The Regional Planning Commission dated from 1956, and included only the jurisdictions of Chesterfield, Henrico and Richmond, during most of its existence.

The Regional Planning Commission in February of 1964, published a study of population trends in the Richmond region. The study bears a letter of transmittal to the three political jurisdictions, Richmond, Henrico and Chesterfield, signed by Irvin G. Horner, a member of the Chesterfield Board of Supervisors, and then Chairman of the Regional Planning Commission. (I–80) The report called to the attention of the recipients that Richmond in 1960 had a population 42% non-white.

It contains the information that in the prior decade the City of Richmond had lost 29,600 white residents and gained 19,250 black residents. It continues: "As 1964 begins there are several indications that if Richmond's population is going to grow at all by its own momentum, people will come in the non-white sector. Thus, the present trends hold forth the very real prospect of a non-white majority in Richmond by 1970; however, that prospect is subject to maintaining the present city limits." (I–81)

The report notes factors governing migration into and out of the city in the foreseeable future, citing "A continuing lack of attractiveness of the central city with its congestion, blight, crime rate, and changing racial composition, particularly to the white age groups which foster the greatest population increases through migration and natural increases. Too, there is a lingering apprehensiveness among this group about confronting the city school situation where non-whites already out number white students." (I–84–85)

In 1966 the General Assembly established the Hahn Commission to suggest solutions to metropolitan problems. In November of 1967 the Hahn Commission report was submitted. The Commission reported, "Two broad factors contribute to the limited success of government in metropolitan Virginia. The first of these is the failure of the state to assume a more positive role in restructuring its political subdivisions and encouraging them to work together on matters involving area-wide resources and needs. The second is the inadequacy of local government individually to meet area-wide problems. This inadequacy stems from limited jurisdiction, limited finances and insufficient governmental cooperation.

"The state is sovereign and the political subdivisions such as counties and cities are creatures of the state, created for the purpose of fulfilling a part of the state's responsibility to its citizens. The General Assembly, within constitutional limitations, may revise constitutional structure, abolish or create local governments, *assign new functions or renew* existing ones. Although this power rests in large part on legal precedent and historical tradition, it exists also for practical reasons. The state has the geographic social base to make broad policy decisions effective."

The report relates that inaction at the state level is often accompanied by inaction at the local level as well. It notes the tendency in certain restricted fields of the state to assume responsibility, often with some success.

By reports such as these, and in particular the Hahn Commission report, the attention of state and local officials was brought to the fact that existing patterns of administration were incapable of solving urgent metropolitan problems.

According to Mr. Councill's judgment, the Virginia General Assembly adopted almost to the letter the dissent annexed to the Hahn Commission report. (F–38)

The SUA consultants reported to their county clients in 1967 on the high non-white percentage of Richmond's population and the comparatively very low percentage in the counties. The reporters continued: "And there is every reason to believe that life in the Richmond metropolitan area is becoming *more* segregated with time, rather than less segregated. By that we mean non-white populations are continuing to be concentrated in the City of Richmond, and the small non-white percentages in Henrico and Chesterfield Counties are likely to become even smaller with time as the white population in these counties continues to expand." At the present time there is little reason to believe that the state of Virginia or the United States Government is likely to adopt legislation, such as a "fair housing act," which would significantly alter this pattern of concentrating Negro housing in central cities and white housing in suburbs. (HX 25, at 4–3)

The following diagnosis of social and economic disparities in the Richmond region was made:

"The outward movement of people has been from the relatively higher income, white segment of the population. This has resulted in there being a disproportionate number of Negroes in Richmond. As the percentage of Negroes exceeds national averages, another form of segregation is created and must be alleviated. The concentration of the disadvantaged and the economically deprived in a limited area and intolerable housing prevents their rising out of such conditions. The dense concentration of any low-income, poorly educated group in decrepit housing multiplies the costs of governmental services.

 \* \* \* \* \* \*

"Much more must be done in education, from pre-school through high school education and vocational training. All officials in all levels of government must participate in the improvement of education for the Negroes and developing employment opportunities that permit growth and full utilization of aspirations, education and abilities.

"A continually growing concentration of the Negroes without improvements in

housing, education and opportunities will further increase the disparities between the central city and the suburbs, making cooperative regional action more difficult in eradicating the disparities." (RSBX 47, at 3–2)

In July of 1970, the Regional Planning District Commission published a document entitled "Housing in the Richmond Region." According to the report in 1961 the City had 886 acres of housing which was considered 50% blighted or more. These areas were around the central business district of the city and were occupied principally by blacks. The report related that there were 42,991 substandard housing units in the region as a whole, of which 14,000 were occupied by blacks. Nearly 50% of the blacks in the region lived in such housing, whereas only 15% of white families were so disadvantaged. The report continues, "A racially segregated housing pattern in the Richmond area was reported in the Revised Initial Housing Element in November, 1969. This pattern has been an historical trend, but contemporary factors act to prolong segregation. It is fairly clear that a desegregated housing pattern will become a reality only when these factors cease to be important.

"The most important factor is economic. The 1960 census reported a median income for all families in the SMSA of $6,071.00; but for non-white families in Richmond, the median was $3,387.00. While non-white incomes have increased during the past decade in the nation, those of whites have grown even more rapidly. Thus, the gap is probably even greater in 1970 than it was in 1960. Low incomes continue to limit the residential locations of most non-white families in the region. A major reason for lower income among Negroes, as previously reported, is the lower median educational level among non-whites in the region.

"The role that social factors play in the housing situation basing non-white families is difficult to discern. Even if there were no social barriers, many non-white families would wish to reside in non-white neighborhoods. But the fact is that there are many areas in the region in which the non-white family is not likely to reside, regardless of their resources or preferences. This has necessitated the choice of housing of a quality below which their desires and incomes would normally dictate." (Tr. F–13–14)

The "paths to progress" report, in suggesting efforts to prevent the spread of blight, had specific recommendations: "More specifically, reorganization of local tax structures, as previously mentioned, and the achievement of true open housing might provide the most significant long-range influences on stabilization." (PX 148, at 28)

The 1970 report of the Planning Commission quoted the existence of poverty areas, mostly inhabited by blacks, subject to a cycle of decay.

"Selected areas of the central city and rural jurisdictions are characterized by relatively high percentages of unemployed and under employed residents. These same areas contain most of the region's poverty families as well and thus are least able to cope with unemployment problems. Non-whites are hardest hit of ethnic and racial groups, and reflect an unemployment rate three times that of the region's average . . . Despite this alarming concentration of circumstances, industrial and commercial firms are facing labor shortages. Even small businesses are finding it difficult to recruit help. Because of these reasons, the several dimensions of this problem are apparent: The vicious cycle of poverty, particularly among the non-white; the adverse conditions which confront the labor situation and thus industrial development expansion; and the difficulties which face the small business-man.

"A further characteristic of these isolated sections of the region is that most of the area's substandard housing—an additional burden on these residents—is located there also. With nearly one of every two families unable to afford the single family homes currently being constructed and an increasing number of families forced to live in substandard

units, over 1,000 new households will not be supplied with standard housing this year—and in future years, if the current market situation does not change drastically. The problem of substandard housing, thus, is an increasing one.

\* \* \* \* \* \*

"Working against finding workable solutions to these and other social-cultural problems is the tendency of local governments, and citizens too, to view such problems as being intra-jurisdictional in nature and therefore none of their concern." (PC 148, at 32–33)

The Planning District Commission reported on the contribution of discriminatory practices to economic inequality. "An underlying factor contributing to the above problems is racial (and to a lesser extent, economic) discrimination. Housing restricted by regulations or by customs, differential hiring practices, and denial of equal opportunity based on racial, ethnic or class discrimination have all been realities of regional life in the past. Although the trend appears to be away from such practices, much remains to be done before discrimination ceases to be an influence upon the regional economy." (PX 148, at 9)

The Commission concluded in addition that blacks face discrimination in attempting to set up and operate black-owned businesses. As a result, few such businesses exist, and those which do are financially less secure. (PX 148, at 11) The report called on local governments to cooperate with private parties to eliminate such discrimination. (PX 148, at 14)

The Commission reported that "lack of employment among minority group members, however, has been far above 3%. In Richmond's model neighborhood area, for example, the unemployment rate is estimated to be approximately four times the SMSA rate. No direct estimates of under-employment are available. Once again, though, there are indications that minority groups suffer more from under-employment than does the rest of the region's population. The 1960 census showed the median family income in the SMSA to be $6,071.00—a figure 79% higher than the comparable figure for non-whites of $3,387.00. While non-white incomes have grown significantly since 1960, it is believed that the 1970 census will show that family incomes for the rest of the region's population has risen even faster." (PX 148, at 23)

It further states, "Discriminatory practices while being more difficult to discern, nonetheless contribute a major source of problems of a regional nature. Racially, the region consists of 30% non-whites, most of which are black. All district jurisdictions except Henrico and Chesterfield Counties, have significant black population. The four rural counties have from 36% to 84% black residents and the city's ratio exceeds 40%. The major result of such practices are reflected in housing, employment and educational opportunities. Historically, residentially, segregated housing patterns perpetuated by discriminatory real estate practices have combined to deny economic and educational opportunities available to whites, as well as other non-white groups." (Tr. F–17)

### Henrico

Dr. Campbell said that in Henrico County, "We have both black and white living short distances from where I live, and black people all over Henrico County, scattered just everywhere, practically any way you turn." (H–79) In fact, this is not the case. Housing patterns in Henrico are segregated. When blacks move into the county, they settle principally in colonies. New residents expand areas of black occupancy, but the process is always one of contiguous growth.

Unrefuted evidence supports the existence of a custom of privately administered housing segregation in the County of Henrico. James H. Johnson was seeking a house in Henrico County in August of 1970. In response to a newspaper advertisement for a house in the Chamberlayne Heights section of Henrico, Johnson made an appointment to meet

with a real estate agent. Johnson saw the agent at the appointed place and time, but the man eluded him, despite Johnson's efforts to stop him. Johnson later telephoned the agent; this man did not deny having made the appointment, but Johnson made no further efforts to purchase the house because he was able to conclude that it was unavailable to him, a black. On another occasion, Johnson and his wife were discouraged from attempting to purchase a house with the explanation that the house had already been sold. They inquired again, this time by telephone, made an appointment, and arrived to find that the realtor had "forgotten" his key to the house. Johnson filed a complaint with the Department of Housing and Urban Development. Thereafter the owner of the house terminated the agency of the realtor.

The School Superintendent, Dr. Campbell, was unaware of any housing segregation in the County of Henrico. (H–79) Plaintiffs' exhibit 98, a map of the Richmond metropolitan area, illustrates 1970 census figures for racial distribution. Although blacks comprise somewhere around 10% of the county's population, in certain areas from 20 to 40% of the residents of census tracts are black. And one area to the immediate northeast of the city's boundary contains 60 to 80% black residents.

This map also illustrates a remarkable congruence between the city's boundary and patterns of racial occupancy. Along an extended portion of the city's northeast boundary, census tracts on the county side are occupied by 0 to 19.9% black persons, whereas on the city's side, residency is between 40 and 100% black.

Moreover, if it is accurate that blacks live throughout Henrico County, one might expect that school authorities' use of a neighborhood attendance plan would result in a fairly even distribution of black pupils throughout the system's schools. However, this is not the case. Many Henrico schools have a very low black enrollment. Some have none.

Alfred Henderson, a resident of Henrico County, testified to his efforts to develop an apartment project on vacant land he owned in the county. Henderson is black. Recently, the area surrounding Henderson's land had been rezoned to R-5. The Henrico Planning Commission approved rezoning of his own 20 acres of land from A-1, agricultural, to R-5, residential classification, but the rezoning of 10 of the 20 acres was contingent upon Henderson's securing additional access routes. The County Board of Supervisors approved the rezoning of 10 acres. Thereafter, Henderson approached the Federal Housing Administration for their recommendations on developing the area. FHA officials advised Henderson to consider constructing a federally-assisted project under Section 221D(3), with a rent supplement component.

In order to take advantage of the federal rent supplement program, the approval of the County Board of Supervisors was necessary, because Henrico County did not have in effect a "workable program" for housing development in the area. Henderson appeared before the board to request such a resolution. He told them that, "We, as a county, have no place for our unfortunate families, and that I felt that sooner or later somebody would come along and force us to make steps to take care of our unfortunate families . . . . I made the statement that Henrico County could not indefinitely dump their unfortunate families on Richmond." (E–38) On December 9, 1970, the Board of Supervisors declined to pass the resolution requested. (PX–91)

In Henrico County after World War II, the major period of growth was decade 1951–1960. In that time spane 420 subdivisions with 15,142 lots were made. In 1961–70, the statistics were 239 subdivisions with 5,639 lots. (HX–24)

Prior to 1950, Lawyers Title Insurance Company insured title on 73 subdivisions in Henrico County with racially restrictive covenants and 91 without.

Subsequent to 1950 five subdivisions had such covenants and 191 did not.

At least three subdivisions with racially restrictive covenants in Henrico now have black residents.

At meetings of the Henrico County Board of Supervisors perhaps 20% of the items on a typical agenda concern zoning.

In Henrico County there is a total of 37,000 acres zoned from classification R-O through R-TH. Single family residences can be built on all this area. The minimum house size generally is 900 square feet, and somewhat less in some areas. One-family houses can also be built in A-1 agricultural districts, which cover 93,000 acres in the county. In toto, Henrico covers 131,000 acres. Therefore, 84% of the county's area may be used to construct one-family dwellings. The number which could be built is not in evidence.

The minimum dwelling size in the R-O zoning area in Henrico is 1,600 square feet.

When the City of Richmond and the Federal Public Housing Authority undertook, in 1946, to create several hundred housing units on federally owned land in Henrico County, the Henrico Board of Supervisors, by resolution, stated that such a project would be detrimental to the community and requested the City and the federal agency not to go forward with the plans unless absolutely necessary. (PX 121, at 242)

Although Henrico County has obtained federal grants to assist its police and develop its utilities, it has no one person in its administration in charge of coordinating federal programs. There is no public housing in Henrico County. (Beck)

In Henrico County no section 221–d–3 programs have been built, nor are any applications pending. Several section 236 projects have been constructed or approved for construction in Henrico. However, none of these incorporates a rent supplement component. (Young)

The Court finds it unnecessary to relate in detail how the discovery material, admitted in evidence, shows that the public employment in Henrico and Chesterfield Counties over the years has been available almost exclusively to whites. (PX 104, 105, 106, 107a, 107b, 107c) Knowledge of such job discrimination can hardly have encouraged a black resident to change his place of residence to one of the counties.

Until very recently the Henrico County government required that county employees reside within the county. This rule was relaxed in 1970; that year the county hired its first black policeman. (Beck)

Recreational facilities available to the public are located at several Henrico County schools. The county manager was unaware whether most recreational facilities in the county were planned on a segregated basis. However, it is apparent that in 1962 schools in the city and the county were racially designated. (RSBX 86, at —— City exh. 179).

The population densities, according to 1970 census figures, of the magisterial districts of Henrico County are as follows: Tuckahoe, 1.61 persons per acre; Three Chopt, 1.75 persons per acre; Brookland, 1.64 persons per acre; Fairfield, 1.37 persons per acre; Varina, 0.38 persons per acre (HX 38).

### Chesterfield

Chesterfield Exhibit 10, a map of the entire county showing those areas occupied by blacks, illustrates the manner in which the black citizens have settled in small, contiguous cells rather than being widely dispersed among the population at large. It also appears from the map that those parts of Chesterfield closest to the border with the City of Richmond are occupied principally by whites. The rapid outward development of the suburban fringes of Richmond in this direction has occurred without the incursion of any substantial number of Negroes. Exhibit 12, showing multi-family dwellings in operation or projected in Chesterfield County, illustrates that the locations

of these units do not correspond to the concentrations of black occupancy shown on Exhibit 10. Such visual demonstrations show in a more objective manner the extent of the housing segregation which Dr. Taeuber discussed.

There is unrebutted circumstantial evidence that in Chesterfield, as in Henrico, discrimination on the basis of race effectively limits the choice of housing locations available to blacks. James H. Taylor, Jr., an employee of Chesterfield County public schools, and an educator, testified to his own difficulties as recently as July, 1971, in attempting to buy a home in Chesterfield. Taylor is black. He sought without success to buy a home in the immediate neighborhood of the school to which he was assigned.

All but four of the subdivisions on the plaintiffs' list of those in Chesterfield County which employ racially restrictive covenants were built in the now annexed area of the City of Richmond. This annexation, however, took place in January of 1970. When the subdivisions were developed over many years before that these covenants contributed to the creation of a white barrier to black settlement in the northern parts of the county.

There are 363 subdivisions in Chesterfield County with title insurance handled by Lawyers Title Insurance Company. Of these, 37 subdivisions with 3,323 lots had racially restrictive covenants incorporated in their documents of title. All were recorded prior to 1950 except one, dating from 1955. 14,154 lots in 326 subdivisions did not have racially restrictive covenants (CX 37, 38).

On December 11, 1945, the Board of Supervisors adopted a zoning ordinance of county-wide scope.

On April 13, 1948, the Chesterfield Board of Supervisors passed a subdivision control ordinance. (PX 117, at 46–50)

On December 9, 1952, the Board of Supervisors passed an ordinance defining the powers and duties of the County Planning Commission. (PX 117, at 66–68)

In the 1940's, the Chesterfield County Board of Supervisors approved the construction of an airport in the county and granted a special use permit allowing the operation of a midget auto racing tract over the protests of black residents.

Subsequent to the passage of the zoning ordinance, the Board of Supervisors' minutes are replete with instances of decisions on applications for rezoning. (See, e. g., PX 117, at 36, 40, 44)

It is true that a very high proportion of the land in Chesterfield County is available for residential building, because agriculturally zoned land can be so used. However, without having been shown otherwise, the Court assumes that most of the land zoned for agricultural uses is in fairly large plots. Without being rezoned and subdivided, for residential uses, therefore, it is of little practical economical use as residential land.

In areas zoned for agricultural uses in Chesterfield, multi-family dwellings are not permitted.

393 of 426 subdivisions constructed in Chesterfield were begun after 1954. These comprise 13,411 of 14,199 developed lots. (CX 21)

Under Chesterfield County land use ordinances the minimum building size requirement for 95% of the county is 400 square feet. In the remainder, zoned R-A residential, the minimum size is 2,000 square feet. Chesterfield Exhibit No. 8 is a zoning map of the county areas zoned R-A shown in green. In the past, the Chesterfield Board of Supervisors has granted variances from the building square footage requirement so as to permit blacks to move into R-A zones.

From April 2, 1938, to date, no lawsuits were brought in the Circuit Court of Chesterfield County, the court of general jurisdiction there, to enforce racially restrictive covenants upon real property. We have, however, voluminous evidence of the existence of such covenants. It stands to reason that such clauses would not have been employed so generally were they considered vain

words. It was the judgment of the Federal Housing Administration that such covenants were necessary and effective means to exclude blacks from ownership of real property. It was also the judgment of the Civil Rights Division of the Department of Justice that the existence of such covenants in outstanding deed and title insurance policies would deter both purchasers and sellers from violating their terms. The judgment of such federal agencies is entitled to considerable weight. Ehlert v. United States, 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625 (US Apr. 1971). Segregated occupancy patterns exist and discriminatory practices in real estate trading persist to this day.

The County of Chesterfield declined to join the Richmond Regional Planning District Commission. One factor in this decision was its determination to retain full control over the county's rate of expansion. When the Planning District Commission came into being a study was being conducted concerning the consolidation of Richmond metropolitan area utilities. The rate of expansion of utilities services largely governs the rate of development, and Chesterfield feared that control over utilities might fall into outside hands.

Executive Secretary Burnett agreed that in most cases people desire to live reasonably close to their places of employment. Especially this is true of the poor who often depend upon public transportation for access to work. Public transportation within Chesterfield County is very scanty. The Virginia Transit Company runs one bus to the DuPont plant, just across the county line; and the Bon Air Transit Company operates a single bus in the northern part of the county.

The Chesterfield Police, Fire, Sheriffs, data processing, real estate assessors, and welfare department are manned almost entirely by whites. Blacks occupy at best menial positions.

In 1965, the Richmond Times-Dispatch, the newspaper with the largest circulation in the Richmond metropolitan area, permitted racial designations in its help wanted columns. This practice continued until April 16, 1968.

Until May, 1968, advertisers in the real estate sales section were permitted to use the designation, "colored" in classified advertisements. (PX 41) The "colored" designation was principally used in a separate column of real estate advertisements, not devoted, like other columns, to locations in a particular zone of the City. When the racial designations were abandoned in 1968, this separate column was continued. When the Department of Justice protested the use of this "houses for sale (134)" column in the morning and evening newspapers published in Richmond, the practice was, in 1971, after a delay of nearly 11 months, abandoned. (PX 42 a–c)

In November of 1969, the Civil Rights Division of the Department of Justice advised the Lawyers Title Insurance Company, in Richmond, that an investigation had disclosed to it that the company carried, in its title insurance policies, racial restrictions included in documents of title real property. The Justice Department asserted that such practice violated Title 8 of the 1968 Civil Rights Act, 42 U.S.C., § 3604(c). Assistant Attorney General Jerris Leonard, writing for the Justice Department, stated that, "We believe that the inclusion of racial restrictions in title insurance policies has the inevitable effect of discouraging white persons from permitting Negro occupancy of dwellings subject to the restrictions, and of discouraging Negroes from attempting to secure title to affected property." President Scott, of Lawyers Title, responded that he did not consider the prevailing practice to be a violation of the act, but that the company would not make reference to racial restrictions in title policies issued in the future. Very promptly the insurance company forwarded to all branch offices a memorandum instructing its agents and employees to eliminate racial restrictions as qualifications on title insurance policies. (E–17)

On June 29, 1971, the President of the United States submitted to Congress a third annual report on national housing goals, prepared by the Secretary of Housing and Urban Development. The report states, at page 26, "residential separation of racial minorities was, and is, another characteristic of the social environment which has been influenced by federal housing policy. Until 1949 FHA officially sanctioned and perpetuated community patterns of residential separation based on race by refusing to insure mortgages in neighborhoods not racially homogeneous. The effects of this policy have persisted for many years after its reversal and are still evident in metropolitan areas today." (PX–126, at 26)

County and state defendants make much of the fact that housing discrimination in the Richmond metropolitan area has been traced in part, not to the activities of state agencies' defendants, but to those of the federal government, through its Federal Housing Administration, the Veterans Administration, and the Federal Housing Authority. Passing for the moment the question whether, it being shown that governmental action has brought about school segregation, other governmental units ought not to participate in remedial efforts, it is clear that local authorities have in fact played a role in bringing about existing segregation. Public housing, for example, is affected by the action of the political bodies of each of the three jurisdictions concerned. The uncontradicted evidence is that the counties will not accept such projects within their boundaries. In the city, public housing is administered by an agency owing its existence to a state enabling act. Its efforts, too, are circumscribed by the need for leave to proceed by the Richmond City Council. Racially restrictive covenants likewise gain their interrorem effect from the possibility of state judicial enforcement. And subdivisions insured on such a great scale by federal agencies are undertaken by leave of local governing bodies, pursuant to the terms of zoning and subdivision ordinances.

Housing discrimination in Richmond has received some official support on subdivision approval practices. In some instances deep through lots have been employed which work to insulate a projected white community from adjacent black neighborhoods. Three or four times in the past twenty years block lengths have been increased to create buffer zones to maintain racial boundaries.

Since at least January of 1948, the City of Richmond has possessed regulatory power over subdivisions developed in adjoining counties within five miles of the city limits.

The majority of the subdivisions developed in the area of Richmond, Chesterfield, Henrico and Hanover and recorded with the Lawyers Title Insurance Company up until early 1950 contained racially restrictive covenants. (Tr. June 24, 1970, at 835, admitted by stipulation). At that time the FHA and VA withdrew their approval of such practices. Even thereafter some builders retained them. New subdivision construction since that time has been almost nonexistent in the city, save in the area annexed in 1970.

## CONCLUSION

There are pending motions filed on behalf of the state and county defendants to dismiss the amended complaint, which motions were held in abeyance and which obviously must be denied for reasons which have been already amply covered in this memorandum. In addition there is a motion to dismiss the cross-claim of the defendant, Richmond School Board, which motion was filed by the state and county defendants, and this too shall be denied.

The standing of the City School Board to maintain an action such as this by means of filing a cross-claim is not open to serious question. That Board has the constitutional obligation to take such steps as will not hinder it in afford-

ing the pupils whom it educates equal educational opportunities. School boards in the past have been permitted to bring a suit against those who threaten to interrupt the desegregation process or make it impossible. See Brewer v. Hoxie School District, No. 46, 238 F.2d 91 (8th Cir. 1956).

██ In the instant case, said defendants with constitutional obligations had been sued. The School Board's cross-claim is brought in the capacity of the Board as guardian, as it were, for the pupils in the Richmond city schools, and as such its action is brought on behalf of the white and the black students. While the plaintiff class consists only of black students, white students as well have a standing to sue to rectify a situation wherein the process of desegregation imposes unequal and unfair burdens upon them as opposed to others. On that basis alone the standing of the Richmond School Board is secure, for no one but they here represent the interests of the white school children in the City of Richmond. In addition, were school boards not to be accorded standing, serious deprivations to constitutional rights might occur, especially in situations wherein individual plaintiffs might well lack the resources to bring and maintain the type of mammoth law suit involved. Conceivably a school board could sue the class of black plaintiffs educated by it for declaratory judgment of rights and liberties and, to stretch the hypothetical, it might move for joinder of adjoining communities or higher state authorities as necessary parties, as has been done in this case. Such a solution, however, is unwieldy and bears the danger of collusive law suits, especially where no parties other than a local school board and its constituent pupils are before the court.

Obviously in some cases school boards resist and in others they press for relief by means of desegregation. In the latter case it is much the preferable course to preserve the adversary con-

text [25] essential for the development of legal and factual issues, by granting a school board standing, if no plaintiff, to sue on behalf of its students. One of the purposes of requirement of standing, after all, is to preserve a genuine adversary context. The Court is confident that in this instance that has been accomplished.

During the hearing objections were made by the Attorney General's office as to the availability of certain documents sought by the plaintiffs. The Court has concluded that the objections made were insubstantial and has considered in its conclusions certain of those documents to which objection was made.

The Court's order will provide for reports to be filed as to the progress made in conformity with said order. It is to be remembered, however, that the Court stands ready at any time to consider any proposed modifications to the plan to be approved.

██ While the viable racial mix contemplated by the plan is educationally sound and would indeed result in a unitary system, variations from that suggested viable mix may be unavoidable. All parties are admonished that it is not the intention of the Court to require a particular degree of racial balance or mixing. If in the implementation of the plan improved modifications seem appropriate, the Court stands ready to entertain them.

██ It is the duty of a court of equity in other circumstances outside the school desegregation context fully to resolve a violation of federal law, and the remedy must, based on simple considerations of practicality, address itself to the current circumstances. Decrees speak from the time of their entry. United States v. Aluminum Company of America, 148 F.2d 416, 445 (2d Cir. 1945).

An order consistent with these findings of fact and conclusions of law will be entered.

✕

25. Whitley v. Wilson City Board of Education, 427 F.2d 179 (4th Cir. 1970).

# APPENDIX A

COMPARISON OF RICHMOND PUBLIC SCHOOLS K-12 MEMBERSHIP
PROJECTIONS UNDER PLAN III, 1971-72, WITH
ACTUAL K-12 MEMBERSHIP ON SELECTED
DATES DURING THE FIRST MONTH OF SCHOOL

| DESCRIPTION | BLACK | | WHITE | | TOTAL |
|---|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | PERCENT | |
| REVISED PROJECTIONS | 30155 | 63 | 17462 | 37 | 47617 |
| Membership, August 30, 1971 | 26517 | 68 | 12394 | 32 | 38911 |
| Membership, September 1, 1971 | 28365 | 69 | 12986 | 31 | 41351 |
| Membership, September 7, 1971 | 29163 | 69 | 13260 | 31 | 42423 |
| Membership, September 13, 1971 | 29545 | 69 | 13482 | 31 | 43027 |
| Membership, September 24, 1971 | 29747 | 69 | 13500 | 31 | 43247 |
| Revised projections minus September 24, 1971 membership; i.e., loss | 408 | | 3962 | | 4370 |
| Loss expressed as percent of revised projections | 1.4% | | 22.7% | | 9.2% |

Department of Research
October 7, 1971
[A5315]

# APPENDIX A(2)

Department of Research
July 30, 1971 vhn
Sheet 1 of 2 sheets
Substitute #30
COMPARISON OF RACIAL MIX

(As of 9/25/70)

| Name of School | Freedom of Choice Plan 1969-70 Percent | | School Board Plan 1970-71 | | | |
| | Black | White | Projected Percent | | Actual Percent | |
| | | | Black | White | Black | White |
|---|---|---|---|---|---|---|
| **High Schools** | | | | | | |
| Armstrong | 100.0 | 0.0 | 59.0 | 41.0 | 75.0 | 25.0 |
| Huguenot | .74 | 99.26 | 29.0 | 71.0 | 20.0 | 80.0 |
| Thomas Jefferson | 8.0 | 92.0 | 59.0 | 41.0 | 43.0 | 57.0 |
| John F. Kennedy | 100.0 | 0.0 | 71.0 | 29.0 | 93.0 | 7.0 |
| John Marshall | 68.0 | 32.0 | 67.0 | 33.0 | 73.0 | 27.0 |
| Maggie Walker | 100.0 | 0.0 | 61.0 | 39.0 | 79.0 | 21.0 |
| George Wythe | 19.0 | 81.0 | 47.0 | 53.0 | 44.0 | 56.0 |
| **Middle Schools** | | | | | | |
| Bainbridge | 31.0 | 69.0 | 51.0 | 49.0 | 56.0 | 44.0 |
| Binford | 73.0 | 27.0 | Paired with Hill | | Paired with Hill | |
| Chandler | 88.0 | 12.0 | 67.0* | 33.0* | 77.0** | 23.0** |
| East End | 100.0 | 0.0 | 57.0 | 43.0 | 68.0 | 32.0 |
| Elkhardt | 3.0 | 97.0 | 21.0 | 79.0 | 27.0 | 73.0 |
| Graves | 100.0 | 0.0 | 70.0 | 30.0 | 74.0 | 26.0 |
| Albert Hill | 9.0 | 91.0 | 71.0 | 29.0 | 72.0 | 28.0 |
| Mosby | 99.92 | .08 | 85.0 | 15.0 | 95.0 | 5.0 |
| Thompson | 2.0 | 98.0 | 35.0 | 65.0 | 42.0 | 58.0 |
| **Elementary Schools** | | | | | | |
| Amelia | 100.0 | 0.0 | 69.0 | 31.0 | 68.0 | 32.0 |
| Arents | 8.0 | 92.0 | Special Learning Center | | | |
| Bacon | 99.86 | .14 | Part of East End Cluster | | | |
| Baker | 99.90 | .10 | 91.0 | 9.0 | 99.59 | .41 |
| Bellemeade | .31 | 99.69 | 23.0 | 77.0 | 31.0 | 69.0 |
| Bellevue | 100.0 | 0.0 | 100.0 | 0.0 | 98.88 | 1.12 |
| Blackwell | 100.0 Elem. and Jr. | 0.0 | 75.0 | 25.0 | 79.0 | 21.0 |
| Bowler | 100.0 | 0.0 | 100.0 | 0.0 | 100.0 | 0.0 |
| Broad Rock | 2.0 | 98.0 | .17 | 99.83 | 4.0 | 96.0 |
| Carver | 100.0 | 0.0 | 97.0 | 3.0 | 100.0 | 0.0 |
| Chimborazo | 99.88 | .12 | 98.0 | 2.0 | 99.66 | .34 |
| Clark Springs | 99.29 | .71 | 60.0 | 40.0 | 68.0 | 32.0 |
| Webster Davis | 100.0 | 0.0 | Paired with Fulton | | | |
| Fairfield Court | 100.0 | 0.0 | 100.0 | 0.0 | 99.44 | .56 |
| Fairmount | 100.0 | 0.0 | 98.0 | 2.0 | 100.0 | 0.0 |
| Fisher | 0.0 | 100.0 | 0.0 | 100.0 | .20 | 99.80 |
| William Fox | 10.0 | 90.0 | 76.0 | 24.0 | 70.0 | 30.0 |
| Francis | 2.0 | 98.0 | 0.0 | 100.0 | 2.0 | 98.0 |
| Franklin | 100.0 | 0.0 | 57.0 | 43.0 | 55.0 | 45.0 |
| Fulton | 6.0 | 94.0 | 66.0 | 34.0 | 53.0 | 47.0 |
| Ginter Park-Brook Hill | 30.0 | 70.0 | 51.0 | 49.0 | 47.0 | 53.0 |
| Greene | 8.0 | 92.0 | 6.0 | 94.0 | 7.0 | 93.0 |

 *Projected percents for Chandler included the pupils expected to attend Northside Middle School
**Actual percents for Chandler included the pupils who attended Northside Middle School
(A5316)

Sheet 2 of 2 sheets
July 30, 1971

COMPARISON OF RACIAL MIX

| Name of School | Freedom of Choice Plan 1969-70 Percent | | School Board Plan 1970-71 | | | |
|---|---|---|---|---|---|---|
| | | | Projected Percent | | Actual Percent | |
| | Black | White | Black | White | Black | White |
| **Elementary Schools (continued)** | | | | | | |
| Patrick Henry | 7.0 | 93.0 | Paired with Franklin | | | |
| Highland Park | 78.0 | 22.0 | 55.0 | 45.0 | 90.0 | 10.0 |
| Robert E. Lee | 9.0 | 91.0 | Paired with Amelia | | | |
| Mason | 100.0 | 0.0 | 100.0 | 0.0 | 100.0 | 0.0 |
| Maury | 37.0 | 63.0 | Part of Bainbridge | | | |
| Maymont | 100.0 | 0.0 | Paired with Thompson | | | |
| Munford | 3.0 | 97.0 | 14.0 | 86.0 | 18.0 | 82.0 |
| Norrell and Annex | 100.0 | 0.0 | 97.0 | 3.0 | 99.47 | .53 |
| Oak Grove and Annex | 47.0 | 53.0 | Paired with Bellemeade | | | |
| Redd | 0.0 | 100.0 | 0.0 | 100.0 | .19 | 99.81 |
| Mary Scott | 100.0 | 0.0 | Paired with Ginter Park/Brook Hill | | | |
| Southampton | 5.0 | 95.0 | 8.0 | 92.0 | 7.0 | 93.0 |
| Stuart | 100.0 | 0.0 | 100.0 | 0.0 | 91.0 | 9.0 |
| Summer Hill-Ruffin Road | 12.0 | 88.0 | 19.0 | 81.0 | 14.0 | 86.0 |
| West End | 100.0 | 0.0 | Paired with Fox | | | |
| Westhampton | 14.0 | 86.0 | 21.0 | 79.0 | 22.0 | 78.0 |
| Westover Hills | .55 | 99.45 | 35.0 | 65.0 | 29.0 | 71.0 |
| Whitcomb Court | 100.0 | 0.0 | 96.0 | 4.0 | 99.75 | .25 |
| Woodville | 100.0 | 0.0 | 100.0 | 0.0 | 99.52 | .48 |
| | | | | | | |
| **Special Programs** | | | | | | |
| Bowser | 66.0 | 34.0 | 66.0 | 34.0 | 76.0 | 24.0 |
| Cary | 60.0 | 40.0 | 49.0 | 51.0 | 52.0 | 48.0 |
| Churchill Opp. Ctr. | 92.0 | 8.0 | Part of East End Cluster | | | |
| Community Trg. Ctr. | 100.0 | 0.0 | | | | |
| Cooperative Trg. Ctr. | 22.0 | 78.0 | 22.0 | 78.0 | 38.0 | 62.0 |
| Stonewall Jackson | 47.0 | 53.0 | 47.0 | 53.0 | 33.0 | 67.0 |
| Memorial Foundation | 38.0 | 62.0 | 38.0 | 62.0 | 26.0 | 74.0 |
| Randolph | | | | | | |
| Richmond Cerebral Palsy Ctr. | 18.0 | 82.0 | 18.0 | 82.0 | 21.0 | 79.0 |
| Richmond Technical Ctr. | . | Students accounted for in high schools | | | | |
| Rich. Trades Trg. Ctr. | 83.0 | 17.0 | 83.0 | 17.0 | 90.0 | 10.0 |
| Sidney | 100.0 | 0.0 | Closed October 2, 1970 | | | |
| Hickory Hill | 10.0 | 90.0 | 71.0 | 29.0 | 40.0 | 60.0 |
| Thirteen Acres | 0.0 | 100.0 | 0.0 | 100.0 | 6.0 | 94.0 |

[A5329]

## APPENDIX A(3)
## CHESTERFIELD COUNTY

| HIGH SCHOOLS | 1966-1967 Pupils B W | | Faculty B W | | 1967-1968 Pupils B W | | Faculty B W | | 1968-1969 Pupils B W | | Faculty B W | | 1969-1970 Pupils B W | | Faculty B W | | 1970-1971 Pupils B W | | Faculty B W | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carver | 255 | 0 | 33 | 1 | 264 | 0 | 33 | 2 | 245 | 0 | 26 | 1 | 210 | 0 | 27 | 2 | ------ | | ------ | |
| Grange Hall | 12 | 54 | 0 | 11 | 11 | 54 | 0 | 10 | 4 | 60 | 1 | 15 | 8 | 51 | 0 | 7 | 15 | 63 | 1 | 17 |
| Huguenot | 12 | 1397 | 0 | 82 | 11 | 1582 | 1 | 82 | 9 | 1240 | 0 | 73 | 10 | 1341 | 1 | 79 | Richmond School | | | |
| Manchester | 25 | 1177 | 1 | 63 | 18 | 1275 | 1 | 68 | 24 | 867 | 1 | 11 | 37 | 1087 | 1 | 62 | 62 | 1139 | 4 | 62 |
| Matoaca | 73 | 159 | 0 | 32 | 81 | 161 | 1 | 28 | 94 | 164 | 4 | 36 | 114 | 179 | 6 | 44 | 167 | 198 | 8 | 49 |
| Meadowbrook | 8 | 818 | 0 | 46 | 15 | 875 | 0 | 48 | 13 | 942 | 1 | 49 | 13 | 994 | 1 | 57 | 30 | 1062 | 3 | 60 |
| Midlothian | 8 | 245 | 0 | 38 | 11 | 283 | 0 | 47 | 19 | 371 | 1 | 48 | 17 | 517 | 0 | 58 | 41 | 637 | 4 | 63 |
| Thomas Dale | 25 | 1109 | 0 | 63 | 29 | 1247 | 1 | 70 | 23 | 862 | 2 | 75 | 42 | 913 | 2 | 85 | 147 | 1035 | 4 | 62 |

## CHESTERFIELD COUNTY

| MIDDLE SCHOOLS | 1966-1967 Pupils B W | | Faculty B W | | 1967-1968 Pupils B W | | Faculty B W | | 1968-1969 Pupils B W | | Faculty B W | | 1969-1970 Pupils B W | | Faculty B W | | 1970-1971 Pupils B W | | Faculty B W | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carver Annex * | 240 | 0 | 33 | 1 | 219 | 0 | 33 | 2 | 186 | 0 | 26 | 1 | 71 | 0 | 27 | 2 | 41 | 443 | 3 | 25 |
| Chester Int. | 26 | 789 | 0 | 35 | 38 | 864 | 0 | 37 | 77 | 874 | 4 | 39 | 91 | 928 | 2 | 54 | 127 | 928 | 4 | 47 |
| Elkhardt Int. | 18 | 715 | 0 | 35 | 22 | 715 | 1 | 36 | 20 | 723 | 1 | 38 | 22 | 753 | 0 | 31 | Richmond School | | | |
| Falling Creek Int. | 10 | 1025 | 0 | 47 | 12 | 1165 | 1 | 50 | 23 | 1211 | 1 | 55 | 39 | 1289 | 2 | 45 | 39 | 1305 | 3 | 69 |
| Grange Hall | 7 | 85 | 0 | 11 | 10 | 90 | 0 | 10 | 26 | 73 | 1 | 15 | 35 | 78 | 1 | 7 | 49 | 81 | 1 | 17 |
| Matoaca | 97 | 259 | 0 | 32 | 123 | 274 | 1 | 28 | 168 | 271 | 4 | 36 | 197 | 269 | 6 | 44 | 212 | 301 | 8 | 49 |
| Midlothian | 23 | 505 | 0 | 38 | 24 | 614 | 0 | 47 | 46 | 521 | 1 | 48 | 54 | 506 | 0 | 58 | 53 | 664 | 0 | 10 |
| Providence | ------ | | | | ------ | | | | 23 | 971 | 2 | 46 | 28 | 1168 | 3 | 59 | 31 | 1271 | 3 | 41 |

* Prior to 1970-71 was Carver

[A5317]

## CHESTERFIELD COUNTY

| ELEMENTARY SCHOOLS | 1966-1967 | | | | 1967-1968 | | | | 1968-1969 | | | | 1969-1970 | | | | 1970-1971 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pupils B | W | Faculty B | W | Pupils B | W | Faculty B | W | Pupils B | W | Faculty B | W | Pupils B | W | Faculty B | W | Pupils B | W | Faculty B | W |
| Thomas Dale | 20 | 1116 | 0 | 49 | 14 | 1121 | 0 | 55 | 23 | 477 | 2 | 75 | 29 | 467 | 2 | 85 | Richmond School | | | |
| Thompson Int. | | | | | | | | | 13 | 1252 | 1 | 58 | 24 | 1285 | 1 | 63 | Richmond School | | | |
| Bellwood | 5 | 404 | 0 | 18 | 25 | 423 | 0 | 16 | 50 | 548 | 1 | 20 | 59 | 570 | 1 | 28 | 54 | 601 | 1 | 27 |
| Bensley | 3 | 515 | 0 | 19 | 3 | 542 | 0 | 20 | 5 | 680 | 1 | 22 | 4 | 673 | 2 | 25 | 5 | 769 | 2 | 29 |
| Enon Annex* | 161 | 0 | 6 | 0 | 128 | 0 | 5 | 0 | 93 | 0 | 5 | 0 | | | | | 16 | 127 | 1 | 12 |
| Beulah | 2 | 378 | 0 | 15 | 1 | 426 | 0 | 16 | 4 | 559 | 0 | 20 | 2 | 494 | 1 | 20 | 2 | 522 | 0 | 20 |
| Bon Air | 3 | 788 | 0 | 31 | 3 | 888 | 1 | 33 | 3 | 1025 | 1 | 35 | 25 | 972 | 1 | 40 | 24 | 936 | 1 | 36 |
| Broad Rock | 9 | 546 | 0 | 22 | 10 | 582 | 0 | 22 | 11 | 485 | 0 | 18 | 12 | 484 | 1 | 20 | | | | |
| J. A. Chalkley | 35 | 804 | 0 | 30 | 29 | 866 | 1 | 31 | 31 | 836 | 2 | 29 | 58 | 907 | 2 | 38 | 43 | 895 | 2 | 38 |
| Crestwood | 0 | 757 | 0 | 28 | 0 | 753 | 0 | 28 | 0 | 894 | 1 | 31 | 1 | 818 | 2 | 33 | 2 | 790 | 2 | 32 |
| C. E. Curtis | 29 | 806 | 0 | 30 | 47 | 845 | 1 | 30 | 43 | 1018 | 2 | 36 | 43 | 922 | 3 | 35 | 38 | 975 | 2 | 37 |
| A. M. Davis | 5 | 712 | 0 | 27 | 9 | 741 | 1 | 28 | 12 | 939 | 0 | 36 | 43 | 1005 | 2 | 40 | 33 | 1025 | 3 | 35 |
| Ettrick Annex** | 138 | 0 | 6 | 0 | 132 | 0 | 5 | 0 | 134 | 0 | 7 | 0 | 113 | 1 | 6 | 1 | 63 | 83 | 5 | 4 |
| Enon | 8 | 368 | 0 | 14 | 22 | 406 | 0 | 16 | 19 | 482 | 2 | 19 | 81 | 487 | 2 | 22 | 56 | 361 | 2 | 14 |
| Ettrick | 30 | 291 | 0 | 13 | 53 | 341 | 0 | 14 | 122 | 326 | 2 | 16 | 143 | 314 | 4 | 15 | 182 | 222 | 3 | 15 |
| Falling Creek | 0 | 616 | 0 | 23 | 0 | 701 | 0 | 27 | 0 | 885 | 0 | 32 | 0 | 961 | 0 | 39 | 0 | 983 | 0 | 40 |
| J. B. Fisher | 0 | 470 | 0 | 19 | 0 | 527 | 0 | 19 | 0 | 682 | 0 | 26 | 0 | 703 | 0 | 30 | Richmond School | | | |
| Forest View | 0 | 461 | 0 | 18 | 0 | 497 | 0 | 20 | 0 | 609 | 0 | 23 | 0 | 636 | 0 | 26 | Richmond School | | | |
| Grange Hall | 6 | 189 | 0 | 7 | 10 | 193 | 0 | 8 | 19 | 219 | 0 | 9 | 13 | 497 | 2 | 22 | 72 | 134 | 0 | 8 |
| E. S. H. Greene | 1 | 521 | 0 | 20 | 5 | 543 | 1 | 19 | 25 | 614 | 0 | 23 | 93 | 231 | 2 | 14 | Richmond School | | | |

IA5318J

# 236

## CHESTERFIELD COUNTY

| ELEMENTARY SCHOOLS | 1966-1967 Pupils B | W | Faculty B | W | 1967-1968 Pupils B | W | Faculty B | W | 1968-1969 Pupils B | W | Faculty B | W | 1969-1970 Pupils B | W | Faculty B | W | 1970-1971 Pupils B | W | Faculty B | W |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Harrowgate | 9 | 520 | 0 | 20 | 31 | 539 | 0 | 22 | 53 | 633 | 0 | 27 | 106 | 540 | 0 | 26 | 106 | 548 | 2 | 24 |
| J. G. Hening | 0 | 592 | 0 | 22 | 0 | 647 | 0 | 23 | 0 | 686 | 1 | 26 | 1 | 736 | 1 | 31 | 0 | 733 | 1 | 30 |
| Hickory Hill | 164 | 0 | 8 | 0 | 153 | 0 | 7 | 0 | 100 | 0 | 5 | 2 | --- | | | | --- | | | |
| Kingsland | 194 | 0 | 9 | 0 | 127 | 0 | 6 | 2 | 105 | 0 | 5 | 2 | --- | | | | --- | | | |
| Matoaca | 2 | 286 | 0 | 10 | 3 | 306 | 0 | 12 | 24 | 284 | 0 | 14 | 39 | 318 | 1 | 15 | 80 | 209 | 2 | 11 |
| Matoaca Laboratory | 76 | 0 | --- | | 88 | 3 | --- | | 78 | 5 | 7 | 0 | 91 | 0 | 5 | 0 | 91 | 1 | 6 | 0 |
| Midlothian | 201 | 0 | 8 | 0 | 175 | 0 | 6 | 2 | 104 | 0 | 5 | 0 | --- | | | | --- | | | |
| G. H. Reid | 9 | 937 | 0 | 35 | 12 | 955 | 1 | 36 | 18 | 1116 | -1 | 40 | 20 | 1050 | 2 | 41 | Richmond School | | | |
| Southampton | 41 | 625 | 0 | 25 | 48 | 632 | 1 | 24 | 58 | 750 | 2 | 28 | 13 | 348 | 1 | 32 | Richmond School | | | |
| Union Branch | 109 | 0 | 4 | 0 | 112 | 0 | 4 | 0 | 126 | 0 | 5 | 0 | 129 | 0 | 7 | 0 | --- | | | |
| Union Grove | 101 | 0 | 4 | 0 | 81 | 0 | 4 | 0 | --- | | | | --- | | | | --- | | | |
| J. B. Watkins | 20 | 519 | 0 | 21 | 18 | 602 | 0 | 21 | 72 | 528 | 1 | 21 | 108 | 487 | 3 | 28 | 105 | 564 | 1 | 26 |
| Grange Hall Annex*** | 115 | 0 | 5 | 0 | 101 | 0 | 6 | 0 | 81 | 0 | 3 | 1 | --- | | | | 55 | 112 | 0 | 6 |
| J. L. Francis | --- | | | | --- | | | | 13 | 462 | 1 | 17 | 13 | 497 | 2 | 22 | Richmond School | | | |
| Reams Road | --- | | | | --- | | | | 9 | 529 | 0 | 21 | 10 | 617 | 1 | 23 | 6 | 651 | 1 | 27 |
| Robious | --- | | | | --- | | | | --- | | | | 7 | 449 | 1 | 20 | 7 | 512 | 0 | 21 |
| Salem Church | --- | | | | --- | | | | --- | | | | 70 | 464 | 5 | 21 | 118 | 491 | 3 | 21 |
| Matoaca Annex | --- | | | | --- | | | | --- | | | | --- | | | | 31 | 100 | 1 | 5 |

* Prior to 1970-71 was Bermuda

** Prior to 1970-71 was Dupuy

*** Prior to 1970-71 was Winterpock

[A5319]

APPENDIX A(4)
HENRICO COUNTY SCHOOLS

| HIGH SCHOOLS | 1966-1967 Pupils B | W | Faculty B | W | 1967-1968 Pupils B | W | Faculty B | W | 1968-1969 Pupils B | W | Faculty B | W | 1969-1970 Pupils B | W | Faculty B | W | 1970-1971 Pupils B | W | Faculty B | W |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Douglas Freeman | 10 | 1448 | 0 | 74 | 10 | 1523 | 0 | 86 | 6 | 1654 | 1 | 89 | 17 | 1768 | 1 | 95 | 14 | 1915 | 0 | 103 |
| Henrico | 13 | 1621 | 0 | 84 | 12 | 1595 | 0 | 84 | 18 | 1653 | 0 | 88 | 45 | 1657 | 2 | 90 | 68 | 1659 | 1 | 104 |
| Hermitage | 10 | 1330 | 0 | 71 | 20 | 1350 | 0 | 76 | 29 | 1397 | 0 | 78 | 103 | 1509 | 6 | 84 | 96 | 1510 | 4 | 86 |
| Highland Springs | 18 | 1077 | 0 | 65 | 25 | 1081 | 0 | 66 | 57 | 1099 | 1 | 65 | 164 | 1124 | 2 | 75 | 180 | 1178 | 2 | 78 |
| J. R. Tucker | 20 | 1903 | 0 | 96 | 21 | 2009 | 0 | 103 | 25 | 2091 | 0 | 110 | 57 | 2148 | 3 | 114 | 53 | 2180 | 4 | 112 |
| Varina | 114 | 913 | 0 | 57 | 115 | 958 | 0 | 63 | 135 | 977 | 0 | 69 | 196 | 997 | 2 | 72 | 203 | 1076 | 3 | 71 |
| Virginia Randolph | 479 | | 35 | 0 | 566 | | 39 | 1 | 476 | 0 | 39 | 1 | ---- | ---- | ---- | ---- | ---- | ---- | ---- | ---- |

HENRICO COUNTY SCHOOLS

| MIDDLE SCHOOLS | 1966-1967 Pupils B | W | Faculty B | W | 1967-1968 Pupils B | W | Faculty B | W | 1968-1969 Pupils B | W | Faculty B | W | 1969-1970 Pupils B | W | Faculty B | W | 1970-1971 Pupils B | W | Faculty B | W |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Brookland | 10 | 1586 | 0 | 74 | 16 | 1623 | 0 | 78 | 39 | 1720 | 0 | 81 | 140 | 1530 | 5 | 83 | 159 | 1619 | 4 | 82 |
| Fairfield Jr. | 73 | 1523 | 0 | 71 | 89 | 1411 | 0 | 75 | 172 | 1452 | 0 | 75 | 294 | 1500 | 3 | 82 | 288 | 1300 | 7 | 77 |
| Tuckahoe Jr. | 12 | 1701 | 0 | 80 | 10 | 1528 | 0 | 80 | 16 | 1540 | 0 | 82 | 27 | 1534 | 4 | 86 | 23 | 1621 | 5 | 81 |

(A5320)

HENRICO COUNTY SCHOOLS

| ELEMENTARY SCHOOLS | 1966-1967 | | | | 1967-1968 | | | | 1968-1969 | | | | 1969-1970 | | | | 1970-1971 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pupils | | Faculty | | Pupils | | Faculty | | Pupils | | Faculty | | Pupils | | Faculty | | Pupils | | Faculty | |
| | B | W | B | W | B | W | B | W | B | W | B | W | B | W | B | W | B | W | B | W |
| Antioch | 0 | 17 | 0 | 1 | | | | | | | | | | | | | | | | |
| Baker | 19 | 602 | 0 | 27 | 25 | 457 | 0 | 22 | 32 | 464 | 0 | 21 | 68 | 452 | 2 | 19 | 50 | 434 | 2 | 19 |
| Bethlehem | 1 | 735 | 0 | 29 | 6 | 744 | 0 | 30 | 8 | 752 | 0 | 30 | 9 | 777 | 1 | 30 | 8 | 749 | 1 | 31 |
| Central Gardens | 327 | 195 | 4 | 19 | 372 | 107 | 8 | 14 | 509 | 52 | 11 | 12 | 593 | 34 | 11 | 14 | 642 | 25 | 11 | 16 |
| Chamberlayne | 5 | 674 | 0 | 28 | 8 | 712 | 0 | 28 | 8 | 650 | 0 | 28 | 90 | 720 | 1 | 31 | 94 | 689 | 0 | 28 |
| Crestview | 0 | 831 | 0 | 33 | 0 | 822 | 0 | 34 | 0 | 868 | 0 | 35 | 0 | 854 | 1 | 35 | 0 | 717 | 1 | 31 |
| Jackson Davis | 1 | 703 | 0 | 32 | 7 | 706 | 0 | 32 | 7 | 676 | 0 | 31 | 9 | 792 | 1 | 32 | 5 | 790 | 1 | 32 |
| Dumbarton | 9 | 583 | 0 | 25 | 26 | 570 | 0 | 25 | 24 | 599 | 0 | 26 | 36 | 596 | 1 | 25 | 33 | 540 | 1 | 25 |
| Fair Oaks | 205 | 0 | 10 | 1 | 190 | 0 | 9 | 1 | 176 | 0 | 9 | 1 | | | | | 22 | 183 | 0 | 10 |
| Glen Allen | 8 | 580 | 0 | 24 | 16 | 566 | 0 | 24 | 14 | 344 | 0 | 19 | 110 | 392 | 1 | 20 | 106 | 382 | 1 | 24 |
| Glen Echo | 7 | 147 | 0 | 9 | | | | | | | | | | | | | | | | |
| Glen Lea | 0 | 454 | 0 | 20 | 0 | 431 | 0 | 19 | 8 | 411 | 0 | 21 | 0 | 416 | 1 | 19 | 1 | 415 | 1 | 18 |
| Henrico Central | 252 | 0 | 13 | 0 | 232 | 0 | 11 | 0 | 211 | 0 | 10 | 0 | | | | | | | | |
| Highland Springs | 5 | 737 | 0 | 29 | 3 | 706 | 0 | 32 | 5 | 704 | 0 | 33 | 39 | 773 | 1 | 31 | 3 | 715 | 1 | 29 |
| Leburnum | 23 | 463 | 0 | 21 | 29 | 531 | 0 | 24 | 35 | 561 | 0 | 25 | 81 | 482 | 1 | 23 | 126 | 485 | 1 | 28 |
| Lakeside | 0 | 824 | 0 | 32 | 0 | 808 | 0 | 31 | 0 | 586 | 0 | 26 | 0 | 689 | 1 | 27 | 0 | 621 | 1 | 29 |
| Longan | 2 | 691 | 0 | 30 | 3 | 730 | 0 | 30 | 1 | 732 | 0 | 31 | 80 | 625 | 1 | 32 | 63 | 652 | 1 | 33 |
| Longdale | 0 | 152 | 0 | 8 | 0 | 167 | 0 | 8 | 9 | 159 | 0 | 8 | 3 | 144 | 1 | 7 | 4 | 148 | 1 | 7 |

IA5321

HENRICO COUNTY SCHOOLS

| ELEMENTARY SCHOOLS | 1966-1967 | | | | 1967-1968 | | | | 1968-1969 | | | | 1969-1970 | | | | 1970-1971 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pupils | | Faculty | | Pupils | | Faculty | | Pupils | | Faculty | | Pupils | | Faculty | | Pupils | | Faculty | |
| | B | W | B | W | B | W | B | W | B | W | B | W | B | W | B | W | B | W | B | W |
| Maybeury | 5 | 795 | 0 | 31 | 16 | 707 | 0 | 30 | 20 | 709 | 0 | 30 | 26 | 720 | 0 | 29 | 22 | 712 | 0 | 31 |
| Montrose | 0 | 413 | 0 | 17 | 0 | 328 | 0 | 16 | 1 | 315 | 0 | 17 | 0 | 302 | 0 | 15 | 0 | 299 | 0 | 15 |
| Pinchbeck | 0 | 857 | 0 | 33 | 0 | 632 | 0 | 29 | 2 | 738 | 0 | 32 | 0 | 720 | 1 | 30 | 1 | 749 | 1 | 31 |
| Ratcliffe | 0 | 416 | 0 | 19 | 0 | 419 | 0 | 20 | 0 | 405 | 0 | 21 | 0 | 384 | 1 | 17 | 0 | 372 | 1 | 17 |
| Ridge | 14 | 614 | 0 | 25 | 20 | 232 | 0 | 23 | 15 | 519 | 0 | 23 | 14 | 521 | 0 | 23 | 16 | 479 | 0 | 22 |
| Sandston | 0 | 492 | 0 | 20 | 0 | 382 | 0 | 17 | 1 | 384 | 0 | 17 | 0 | 448 | 0 | 18 | 0 | 375 | 1 | 16 |
| Seven Pines | 0 | 754 | 0 | 30 | 0 | 702 | 0 | 29 | 3 | 829 | 0 | 32 | 63 | 767 | 1 | 33 | 66 | 736 | 0 | 34 |
| Short Pump | 8 | 270 | 1 | 13 | 9 | 205 | 0 | 13 | 15 | 204 | 0 | 13 | 47 | 205 | 1 | 13 | 43 | 196 | 0 | 14 |
| Skipwith | 6 | 824 | 0 | 35 | 6 | 888 | 0 | 35 | 1 | 874 | 0 | 36 | 4 | 835 | 1 | 34 | 1 | 837 | 1 | 33 |
| Maude Trevvett | 0 | 666 | 0 | 27 | 0 | 697 | 0 | 28 | 3 | 714 | 0 | 29 | 4 | 767 | 1 | 29 | 4 | 784 | 1 | 30 |
| Tuckahoe | 21 | 625 | 0 | 28 | 21 | 685 | 0 | 30 | 30 | 724 | 0 | 32 | 28 | 731 | 1 | 30 | 18 | 721 | 1 | 31 |
| Vandervall | 220 | 0 | 7 | 2 | | | | | | | | | | | | | | | | |
| Varina | 21 | 481 | 0 | 21 | 26 | 495 | 0 | 21 | 35 | 512 | 0 | 24 | 176 | 493 | 3 | 26 | 165 | 677 | 1 | 36 |
| Virginia Randolph | 226 | 0 | 9 | 1 | | | | | 317 | 0 | 12 | 2 | | | | | | | | |
| Adams | | | | | 21 | 774 | 0 | 31 | 27 | 719 | 0 | 33 | 98 | 614 | 1 | 30 | 100 | 601 | 0 | 30 |
| Carver | | | | | 7 | 589 | 0 | 25 | 4 | 691 | 0 | 34 | 1 | 768 | 1 | 34 | 6 | 757 | 1 | 34 |
| Eliz. Holladay | | | | | | | | | 2 | 649 | 0 | 27 | 0 | 748 | 1 | 30 | 0 | 711 | 1 | 31 |

[A5322]

APPENDIX A(5)
RICHMOND CITY

| MIDDLE SCHOOLS | 1969-1970 Pupils | | 1969-1970 Faculty* | | 1970-1971 Pupils Projected | | 1970-1971 Pupils Actual | | 1970-1971 Faculty* | | 1971-1972 Pupils Projected | | 1971-1972 Pupils Actual | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | B | W | B | W | B | W | B | W | B | W | B | W | B | W |
| Bainbridge | 31% | 69% | 5 | 29 | 51% | 49% | 56% | 44% | 27** | 30** | 57% | 43% | 62% | 38% |
| Binford | 73 | 27 | 11 | 24 | 71 | 29 | 72 | 28 | 16 | 19 | 77 | 23 | 83 | 17 |
| Chandler | 88 | 12 | 20 | 32 | 67 | 33 | 77 | 23 | 25 | 23 | 81 | 19 | 89 | 11 |
| East End | 100 | 0 | 45 | 0 | 57 | 43 | 68 | 32 | 53 | 25 | 70 | 30 | 66 | 34 |
| Elkhardt | 3 | 97 | 1 | 44 | 21 | 79 | 27 | 73 | 28 | 32 | 46 | 54 | 45 | 55 |
| Graves | 100 | 0 | 49 | 0 | 70 | 30 | 74 | 26 | 27 | 20 | 70 | 30 | 74 | 26 |
| Hill | 9 | 91 | 2 | 43 | 71 | 29 | 72 | 28 | 28 | 22 | 77 | 23 | 76 | 24 |
| Mosby | 99.92 | .08 | 114 | 6 | 85 | 15 | 95 | 5 | 68 | 47 | 75 | 25 | 86 | 14 |
| Thompson | 2 | 98 | 1 | 64 | 35 | 65 | 42 | 58 | 32 | 32 | 39 | 61 | 42 | 58 |

*Includes entire staff.
**Includes Maury

RICHMOND CITY

| HIGH SCHOOLS | 1969-1970 Pupils | | 1969-1970 Faculty | | 1970-1971 Pupils Projected | | 1970-1971 Pupils Actual | | 1970-1971 Faculty | | 1971-1972 Pupils Projected | | 1971-1972 Pupils Actual | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | B | W | B | W | B | W | B | W | B | W | B | W | B | W |
| Armstrong | 100% | 0% | 85 | 6 | 59% | 41% | 75% | 25% | 45 | 38 | 70% | 30% | 72% | 28% |
| Huguenot | .74 | 99.26 | 1 | 79 | 29 | 71 | 20 | 80 | 40 | 47 | 43 | 57 | 43 | 57 |
| Jefferson | 8 | 92 | 4 | 87 | 59 | 41 | 43 | 57 | 38 | 48 | 59 | 41 | 57 | 43 |
| Kennedy | 100 | 0 | 73 | 15 | 71 | 29 | 93 | 7 | 48 | 47 | 75 | 25 | 88 | 12 |
| Marshall | 68 | 32 | 9 | 66 | 67 | 33 | 73 | 27 | 38 | 39 | 79 | 21 | 78 | 22 |
| Walker | 100 | 0 | 75 | 6 | 61 | 39 | 79 | 21 | 39 | 40 | 74 | 26 | 77 | 23 |
| Wythe | 19 | 81 | 6 | 86 | 47 | 53 | 44 | 56 | 42 | 43 | 57 | 43 | 57 | 43 |

*Includes entire staff.

[A53233]

RICHMOND CITY

| ELEMENTARY SCHOOLS | 1969-1970 Pupils | | 1969-1970 Faculty* | | 1970-1971 Pupils Projected | | 1970-1971 Pupils Actual | | 1970-1971 Faculty* | | 1971-1972 Pupils Projected | | 1971-1972 Pupils Actual | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | B | W | B | W | B | W | B | W | B | W | B | W | B | W |
| Amelia | 100% | 0% | 16 | 1 | 69% | 31% | 68% | 32% | 12 | 10 | 76% | 24% | 78% | 22% |
| Arents | 8 | 92 | 0 | 9- | (MS) | | (MS) | | ---- | ---- | (MS) | | (MS) | |
| Bacon | 99.86 | .14 | 28 | 0 | 57 | 43 | 68 | 32 | ---- | ---- | 60 | 40 | 80 | 20 |
| Baker | 99.80 | .10 | 46 | 0 | 91 | 9 | 99.59 | .41 | 22 | 15 | 34 | 66 | 37 | 63 |
| Bellemeade | .31 | 99.69 | 4 | 20 | 23 | 77 | 31 | 69 | 13 | 10 | 64 | 36 | 56 | 44 |
| Bellevue | 100 | 0 | 20 | 1 | 100 | 0 | 98.88 | 1.12 | 4 | 4 | 80 | 20 | 85 | 15 |
| Blackwell | 100 | 0 | 48 | 6 | 75 | 25 | 79 | 21 | 27 | 24 | 64 | 36 | 74 | 26 |
| Bowler | 100 | 0 | 21 | 0 | 100 | 0 | 100 | 0 | 18 | 11 | 61 | 39 | 57 | 43 |
| Broad Rock | 2 | 98 | 1 | 20 | .17 | 99.83 | 4 | 96 | 12 | 10 | ---- | ---- | 72 | 28 |
| Carver | 100 | 0 | 34 | 0 | 97 | 3 | 100 | 0 | 15 | 12 | 61 | 39 | 71 | 29 |
| Chimborazo | 99.88 | .12 | 30 | 3 | 98 | 2 | 99.66 | .34 | 22 | 15 | 64 | 36 | 65 | 35 |
| Clark Springs | 99.29 | .71 | 18 | 6 | 60 | 40 | 68 | 32 | 14 | 11 | 52 | 48 | 44 | 56 |
| Webster Davis | 100 | 0 | 17 | 2 | 66 | 34 | 53 | 47 | 9 | 7 | 52 | 48 | 76 | 24 |
| Fairfield Court | 100 | 0 | 29 | 0 | 100 | 0 | 99.44 | .56 | 21 | 9 | 54 | 46 | 80 | 20 |
| Fairmount | 100 | 0 | 34 | 1 | 98 | 2 | 100 | 0 | 22 | 12 | 57 | 43 | 68 | 32 |
| Fisher | 0 | 100 | 0 | 30 | 0 | 100 | .20 | 99.80 | 12 | 10 | 61 | 39 | 69 | 31 |
| Fox | 10 | 90 | 5 | 22 | 76 | 24 | 70 | 30 | 13 | 10 | 55 | 45 | 62 | 38 |
| Francis | 2 | 98 | 2 | 22 | 0 | 100 | 2 | 98 | 12 | 15 | 49 | 51 | 57 | 43 |
| Franklin | 100 | 0 | 29 | 0 | 57 | 43 | 55 | 45 | 11 | 8 | 55 | 45 | 50 | 50 |
| Fulton | 6 | 94 | 4 | 12 | 66 | 34 | 53 | 47 | 8 | 7 | 55 | 45 | 50 | 50 |

LA5324J

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ginter Park - Brook Hill | 30 | 70 | 5 | 31 | 51 | 49 | 47 | 53 | 18** | 13** | 72 | 28 | 75 | 25 |
| Greene | 8 | 92 | 1 | 32 | .6 | 94 | 7 | 93 | 15 | 13 | 54 | 46 | 61 | 39 |
| Henry | 7 | 93 | 2 | 24 | 57 | 43 | 55 | 45 | 11 | 9 | 40 | 60 | 51 | 49 |
| Highland Park | 78 | 22 | 21 | 28 | 55 | 45 | 90 | 10 | 27 | 22 | 65 | 35 | 84 | 16 |
| Lee | 9 | 91 | 3 | 21 | 69 | 31 | 68 | 32 | 16 | 13 | 69 | 31 | 62 | 38 |
| Mason | 100 | 0 | 41 | 0 | 100 | 0 (MS) | 100 | 0 | 29 | 12 | 61 | 39 | 83 | 17 |
| Maury | 37 | 63 | 4 | 17 | 51 | 49 (MS) | 56 | 44 | (See Bainbridge MS) (MS) | | --- | --- | --- | --- |
| Maymont | 100 | 0 | 15 | 0 | 35 | 65 | 42 | 58 | 14 | 12 | 76 | 24 | 78 | 22 |
| Munford | 3 | 97 | 3 | 27 | 14 | 86 | 18 | 82 | 11 | 10 | 69 | 31 | 82 | 18 |
| Norrell & Annex | 100 | 0 | 43 | 1 | 97 | 3 | 99.47 | .53 | 18 | 13 | 71 | 29 | 83 | 17 |
| Oak Grove & Annex | 47 | 53 | 3 | 27 | 23 | 77 | 31 | 69 | 12 | 10 | 29 | 71 | 42 | 58 |
| Redd | 0 | 100 | 0 | 26 | 0 | 100 | .19 | 99.81 | 12 | 11 | 52 | 48 | 60 | 40 |
| Scott | 100 | 0 | 9 | 2 | 51 | 49 | 47 | 53 | (See Ginter Park) | | 72 | 28 | 75 | 25 |
| Southampton | 5 | 95 | 1 | 33 | 8 | 92 | 7 | 93 | 13 | 12 | 69 | 31 | 68 | 32 |
| Stuart | 100 | 0 | 16 | 10 | 100 | 0 | 91 | 9 | 14 | 12 | 73 | 27 | 79 | 21 |
| Summer Hill - Ruffin Rd. | 12 | 88 | 6 | 20 | 19 | 81 | 14 | 86 | 14 | 11 | 63 | 37 | 62 | 38 |
| West End | 100 | 0 | 26 | 0 | 76 | 24 | 70 | 30 | 13 | 10 | 68 | 32 | 71 | 29 |
| Westhampton | 14 | 86 | 3 | 32 | 21 | 79 | 22 | 78 | 7 | 7 | 72 | 28 | 79 | 21 |
| Westover Hills | .55 | 99.45 | 1 | 23 | 35 | 65 | 29 | 71 | 11 | 11 | 40 | 60 (MS) | 51 | 49 |
| Whitcomb Court | 100 | 0 | 32 | 2 | 96 | 4 | 99.75 | .25 | 19 | 12 | 59 | 41 | 69 | 31 |
| Woodville | 100 | 0 | 34 | 3 | 100 | 0 | 99.52 | .48 | 20 | 10 | 66 | 34 | 70 | 30 |
| Cary | --- | --- | 6 | 12 | --- | --- | --- | --- | 7 | 10 | No Projections | | 50 | 50 |
| Reid | --- | --- | 2 | 43 | --- | --- | --- | --- | 19 | 15 | 57 | 43 | 62 | 38 |

*Includes entire staff. **Includes Scott

LA53253

## APPENDIX B

## PORTION OF PX–144–I

### EFFECT OF STATE LAWS AND STEPS TO BE TAKEN SHOULD A SCHOOL BE INTEGRATED

---

This memorandum is primarily concerned with Chapter 9.1 of Title 22 of the Code of Virginia, "Operation of Schools by State." This chapter has two articles, each of which is independent of the other.

Section 22–188.5 provides that the making of an assignment and enrolling of a child in a school, either voluntarily or under court order, which would result in integration shall (1) automatically divest the local school authorities of all authority, power and control over such school. (2) The school is closed and is removed from the public school system. (3) All authority, power and control over the school, its principal, teachers, other employees and all pupils enrolled or ordered to be enrolled is vested in the Commonwealth to be exercised by the Governor.

Section 22–188.6 provides that when the school is automatically closed it shall not be reopened as a public school until in the opinion of the Governor, and after investigation by him, he finds and issues an executive order that (1) the reopening of the school will not disturb the peace and tranquility of the community and (2) the assignment of pupils to the school could be accomplished without enforced or compulsory integration of the races, contrary to the wishes of any child enrolled therein or of his or her parents.

Section 22–188.7 provides that if after investigation the Governor concludes that the school cannot be reopened under the two conditions listed above, he has the authority to reorganize the school, its personnel, curriculum, facilities and to make such other changes as in his discretion may be necessary and desirable and needed to effect a reopening of the school. He may reassign the pupils to any other public schools in the locality including the school in which a pupil was formerly enrolled if he deems it necessary to preserve order. The Governor shall give due consideration to the laws of the Commonwealth and the safety and welfare of the child in assigning and enrolling pupils.

Section 22–188.8 provides that if the school still cannot be reorganized and reopened, he can assign the pupils to other schools in the locality, and the Governor is authorized to make other facilities for the instruction of the children available, and to reassign teachers from the closed school.

Section 22–188.9 provides that if a school is closed and any of the pupils cannot be reassigned to another public school, then the Governor and the local authorities are authorized to make tuition grants available for the child to attend a private school.

Section 22–188.10 authorizes the Governor to supplement the appropriation made available to a political subdivision if necessary to carry out the provisions of this article with respect to assigning pupils to other schools.

Section 22–188.11 provides that whenever it is made to appear to the Governor that any school which has been closed can be reopened and operated with the public peace being maintained and not compulsory or enforced integration, he is authorized to return the operation and control of the school to the local authorities.

Section 22–188.12 provides that notwithstanding any other provision to the contrary, any time the Governor concludes, or the school board, or board of supervisors or city council certifies by resolution, that the school cannot be reopened, or reorganized and reopened in conformity with the provisions of the law, the Governor shall so proclaim and the school shall be returned to the locality, become a part of the public school system, and become subject to the laws

of the State, including the provisions of the Appropriation Act.

The Governor, by section 22–188.13, is granted all necessary powers to carry out the provisions of the article. The State assumes the contractual obligations of the local school board with the principal, teachers and employees of the school closed and, upon authorization of the Governor, they are to be paid by the State.

I am of the opinion that when the school is closed and taken out of the school system, this leaves the rest of the system of a particular locality free to continue to operate and to receive State funds. It is only when the Governor concludes, or the local school board or council certifies, that the school cannot be reopened in conformity with the provisions of law and the school is returned to the locality and to the public school system that the fund cut-off provision is applicable, and it is only applicable if the school is integrated.

Whenever Article I, of Chapter 9.1, comes into operation, it is obvious that the Governor cannot always personally take charge of the school property.

It is my suggestion that, whenever it is probable that the Governor will be required to assume control of any school due to it having become integrated, he explore the possibility of having the Division Superintendent of Schools, or some other school official, represent him. If this is not deemed wise and feasible, the Governor can consider the advisability of alerting the Superintendent of State Police to the possibility of the school's being closed and have available at the school a sufficient number of State Police. Immediately upon enrollment of a Negro child, the representative of the Governor (either the Division Superintendent or some other school official, or the Superintendent of State Police) shall assemble the student body and the faculty and read to them a statement prepared by the Governor. This statement would apprise the faculty and the student body that— by virtue of the powers vested in him by the General Assembly—the Governor is assuming control of the school in question and directs the student body and the faculty to leave the school property, subject to further orders of the Governor. The Governor will then be in a position to determine whether or not it is necessary, in order to protect the property and to prevent any incidents, to maintain a contingent of police at the premises during the time the school is closed and he is attempting to have it reorganized and restored to the school system.

## ORDER

For the reasons stated in the memorandum of the Court dated January 5, 1972, and deeming it proper so to do, it is adjudged and ordered that:

1. The respective motions of the county and state defendants to dismiss the amended complaint be, and the same are hereby, denied.

2. The motion for leave to amend answer and cross-claim filed by the School Board of the City of Richmond be, and the same is hereby, granted.

3. The motion of the respective county and state defendants to dismiss the cross-claim filed by the Richmond School Board be, and the same is hereby denied.

It is further adjudged, ordered and decreed that:

4. Billy W. Frazier, William P. Poff, and Elizabeth M. Rogers, be, and they are hereby, added as party defendants, individually and in their official capacity as members of the Virginia State Board of Education; and the defendant Waldo C. Miles, individually and in his official capacity as a member of the State Board of Education, is dismissed as a party hereto.

5. R. P. Eagles, G. L. Crump, C. C. Wells and C. D. Spencers, are dismissed as party defendants, individually and in their official capacity as members of the School Board of Chesterfield County.

6. Preston T. Holmes, George Ray Partin and Edward A. Mosely, Jr., be, and they are hereby, added as party defendants, individually and in their offi-

cial capacity as members of the School Board of Chesterfield County.

7. H. O. Browning, C. J. Purdy, A. R. Martin and F. F. Dietsch, be, and they are hereby, dismissed as party defendants, individually and in their official capacity as members of the Board of Supervisors of Chesterfield County.

8. E. M. O'Neill, A. J. Krepela and Leo Myers, be and they are hereby, added as party defendants, individually and in their official capacity as members of the Board of Supervisors of Chesterfield County.

9. L. R. Shadwell, Edwin H. Ragsdale and C. Kemper Lorraine, be, and they are hereby, dismissed as party defendants, individually and in their official capacity as members of the Board of Supervisors of Henrico County.

10. Eugene T. Rilee, George W. Jinkins, Jr. and Charles W. Johnson, be, and they are hereby, added as party defendants, individually and in their official capacity as members of the Board of Supervisors of Henrico County.

11. The State Board of Education and the individual members thereof, Dr. Woodrow W. Wilkerson, State Superintendent of Public Instruction, The School Board of Chesterfield County and the individual members thereof, The School Board of Henrico County and the individual members thereof, The School Board of the City of Richmond and the individual members thereof, the City Council of the City of Richmond and the individual members thereof, the Board of Supervisors of Chesterfield County and the individual members thereof, the Board of Supervisors of Henrico County and the individual members thereof, their officers, agents, servants, employees, attorneys and successors, and all those acting in concert or in participation with them, receiving actual notice of this order, be, and they are hereby, mandatorial enjoined to:

a. Forthwith, an in no event longer than thirty (30) days of this date, take all steps and perform all acts necessary to create a single school division composed of the Counties of Chesterfield and Henrico and the City of Richmond, such action to be taken pursuant to § 22–30 of the Code of Virginia, 1950, as amended, to the extent that such statute is not inconsistent with this order and the memorandum of the Court heretofore referred to.

b. Forthwith, and in any event within thirty (30) days of this Order, establish a single school board for the school division created pursuant to subparagraph (a) above, said board to consist of nine members unless a lower number, but not fewer than six, be mutually agreed upon by the governing bodies of Henrico, Chesterfield and Richmond with the approval of the State Board of Education. The Board shall be created in accordance with the provisions of § 22–100.1, § 22–100.3, § 22–100.4, § 22–100.5 and § 22–100.6 of the Code of Virginia, 1950, as amended, to the extent that such statutes are not inconsistent with this Order or the memorandum heretofore referred to.

c. Take all steps and perform all acts necessary to cause title to all school property, both real and personal, presently owned or hereafter acquired which is devoted to or utilized in the operation of public schools to be transferred to the division school board created in subparagraph (b) above. In addition to real and personal property as aforesaid, the School Boards and governing bodies of Henrico, Chesterfield and Richmond shall take such steps as are required to make certain that any other facilities such as administrative offices, warehouse-storage areas and transportation facilities, either presently utilized or contemplated and planned for future use by the existing separate school boards, will be made available to the division school board created pursuant to subparagraph (b) above. Such conveyances, transfers and allocations of space or other facilities shall become effective as of July 1, 1972, and to the extent applicable, shall be made pursuant to § 22–100.7 of the Code of Virginia, 1950, as amended.

d. The Virginia State Board of Education and Dr. Woodrow W. Wilker-

son, State Superintendent of Public Instruction, shall within thirty (30) days from the date of this Order appoint an acting superintendent and such administrative staff and personnel as may be necessary to organize the school division created in subparagraph (a) above, and the defendant School Boards of Chesterfield, Henrico and Richmond shall furnish such personnel and staff as may be requested by the defendant State Board of Education and the Superintendent of Public Instruction. All expenses incident to the organization and establishment of the school division composed of Richmond, Chesterfield and Henrico shall be paid by defendants Chesterfield, Henrico and Richmond on a pro rata basis on enrollment of pupils as of September, 1971, or such other basis as may be mutually agreed upon by the division school board created in subparagraph (b) above with the approval of the State Board of Education and the governing bodies of Henrico, Chesterfield and Richmond.

e. The Virginia State Board of Education and the Superintendent of Public Instruction shall forthwith and in any event within sixty (60) days hereof, promulgate and file with this Court rules and regulations covering the financial plan of operation of the schools in the single school division of Richmond, Chesterfield and Henrico pursuant to § 22–100.8 of the Code of Virginia, 1950, as amended, including but not limited to provisions for expenditures for capital outlay purposes, the incurring of indebtedness for the construction of school buildings consistent with § 22–100.9 of the Code of Virginia, 1950, as amended, and provisions for the retirement of existing debt service in the separate school divisions.

f. The State Board of Education and the State Superintendent of Public Instruction shall forthwith and in any event not later than sixty (60) days from the date of this Order, file a plan for the organizational structure of the school division created in subparagraph (a) above, including but not limited to steps for the unification of personnel policies and procedures now existing in the three separate school divisions.

g. The State Board of Education and the Superintendent of Public Instruction shall, with the assistance of the acting superintendent appointed pursuant to paragraph (d) above and the school board created pursuant to paragraph (b) above, take all necessary steps to implement the desegregation plan presented to this Court by the School Board of the City of Richmond, said plan to be implemented not later than the beginning of the 1972–73 school year and in connection therewith shall:

(1). Modify the plan as presented by making such adjustments necessary by changes in student enrollment, changes in school attendance areas, new construction or other events occurring subsequent to September 1971. The existing school boards of Chesterfield, Henrico and Richmond shall provide data and personnel as requested by the State Board of Education and the Superintendent of Public Instruction to accomplish the foregoing.

(2). Submit to this Court within seventy (70) days from the date of this Order the modifications required by paragraph g(1) above as well as any other modifications, changes or recommendations, as may be desired by the State Board of Education, the State Superintendent of Public Instruction, the acting school superintendent or the school board created pursuant to paragraph b. above.

h. The State Board of Education and the State Superintendent of Public Instruction shall file with this Court within ninety (90) days of the date of this Order a detailed plan for the implementation of the desegregation plan for the school division of Richmond, Chesterfield and Henrico as presented by the Richmond School Board and as modified in accordance with paragraphs g(1) and (2) above, said plan to include:

(1) the projected enrollment and racial composition for each school during the 1972–73 school year;

(2) A summary of the number and racial composition of all professional

personnel presently employed by the existing separate school divisions with an appropriate breakdown between classroom instructors, staff personnel assigned to specific schools, and staff personnel assigned to central administrative positions;

(3) After determining the racial composition of the total number of faculty and staff presently assigned to all of the schools of the existing separate divisions, an assignment plan for faculty and staff to insure that each school for the 1972–73 school year will have a racial composition within five percentage points thereof;

(4) A plan for the attainment of a comparable ratio as mentioned in subparagraph (3) above for any central administrative staff;

(5) The tentative transportation plan for the school division of Richmond, Chesterfield and Henrico including a statement as to the adequacy of transportation equipment and facilities presently owned or committed to the existing separate school divisions, and in the event of insufficient equipment or facilities, a plan to acquire within sufficient time for use throughout the 1972–73 school year, sufficient transportation equipment and facilities for the implementation of the aforesaid desegregation plan;

(6) A status report on any proposed school construction including the location of acquired or contemplated school sites;

(7) A summary of those steps proposed to bring about meaningful integration within all schools in the school division of Richmond, Chesterfield and Henrico for the 1972–73 school year, including but not limited to plans for in-service training of staff, creation of biracial committees, employment of black counsellors in all schools, and plans for biracial extracurricular activities.

(8) If the creation of a single school division required under this order necessitates a reduction in the number of superintendents, principals, teachers, teacher-aides, or other professional staff now employed by the three districts involved, and if this reduction will result in the dismissal or demotion of any such staff members, the selection of any staff members to be dismissed or demoted must be made on the basis of objective, non-racial and non-ethnic standards from among all the staff members of the single school division including all those presently employed in the separate districts. Within these guidelines, the defendants and the successor division shall avoid any substantially disproportionate reduction or removal of black personnel from positions of control or authority.

(9) Staff members who work directly with children and professional staff who work on the administrative level shall be hired, assigned, promoted, paid, demoted, dismissed, or otherwise treated without regard to race, color or national origin. There shall, however, be no reduction by the defendants or their successors of their efforts to increase minority group representation among their faculties and professional staffs.

(10) The School board of the single school division shall develop objective, non-racial and non-ethnic criteria to be used in the hiring, assigning, promoting, paying, demoting, and dismissing of staff members. These criteria shall be developed and made available for public inspection prior to the single school division's staffing its system for the 1972–73 school year, a copy thereof shall be submitted to the Court with a copy to the plaintiffs, and a copy thereof shall be retained by the school division. The school division also shall record its evaluations of staff members under the criteria described above and shall preserve these records for as long as the staff member is employed by the division, and for at least three years following the termination of the staff member's employment by the division. The record of such evaluations shall be made available to a dismissed or demoted employee upon request.

(11) "Demotion" as used above includes any reassignment (a) under which the staff member receives less pay or has less responsibility than under the

248

assignment he held previously, (b) which requires a lesser degree of skill than did the assignment he previously held, or (c) under which the staff member is asked to teach a subject or grade other than one in which he is certified or one in which he has had substantial experience within a period of five years.

(12) The existing school boards of Chesterfield, Henrico and Richmond shall continue to function and shall continue to have control over the operation of schools within the existing separate school divisions until June 30, 1972, and on July 1, 1972, the division school board created in paragraph b above shall become the successor board of education to the defendant School Boards of Richmond, Henrico and Chesterfield, assuming all rights, powers, responsibilities, duties and obligations (including obligations under employment contracts for terms in excess of one year) presently held in whole or in part by the existing defendant School Boards.

(13) All defendants, individually and in their official capacity, and all officers, agents, servants, employees, attorneys and successors of the Counties of Henrico and Chesterfield and the City of Richmond, and all those acting in concert or in participation with them or receiving actual notice of this Order are hereby enjoined from taking any step or action and from permitting, engaging in, giving consent or approval to, or supporting any policy or practice which is inconsistent with or which may delay or prejudice the creation or organization of a school division composed of Richmond, Chesterfield and Henrico and the effective implementation of the aforementioned desegregation plan at the beginning of the 1972–73 school year.

(14) The Virginia State Board of Education and Dr. Woodrow W. Wilkerson, State Superintendent of Public Instruction, shall within thirty-five (35) days from this date file with this Court a detailed report setting out in detail the steps taken up to that time in conformity with this order.

The Clerk shall serve copies of this order on each of the defendants by mailing by certified mail a copy of same to the address of their respective offices.